# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT CINCINNATI

PATRICK LEONARD,

                        :

        Petitioner,                    Case No. 1:09-cv-056

                        :        Chief Judge Susan J. Dlott

     -vs-                        Magistrate Judge Michael R. Merz

WARDEN, Ohio State Penitentiary,

                        :

        Respondent.

---

# REPORT AND RECOMMENDATIONS

---

This capital habeas corpus case, brought under 28 U.S.C. § 2254, is before the Court for decision on the merits.

## Factual Background

The Ohio Supreme Court, considering this case on direct appeal, described its factual background as follows:

> [**P1]  On July 29, 2000, Patrick T. Leonard, defendant-appellant, followed Dawn Flick, his former fiancee, while she was driving her car, forced her to a stop, and ordered her to return to her home. Leonard followed Flick to her house, and, once inside, Leonard handcuffed Flick, attempted to rape her, and then shot her three times in the head. Leonard was convicted of the aggravated murder, attempted rape, and kidnapping of Flick and was sentenced to death.

> [**P2]  Leonard and Flick became engaged in the fall of 1995. During their engagement, Leonard fathered a son by Penny McBride. Leonard and Flick ended their engagement in 1998 but continued to date. Leonard also continued his relationship with McBride. Approximately nine months before Flick was murdered,

1

a second child was born to Leonard and McBride. Leonard tried to conceal from Flick and others that he was the child's father.

[**P3]  The evidence presented at Leonard's trial indicated that Flick had intended to end her relationship with Leonard. In his confession, Leonard stated that he had a "broken heart" because he was losing Flick. On Friday, July 28, 2000, the day before the murder, Leonard told Alvie Woods, a friend of Leonard's and Flick's, that if he caught Flick "fooling around" with anyone, Leonard would kill somebody. According to Woods, Leonard had said, "If I can't have her, no one can."

[**P4]  Flick tended bar at her family's restaurant, Les Flick's Home Like Inn, on the evening of July 28 and early morning of July 29. After the restaurant closed for the night, Flick drove to Snow's Lake Bar to meet some friends. Leonard followed Flick and, according to his confession, "got her to pull over." Leonard then confronted Flick about her earlier statement that she would be staying home for the evening. Leonard left Flick alone after she agreed to call him when she returned home. When she arrived at Snow's, Flick appeared upset, according to Woods, Deborah Schroeder, and Reva Ketterer, and she told them that Leonard had just run her car off the road.

[**P5]  When Snow's closed for the night, Flick planned to go to the house of her friend, Ryan Gries. Leonard followed Flick as she drove to Gries's house and again stopped her car. Leonard ordered Flick to return to her home, and he followed her there. Once inside, Leonard handcuffed her wrists. Leonard then pointed a gun at Flick as she called to tell Gries that she was not coming to his house. During their telephone conversation, Gries was able to elicit from Flick that she was with Leonard and was in danger.

[**P6]  Gries and his friend Frank Minges rushed to Flick's house. When Leonard heard Gries's truck drive up, he shot Flick three times in the head. He then fired through the door, striking Gries in the chest. Gries and Minges left to call the police, and Leonard fled in his truck.

[**P7]  Leonard then called a friend, Sergeant Nick Chaplin, a deputy sheriff in Campbell County, Kentucky. Leonard told Chaplin that he had shot and killed Flick, and he agreed to surrender to Chaplin. Leonard drove to Kentucky, where he was taken into custody.

*State v. Leonard*, 104 Ohio St. 3d 54 (2004).

**Procedural History**

Leonard was indicted by the Hamilton County Grand Jury on August 7, 2000, on two counts of aggravated murder with capital specifications, two counts of attempted murder, and one count each of rape and kidnapping (Indictment, Apx. Vol. 1, pp. 22-28[1]).  The guilt phase of the trial commenced May 15, 2001, and the jury found Leonard guilty of attempted rape, two counts of aggravated murder with the capital specification that it had occurred during the course of the attempted rape, felonious assault, and all the charged firearm specifications (Verdicts, Apx. Vol. 3, pp. 210-230).

The penalty phase of the trial commenced May 25, 2001, and the jury returned a death recommendation verdict on May 31, 2001 (Verdict, Apx. Vol. 3, pp. 250-251).  The trial judge imposed the death sentence on June 28, 2001 (Judgment Entry, Apx. Vol. 3, p. 261).

Because the murder in issue occurred after January 1, 1995, Leonard's direct appeal was to the Ohio Supreme Court which affirmed the conviction and death sentence.  *State v. Leonard*, 104 Ohio St. 3d 54 (2004).

While his appeal was pending in the Ohio Supreme Court, Leonard filed in the trial court a petition for post-conviction relief under Ohio Revised Code § 2953.21 (Petition, Apx. Vol. 6, pp. 21 et seq.)  The trial court denied the petition (Entry, Apx. Vol. 10, pp. 188 et seq.) and Leonard appealed to the First District Court of Appeals which rejected all of Leonard's claims except those relating to the use of a stun belt during trial; those claims were remanded for an evidentiary hearing.  *State v. Leonard*, 157 Ohio App. 3d 653 (Ohio App. 1st Dist. 2004).  On

---

[1] The record in this case was filed before the Court began requiring electronic filing of the record in habeas corpus cases.  The Appendix was therefore filed manually (See Doc. No. 12) and there are no PageID references to these pages.

3

remand and after hearing evidence, the trial court again rejected the stun belt claims (Apx. Vol. 13, pp. 309-320). Leonard appealed, but this time the First District affirmed the dismissal. *Ohio v. Leonard*, 2007-Ohio-7095, 2007 Ohio App. LEXIS 6214 (Ohio App. 1st Dist. Dec. 31, 2007). The Ohio Supreme Court declined jurisdiction over a further appeal (Entry, Apx. Vol. 15, p. 72) and the United States Supreme Court denied a petition for certiorari, *Leonard v. Ohio*, 555 U.S. 1075 (2008). Leonard filed the instant Petition July 9, 2009, after this Court appointed counsel (Doc. No. 6). The Return of Writ and Appendix were filed November 23, 2009 (Doc. Nos. 11, 12), and the Reply was filed April 22, 2010 (Doc. No. 17). After completion of discovery and expansion of the record, the Court set a briefing schedule on the merits (Doc. No. 36). Briefs were filed on May 6, 2011 (Petitioner's Brief, Doc. No. 39), July 8, 2011 (Warden's Brief, Doc. No. 41), and August 8, 2011 (Petitioner's Reply Brief, Doc. No. 43). The case therefore became ripe for decision on August 8, 2011.

Leonard pleads the following grounds for relief:

> **Ground One:** Leonard's rights to a fair trial, due process, the presumption of innocence, counsel, and to participate in his own defense were violated when the trial court erred in forcing Leonard to wear a stun belt without adequate justification, thus violating his rights under the Sixth, Eighth, and Fourteenth Amendments.
>
> A. Leonard suffered inherent prejudice when he was forced to wear a stun belt without adequate justification.
>
> B. The stun belt had an adverse impact on Leonard's behavior, depriving him of the physical indicia of innocence, creating a risk of injecting an improper factor into sentencing, and undermining potential mitigation strategies.
>
> C. Leonard's wearing of the stun belt infringed upon his right to counsel and his ability to assist in his own defense.
>
> **Ground Two:** Leonard's rights to confront witnesses and to a fair trial as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth

Amendments to the United States Constitution were violated when improper hearsay was admitted into evidence by the trial court.

**Ground Three:**  Leonard's rights to remain silent, counsel, and a fair trial under the Fifth and Fourteenth Amendments to the United States Constitution were violated when the trial court failed to suppress Leonard's statement to the police.

**Ground Four:**  Leonard's rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated when he was denied sufficient funds to adequately defend himself against the charges against him.

**Ground Five:**  Leonard's rights to a fair trial and due process under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when the trial court admitted gruesome and otherwise prejudicial photographs.

**Ground Six:**  Leonard's rights to a fair trial as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated when the trial court failed to maintain a complete record of all proceedings in Leonard's trial.

**Ground Seven**:  Leonard's rights to a fair trial and due process under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when the trial court committed numerous errors in instructing the jury in the guilt determination phase of Leonard's capital trial.

**Ground Eight:**  Leonard was denied his rights to due process and a fair and reliable determination of his sentence under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution when erroneous instructions were given at the penalty phase of his capital trial.

**Ground Nine:**  The trial court erred by allowing Leonard to be tried, convicted, and sentenced to death on an indictment which charged Leonard with a rape specification based on the accusation that he was "the principal offender" and/or committed the aggravated murder "with prior calculation and design," in violation of the prohibition against duplicitous indictments, and deprived Leonard of his rights to a unanimous verdict, as well as substantive and procedural due process as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**Ground Ten:**  Leonard was denied his right to a fair trial by an impartial jury in his capital case as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution when the trial court limited trial counsel's ability to conduct voir dire.

**Ground Eleven:**  Leonard's right to a fair trial by an impartial jury under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution was violated when the trial court failed to excuse for cause jurors whose statements during voir dire indicated that they could not be fair and impartial.

**Ground Twelve:**  Leonard's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated when jurors were improperly excused by the prosecution because of some scruples against the death penalty.

**Ground Thirteen:**  Leonard's right to confront witnesses and to a fair trial guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution were violated by the admission of police reports by the trial court.

**Ground Fourteen**:  Leonard's rights to due process and a fair trial under the Fifth and Fourteenth Amendments were violated when partial testimony of witnesses was read to the jury during deliberations.

**Ground Fifteen:**  Leonard's rights to due process and a fair trial under the Sixth and Fourteenth Amendments were violated when the trial court changed the verdict forms after the jury had rendered a verdict.

**Ground Sixteen:**  Leonard's rights to due process and a fair trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when the prosecutor engaged in misconduct during his capital trial and sentencing.

A. Leonard's right to a fair trial was violated when the prosecutor engaged in misconduct by issuing extrajudicial subpoenas.

B. Leonard's rights to a fair trial and reliable sentencing determination were violated when the prosecutor committed acts of misconduct during the trial and penalty phase of his trial.

**Ground Seventeen**:  Leonard's right to a fair trial under the Fifth, Eighth, and Fourteenth Amendment was violated when the prosecutor withheld material, exculpatory evidence.

**Ground Eighteen:**  Leonard was denied us constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments due to the prosecutor's discriminatory process of charging and prosecution of actions in Hamilton County.

**Ground Nineteen:**  Leonard's right to the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments was violated when his trial counsel suffered from a conflict of interest.

A. A conflict of interest was created when Leonard's family retained counsel for Leonard.

B. A conflict of interest was created when a friend of the Leonard family represented Leonard at trial.

C. A conflict of interest was created by the dual representation of Leonard and his brothers' corporation.

**Ground Twenty**:  Leonard was denied the effective assistance of counsel during the trial phase of his capital trial in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

A. Leonard was denied the effective assistance of counsel during the pretrial stages of his capital case

B. Leonard was denied the effective assistance of counsel during the voir dire of his capital case.

C. Leonard was denied the effective assistance of counsel during the trial stage of his capital case.

**Ground Twenty-One:**  Leonard's right to the effective assistance of counsel was violated when his counsel performed deficiently during the mitigation phase of his capital trial, in violation of the Sixth, Eighth, and Fourteenth Amendments to the Constitution.

A. Leonard was denied the effective assistance of counsel when his counsel failed to conduct a reasonable investigation into issues relevant to the mitigation phase.

B. Leonard was denied the effective assistance of counsel when his counsel presented incomplete, damaging, and misleading information during the mitigation phase.

**Ground Twenty-Two:**  Leonard was denied the effective assistance of appellate counsel on his sole appeal of right to the Supreme Court of Ohio and as such his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated.

**Ground Twenty-Three:**  Leonard's rights under the Fifth, Sixth, eighth, and Fourteenth Amendments to the United States Constitution were violated when he was convicted and sentenced to death under Ohio's death penalty system which fails to provide an adequate system of appellate and proportionality review in death penalty cases.

**Ground Twenty-Four**:  Leonard's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated when he was convicted of aggravated murder without legally sufficient evidence, and contrary to the manifest weight of the evidence.

**Ground Twenty-Five**:  Leonard's right to a fair and impartial jury and equal protection were violated when the state engaged in racial discrimination in the selection of members of the grand jury and petit jury venire as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**Ground Twenty-Six:**  Leonard's constitutional rights to due process, equal protection, and a reliable trial and sentencing were violated by Ohio's inadequate state post-conviction process that failed to provide a remedy for Leonard to fully and fairly vindicate his federal constitutional claims in the state courts.

**Ground Twenty-Seven:**  Leonard's constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated when he was convicted and sentenced to death under Ohio's unconstitutional death penalty scheme.

**Ground Twenty-Eight:**  Leonard's rights under the Eighth and Fourteenth Amendments were violated by requiring that mitigating factors be proven by a preponderance of the evidence during the penalty phase of his capital trial.

**Ground Twenty-Nine:**  The practice of execution by lethal injection violates Leonard's right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

**Ground Thirty:**  The cumulative effects of the errors and omissions set forth in the preceding claims for relief prejudiced Leonard and deprived him of his right to a fair trial and sentencing determination in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

(Petition, Doc. No. 6, PageID 25-31.)

## Analysis

### Ground One:  The Stun Belt

In his First Ground for Relief, Leonard asserts his constitutional rights were violated when he was compelled by the trial court to wear a stun belt during the trial.  In his Final Brief, Leonard informs the Court that he relies on the argument made in his Traverse (Doc. No. 39, PageID 944, referring the Court to the Traverse, Doc. No. 17, PageID 319-359).

The Warden argues in conclusory terms that this Ground for Relief is procedurally defaulted, but has made none of the showings required for procedural default under the governing precedent, *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).  The Magistrate Judge concludes this claim has been preserved for merit review.

When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court.  28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. ___, 131 S. Ct. 770, 785 (2011); *Brown v. Payton,* 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685,

9

693-94 (2002); *Williams (Terry) v. Taylor,* 529 U.S. 362, 379 (2000).

**Sub-claim One: Denial of Fair Trial by Interfering with the Physical Indicia of Innocence.**

In *Deck v. Missouri,* 544 U.S. 622 (2005), a capital defendant was shackled with leg irons, handcuffs, and a belly chain for the retrial of the penalty portion of his case. Tracing the concern about visible shackles back to Coke and Blackstone, the Supreme Court expressly held that:

> [T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial. Such a determination may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.

*Id.* at 629. It also expressly held that the fact that Deck was shackled only for the penalty phase of his trial made no constitutional difference. *Id.* at 632.

*Deck* was decided May 23, 2005, long after Leonard's trial was completed. The federal constitutional violation which will ground issuance of the writ of habeas corpus must be of a right clearly established at the time the state court acted. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004), quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Cornwell v. Bradshaw*, 559 F.3d 398, 404-405 (6th Cir. 2009). However, in *Mendoza v. Berghuis*, 544 F.3d 650 (6th Cir. 2008), the court held:

> *Deck* came down in May 2005, well after all of the relevant state-court decisions here. That would normally preclude Mendoza from relying upon the case in seeking habeas relief. But our court has twice held that the principles underlying *Deck* were, in fact, clearly established by the Supreme Court before its decision in *Deck. See*

10

> *Lakin v. Stine*, 431 F.3d 959, 963 (6th Cir. 2005); *Robinson v. Gundy*, 174 F. App'x 886, 893 (6th Cir. 2006) (unpublished). In so holding in each case, we noted that the *Deck* Court itself had stated that "' [t]he law has long forbidden routine use of visible shackles during the guilt phase'" of a criminal trial. *Lakin*, 431 F.3d at 963 (quoting *Deck*, 544 U.S. at 626); *Robinson*, 174 F. App'x at 893 (same). Per our precedent, therefore, we treat *Deck's* holding, *in toto*, as if it were clearly established as of the time of the relevant state-court decisions here.

*Id.* at 653-654.   The relevant proceedings in this case appear to have happened after the proceedings in *Mendoza*.  Bound by *Mendoza*, the Magistrate Judge concludes the right upheld in *Deck* was clearly established Supreme Court law as of the time of Leonard's trial.  While the holding in *Deck* was made under the Due Process Clauses of the Fifth and Fourteenth Amendments (544 U.S. at 629), the Court also discusses the Sixth Amendment right to counsel. *Id.* at 631.

Leonard argues that the use of visible restraints is inherently prejudicial, i.e., that a defendant subjected to visible restraints need not show prejudice, but that prejudice is to be presumed.  (Traverse, Doc. No. 17, PageID 333, citing *Deck,* 544 U.S. at 629-633.)   The Supreme Court did hold "given their prejudicial effect, due process does not permit the use of visible restraints if the trial court has not taken account of the circumstances of the particular case."  *Id.* at 632.  The Missouri Supreme Court had held lack of proof of prejudice to be material.  *Id.* at 625.  Thus the Supreme Court's holding implies that a prejudicial effect is to be presumed.

In *Earhart v. Konteh*, 589 F.3d 337 (6th Cir. 2009),[2] the court noted that the Supreme Court had not yet expressly held that a stun belt was the constitutional equivalent of shackles. *Id.* at 347-348.  Nonetheless, it concluded

---

[2] Leonard's counsels' first citation to this case reads "*Earhart v. Konteh*, 589 U.S. 337, 349 (6th Cir. 2009)."

> [T]he Supreme Court has decided a series of cases over the past forty years that clearly establish the proposition that a trial court may not impose a physical restraint upon a defendant's person without an individualized finding of dangerousness or risk of escape. *See, e.g., Holbrook v. Flynn*, 475 U.S. 560, 568-69, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986) (noting that shackling is "inherently prejudicial" and is only "justified by an essential state interest specific to each trial"); *Illinois v. Allen*, 397 U.S. 337, 343-44, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970) (holding that "no person should be tried while shackled and gagged except as a last resort" but that such measures are allowed if the defendant is "disruptive, contumacious, [and] stubbornly defiant"). The Supreme Court most recently reaffirmed these principles in *Deck v. Missouri*, 544 U.S. 622, 626, 125 S. Ct. 2007, 161 L. Ed. 2d 953 (2005), by noting that "[t]he law has *long forbidden* . . . permit[ting] a State to shackle a criminal defendant [without] the presence of a special need." (emphasis added). While the Supreme Court decided *Deck* after Earhart's conviction became final, the principle that the State cannot as a matter of general policy shackle a defendant predates *Deck. See id.; Lakin v. Stine*, 431 F.3d 959, 963 (6th Cir. 2005) ("[T]he principle that shackling a defendant at trial without an individualized determination as to its necessity violates the due process clause was clearly established long before *Deck* was decided."). This is because physical restraints necessarily degrade a defendant's ability to aid in his own defense. *Allen*, 397 U.S. at 344.

*Id.* at 348. The Magistrate Judge reads *Earhart* to hold that it is clearly established for habeas corpus purposes that a stun belt is the constitutional equivalent of shackles and leg irons.[3]

*Earhart* also recognizes as clearly established the proposition that physical restraint may not be imposed "without an individualized finding of dangerousness or risk of escape." *Id.*, citing *Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986); and *Illinois v. Allen*, 397 U.S. 337, 343-44 (1970).

Leonard raised his claims relating to the stun belt as his first claim for relief in post-conviction. Denied relief by the trial court, he appealed and obtained a remand. The court of

---

[3] Although *Earhart* was decided in 2009, well after the trial court acted in this case, Earhart's own trial had occurred in July, 2002. *Id.* at 341. *Earhart* is therefore further support, along with *Mendoza*, for the proposition that the constitutional principles reaffirmed in *Deck* were clearly established at the time of Leonard's trial.

appeals noted that there had been no hearing in the trial court on the need for restraints and held:

> [**P50] In the absence of a hearing on the need for restraints, the record of the proceedings at Leonard's trial manifested no such need. Leonard stood charged with a variety of violent crimes. But the violent nature of the crimes for which Leonard was being tried could not, standing alone, justify the requirement that Leonard wear the stun belt. See *Miller v. Florida* (Fla.App.2003), 852 So. 2d 904 (noting that "allowing the charges of violence[] for which [a defendant was standing] trial[] to justify the use of restraint devices is circular reasoning that offends the presumption of innocence[] and [hence the defendant's] right to a fair trial"). And the record at this time otherwise disclosed no circumstance that might be said to have "illustrated a compelling need to impose exceptional security procedures."

> [**P51] The evidence submitted by Leonard in support of his postconviction petition showed that he had had no criminal record, and that he had displayed no violent tendencies either while in custody of the sheriff's office or during the proceedings before the trial court that had preceded the denial of his motion to appear before the jury without restraints. As we noted supra, Leonard's theory of defense and mitigation (which we have, at the state's urging, found to be at least competent) was that Leonard was not a violent man who had visited his violent nature upon the victims, but an essentially peaceful man who had acted out of character on the night in question. The evidence offered by Leonard in support of his petition showed that the stun belt was discernible to spectators in the courtroom, and that the stun belt could also have been discernible to the jurors. Leonard argues that the apparent presence of these restraints would have suggested to the jurors that Leonard was not capable of self-restraint.

*State v. Leonard*, 157 Ohio App. 3d 653 ¶¶ 50-51(Ohio App. 1st Dist. 2004). The Magistrate Judge reads this decision as holding that the Common Pleas Court made no individualized finding of the need for restraints at the time of trial, except for the brief oral comments of Judge Schweikert in ruling on Leonard's motion to appear without restraints.

On remand the Common Pleas Court held the ordered evidentiary hearing[4] and filed Findings of Fact, Conclusions of Law, and Entry Denying Defendant's Post-Conviction Petition

---

[4] The matter was handled on remand by Judge Robert Winkler because the judge who had tried the case, Mark Schweikert, had retired.

and Amended Post-Conviction Petition (Apx., Vol. 13, pp. 309 et seq., hereinafter "Findings").

Judge Winkler confirmed that there was nothing in the trial record on Leonard's motion to appear at all hearings without restraints except an oral ruling that Judge Schweikert was going to follow the Sheriff's regulations on the stun belt and if trial counsel had any problem during trial, he was to raise it with the judge. (Findings, Apx. Vol. 13, at 310.)

Judge Winkler found that "Leonard was fitted with a Remote Electronic Activated Control Technology Device ("React Belt") . . . ." *Id.* at 311. Each of the deputy sheriffs assigned to courtroom duty was trained in the use of the device; two or three of them were assigned for the trial. *Id.* Leonard was notified what behaviors on his part would result in activation. *Id.* The React Belt is designed to be fitted around the waist with an "electric pack" "that is placed on the back at the base of the spine." *Id.* at 312. "The React Belt was placed under Leonard's clothing to prevent the jury from seeing that he was being restrained." *Id.* It has a remote transmitter which, when used, emits a one-second warning tone before an eight-second electric shock is administered if the undesired behavior is not stopped. The stun belt was never activated during the trial. *Id.*

Judge Winkler reported that he heard testimony from

> Jerome Kunkel, an experienced prosecutor, who had personally prosecuted more than twenty-five murder trials, testified that Leonard's trial courtroom was "probably the most emotional and tension-filled courtroom that I have ever been in." . . . [D]uring the trial Leonard would turn and look at the decedent's family members. The courtroom was described as small, with counsel tables situated close to each other. During the three-week trial, the courtroom was filled with spectators. Because the room was filled to capacity, spectators were seated closely to each other.

*Id.* at 312-13. Representatives from the Sheriff's Office testified

> Leonard's trial was considered to be a high-risk trial, due to (1) the nature of the charges against him; (2) the high level of emotion in

14

> the courtroom which emanated from Leonard's family members,
> the surviving victims of Leonard's crimes, and the decedent's
> family members; (3) the small, crowded courtroom setting; and (4)
> the responsibility of protecting Leonard, spectators, lawyers and
> court personnel.

*Id.* at 313. Citing *Allen, supra, Holbrook, supra*, and *State v. Richey*, 64 Ohio St. 3d 353 (1992),

Judge Winkler concluded that Judge Schweikert's order for the use of the stun belt was "proper

based on the foregoing factors [i.e. those mentioned in the cases]." *Id.* Judge Winkler assumed

that the same or similar testimony would have been given if Judge Schweikert had held a hearing

on the motion to appear without restraints. *Id.*

As to the visibility of the stun belt to the jurors, Judge Winkler recounted the testimony

of Leonard's sister, Jean Hutchenson, who swore she saw "a big bulky thing under the back of

Leonard's shirt" when he was escorted in and out of the courtroom. *Id.* at PageID 314. She also

swore she saw it when he was seated at counsel table and when he approached the witness stand

to give his unsworn statement. *Id.*

The parties submitted as a joint exhibit "a compilation of pooled television[5] scenes from

the penalty phase of Leonard's trial." From watching the excerpts, Judge Winkler found:

> As Leonard walked to the witness box to read his unsworn
> statement to the jury, the outline of a square object can be observed
> on his back and under his shirt. Watching the television scenes, the
> bulge is not identifiable as a stun belt. There is nothing to indicate
> what the bulge was. It took no more than six (6) seconds for
> Leonard to walk from counsel table to the witness chair. Allowing
> the same amount of time for Leonard to walk back to his seat, the
> Jury may have seen the bulge beneath Leonard's shirt for
> approximately twelve (12) seconds.
>
> The remaining witnesses called did not observe the React Belt
> being worn by Leonard. Hamilton County Sheriff's Deputy Donald
> Maher testified that neither the React Belt nor its outline had been
> visible in the courtroom. Deputy Maher's observations occurred

---

[5] Unlike the federal courts, Ohio trial courts have permitted television cameras in the courtroom since approximately 1983.

> while Defendant was seated at counsel table. Deputy Robert Weber testified that Leonard had worn a baggy shirt that concealed the React Belt.  Father DuPlantier attended Leonard's trial and was unaware that Leonard was wearing a react belt. Prosecutor Jerome Kunkel, Bailiff Vince Wallace, and Court Reporter Debbie Wallace testified that they were aware of Leonard's wearing the React Belt throughout the trial, but it was not visible to them.
>
> Significantly, no evidence was presented that would indicate that any trial jurors had observed the React Bell or had known that Leonard wore it. The React Belt was worn under Leonard's clothing, thus preserving the physical indicia of innocence. There was absolutely no testimony from jurors indicating they either observed or were aware that Leonard was wearing the React Belt. Moreover, there is no evidence that the belt itself was ever exposed to the jury.

*Id.* at 314-15.  Judge Winkler found the fact that the belt was concealed under Leonard's clothing significant in contrast to the shackles, belly chain, and leg irons in *Deck, supra*, all of which were visible to the jury.  *Id.* at 315.  As to the jury's ability to see and be prejudiced by the stun belt, Judge Winkler found:

> At the time that Leonard approached the witness stand to read his unsworn statement, the pooled television scenes (Joint Exhibit Five) reveal the outline of a square object on his back. That outline is apparently the React Belt. There is no evidence to suggest, that any of the jurors had seen the square object under Leonard's clothing, and if they had, there is no evidence any juror knew that it was the React Belt as opposed to a medical device, a physical deformity, or any number of other objects. There is nothing to indicate the use of the React Belt infringed upon Leonard's presumption of innocence in that there is absolutely no evidence the jury was aware he was wearing a React Belt.  Accordingly, the jury's perception of Leonard would not have been affected. It would be pure speculation for this Court to find otherwise.

*Id.* at 316.  From this the judge concluded that the presence of the stun belt had not impinged on Leonard's physical appearance of innocence, essentially the due process claim.  *Id.*

Judge Winkler dealt separately with the Sixth Amendment claim.  He reported that there

was conflicting testimony from Leonard and from the prosecutor, the bailiff, and the court reporter about Leonard's difficulty or lack thereof in communicating with his counsel. *Id.* at 317. The judge discounted Leonard's testimony because the pooled TV scenes showed him "frequently conferring with his attorneys." *Id.* at 317. Despite Leonard's testimony that the belt made him uncomfortable, Judge Winkler found his attorneys had never complained to Judge Schweikert about this, as they had been instructed to do. *Id.* at 318. Leonard admitted one of the deputies told him to speak up if it made him uncomfortable and needed to be adjusted. *Id.* That deputy testified Leonard never said anything to him about it during the trial. *Id.*

Judge Winkler summarized the testimony of Dr. Robert Smith, an expert witness retained by Petitioner, who testified that the stun belt "may have affected Leonard's manner, appearance, and ability to confer with and assist his attorneys, due to his fear of the React Belt being activated." *Id.* The judge discounted Dr. Smith's testimony, finding it unconvincing. *Id.* He noted that neither of the trial attorneys testified in the post-conviction hearing, an omission he obviously found telling. *Id.* at 319. Judge Winkler concluded that if there had been any interference with consultation with counsel, the trial attorneys would have raised it and they did not. *Id.* The Sixth Amendment claim was therefore found to be without merit. *Id.* at 320.

Leonard asserts that the conclusion of the Common Pleas Court was contrary to or an objectively unreasonable application of "clearly established federal law" or "based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)." (Traverse, Doc. No. 17, PageID 331.)

Having made that conclusory assertion, Petitioner immediately turns around and claims the state court made a "finding that the stun belt was visible during Leonard's trial. . . . [and that] was a factual determination entitled to a presumption of correctness." *Id.* at PageID 331-332.

17

The trial court made no such finding.  What it found was that a bulge on Leonard's back was visible to some people in the courtroom and watching the trial on television for varying small amounts of time.  Judge Winkler also found there was no evidence any juror had ever seen the bulge or that, if they had, that they would have known it was a restraint.

Leonard argues the trial court's findings and conclusions are not "factual findings, and are not entitled to any presumption of correctness."  (Traverse, Doc. No. 17, PageID 332, relying on *Vasquez v. Bradshaw*, No. 07-4466, 2009 U.S. App. LEXIS 19979  (6th Cir. Sept. 2, 2009)).  In *Vasquez* the Sixth Circuit was required to parse an Ohio trial court decision on post-conviction review and decided that only those portions of the decision that actually decided a factual issue were entitled to deference under 28 U.S.C. § 2254(e)(1), even  though they were found in the section of the decision labeled "conclusions of law."

Ohio Revised Code § 2953.21, the Ohio post-conviction statute, provides at subsection (G):  "If the court does not find grounds for granting relief, it shall make and file findings of fact and conclusions of law and shall enter judgment denying relief on the petition."  That requirement is similar to the provision in Ohio R. Civ. P. 52 which provides for separately stated "conclusions of fact" and "conclusions of law" on demand in bench-tried civil cases in Ohio.  In place of "conclusions of fact," the same Ohio rule twice uses the more familiar "findings of fact" to describe what is required of a trial judge in these circumstances.  Fed. R. Civ. P. 52 requires in a federal civil bench trial that "the court must find the facts specially and state its conclusions of law separately."  However, no special form is required:  "The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or memorandum of decision filed by the court."

Whatever the linguistic form of a trial court's conclusions, the difference between a

finding of fact on the one hand and a conclusion of law or a mixed conclusion of law as applied

to fact on the other are important.  Even on direct review, the findings of fact are to be accepted

unless "clearly erroneous," whereas pure and mixed conclusions of law receive *de novo* review.

In habeas under AEDPA, state court findings of fact are presumed correct unless overcome by

"clear and convincing evidence," meaning precisely that they are clearly erroneous.  The clear

and convincing test requires the same degree of certainty that a proposition is true as the clearly

erroneous test requires in showing that a proposition is untrue.  *Concrete Pipe and Products v.*

*Construction Laborers Trust for Southern California*, 508 U.S. 602 (1993).

    As Judge Boggs reminds us in *Vasquez*, AEDPA can require deference to a finding of

fact whether the state court labels it a finding of fact or something else.  In other words, the test

under § 2254(e)(1) is functional and not dependent on labels.  A state trial court statement which

determines a factual issue is entitled to deference however labeled; something labeled "finding of

fact" which does not determine a factual issue is not entitled to deference regardless of the label.

    Applying this test, Leonard asserts that Judge Winkler made very few "factual

determinations" and that most of the determinations he made were "erroneous."  (Traverse, Doc.

No. 17, PageID 333.)

    Leonard first argues that there was an insufficient showing of facts necessary to warrant

use of the stun belt.  He cites such factors as escape attempts, threats to witnesses, previous

violent crime convictions, violent or disruptive pre-trial conduct, or gang affiliation.  (Traverse,

Doc. No. 17, PageID 335.)  The trial record did not show any of these facts, either before Judge

Schweikert made the decision to follow the Sheriff's recommendation, or thereafter during the

trial.  The court of appeals in its first post-conviction decision reached virtually this same

conclusion.  *State v. Leonard*, 157 Ohio App. 3d 653 ¶¶ 50-51 (Ohio App. 1st Dist. 2004).  The

only facts which became known to Judge Schweikert after his initial decision which might have

supported the decision were the crowded courtroom with people from Leonard's and the victim's

families and the tense atmosphere.  But those facts were not known at the time the decision was

made and so cannot have affected the decision.  It is a fair reading of the record that Judge

Schweikert decided to allow the stun belt because it was pursuant to the Sheriff's policy to place

them on all capital defendants.  We know from *Earhart, supra*, that it was the same Sheriff's

policy, followed in that case, to place them on all *pro se* defendants.  Perhaps it was Sheriff Leis'

prior experience as both Hamilton County Prosecutor and Common Pleas Judge which prompted

Judge Schweikert to follow his recommendation without holding a hearing and Judge Winkler to

find that Judge Schweikert was justified in doing so.[6]  Be that as it may, the question before the

state courts on post-conviction and before this Court is not whether the stun belt should have

been imposed, but whether its undoubted imposition denied Leonard a fair trial.

In *Deck*, the Supreme Court found that combination of inadequate justification and

visible shackles, belly chain, and leg irons warranted vacating the conviction on direct appeal.  In

*Holbrook* the Court denied habeas relief, distinguishing the presence of armed security guards at

trial from the inherently prejudicial visible shackling condemned in *Deck*.  Leonard points to no

Supreme Court case establishing entitlement to relief where restraints were used that were not

visible to the jury.   Of the many lower court cases cited by Leonard as adumbrating the factors

to be considered (Traverse, Doc. No. 17, PageID 335), only one granted habeas for a violation

and that decision was reversed on appeal.  *Stephenson v. Wilson*, 619 F.3d 664 (7th Cir. 2010),

---

[6] Simon Leis was Sheriff of Hamilton County for twenty-five years prior to January, 2013, when he retired after not
running for re-election.  He advised the media that he planned to become a visiting judge which he is eligible to do,
having retired from Hamilton County Common Pleas Court in 1987.  www.local12.com/news (visited February 7,
2013).

20

reversing *Stephenson v. Levenhagen*, 2009 U.S. Dist. Lexist 56814 (N.D. Ind. July 1, 2009).[7]

Leonard argues "[t]he trial court correctly found that the stun belt was visible at least twice, but unreasonably asserted that there was no evidence that the jury saw the belt or knew what it was." (Traverse, Doc. No. 17, PageID 337.)  This so-called assertion is a finding of fact – a conclusion from the evidence presented of what factual inferences could be drawn from that evidence.  This fits squarely within the "determination of a factual issue" definition given by Judge Boggs in *Vasquez*.

To overcome the presumption of correctness of this finding, Leonard must present clear and convincing evidence drawn from the state court record.[8]  To do so, Leonard asserts:

> Certainly the fact that the bulky, square object attached to Leonard's back was visible in news footage from only a few minutes of a trial that took place over at least 13 days, is compelling evidence that the jury would have seen the belt on more than one occasion. The only reasonable conclusion to be drawn from the clear and convincing evidence that the belt was visible was that the jurors saw the belt.

(Traverse, Doc. No. 17, PageID 337-338.)  Joint Exhibit 5 from the evidentiary hearing contains 4:14 minutes of clips of various lengths.  Most of them depict Leonard sitting at counsel table; in one clip he is seen to converse openly with one of his attorneys.  One clip lasting 5.7 second shows Leonard walking to the witness stand.  His shirt is slightly bloused in back and one can discern that something is under the blousing.  The clips do not show him leaving the witness stand, but Judge Winkler apparently inferred that it would take as long to walk back to his seat as it did to walk in the opposite direction.  Hence the finding of twelve seconds possible exposure to

---

[7] Citing an unpublished district court decision for a proposition of law on which the district court was reversed on appeal in a published opinion without citing the appellate opinion is misleading to the reader.

[8] In determining whether the state court decision is an unreasonable determination of the facts or an objectively unreasonable application of the law, a habeas court is limited to the state court record. *Cullen v. Pinholster,* 563 U.S. ___, 131 S.Ct. 1388 (2011).

jury view.

If there were any proof that Leonard's courtroom movements walking to the stand were duplicated at any other time during the trial, then one might infer, as his counsel do, that that is "evidence the jury would have seen the belt on more than one occasion" during the 13-day trial. But there is no such evidence pointed out to this Court. Leonard made an unsworn statement from the witness stand during the mitigation phase. This happened only once. There is no evidence he walked in the courtroom at any other time in the presence of the jury.[9]

Leonard also argues that:

> Leonard's position relative to the jurors, and the physical limitations imposed by the stun belt, also undermine the reasonableness of any conclusion that the jurors did not see the belt during other portions of the trial. Leonard was seated with the jury to his right, within a few feet from the jury box. (Apx. Vol. 20, DVD – Joint Exh. 5, p. 197-98.) From the jury box, Leonard would have been viewed in profile. (Id. at 198.) His profile would have been even more noticeable due to the fact that the stun belt prevented him from being able to sit with his back flush against the back of his chair. (Apx. Vol. 21, p. 126-27.)

(Traverse, Doc. No. 17, PageID 338.) However, the evidence pointed to is not clear and convincing evidence that Judge Winkler's determination was unreasonable. The two photographs of the courtroom at pages 197-98 of Apx. Vol. 20 do not show that Leonard's profile and the fact that he could not sit all the way back in his chair would have been visible to the jury. Although the jury was to his right and he was only a "few feet" from them, the photographs do not demonstrate that his back would have been within the line of sight of any of the jurors.

To prove that Judge Winkler was wrong, Leonard relies on factual findings about stun

---

[9] The clips show Leonard being placed in handcuffs and led from the courtroom. In the absence of any comment by his counsel on what would otherwise have been a violation of *Deck, supra*, the Court understands these clips to have been filmed after the jury left the courtroom.

belts made by the Eleventh Circuit Court of Appeals in *United States v. Durham*, 287 F.3d 1297

(11th Cir. 2002). There had been

> no testimony in the record from a single sworn witness about the
> operation of the stun belt, nor are there any findings of fact on the
> issue. We therefore have nothing in the record that provides us
> with a factual basis for assessing how the belt operates. Our
> discussion of the relationship between the principles outlined
> above and the use of this restraint will thus rely on Durham's
> uncontested claims about certain of the stun belt's basic operational
> facts.

*Id.* at 1305. The *Durham* court discussed the differences between more obvious restraint devices

and the stun belt:

> One of the most prominent concerns about the use of most
> methods of restraint comes from the possibility of prejudice to the
> defendant if those restraints are visible to the jury. *Elledge*, 823
> F.2d at 1454 (Edmondson, J., concurring in part and dissenting in
> part) ("The single major analytic thrust of all the guilt-innocence
> phase cases is . . . whether the defendant's right to a presumption of
> innocence was infringed by the security measure adopted by the
> trial court" (footnote omitted).). In the case of stun belts, this
> would seem to be less of a concern than it generally is with other
> physical restraints. As we understand it, stun belts are worn
> underneath the prisoner's clothing, and are not readily visible to the
> jury. Other restraints (such as handcuffs or gags) are not so easily
> concealed, and the possibility of prejudice is more obvious in such
> cases. Nonetheless, if the stun belt protrudes from the defendant's
> back to a noticeable degree, it is at least possible that it may be
> viewed by a jury. If seen, the belt "may be even more prejudicial
> than handcuffs or leg irons because it implies that unique force is
> necessary to control the defendant." *State v. Flieger*, 91 Wn. App.
> 236, 955 P.2d 872, 874 (Wash. Ct. App. 1998). The use of a stun
> belt as a security device undoubtedly raises some concern about
> possible prejudice to the defendant, and this is a concern that needs
> to be considered before the device is imposed on a defendant.
> However, it is notable that a stun belt likely poses fewer problems
> in this regard than do other, more obvious methods of restraint.

*Id.* Leonard relies on factual statements about the stun belt made in *Durham* as if they were

universally true, but the Eleventh Circuit made its findings on the basis of no trial court record,

but only Durham's assertions.  Our task on review in a habeas case is far different from that.

And in any event, the strongest finding in support of Leonard's position is that "it is at least

possible that it may be viewed by a jury."  We are concerned in this case with what the jury saw.

The huge gap in the evidence on the stun belt issue is that there is no testimony from any

juror about what he or she actually saw.  Leonard gives no excuse for that, but lamely says "he

need not submit juror testimony in order to prove that the belt prejudiced him. . . ."  (Traverse,

Doc. No. 17, PageID 338.)  He never explains why he did not present evidence from any juror.

He was granted discovery on remand from the court of appeals and certainly the jurors names

were available to him.  The jurors could have testified about what they saw and whether they

understood the bulge to be a restraint device without getting into subject areas proscribed by

Ohio R. Evid. 606(B).  Indeed, if any juror saw the bulge and thought it was a stun belt and

testified to that effect, and Judge Winkler had ignored that testimony, Leonard's case would be

stronger.  But Judge Winkler reasonably determined on the basis of the evidence before him,

which inexplicably includes no juror testimony, that no juror was shown to have observed the

stun belt or to have known that it was a restraint device.

Leonard spends a good deal of time attacking the credibility of the testimony of Sheriff's

deputies, the bailiff, the court reporter, and the prosecutor (Traverse, Doc. No. 17, PageID 338-

340).  This Court is not pointed to any place in the state court record where these arguments were

made to Judge Winkler.  Assuming they were, however, he was in the best position to assess

their credibility.  While counsel as good lawyers can hypothesize good cross-examination of

these witnesses, their burden is not to show doubt about their testimony, but to overcome it with

clear and convincing evidence.  Yes, as employees of the Common Pleas Court, the Sheriff, or

the prosecutor, they could be assumed to have some bias in favor of the State.  But they were in

fact eyewitnesses able to provide direct testimony about what happened in the courtroom. The unbiased witnesses – the people whose perceptions count on this issue, the jurors – were not presented.

Leonard accuses Judge Winkler of *sua sponte* opining that the jurors could have thought it was "a medical device, a physical deformity, or any number of other objects." (Traverse, Doc. No. 17, PageID 339.) He asserts it "strains credulity to assume jurors would more likely conclude that a square, bulky object strapped to a capital defendant's back was a medical device or deformity than some form of restraint." *Id.* at 339-340. This argument reverses the burden of proof. It was Leonard's burden to prove that jurors saw the bulge and inferred it was a restraint device. Judge Winkler watched the video clips and inferred from what he observed that a juror could have perceived it to be something other than a restraint device. It may be that any particular juror perhaps familiar with "true crime" fiction, would be more likely to have thought it was a stun belt. On the other hand, a person with an acquaintance with an insulin pump might have been more likely to think it was a medical device. The point is that just from looking one cannot tell what it is under the shirt and Leonard produced no juror to testify what he or she did think it was. Judge Winkler found "[w]atching the television scenes, the bulge is not identifiable as a stun belt. There is nothing to indicate what the bulge was." (Findings, Apx. Vol. 13 at 314.) Having viewed the same television scenes, the Magistrate Judge concludes this finding was not an unreasonable determination based on that evidence.

The Magistrate Judge concludes that Judge Winkler's determination of the relevant factual issue – could jurors see the stun belt and understand it to be a restraint device? – was not clearly erroneous based on the evidence before him. And Judge Winkler's conclusion that Leonard was not denied a fair trial by having the stun belt interfere with his physical indicia of

25

innocence is not an objectively unreasonable application of *Allen, Holbrook* and *Deck.*

**Sub-claim Two:  Interference with the Rights to Counsel, to Participate in the Defense, and to Have the Jury Consider Mitigating Evidence.**

        In addition to his claim that the stun belt deprived him of the physical indicia of innocence, Leonard claims it interfered with his right to consult with and assist counsel in violation of the Sixth Amendment and his right to have the jury consider mitigating evidence, in violation of the Eighth and Fourteenth Amendments.  This sub-claim was also decided on the merits by the Ohio courts and is preserved for merit review in habeas corpus.

        In contrast to the physical indicia precedent (*Allen, Holbrook* and *Deck)*, Leonard points to no Supreme Court precedent clearly establishing a right to be free from the psychological impact of a stun belt on the relationship with counsel or presentation of mitigation.[10]  In contrast, the precedent focuses on the probable psychological impact of restraints on the jury, not the defendant.

        Judge Winkler acknowledged that Leonard had been notified of the behavior he was expected to avoid while wearing the stun belt and the consequences of non-compliance if the belt was activated.  (Findings, Apx. Vol. 13 at 311.)  He found the stun belt is "generally effective at stopping the undesired behavior."  *Id.* at 312.  Because he also found the stun belt was never activated, it is fair to infer that Leonard never engaged in any of the behaviors he was warned would result in triggering the device. *Id.*  Indeed, his claim is, to the contrary, that the device frightened him into not engaging in constitutionally protected activities.

---

[10] Justice Breyer in *Deck* notes the possible interference of shackles with a defendant's ability to communicate with counsel and his willingness to testify in his own defense.  544 U.S. at 631.  The holding in Deck, however, is that "[T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial."

Judge Winkler decided this sub-claim as follows:

Leonard's Ability to Confer with Counsel and Assist in his Defense

Leonard argues that his Sixth Amendment right to confer with counsel and assist in his defense was infringed as a result of being required to wear the React Belt during all phases of his trial.

Leonard testified that as a consequence of his being required to wear the React Belt, he kept his movements to a minimum so as not to cause problems. Concerned about the activation of the React Belt, he believes that had he not been wearing it, he would have interacted more freely with his attorneys.

Leonard stated that the React Belt was uncomfortable and that he had mentioned it to his attorneys. Leonard stated his attorneys did not bring it to the attention of the trial court. Leonard admitted that Deputy Weber advised him that if the React Belt was uncomfortable he would be willing to adjust it. Despite the alleged discomfort of the React Belt and his concerns about its activation, Leonard was able to read his unsworn statement to the jury during the mitigation phase of his trial.

Jerome Kunkel testified that he observed Leonard constantly consulting with his attorneys during trial.

The courtroom Bailiff, Vincent Wallace, observed Leonard writing notes and leaning over to whisper to his attorneys. He did not observe Leonard having any difficulty communicating or interacting with counsel during the trial.

The Court Reporter, Deborah Wallace, stated that she did not see Leonard having any difficulty consulting with his attorneys during the trial.

Leonard's testimony is belied by the trial record and his actions as depicted by the pooled television scenes (Joint Exhibit Five). Those scenes depict Leonard frequently conferring with his attorneys. At all times, either one or both of Leonard's attorneys were at his side. Additionally, Leonard showed no difficulty in taking the witness stand to read his unsworn statement to the jury.

Leonard contends that he advised his two attorneys and the sheriff's deputies of his discomfort caused by the React Belt. The record does not support this contention. If so, neither of the attorneys brought it to the attention of the Court as directed by

27

Judge Schweikert. In order to believe Leonard's assertion, one would have to find that his two attorneys believed their role as defense counsel was limited to mere courtroom adornment. Moreover, by Leonard's own admission, the sheriff's deputy assigned to fit Leonard with the React Belt advised him that if the React Belt became uncomfortable it would be adjusted. The deputy testified that Leonard did not complain to him that the belt was uncomfortable. Leonard's testimony was not credible when viewed in light of the trial record and testimony of the other witnesses.

Dr. Robert Smith, a clinical psychologist, retained by the State Public Defenders Office, testified as to behavior modification experiments conducted by B.F. Skinner. The gist of Dr. Smith's testimony was that the React Belt may have affected Leonard's manner, appearance, and ability to confer with and assist his attorneys, due to his fear of the React Belt being activated.

After Leonard's conviction, Dr. Smith met with Leonard to discuss issues touching upon the React Belt. He also viewed the pooled television scenes (Joint Exhibit Five) before reaching his conclusions.

During cross-examination, Dr. Smith admitted Leonard could be viewed in a negative light by the jurors for reasons other than being restrained by the React Belt. The fact that he was on trial for capital murder could potentially cause jurors to view him negatively. Dr. Smith also stated that shame, the media filming and taking notes, feelings of humiliation, fear and apprehension could have contributed to the behavior described in his testimony.

At one point Dr. Smith admitted that the React Belt may even produce behavior which would cast Leonard in a more favorable light.

Dr. Smith's testimony was interesting in so much as it would provide for a lively dinnertime debate, however, it is not useful here. In light of the testimony of Dr. Smith, this Court is not convinced that the React Belt affected Leonard's manner, appearance, or ability to confer with counsel and assist in his defense. Those characteristics could be attributable to any number of other factors described by Dr. Smith.

Neither of Leonard's trial attorneys testified during the Post-Conviction Petition hearing. Both were experienced trial attorneys and had been advised by Judge Schweikert to promptly advise him if they had "a problem with how the sheriff's deputies are handling

28

your client." At no time did Leonard or his attorneys notify Judge Schweikert that Leonard experienced any problems with the belt. Moreover, there is nothing in the trial record reflecting Leonard's discomfort, inability to confer with counsel, or fear that the React Belt may be activated.

The first District Court of Appeals in reversing the trial court's dismissal of Leonard's Post-Conviction Petition found that "placing restraints on a criminal defendant during trial violates the Sixth Amendment if the restraints impede the defendant's ability to confer with counsel or to assist in his defense." *State v. Leonard, supra.*

Leonard cites the case of *United States v. Durham* (2002), 287 F.3d 1297, for the proposition that a defendant's awareness of the possible consequences of the React Belts [sic] activation presents a substantial risk of interference with his right to confer with counsel and may affect his right to be present at trial and participate in his defense. In *People v. Mar* (2002), 28 Cal.4111 1201, the court held that the wearing of a stun belt may lead to an increase in anxiety that may materially impair and prejudicially affect a Defendant's ability to testify on his own behalf.

Reason and common sense dictate that had Leonard's ability to confer with counsel or to assist in his defense been affected, Leonard or his trial attorneys would have brought it to the attention of the trial court.

Therefore, based on the foregoing findings of fact, the trial record, and evidence produced, Leonard 's claim that his Sixth Amendment Right to consult with his attorneys and assist in his defense was infringed as a result of wearing the React Belt is not supported.

(Findings, Apx. Vol. 13 at 316-320.)

In their argument on this sub-claim (Traverse, Doc. No. 17, PageID 346-354), Leonard's counsel have conflated testimony from Leonard himself, his sister, Father DuPlantier, and Dr. Robert Smith.  Judge Winkler gave reasons for discounting this testimony.  In part it conflicted with other evidence about how Leonard behaved during the trial, including the television clips. In part he found it not credible because it was inconsistent with what happened during the trial.

29

Nowhere in the Traverse do Leonard's habeas counsel attempt to demonstrate how any of the factual determinations made by Judge Winkler are clearly erroneous or his legal conclusions on this sub-claim are contrary to or objectively unreasonable applications of Supreme Court precedent.

Leonard's sister's testimony and that of Father DuPlantier (who counseled Leonard pre-trial) could be appropriately discounted for bias by identification with a party.[11]  Leonard's own testimony could appropriately be discounted on the same basis and on its inconsistency with his failure to say anything at trial or to produce either of his trial attorneys to testify about any complaints by him or observations by them of interference with communication.  Leonard's counsel's insistence in the Traverse that the trial record is irrelevant misses this important point: it is commonplace in weighing evidence and often part of standard jury instructions to discount the credibility of present testimony by its inconsistency with prior behavior.

Leonard places heavy emphasis on the testimony of Dr. Robert Smith, a clinical psychologist, retained by the Ohio Public Defender to evaluate and testify to the likely psychological effects of the stun belt on Leonard.  Judge Winkler rejected Dr. Smith's testimony as "not useful."  While that conclusion is summary, it is an appropriate way for a finder of fact to characterize his reaction to expert testimony; juries are frequently instructed that they are not bound by the opinions of experts, but are to consider it if they find it useful.  *See United States v. Thomas*, 74 F.3d 676 (6th Cir. 1996), *abrogated on other grounds by General Electric Co. v. Joiner,* 522 U.S. 136 (1997); see also Sixth Circuit Pattern Jury Instruction 7.03.

It was appropriate (i.e., within his discretion as a fact finder) for Judge Winkler to find Dr. Smith's testimony not useful.  Dr. Smith purported to testify about how the stun belt had

---

[11] The Magistrate Judge is not saying that they should have been thus discounted, but merely that the weighing of testimony for, *inter alia*, bias is part of the function of a judge hearing evidence and deciding what it proves.

changed Leonard's behavior, but he had no experience with Leonard at all before being retained after the case was remanded for evidentiary hearing. In other words, any comparison was purely speculative.

There is no constitutional right clearly established by holdings of the Supreme Court to be free from the psychological impact of wearing a stun belt at trial on the relationship with one's defense counsel. Furthermore, Judge Winkler's decision that Leonard had not proved any adverse impact on his relationship with counsel has not been shown to be clearly erroneous. Therefore Sub-claim Two is without merit.

**Which State Court Decision is to be Reviewed?**

This Report has spent considerable space analyzing Judge Winkler's Findings because Leonard insists the opinion of the court of appeals affirming his judgment is not the last reasoned state court decision on the merits because the appellate court only concluded Judge Winkler had not abused his discretion (Traverse, Doc. No. 17, PageID 330). Leonard cites *Benge v. Johnson*, 474 F.3d 236 (6th Cir. 2007), which refused to give AEDPA deference to an Ohio Supreme Court decision reviewing only for plain error. Of course, plain error review in Ohio appellate practice is a means of enforcing a procedural default in the trial court. *Wogenstahl v. Mitchell*, 668 F.3d 307, 337 (6th Cir. 2012); *Jells v. Mitchell,* 538 F.3d 478, 511 (6th Cir. 2008); *Lundgren v. Mitchell,* 440 F.3d 754, 765 (6th Cir. 2006); *White v. Mitchell,* 431 F.3d 517, 525 (6th Cir. 2005); *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005); *Hinkle v. Randle,* 271 F.3d 239 (6th Cir. 2001), *citing Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000). The Sixth Circuit has, since *Benge*, held that opinions on plain error review are entitled to AEDPA deference. *Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009). In any event, plain error review in Ohio law involves

31

a different standard than abuse of discretion.

Leonard also relies on *Vasquez v. Bradshaw, supra,* to persuade the Court that the appellate decision is not "on the merits."  In that case the court noted the problem of abuse of discretion review, but found it unnecessary to decide whether such an appellate opinion was entitled to AEDPA deference.  *Id.* at n. 1.  Thus there is no Sixth Circuit holding on the point.

The only abuse of discretion question the Ohio court of appeals decided was whether Judge Schweikert had abused his discretion in allowing the stun belt.  It also considered Judge Winkler's decision that the use of the stun belt had not violated Leonard's constitutional rights to physical indicia of innocence and to consult with this counsel.  It opined:

> The [trial] court also concluded that, although the stun belt had been visible to Leonard's sister and on the news footage, Leonard had failed to prove that he had been stripped of the physical indicia of innocence, or that his restraint with the stun belt had factored into the jury's determination of his future dangerousness or ability to adjust to incarceration, because nothing suggested that the stun belt had been visible to the jurors or that the stun belt had been identifiable as such. The court also found less than credible, in light of the testimony of other witnesses, Leonard's statements concerning his discomfort with the stun belt and the limits the stun belt had imposed on his interaction with his counsel. And the court found less than compelling, in light of its contradictions, the psychologist's testimony concerning the negative impact of the stun belt on Leonard's manner, appearance, or ability to interact with counsel. Thus, the court concluded that Leonard had failed to prove that the order that he wear the stun belt infringed on his right to confer with counsel and to assist in his defense.
>
> Our review of Leonard's challenge on appeal, to the balance struck by the common pleas court in weighing the evidence adduced at the hearing on his postconviction claim, entails an inquiry into whether the court's findings were "supported by competent and credible evidence." *State v. Gondor*, 112 Ohio St. 3d 377 (2006). The record of the hearing provides competent and credible evidence to support  the common pleas court's conclusion that the circumstances surrounding Leonard's trial demonstrated a compelling need for exceptional security in the form of a stun belt. We, therefore, hold that the common pleas court properly denied

> Leonard's claim. Accordingly, we overrule the assignments of error and affirm the judgment of the common pleas court.

*State v. Leonard,* 2007 Ohio 7095, 2007 Ohio App. LEXIS 6214 (Ohio App. 1st Dist. Dec. 31, 2007).  *Gondor* does adopt an abuse of discretion standard for review of trial court decisions under Ohio Revised Code § 2953.21.

If the Sixth Circuit were to adopt footnote 1 of *Vasquez*, it might be the case that this Court would be compelled to look through the court of appeals decision to Judge Winkler's Findings. We are not compelled to do so because *Vasquez* footnote 1 is not as yet the law.  Out of an abundance of caution, however, the Magistrate Judge has looked through the court of appeals' decision.  Although that court did affirm denial of the post-conviction decision, it did not make any findings of fact independent of what Judge Winkler did.  Instead, it found his conclusions were supported by competent and credible evidence, essentially the same decision the Magistrate Judge recommends this Court make on Ground One for Relief.

The First Ground for Relief is without merit and should be dismissed with prejudice. However, the Magistrate Judge concludes reasonable jurists could disagree with this conclusion as to Sub-claim One and Leonard should be granted a certificate of appealability on that sub-claim.

### Ground Two:  Confrontation Rights

In his Second Ground for Relief, Leonard asserts his rights under the Confrontation Clause and to a fair trial were violated when improper hearsay testimony was admitted against him.

The admitted hearsay of which Leonard complains is listed in his Traverse as follows:

33

- Ryan Gries testified that Dawn Flick told him she was going down to his house to play pool after the bar closed. (Tr. Vol. 9, p. 1098.) He was allowed to testify as to Flick's telephone conversation with him immediately before her death, in which she stated she would not be coming to his house to play pool. (*Id*. at 1104.) Further, he stated that during the conversation, Flick told him that Patrick Leonard was at her house, and that he was beating her. (*Id*. at 1105.) In addition, she told him not to come to her house or call the police. (*Id*. at 1124.)

- Numerous witnesses, including Alvie Woods and Deborah Schroeder, testified to an alleged statement made by Flick about Leonard trying to drive her off the road. (*Id.* at 1168-70, 1182-87.)

- Sabrina Frye was permitted to testify as to statements allegedly made by Flick about Leonard's children with Penny McBride, and that she was going to break it off with Leonard. (Tr. Vol. 10, p. 1227-34.) Frye was permitted to testify as to Leonard supposedly telling Dawn Flick that if he could not have her, no one could; that he would kill him. (*Id*. at 1235-36.) Frye also testified that Flick believed that if she did not let Leonard stay with her he would hurt himself. (*Id*. at 1243.)

- Alvie Woods testified that Leonard threatened to kill somebody if he caught Flick fooling around on him. (Tr. Vol. 9, at 1162.)

- Penny McBride [testified] concerning statements that Leonard had made to her. (Tr. Vol. 10, p. 1268, 1269, 1276, 1278, 1280-83, 1287.)

- Deborah Schroeder [testified] concerning the conversation that Patrick Leonard had with the victim at the restaurant on the evening of the homicide. (Tr. Vol. 9, p. 1176.) Lea Ketterer was also allowed to testify regarding telephone calls Leonard made repeatedly to

34

the restaurant that evening. (Tr. Vol. 10, p. 1215.)

(Traverse, Doc. No. 17, PageID 363-364.)

Leonard raised some of these claims on direct appeal and some by way of an application for reopening the direct appeal upon an assertion of ineffective assistance of appellate counsel. Because different law applies to these two separate presentations of the claim, they are analyzed separately here.

**Direct Appeal**

Leonard's Twenty-Third Proposition of Law on direct appeal reads "Improper hearsay admissions of decedent allowed into evidence violated Appellant's confrontation rights under the United States and Ohio Constitutions and deprive Leonard of a fair trial." Leonard argued the claim under the hearsay rule and then concluded that their admission violated the Confrontation Clause because none of them came within a firmly rooted exception or contained other indicia of reliability. (Leonard's Merit Brief, Apx. Vol 4, at 173-176). Leonard relies on *White v. Illinois,* 502 U.S. 346 (1992), the sole case authority cited by Leonard in his argument to this Court.

The Ohio Supreme Court ruled on hearsay on direct appeal as follows:

> **C. Hearsay**
>
> **[\*\*P91]** In his 23rd proposition of law, Leonard argues that the admission of several hearsay statements violated his right to confront his accuser and denied him a fair trial.
>
> **[\*\*P92]** Leonard first claims that Ryan Gries was allowed to testify that on the night of the murder Flick had said she was going to Gries's house to play pool. But the trial court sustained an objection and precluded any testimony from Gries as to what Flick had said in this regard. Further, any testimony from Gries that Flick had intended to go to his house that night would have been merely cumulative of evidence in Leonard's confession.

35

**[\*\*P93]** Leonard also challenges Gries's testimony regarding his telephone conversation with Flick the night she was killed. Over objection, the trial court admitted testimony from Gries that Flick had told him on the telephone that she was not coming to his house. According to Gries, Flick kept repeating that she was "not coming down tonight." Gries eventually was able to elicit from Flick, through her responses to his questions, that Leonard was at her house and was hurting her.

**[\*\*P94]** Flick's statements to Gries were admissible under the excited-utterance exception of Evid.R. 803(2), which allows a hearsay statement to be admitted into evidence if it relates "to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." According to Leonard's confession, when Flick was on the phone with Gries, Leonard had a gun pointed at her. Further, Gries testified that during their phone conversation, Flick was very upset, she was crying, and she had a tremendous amount of fear in her voice. The evidence thus reflects that Flick's statements were made while she was in fear and under the stress of a startling event. See, e.g., *State v. O'Neal* (2000), 87 Ohio St.3d 402, 410-411, 2000 Ohio 449, 721 N.E.2d 73.

**[\*\*P95]** Moreover, the fact that Flick's statements were made in response to Gries's questions does not preclude their admission as an excited utterance. "The admission of a declaration as an excited utterance is not precluded by questioning which: (1) is neither coercive nor leading, (2) facilitates the declarant's expression of what is already the natural focus of the declarant's thoughts, and (3) does not destroy the domination of the nervous excitement over the declarant's reflective faculties." *State v. Wallace* (1988), 37 Ohio St.3d 87, 524 N.E.2d 466, paragraph two of the syllabus.

**[\*\*P96]** Gries's questions were not coercive or leading. Gries asked simple, straightforward questions: "What happened?" "What's the matter?" When Flick repeatedly responded, "I'm not coming down tonight," Gries asked, "Is [Leonard] there? * * * Is he beating you?" The questions were not designed to elicit a particular response or to obtain information that Flick tried to withhold. Gries's inquiries merely facilitated Flick's expressions. Certainly, under these circumstances, Flick's statements were made while she was under the stress of excitement of Leonard's pointing a gun at her and were not the product of reflective thought.

**[\*\*P97]** Leonard additionally claims that the trial court improperly

allowed Gries's testimony that during the same phone call, Flick had told Gries not to come to her house and not to call the police. According to Gries's testimony, Flick responded negatively when Gries told her to call the police and when he said that he was going to come to her house. But these responses do not fall within the definition of hearsay, because they are not assertions. See Evid.R. 801(A) (defining a hearsay "statement" as "an oral or written *assertion.*" Emphasis added). "An 'assertion' for hearsay purposes 'simply means *to say that something is so, e.g.,* that an event happened or that a condition existed.' (Emphasis *sic.)" State v. Carter* (1995), 72 Ohio St.3d 545, 549, 1995 Ohio 104, 651 N.E.2d 965 , quoting 2 McCormick on Evidence (4th Ed.1992) 98, Section 246. The communication challenged by Leonard is not an assertion, because it cannot be proved true or false. Thus, it is incapable of being offered to prove the truth of the matter asserted, and, as such, the expression falls outside the definition of hearsay pursuant to Evid.R. 801(C). See, e.g., *State v. Young* (May 16, 2001), Cuyahoga App. No. 78058, 2001 Ohio App. LEXIS 1700, 2001 WL 370460.

[**P98] Leonard also argues that Flick's statement that Leonard had forced her car off the road was inadmissible hearsay. On the night of her murder, Flick had planned to meet friends at Snow's Lake Bar. Leonard followed Flick as she headed for Snow's and, as he claims in his confession, "got her to pull over." Three witnesses, Alvie Woods, Deborah Schroeder, and Reva Ketterer, testified that when Flick arrived at Snow's, she told them that Leonard had just run her car off the road. Based on the following, Flick's statement was admissible as an excited utterance.

[**P99] For an excited utterance to be admissible, "the central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may *not* be the result of reflective thought." (Emphasis sic.) *State v. Taylor* (1993), 66 Ohio St.3d 295, 303, 612 N.E.2d 316. The evidence indicated that Flick lived five to ten miles from Snow's and that during her drive, Leonard stopped her car. When Flick first arrived at Snow's, she was "upset," "scared," "very shaken," and "anxious." Ketterer and Schroeder both testified that upon entering Snow's, Flick immediately stated: "That son of a bitch [Leonard] ran me off the road." Flick's statement was not the result of reflective thought and was made under the stress of excitement caused by Leonard's having just forced her car from the road. See, e.g., *State v. Huertas* (1990), 51 Ohio St.3d 22, 31, 553 N.E.2d 1058 (affirming finding that a statement made 45 minutes after

event but while the declarant was still agitated and in serious pain and had not calmed down to be an excited utterance).

[**P100] Leonard further complains of hearsay elicited through the testimony of Sabrina Frye. Leonard first complains of Frye's testimony that four days before the murder, Flick had said she intended to end her relationship with Leonard because he had fathered a second child by Penny McBride. But Frye's testimony was admissible as a statement of Flick's then existing mental condition. Evid.R. 803(3) allows for introduction of a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)." This testimony was probative of Flick's intent to end her relationship with Leonard. See, e.g., *State v. Tibbetts,* 92 Ohio St.3d at 158-159, 749 N.E.2d 226.

[**P101] However, the state-of-mind exception does not permit witnesses to relate why the declarant held a particular state of mind. See *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 21, 514 N.E.2d 394, citing *United States v. Cohen* (C.A.5, 1980), 631 F.2d 1223, 1225. Therefore, Frye's testimony regarding Flick's statement as to why she intended to end the relationship was inadmissible.

[**P102] Nevertheless, any error was harmless. Leonard stipulated at trial that he had fathered two children by McBride. In his confession, he stated that he had believed that his relationship with Flick was ending and that he had shot Flick because she had broken his heart.

[**P103] Leonard also argues that the trial court erred in admitting hearsay testimony from Frye regarding statements Leonard allegedly had made to Flick during conversations to which Frye was not a party. Specifically, Frye testified that Flick had told her that Leonard had said that if he could not have her, no one else could; and that if he ever saw Flick with another man, Leonard would kill him. Defense counsel's objection was overruled.

[**P104] We conclude that the trial court should have sustained counsel's objection because Frye's testimony was inadmissible hearsay. The testimony was not admissible under Evid.R. 803(3), because it did not reflect Flick's then existing state of mind. Instead, Frye merely restated a threat that Leonard had allegedly made to Flick. Even if it were admitted to show Flick's state of mind (e.g., that she was afraid of Leonard), Frye's testimony goes beyond the scope of the exception because it encompasses the

underlying basis for Flick's mental state. See *State v. Awkal* (1996), 76 Ohio St.3d 324, 330-331, 1996 Ohio 395, 667 N.E.2d 960, citing *State v. Apanovitch,* 33 Ohio St.3d at 21-22, 514 N.E.2d 394. Thus, the trial court erred in admitting this testimony.

**[**P105]** However, we conclude that the error was harmless. Leonard had told Alvie Woods the same thing directly that he had allegedly told Flick, and during Woods's testimony, the trial court properly admitted the statement under Evid.R. 801(D)(2)(a) (a statement is not hearsay if it is offered against a party and is the party's own statement). Therefore, this evidence was cumulative. See, e.g., *State v. O'Neal,* 87 Ohio St.3d at 411, 721 N.E.2d 73.

**[**P106]** Finally, we find that Frye's testimony regarding Flick's statement explaining why she had permitted Leonard to stay at her house the night before the murder was inadmissible. Frye testified that Flick had said that she had allowed Leonard to spend the night because Leonard "had continued to call and harass her and she was afraid that he would hurt himself." Defense counsel objected, but the trial court admitted the testimony under Evid.R. 803(3).

**[**P107]** Evidence may be admitted under Evid.R. 803(3) when it concerns the declarant's present state of mind or to show that the declarant subsequently acted in accordance with that state of mind. 2 Giannelli & Snyder, Evidence (2d Ed.2001) 102, Section 803.17. However, Evid.R. 803(3) excludes a statement of "memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."

**[**P108]** According to Frye's testimony, Flick made this statement to Frye on Friday, July 28, 2000. It concerned an event -- Leonard's spending the night at Flick's house -- that took place the previous evening. Statements under Evid.R. 803(3) "must point towards the future rather than the past." *State v. Apanovitch,* 33 Ohio St.3d at 21, 514 N.E.2d 394. See, also, *Shepard v. United States* (1933), 290 U.S. 96, 105-106, 54 S.Ct. 22, 78 L.Ed. 196 (hearsay statements that relate past events are not admissible under the state-of-mind exception); Weissenberger, Ohio Evidence (2004) 463, Section 803.30 ("Where the statement does not pertain to a 'then existing' condition, it must be viewed as a narrative account of a past event formulated after time for reflection, and it is not admissible under Rule 803[3]"). Because Flick's statement related to past conduct, it does not fall within the state-of-mind exception under Evid.R. 803(3). But the error of admitting the testimony was harmless. Leonard confessed to the murder, and

> there was substantial evidence to support his attempted-rape
> conviction beyond a reasonable doubt. See, e.g., *State v. Steffen*
> *(1987), 31 Ohio St.3d 111, 120, 31 OBR 273, 509 N.E.2d 383.*
> Based on the foregoing, we overrule Leonard's 23rd proposition of
> law.

*State v. Leonard*, 104 Ohio St. 3d 54, ¶¶ 91-108 (2004).  The Ohio Supreme Court decision does

not expressly address the Confrontation Clause question, but the issue was presented to that court

and must be deemed to have been decided by it.  Thus on habeas review this Court must decide

whether the decision was an objectively unreasonable application of clearly established Supreme

Court law.

    A state court decision can constitute an "adjudication on the merits" entitled to deference

under 28 U. S.C. §2254(d)(1) even if the state court does not explicitly refer to the federal claim

or to relevant federal case law.  In *Harrington v. Richter*, 562 U.S. ___, 131 S. Ct. 770 (2011),

the Supreme Court held:

> By its terms § 2254(d) bars relitigation of any claim "adjudicated
> on the merits" in state court, subject only to the exceptions in §§
> 2254(d)(1) and (d)(2). There is no text in the statute requiring a
> statement of reasons. The statute refers only to a "decision," which
> resulted from an "adjudication." As every Court of Appeals to
> consider the issue has recognized, determining whether a state
> court's decision resulted from an unreasonable legal or factual
> conclusion does not require that there be an opinion from the state
> court explaining the state court's reasoning. *See Chadwick v.*
> *Janecka*, 312 F.3d 597, 605-606 (CA3 2002); *Wright v. Secretary*
> *for Dept. of Corrections*, 278 F.3d 1245, 1253-1254 (CA11 2002);
> *Sellan v. Kuhlman*, 261 F.3d 303, 311-312 (CA2 2001); *Bell v.*
> *Jarvis*, 236 F.3d 149, 158-162 (CA4 2000) (en banc); *Harris v.*
> *Stovall*, 212 F.3d 940, 943, n. 1 (CA6 2000); *Aycox v. Lytle,* 196
> F.3d 1174, 1177-1178 (CA10 1999); *James v. Bowersox*, 187 F.3d
> 866, 869 (CA8 1999). And as this Court has  observed, a state
> court need not cite or even be aware of our cases under § 2254(d).
> *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263
> (2002) (per curiam). Where a state court's decision is
> unaccompanied by an explanation, the habeas petitioner's burden
> still must be met by showing there was no reasonable basis for the
> state court to deny relief. This is so whether or not the state court

> reveals which of the elements in a multipart claim it found
> insufficient, for § 2254(d) applies when a "claim," not a
> component of one, has been adjudicated.

*Id.* at 784. "This Court now holds and reconfirms that §2254(d) does not require a state court to

give reasons before its decisions can be deemed to have been 'adjudicated on the merits.'" *Id.* at

785. "When a federal claim has been presented to a state court and the state court has denied

relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

of any indication or state-law procedural principles to the contrary.*"* *Brown v. Bobby*, 656 F.3d

325 (6th Cir. 2011), quoting *Harrington,*131 S. Ct. at 784-85. When the state court is silent as to

its reasoning in denying a claim, "a habeas court must determine what arguments or theories

supported or could have supported the state court's decision." *Walker v. McGuiggan*, 656 F.3d

311 (6th Cir. 2011), vacated on other *grounds Howes v. Walker*, 132 S. Ct. 2741, 183 L. Ed. 2d

32 (2012), *quoting Harrington,* 131 S. Ct. at 786. When the state court gives no explanation of

its decision, "a habeas petitioner may meet his or her burden 'by showing there was no

reasonable basis for the state  court to deny relief.'" *Carter v. Mitchell*, 693 F.3d 555, 562 (6th

Cir. 2012), *quoting Harrington* at 784.

The Ohio Supreme Court relied on two exceptions to the hearsay rule, principally excited

utterance, but also the concept that an utterance which is not an assertion does not constitute

hearsay. *White v. Illinois*, 502 U.S. 346 (1992), the sole Supreme Court authority cited by

Leonard, expressly holds that the excited utterance[12] exception is firmly rooted.

> The exception for spontaneous declarations is at least two centuries
> old, see 6 J. Wigmore, Evidence § 1747, p. 195 (J. Chadbourn rev.
> 1976), and may date to the late 17th century. See Thompson v.
> Trevanion, 90 Eng. Rep. 179 (K. B. 1694). It is currently
> recognized under Federal Rule of Evidence 803(2), and in nearly

---

[12] The evidence rule at issue in *White* speaks of "spontaneous declarations."  The Supreme Court's discussion
makes it clear that the same exception is at issue there as here.

> four-fifths of the States. See Brief for State of California et al. as
> Amici Curiae 15-16, n. 4 (collecting state statutes and cases).

502 U.S. at 356, n. 8.  Leonard has cited no authority for the proposition that a non-assertional

utterance is subject to the hearsay rule.  In sum, the Ohio Supreme Court's decision on the

hearsay questions presented on direct appeal is not an objectively unreasonable application of

Supreme Court law.

**Application for Reopening**

In his Application for Reopening under S. Ct. Prac. R. XI(6), Leonard presented claims

about presented claims about hearsay which had been omitted from the direct appeal as follows:

**Proposition of Law No. V**

> **Testimony that contains statements made by persons other than the witness is not admissible for the truth of the matter, unless the other person is subject to cross-examination.**
>
> The trial court admitted a voluminous amount of what has typically has been referred to as hearsay testimony. At one point the trial judge aptly observed that there was so much hearsay coming in that "I'm losing track." (Tr. 1245). Direct appeal counsel failed to raise all of the examples of the trial court's improper admission of hearsay. Leonard's right to confrontation was violated when all of the admissible testimony is viewed in its entirety. *Crawford v. Washington*, 541 U.S. 36 (2004); U.S. Const. amends. XVI; XIV; Ohio Const. art I,§§ 1, 9, 10, 16, and 20.
>
> The trial court improperly admitted the statements of Leonard to Alvie Woods (Tr. 1159, 1162) including the threat to "kill" somebody if he caught Dawn "fooling around on him." (Tr. 1162). The court committed the same error when it permitted the testimony of Penny McBride concerning statements that Leonard had made to her (Tr. 1268, 1269, 1276, 1278, 1280-1283, 1287). Most of these statements had nothing to do with the offense. Finally the court erred when it admitted the testimony of Deborah

42

> Schroeder concerning the conversation that Leonard had with the victim at the restaurant on the evening of the homicide (Tr. 1176) as well as the testimony of Lea Ketter concerning Leonard's telephone calls to the restaurant repeatedly that evening. (Tr. 1215).
>
> In *Crawford, supra,* the United States Supreme Court held that "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id*. at 1374. The trial court's admission of the above testimony violated the Sixth Amendment right to confrontation.

(Apx. Vol. 5, at 141-142.) The Ohio Supreme Court denied reopening without opinion. *State v. Leonard*, 106 Ohio St. 3d 1407 (2005).

As to the claims first presented in the Application for Reopening, they are procedurally defaulted by failure to present them on direct appeal unless that default is excused by ineffective assistance of appellate counsel. Leonard presented that claim to the Ohio Supreme Court which did not render a reasoned opinion. Thus the claim of ineffective assistance of appellate counsel is preserved for this Court to consider as a basis for finding cause and prejudice to excuse omission of those claims on direct appeal.

The only argument Leonard makes for that claim is that "[d]irect appeal counsel failed to raise all of the examples of the trial court's improper admission of hearsay. Leonard's right to confrontation was violated when all of the admissible [sic] testimony is viewed in its entirety. *Crawford v. Washington*, 541 U.S. 36 (2004)." (Traverse, Doc. No. 17, PageID 362.) Although Leonard repeats a good deal of boilerplate law on ineffective assistance of appellate counsel claims, he does not offer any application of that law to these particular omitted hearsay claims.

The governing standard for ineffective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668 (1984):

> A convicted defendant's claim that counsel's assistance was so

43

defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687.

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

Judicial scrutiny of counsel's performance must be highly deferential. . . .  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance;  that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689.

As to the second prong, the Supreme Court held:

The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to overcome confidence in the outcome.

466 U.S. at 694.  *See also Darden v. Wainwright*, 477 U.S. 168 (1986); *Wong v. Money,* 142

F.3d 313, 319 (6th Cir. 1998); *Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987).  *See generally*

Annotation, 26 ALR Fed 218.

The *Strickland* test applies to appellate counsel.  *Smith v. Robbins*, 528 U.S. 259, 285

44

(2000); *Burger v. Kemp,* 483 U.S. 776 (1987). To evaluate a claim of ineffective assistance of appellate counsel, then, the court must assess the strength of the claim that counsel failed to raise. *Henness v. Bagley*, 644 F.3d 308 (6th Cir. 2011), citing *Wilson v. Parker*, 515 F.3d 682, 707 (6th Cir. 2008). Counsel's failure to raise an issue on appeal amounts to ineffective assistance only if a reasonable probability exists that inclusion of the issue would have changed the result of the appeal. *Id*. *citing Wilson.* If a reasonable probability exists that the defendant would have prevailed had the claim been raised on appeal, the court still must consider whether the claim's merit was so compelling that the failure to raise it amounted to ineffective assistance of appellate counsel. *Id. citing Wilson.* The attorney need not advance every argument, regardless of merit, urged by the appellant. *Jones v. Barnes*, 463 U.S. 745, 751-752 (1983)("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." 463 U.S. 751-52). Effective appellate advocacy is rarely characterized by presenting every non-frivolous argument which can be made. *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003). *Williams v. Bagley,* 380 F.3d 932, 971 (6th Cir. 2004), *cert. denied,* 544 U.S. 1003 (2005); see *Smith v. Murray*, 477 U.S. 527 (1986).

The Magistrate Judge finds Leonard's ineffective-assistance-of-appellate-counsel-as-cause argument to be unpersuasive. Testimony by Alvie Woods, Penny McBride and Deborah Schroeder about statements Leonard made to them were admissible under an exception to the definition of hearsay as admissions of a party opponent. Ohio R. Evid. 801(D)(2). Whether party admissions are considered non-hearsay or an exception to the hearsay rule, their admissibility is firmly rooted and therefore no violation of the Confrontation Clause. Because Leonard's statements were admissible in evidence despite the hearsay rule, it was not error to

admit them and not ineffective assistance of appellate counsel to fail to claim such error. Therefore Leonard has not excused his procedural default in failing to present those claims on direct appeal.

Ground Two for Relief should be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, Leonard should be denied a certificate of appealability on these claims.

## Ground Three: Suppression of Confession

In his Third Ground for Relief, Leonard asserts his Fifth and Fourteenth Amendment rights were violated when his confession to police was not suppressed. For argument on this claim, Leonard relies on his Traverse (Final Brief, Doc. No. 39, PageID 944).

Leonard presented this claim to the Ohio Supreme Court on direct appeal as Proposition of Law No. 5. That court decided the claim as follows:

### B. Voluntariness of Confession

[**P31] Leonard claims in proposition of law five that the trial court erred in failing to suppress his confession. Leonard contends that his waiver of his rights and his confession to police were not knowing, intelligent, and voluntary because, at the time, he was "suicidal, heartbroken, and exhausted."

[**P32] In determining whether a pretrial statement is voluntary, a court "'should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.'" *State v. Mason,* 82 Ohio St.3d at 154, 694 N.E.2d 932, quoting *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus. The same considerations apply to whether a defendant voluntarily, knowingly, and intelligently waived his rights. *State v. Eley*

(1996), 77 Ohio St.3d 174, 178-179, 1996 Ohio 323, 672 N.E.2d 640; *State v. Clark* (1988), 38 Ohio St.3d 252, 261, 527 N.E.2d 844.

[**P33] After Leonard surrendered, Campbell County (Kentucky) officers advised him of his *Miranda* rights. Hamilton County detectives gave a second *Miranda* warning. Leonard waived his rights each time, and he signed a waiver-of-rights form. Leonard now asserts that the trial court erred in admitting his confession into evidence because his emotional instability affected his ability to make a valid waiver and a voluntary confession. Evidence introduced at the suppression hearing indicated that Leonard had killed Flick because he was heartbroken and exhausted and that he had contemplated killing himself after he shot her.

[**P34] However, a defendant's mental condition is only one factor in the totality of circumstances to be considered in determining voluntariness. A defendant's mental condition may be a "significant factor in the 'voluntariness' calculus. But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" (Citation omitted.) *Colorado v. Connelly* (1986), 479 U.S. 157, 164, 107 S. Ct. 515, 93 L. Ed. 2d 473. Issues of voluntariness have always turned on the presence or absence of police coercion or overreaching. *Id.* at 170, 107 S.Ct. 515, 93 L. Ed. 2d 473. See, also, *State v. Eley,* 77 Ohio St.3d at 178, 672 N.E.2d 640.

[**P35] We have reviewed the suppression-hearing transcript and find no evidence suggesting that Leonard's "will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct." See *State v. Otte* (1996), 74 Ohio St.3d 555, 562, 1996 Ohio 108, 660 N.E.2d 711; *Colorado v. Connelly,* 479 U.S. at 167, 107 S.Ct. 515, 93 L. Ed. 2d 473. No threats or inducements were made, and both Campbell County and Hamilton County police officers conducted themselves with professionalism. After he was taken into custody, Leonard was cooperative and calm. According to Sergeant Chaplin, Leonard's friend of eight years, Leonard "appeared normal, like nothing was bothering him."

[**P36] Although Leonard claimed that one of the reasons he had killed Flick was his lack of sleep, he did not appear to police to be tired. Cf., *State v. Tibbetts,* 92 Ohio St.3d at 154-155, 749 N.E.2d 226 (claim of grogginess from medication did not render defendant's statements involuntary). Leonard did not appear to be

under the influence of alcohol or drugs. Hamilton County detectives interviewed Leonard for approximately one hour, and during questioning, Leonard was offered water and cigarettes.

[**P37] Based on the totality of the circumstances, we have determined that Leonard's confession was knowing, voluntary, and intelligent and was admissible. See *State v. Eley,* 77 Ohio St.3d at 178-179, 672 N.E.2d 640; *State v. Clark,* 38 Ohio St.3d at 261, 527 N.E.2d 844; *State v. Edwards,* 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus. Therefore, we overrule Leonard's fifth proposition of law.

*State v. Leonard*, 104 Ohio St. 3d 54, ¶¶ 31-37 (2004). Leonard asserts these conclusions are both an unreasonable application of clearly established federal law and based on an unreasonable determination of the facts in light of the evidence presented. (Traverse, Doc. No. 17, PageID 376.)

The trial court heard testimony on the motion to suppress. First to appear was Sergeant Nick Chaplin of the Campbell County, Kentucky, Sheriff's Office (Trial Tr. Vol. 1, p. 55). He had known Leonard for approximately eight years and they had become friends through shoeing horses together. *Id.* at 56. Leonard called him at about 4:00 A.M. on July 29, 2000. *Id.* at 56-57. After identifying himself and without any prompting, he told Chaplin "he was in trouble, that he had just shot Dawn." *Id.* at 57. Leonard knew Chaplin was a sergeant with the Campbell County Sheriff's Office. *Id.* Chaplin asked if Dawn was all right and Leonard responded that she was dead. *Id.* at 58. Leonard sounded a "little bit distressed, distraught but not really." *Id.* Without being asked why he shot her, Leonard told Chaplin "[s]he broke my heart." *Id.* at 59. Leonard said he called because he was in trouble and needed some advice. *Id.* at 60. Although Chaplin told him to turn himself in to local authorities, Leonard insisted on turning himself in to Chaplin. *Id.* at 61.

Leonard and Chaplin then drove to the location Chaplin had suggested. *Id.* at 62. In

response to Chaplin's question about where the gun was, Leonard said it was on the dashboard. *Id.* at 63.  Leonard was handcuffed by Lieutenant Dave Fickenscher from Campbell County and read his *Miranda* rights.  *Id.* at 64.  When they got to the police station, Leonard kept saying "she broke [my] heart."  *Id.* at 67.  In the interrogation room it did not appear to Chaplin that Leonard was drunk or sleepy.  *Id.* at 68.  Chaplin did not want to talk to Leonard and advised him that anything he said, Chaplin would have to testify to and turn over to the Hamilton County authorities.  *Id.*  When he first talked to Chaplin, Leonard asked if he should "finish it," which Chaplin took to mean committing suicide.  *Id.* at 70.

The second witness was Detective Ken Schweinefus from Hamilton County.  *Id.* at 87. He sat down with Leonard about 6:53 A.M., the time he wrote on the rights advisement form. *Id.* at 89.  Leonard signed the waiver immediately.  *Id.* at 91.  He appeared to be calm and never raised or lowered his voice.  *Id.* at 92.  He gave no appearance of being sleepy or under the influence of drugs or alcohol.  *Id.* at 93.  The interview was recorded.  *Id.* At some point he told Schweinefuss that he had not slept.  *Id.* at 108.

In response to this testimony, Leonard presented no evidence.  Judge Schweikert proceeded to orally deny the motion to suppress, finding that Leonard's first statements to Chaplin over the telephone were completely volunteered and that proper advice and waiver of rights happened before any interrogation.  *Id.* at pp. 119-120.

In arguing the merits of this claim, Leonard does not suggest which Supreme Court precedent he contends was unreasonably applied by the Ohio Supreme Court.  They note that the Supreme Court has adopted a totality of the circumstances test (Traverse, Doc. No. 17, PageID 378, *citing Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)).  Factors to be considered include (1) police coercion; (2) length of interrogation; (3) location of interrogation; (4) continuity of

interrogation; (5) the suspect's maturity; (6) the suspect's education; (7) the suspect's physical condition and mental health; and (8) whether the suspect was advised of *Miranda* rights. *Id. citing Withrow v. Williams*, 507 U.S. 680, 693-94 (1993). Other Court precedent suggests a trial judge should consider the defendant's age, his character, his previous experiences with police, his record as to former crimes, his education, background, his mental capacity, and his emotional stability or instability, as well as the state of his health. *Id. citing Chambers v. Florida*, 309 U.S. 227, 290 (1940); and *Harris v. South Carolina,* 338 U.S. 68, 71 (1949). Applying a totality of the circumstances test with the mentioned factors in mind, the Court notes that there was no evidence of any police coercion at all – Leonard called Chaplin, confessed to shooting Flick, then turned himself in. The interrogation took less than an hour and happened in one session. Judge Schweikert heard no evidence about Leonard's education or any prior experience with the police. There was no indication he was in poor physical health and he was not being interrogated after a forceful arrest. He was advised of his *Miranda* rights before being questioned. While he was upset to the point of asking Chaplin if he should commit suicide, he apparently became calm once he confessed and turned himself in. Given the evidence before him, Judge Schweikert appropriately determined that the confession was knowing, intelligent, and voluntary. Indeed, if this confession was not voluntary under the law, it would be hard to imagine an admissible confession by a violent first offender.

The question of whether a confession is knowing, intelligent, and voluntary is a mixed question of law and fact. *United States v. Gaudin,* 515 U.S. 506 (1995)(Rehnquist, C.J., concurring. The decision of the Ohio Supreme Court, implicitly accepting Judge Schweikert's weighing of the credibility of Chaplin and Schweinefus, is neither an objectively unreasonable application of cited Supreme Court precedent nor based on a clearly erroneous determination of

the facts.

Ground Three for Relief is without merit and should be dismissed on that basis. Because reasonable jurists would not disagree with this conclusion, Leonard should be denied a certificate of appealability on this Ground.

### Ground Four:  Insufficient Funds

In his Fourth Ground for Relief, Leonard asserts his Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated when he was not provided sufficient funds with which to defend himself. For argument on this Ground, Leonard relies on his Traverse (Final Brief, Doc. No. 39, PageID 944).

This claim was presented to the Ohio Supreme Court as Proposition of Law No. 1 which the court decided as follows:

> A. Failure to Fund or Appoint Defense Experts
>
> [**P25] In his first proposition of law, Leonard alleges that a lack of funds prevented defense counsel from hiring an investigator, a coroner, a crime-scene investigator, and an expert on sexual abuse or rape. In his eighth proposition of law, Leonard claims that his death sentence must be reversed because a pathologist was not provided to assist trial counsel in either the guilt-determination or penalty phase.
>
> [**P26] R.C. 2929.024 requires the trial court to grant funds in aggravated murder cases for investigative services and experts when "reasonably necessary for the proper representation" of indigent defendants. In State v. Mason (1998), 82 Ohio St.3d 144, 1998 Ohio 370, 694 N.E.2d 932, syllabus, we held that due process "requires that an indigent criminal defendant be provided funds to obtain expert assistance at state expense only where the trial court finds, in the exercise of a sound discretion, that the defendant has made a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense and (2) that denial of the requested expert assistance would result in an unfair trial. (State v. Broom [1988], 40 Ohio St.3d 277, 533 N.E.2d 682,

approved and followed.)" See, also, *Ake v. Oklahoma* (1985), 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53.

[**P27] In this case, Leonard retained private counsel. Nevertheless, on the defense's motion, the trial court declared Leonard indigent and indicated before trial that it would consider any defense request for funds. However, Leonard did not request funding for any of the experts that he now claims were necessary to his defense. In fact, Leonard's trial counsel informed the court that defense experts were not necessary. We need not consider an error that a defendant neglected to bring to the trial court's attention. See *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus. Thus, any error is cognizable only if it amounts to plain error. Crim.R. 52(B).

[**P28] Leonard offers only a conclusory argument that he was prejudiced by a lack of funds. In this case, however, the time, place, and cause of death are not in dispute, and Leonard does not explain how the failure to provide an investigator, a coroner, and a crime-scene investigator would have aided his defense. See, e.g., *State v. Nields* (2001), 93 Ohio St.3d 6, 12, 2001 Ohio 1291, 752 N.E.2d 859. While the defense did vigorously contest the rape charge, it is unclear what value a sexual-abuse or rape expert would have been to the defense. No semen was found at the crime scene, the coroner did not detect vaginal or anal trauma to Flick, and Leonard was found not guilty of rape.

[**P29] Moreover, we find that the evidence supported Leonard's attempted-rape conviction. Flick's body was found in her living room, partially nude and handcuffed. Leonard told police that he had begun to have sex with Flick before shooting her. Thus, Leonard has failed to show a particularized need for these experts or that the failure to employ defense experts denied him a fair trial. Cf. *State v. Mason,* 82 Ohio St.3d at 152, 694 N.E.2d 932; *State v. Clemons* (1998), 82 Ohio St.3d 438, 443, 1998 Ohio 406, 696 N.E.2d 1009.

[**P30] Similarly, we conclude that Leonard has not established a particularized need for an independent pathologist, nor has he shown how the lack of such an expert hindered his defense. Leonard asserts that an independent pathologist was necessary to conduct an independent investigation and testing and to contest the "coroner's methodology and findings in regard to the cause, manner, and timing of death, especially the allegations of strangulation by the State." But the cause, manner, and time of

death are not in dispute. Although defense counsel challenged the
coroner's conclusion that Flick was strangled, strangulation was
not the cause of death, and Leonard offers no explanation of how
expert testimony on this issue would have aided his defense. See,
e.g., *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 151, 2001 Ohio
132, 749 N.E.2d 226. Moreover, the record indicates that the
coroner performed the autopsy in a competent and professional
manner and thoroughly documented his findings. See, e.g., *State v.
Nields,* 93 Ohio St.3d at 12, 752 N.E.2d 859. Because no error
occurred, plain or otherwise, Leonard's first and eighth
propositions of law are overruled.

*State v. Leonard*, 104 Ohio St. 3d 54, ¶¶ 25-30 (2004).

The State contends this Ground for Relief is procedurally defaulted. The procedural

default defense in habeas corpus is described by the Supreme Court as follows:

In all cases in which a state prisoner has defaulted
his federal claims in state court pursuant to an
adequate and independent state procedural rule,
federal habeas review of the claims is barred unless
the prisoner can demonstrate cause of the default
and actual prejudice as a result of the alleged
violation of federal law; or demonstrate that failure
to consider the claims will result in a fundamental
miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Simpson v. Jones,* 238 F.3d 399, 406

(6th Cir. 2000). That is, a petitioner may not raise on federal habeas a federal constitutional right

he could not raise in state court because of procedural default. *Wainwright v. Sykes*, 433 U.S. 72

(1977); *Engle v. Isaac*, 456 U.S. 107, 110 (1982). Absent cause and prejudice, a federal habeas

petitioner who fails to comply with a State's rules of procedure waives his right to federal habeas

corpus review. *Boyle v. Million*, 201 F.3d 711, 716 (6th Cir. 2000)(citation omitted); *Murray v.

Carrier*, 477 U.S. 478, 485 (1986); *Engle*, 456 U.S. at 110; *Wainwright,* 433 U.S. at 87.

*Wainwright* replaced the "deliberate bypass" standard of *Fay v. Noia,* 372 U.S. 391 (1963).

*Coleman,* 501 U.S. at 724.

53

The Sixth Circuit Court of Appeals requires a four-part analysis when the State alleges a habeas claim is precluded by procedural default. *Guilmette v. Howes,* 624 F.3d 286, 290 (6th Cir. 2010)(*en banc*); *Eley v. Bagley*, 604 F.3d 958, 965 (6th Cir.), *cert. denied sub nom, Eley v. Hauk,* __ U.S. __, 131 S.Ct. 822 (2010); *Reynolds v. Berry*, 146 F.3d 345, 347-48 (6th Cir. 1998), *citing Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *accord Lott v. Coyle*, 261 F.3d 594, 601-02 (6th Cir. 2001); *Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001).

> First the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.
>
> . . . .
>
> Second, the court must decide whether the state courts actually enforced the state procedural sanction, citing *County Court of Ulster County v. Allen*, 442 U.S. 140, 149, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).
>
> Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.
>
> Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate under *Sykes* that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

Ohio has a relevant procedural rule, the contemporaneous objection rule, which requires that issues be brought to the attention of the trial court when they can be remedied. *State v. Glaros*, 170 Ohio St. 471 (1960), paragraph one of the syllabus; *see also State v. Mason*, 82 Ohio St. 3d 144, 162 (1998). That rule was plainly enforced by the Ohio Supreme Court in this case. *See Leonard, supra*, ¶ 27. Because there had been no request to the trial court for expert funds, the Ohio Supreme Court reviewed the purported denial of such funds only for plain error. But

under Ohio law, review for plain error is an enforcement of the violated procedural rule. Reservation of authority to review in exceptional circumstances for plain error is not sufficient to constitute application of federal law. *Cooey v. Coyle,* 289 F.3d 882, 897 (6th Cir. 2002); *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000). A state appellate court's review for plain error is enforcement, not waiver, of a procedural default. *Wogenstahl v. Mitchell*, 668 F.3d 307, 337 (6th Cir. 2012); *Jells v. Mitchell,* 538 F.3d 478, 511 (6th Cir. 2008); *Lundgren v. Mitchell,* 440 F.3d 754, 765 (6th Cir. 2006); *White v. Mitchell,* 431 F.3d 517, 525 (6th Cir. 2005); *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005); *Hinkle v. Randle,* 271 F.3d 239 (6th Cir. 2001), *citing Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000)(plain error review does not constitute a waiver of procedural default); *accord, Mason v. Mitchell,* 320 F.3d 604 (6th Cir. 2003).

The Sixth Circuit has repeatedly held that Ohio's contemporaneous objection rule is an adequate and independent state ground of decision. *Wogenstahl v. Mitchell*, 668 F.3d 307, 334 (6th Cir. 2012), (citing *Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006); *Nields v. Bradshaw*, 482 F.3d 442 (6th Cir. 2007); *Biros v. Bagley,* 422 F.3d 379, 387 (6th Cir. 2005); *Mason v. Mitchell*, 320 F.3d 604 (6th Cir. 2003), *citing Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000), *citing Engle v. Isaac,* 456 U.S. 107, 124-29 (1982). *See also Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000); *Goodwin v. Johnson*, 632 F.3d 301, 315 (6th Cir. 2011); *Smith v. Bradshaw*, 591 F.3d 517, 522 (6th Cir.), *cert. denied*, 131 S. Ct. 185 (2010).

In an effort to show excusing cause and prejudice, Leonard claims his attorney was ineffective, but all he says is the attorney did not hire a pathologist or a crime scene investigator (Traverse, Doc. No. 17, PageID 381-382.) There is no showing of prejudice by demonstrating what any such expert would have found or how he or she would have helped Leonard's case.

Ground Four should be dismissed with prejudice as procedurally defaulted.

## Ground Five:  Gruesome Photographs

In his Fifth Ground for Relief, Leonard asserts he was denied a fair trial by the admission of "gruesome and otherwise prejudicial photographs."  Leonard relies for argument on his Traverse (Final Brief, Doc. No. 39, PageID 944.)  The Ohio Supreme Court decided this claim as follows:

### B. Gruesome Photographs

[**P84] In the 12th proposition of law, Leonard contends that the trial court erred by admitting into evidence gruesome and cumulative photographs of the victim. Leonard's pretrial motion in limine to preclude admission of photographs of the victim was overruled, as were counsel's objections at trial.

[**P85] In capital cases, nonrepetitive photographs, even if gruesome, are admissible as long as the probative value of each photograph outweighs the danger of material prejudice to the accused. *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus ; *State v. Morales* (1987), 32 Ohio St.3d 252, 257, 513 N.E.2d 267. Decisions on the admissibility of photographs are "left to the sound discretion of the trial court." *State v. Slagle* (1992), 65 Ohio St.3d 597, 601, 605 N.E.2d 916.

[**P86] Leonard challenges the admission of five crime-scene photographs. These photos illustrated the testimony of the police officers who discovered Flick's body and illustrated the crime scene and the body's condition. See, e.g., *State v. Hughbanks,* 99 Ohio St. 3d 365, 2003 Ohio 4121, at P72, 792 N.E.2d 1081.

[**P87] None of these photos is duplicative or cumulative. Each depicts a different view or angle of the victim's body and her injuries. State's Exhibit 1-E is a partial view of Flick's body as first seen by police looking through a window from outside her house. State's Exhibit 1-I shows a full view of Flick's body and depicts how the body was positioned in the home. State's Exhibit 1-J

shows Flick with her panties at midthigh, with one pant leg down around her calf and the other pant leg completely off. State's Exhibit 1-K depicts bruising on her thighs. State's Exhibit 1-L shows that Flick was handcuffed. These photos, although gruesome, were probative of issues of intent, premeditation, and the manner and circumstances of Flick's death, including whether Leonard had attempted to rape her. We determine that the probative value outweighed the danger of unfair prejudice. See, e.g., *State v. Biros* (1997), 78 Ohio St.3d 426, 444-445, 1997 Ohio 204, 678 N.E.2d 891.

[**P88] Leonard also objected to 11 autopsy photographs, claiming that they are gruesome and repetitive. Autopsy photos serve a purpose different from the crime-scene photographs. See *State v. Reynolds* (1998), 80 Ohio St.3d 670, 676-677, 1998 Ohio 171, 687 N.E.2d 1358. Two photos showed the three gunshot wounds to the head from different angles. These photos illustrated the coroner's testimony and helped show Leonard's intent. The coroner also used autopsy photos in his testimony to explain injuries to Flick's neck and wrists. State's Exhibits 20-K, J, and I are different angles of Flick's right hand and wrist, portraying bruising that corresponds to the handcuffs that had been on her wrists. State's Exhibit 20-H portrays similar bruising to the left wrist. State's Exhibit 20-G depicts Flick's face and shows petechiae, small reddish marks indicating ruptured blood vessels that are caused by compression to the neck. State's Exhibit 20-D demonstrates ligature bruising on the neck caused by Flick's necklace. This photo also shows more petechiae around the neck and stippling, an injury to the skin caused by unburned particles of gunpowder. State's Exhibit 20-B is a close-up of the ligature mark on the neck. These photos supported the coroner's conclusions that Flick had been strangled and had struggled while handcuffed. Finally, State's Exhibit 20-E demonstrates a gunshot injury to Flick's left index finger, and 20-F shows a gunshot wound to the lower lip and also illustrates stippling. None of the autopsy photos were duplicative or cumulative, and the value of each photo outweighed any prejudicial impact. Thus, we conclude that no abuse of discretion occurred in admitting the photos.

*State v. Leonard*, 104 Ohio St. 3d 54, ¶¶ 84-88 (2004).[13]

---

[13] Proposition of Law No. 12 in the Ohio Supreme Court includes complaints about display of photographs on a large television screen and use of photographs in closing argument. No contemporaneous objection was made and the Ohio Supreme Court conducted plain error review. It does not appear from the wording of this Ground for Relief that Leonard intends to present these latter claims in habeas. If he did, they would be procedurally defaulted on the same basis as Ground for Relief Four.

Leonard argues in conclusory fashion that the factual determinations in this decision are unreasonable in light of the evidence and the legal conclusions are objectively unreasonable. However, the entire argument is made in one sentence and presents no analysis whatsoever (Traverse, Doc No. 17, PageID 391). Which of the factual determinations is clearly erroneous? On the basis of what evidence which was before the Ohio Supreme Court? What United States Supreme Court precedent has been unreasonably applied?[14]

The Ohio Supreme Court supports its decision by referring to specific aspects of the photographs, showing that evidence was carefully weighed for its probative value.

Leonard has failed to demonstrate any merit in his Fifth Ground for Relief which should therefore be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, Leonard should be denied a certificate of appealability.

## Ground Six: Lack of a Complete Record

In his Sixth Ground for Relief, Leonard claims his right to a fair trial was violated when the trial court failed to maintain a complete record of all proceedings. Leonard relies for argument on his Traverse (Final Brief, Doc. No. 39, PageID 944.) The Ohio Supreme Court decided this claim as follows:

### A. Incomplete Record

[**P182] Leonard contends in proposition 14 that his conviction and sentence must be reversed because the trial court failed to maintain a complete record of all proceedings as prescribed by Crim.R. 22. Off-the-record conferences were held during the proceedings. However, Leonard failed to object or ask that these conferences be recorded and has waived this issue. *State v. Brewer*

---

[14] For an illustration of how pure conclusory statements do not constitute an argument, see The Argument Sketch from the 29th episode of Monty Python's Flying Circus.

(1990), 48 Ohio St.3d 50, 60-61, 549 N.E.2d 491; *State v. Grant* (1993), 67 Ohio St.3d 465, 481, 1993 Ohio 171, 620 N.E.2d 50.

[**P183] "The requirement of a complete, full, and unabridged transcript in capital trials does not mean that the trial record must be perfect for purposes of appellate review." *State v. Palmer* (1997), 80 Ohio St.3d 543, 1997 Ohio 312, 687 N.E.2d 685, syllabus. Moreover, a reversal will not occur as a result of unrecorded proceedings when the defendant failed to object and fails to demonstrate material prejudice. *Id.* at 554, 687 N.E.2d 685. See, also, *State v. Goodwin* (1999), 84 Ohio St.3d 331, 340, 1999 Ohio 356, 703 N.E.2d 1251.

[**P184] Leonard speculates that crucial rulings were made during these unrecorded conferences. Significantly, appellate counsel failed to invoke the procedures of App.R. 9(C) or 9(E) to reconstruct the off-the-record conferences or to establish their importance. In fact, the subjects discussed during many of these unrecorded conferences are clear from the transcript, and it is clear that they were not crucial. As to the remaining unrecorded conferences identified under this proposition, Leonard has not shown, nor does the record reveal, that these conferences concerned matters vital to appellate review. See, e.g., *State v. Brewer,* 48 Ohio St.3d at 60-61, 549 N.E.2d 491; *State v. Nields,* 93 Ohio St.3d at 26-27, 752 N.E.2d 859. Accordingly, we overrule proposition of law 14.

*State v. Leonard*, 104 Ohio St. 3d 54, ¶¶182-184 (2004).

Leonard argued this claim in the Ohio Supreme Court largely in terms of the Ohio law requiring a complete record in capital cases, Ohio Revised Code § 2929.03(G) and Ohio R. Crim. P. 22.  Most of the federal case law cited interprets the federal statute requiring complete recording in serious criminal cases;  none of those statutes purport to impose any such requirement on the state courts.  Leonard did not cite to the Ohio Supreme Court nor does he cite to this Court any Supreme Court precedent holding that a state conviction, even a capital conviction, can be overturned on the basis that the trial court record is incomplete.  The closest Leonard comes is Justice Marshall's dissent from denial of certiorari in *Arnold v. South Carolina*, 467 U.S. 1265 (1984), and his argument is mostly directed to the exclusion of counsel

59

from a jury view.

Aside from the absence of any Supreme Court precedent clearly establishing the right to habeas relief in the absence of a complete record, this claim is also procedurally defaulted.  As the Ohio Supreme Court notes, trial counsel made no contemporaneous objection to the conduct of some proceedings without their being recorded.  *Leonard, supra,* ¶ 183.

Leonard's Sixth Ground for Relief should be dismissed with prejudice.  Because reasonable jurists would not disagree with this conclusion, he should be denied a certificate of appealability.

### Ground Seven:  Guilt Phase Jury Instruction Error

In his Seventh Ground for Relief, Leonard asserts the trial court made numerous errors in the guilt phase instructions to the jury.  Leonard relies for argument on his Traverse (Final Brief, Doc. No. 39, PageID 944.)  This claim was presented as Proposition of law No. 25 to the Ohio Supreme Court which decided it as follows:

### E. Guilt-Determination-Phase Jury Instructions

[**P115] Leonard contends in proposition of law 25 that the trial court committed numerous errors in instructing the jury during the guilt-determination phase. Leonard first argues that the trial court improperly included an instruction on attempted rape. He also contends that the trial court "expanded the definition of the term 'attempt' from the definition listed in Ohio Revised Code § 2923.01(A) [sic, 2923.02]. " Defense counsel objected to both instructions. However, we find that no error occurred.

[**P116] Attempted rape is a lesser included offense of rape, and the evidence at trial supported the trial court's decision to instruct on that offense. See *State v. Williams,* 74 Ohio St.3d at 578, 660 N.E.2d 724. See, also, *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus. Also, the trial court

did not erroneously expand the definition of "attempt" set forth in R.C. 2923.02. The trial court's definition substantially conformed to the definition of "attempt" set forth in *State v. Green* (1991), 58 Ohio St.3d 239, 240, 569 N.E.2d 1038. See, also, *State v. Woods* (1976), 48 Ohio St.2d 127, 2 O.O.3d 289, 357 N.E.2d 1059, paragraph one of the syllabus (construing R.C. 2923.02[A]), which was cited with approval in *Green.*

[**P117] Leonard next challenges the trial court's instruction on reasonable doubt. The reasonable-doubt instruction in the guilt-determination phase was in accord with R.C. 2901.05(D), and we have previously rejected complaints against the statutory definition. See, e.g., *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 232, 1992 Ohio 108, 594 N.E.2d 604; *State v. Getsy,* 84 Ohio St.3d at 202, 702 N.E.2d 866.

[**P118] Leonard also argues that the trial court erred in its instructions on causation and prior calculation and design, but Leonard failed to object to these instructions at trial. No error, plain or otherwise, occurred. See *State v. Gross,* 97 Ohio St. 3d 121, 2002 Ohio 5524, P97-99, 776 N.E.2d 1061 (in which a substantially identical causation instruction was upheld); *State v. Jones* (2001), 91 Ohio St.3d 335, 348, 2001 Ohio 57, 744 N.E.2d 1163 (in which a similar prior-calculation-and-design instruction was upheld).

[**P119] Leonard's claim that the trial court instructed the jury "on making an inference based on an inference" is not supported by the record. He also asserts that the trial court's instruction that "a good motive is not a defense" negated the court's instruction on purpose. But the trial court instructed the jury that while proof of motive is not required, "the presence or absence of motive is one of the circumstances bearing upon purpose." A single jury instruction may not be judged in artificial isolation but must be viewed in the context of the overall charge. *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772, paragraph four of the syllabus. Leonard failed to object to the trial court's "good motive" instruction, and plain error has not been shown. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

[**P120] We also reject Leonard's argument that the trial court's "purpose" instruction, which is a standard instruction, created a mandatory rebuttable presumption. See *State v. Phillips* (1995), 74 Ohio St.3d 72, 100, 1995 Ohio 171, 656 N.E.2d 643; *State v. Wilson,* 74 Ohio St.3d at 392, 659 N.E.2d 292.

[**P121] Finally, Leonard asserts that the jury was instructed during the guilt-determination phase "as to how they would reach the mitigation phase of the case," but he does not explain how he was prejudiced. To the extent that Leonard contends that the trial court improperly injected the issue of punishment into the guilt-determination phase, we rejected similar arguments in *State v. Phillips,* 74 Ohio St.3d at 100-101, 656 N.E.2d 643, and *State v. Durr,* 58 Ohio St.3d at 90, 568 N.E.2d 674. Cf. R.C. 2929.03(B) ("The instruction to the jury shall * * * not mention the penalty that may be the consequence of a guilty or not guilty verdict on any charge or specification"). Accordingly, Leonard's 25th proposition of law is overruled.

*State v. Leonard*, 104 Ohio St. 3d 54, ¶¶ 115-121 (2004).

In general, in order for habeas relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than that the instructions are undesirable, erroneous, or universally condemned; taken as a whole they must be so infirm that they rendered the entire trial fundamentally unfair. *Henderson v. Kibbe,* 431 U.S. 145 (1977). The only question for a habeas court to consider is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62 (1991) quoting *Cupp v. Naughten*, 414 U.S. 141 (1973). The category of infractions that violate fundamental fairness is very narrow. *Byrd v. Collins*, 209 F.3d 486 (6th Cir. 2000), citing *Dowling v. United States*, 493 U.S. 342, 352 (1990). The proper standard for reviewing claims that allegedly ambiguous instructions caused jury confusion is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Jones v. United States,* 527 U.S. 373 (1999), citing *Estelle v. McGuire,* 502 U.S. 62 (1991), and *Victor v. Nebraska*, 511 U.S. 1 (1994).

Turning to specifics, Leonard's first claim is that the trial court improperly instructed on attempted rape when the only lesser included offense under Ohio law would be gross sexual

imposition.[15]   His second claim is that the trial judge improperly expanded the definition of "attempt" beyond that in Ohio Revised Code § 2923.01(A).  The Ohio Supreme Court answered these challenges squarely by holding that attempted rape was a proper lesser included offense on which to instruct in this case and that the definition of attempt substantially conformed to Ohio case law.

Federal habeas corpus is available only to correct federal constitutional violations.  28 U.S.C. §2254(a); *Wilson v. Corcoran,* 562 U.S. ___, 131 S. Ct. 13; 178 L. Ed. 2d 276 (2010)*; Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Smith v. Phillips*, 455 U.S. 209 (1982), *Barclay v. Florida,* 463 U.S. 939 (1983).   "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

The question whether attempted rape is a lesser included offense of rape in Ohio is solely a question of state law on which we are unauthorized to disturb the state courts' conclusion.

Leonard's third claim is that the instruction on reasonable doubt lowered the standard of proof to clear and convincing evidence and the use of the term "moral evidence" "improperly shifted the focus of the jury to the subjective morality of the defendant rather than the required legal proof."  (Traverse, Doc. No. 17, PageID 400), *citing Victor v. Nebraska*, 511 U.S. 1 (1994). The Ohio Supreme Court found the instruction complied with the required instruction on reasonable doubt commanded by Ohio Revised Code § 2901.05(D).

The instruction on reasonable doubt given by Judge Schweikert is as follows:

---

[15] Leonard's record citations on this Ground for Relief are completely erroneous.  For the two attempt claims, he cites to "Tr. Vol. 13, p. 1606-08." (Traverse, Doc. No. 17, PageID 399.)  The jury instructions actually begin at Trial Tr. Vol. 11 at. 1695.

> Reasonable doubt is present when, after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced of the truth of the charge.  It is a doubt based on reason and common sense.  Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt.  Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs.
>
> If after a full and impartial consideration of all the evidence, you are firmly convinced of the truth of the charge, the State has proved its case beyond a reasonable doubt.  If you are not firmly convinced of the truth of the charge, you must find the defendant not guilty.

(Trial Tr., Vol. 11 at1695-1696.)  Leonard points to no United States Supreme Court decision holding that any part of this instruction is unconstitutional.  In *Thomas v. Arn,* 704 F.2d 865 (6th Cir. 1983), it was held that the "willing to act" language in the Ohio statute was constitutional against same challenge made here. *Accord, Buell v. Mitchell,* 274 F.3d 337 (6th Cir. 2001); *Byrd v. Collins,* 209 F.3d 486  (6th Cir. 2000); *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000).  *Harris v. Bowersox,* 184 F.3d 744, 751 (8th Cir. 1999), endorses the "firmly convinced" language which is found in Pattern Criminal Jury Instructions from the Federal Judicial Center and endorsed by Justice Ginsburg in her concurrence in *Victor v. Nebraska, supra.  Accord, Scott v. Anderson*, 58 F. Supp. 2d 767, 807 (N.D. Ohio 1999).  Finally, this Court has rejected the argument that the "willing to act" and "firmly convinced" language in the standard Ohio reasonable doubt instruction are unconstitutional.  *Zuern v. Tate,* 101 F. Supp. 2d 948 (S.D. Ohio 2000), aff'd, on this point by *Zuern v. Tate*, 2003 U.S. App. LEXIS 14331 (6th Cir. 2003).

Leonard's Seventh Ground for Relief is without merit and should be dismissed with prejudice.  Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability on this Ground for Relief.

### Ground Eight – Erroneous Penalty Phase Instructions

In his Eighth Ground for Relief, Leonard claims constitutional error in the penalty phase jury instructions (Traverse, Doc. No. 17, PageID 404).  Leonard's sole argument on this claim is made in the Traverse (Final Brief, Doc. No. 39, PageID 945).

Leonard raised Subclaims B and C on direct appeal as his Fifteenth and Twenty-Sixth Propositions of Law (Traverse, Doc. No. 17, PageID 405).  The Ohio Supreme Court decided those claims as follows:

#### B. Penalty-Phase Instructions

 [**P131]  Leonard contends in proposition of law 15 that the trial court erred by instructing the jury during the penalty phase using the statutory definition of "reasonable doubt" contained in R.C. 2901.05(D). The instruction given in the penalty phase was consistent with the instruction suggested in *State v. Goff* (1998), 82 Ohio St.3d 123, 132, 1998 Ohio 369, 694 N.E.2d 916. Therefore, we overrule Leonard's 15th proposition of law.

 [**P132]  In proposition 26, Leonard challenges the trial court's penalty-phase instructions, including another challenge to the court's reasonable-doubt instruction. We have rejected Leonard's reasonable-doubt-instruction arguments in the discussions relating to propositions of law 25 and 15. We reject Leonard's remaining claims under this proposition of law for the following reasons.

 [**P133]  There was no error in the trial court's instructions regarding imposing a life sentence. A verdict of life imprisonment is required to be unanimous, and that requirement is constitutional. *State v. Davis,* 62 Ohio St.3d at 351, 581 N.E.2d 1362.

 [**P134]  The trial court also did not err by refusing to instruct on specific R.C. 2929.04(B)(7) mitigating factors that defense counsel believed were supported by the evidence. The trial court instructed the jury to consider "any other factors that support a penalty less

than death or lessen the appropriateness of the death penalty" and permitted defense counsel to argue any nonstatutory mitigating factors raised by the evidence. See *State v. Smith* (1997), 80 Ohio St.3d 89, 109-110, 1997 Ohio 355, 684 N.E.2d 668.

[**P135] The trial court's reference to aggravating "circumstances" tracked the language in R.C. 2929.04 and was not error. In addition, an instruction that a recommendation of death is reviewable by the trial court is not reversible error. See *State v. Carter,* 72 Ohio St.3d at 559, 651 N.E.2d 965; *State v. Woodard* (1993), 68 Ohio St.3d 70, 77, 1993 Ohio 241, 623 N.E.2d 75; and R.C. 2929.03(D)(2). Moreover, the trial court instructed the jury that its sentencing recommendation should be made as if it "is absolute and will be carried out." The record also reflects that the trial court correctly identified the single aggravating circumstance for the jury's consideration.

[**P136] Finally, the trial court's instruction prohibiting the jury's consideration of sympathy was proper. *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph three of the syllabus; *State v. Lorraine,* 66 Ohio St.3d at 417-418, 613 N.E.2d 212. For the reasons stated, we overrule proposition of law 26 in its entirety.

*State v. Leonard*, 104 Ohio St. 3d 54, ¶¶ 131-136 (2004).  As noted above with respect to the Seventh Ground for Relief (*supra*, p. 64), the Sixth Circuit has approved Ohio's reasonable doubt instruction, including the "willing to act" language.  Leonard points to no United States Supreme Court precedent to the contrary or requiring different language in a reasonable doubt instruction at the penalty phase of a capital trial.  The Ohio Supreme Court decision on this point is therefore neither contrary to nor an objectively unreasonable application of clearly established federal law.  Subclaim B is without merit.

In Subclaim C, Leonard objects to Judge Schweikert's having told the jury that a life sentence verdict had to be unanimous, but that is the Ohio law and there is no Supreme Court precedent to the contrary.  An instruction to the jury that its verdict recommending life imprisonment must be unanimous is not a violation of Ohio law and thus not a violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985).  *Williams v.  Anderson*, 460 F.3d 789 (6th Cir.

2006), *citing Buell v. Mitchell*, 274 F.3d 337, 356 (6th Cir. 2001). The same is true of defense counsel's request that the trial court instruct on the particular mitigating factors counsel was emphasizing.

Finally, the trial judge refused to instruct the jury that it could consider sympathy. The Ohio Supreme Court cited only state law to the contrary. *Leonard*, 104 Ohio St. 3d at ¶ 136. However, the claim that the standard Ohio instruction to disregard sympathy is unconstitutional was rejected on the basis of *California v. Brown* in *Depew v. Anderson*, C-1-94-459 Report and Recommendations of June 8, 1999, adopted 104 F. Supp. 2d 879 (S.D. Ohio 2000), *aff'd*, 311 F.3d 742 (6th Cir. 2002). *Accord, Byrd v. Collins*, 209 F.3d 486 (6th Cir. 2000); *Mapes v. Coyle*, 171 F.3d 408, 414-15 (6th Cir. 1999); *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000); *Beuke v. Houk*, 537 F.3d 618 (6th Cir. 2008). Leonard's authority on the sympathy instruction is Justice Thurgood Marshall's dissent from denial of certiorari in *Britz v. Illinois*, 489 U.S. 1044, 1045 (1989). However, a dissent from denial of a certiorari petition does not create clearly established Supreme Court law. Subclaim C is without merit.

Subclaim A – that the trial court erred when it left to the jury the legal issue of determining relevance of the evidence with respect to sentencing considerations -- was first presented to the Ohio courts as the Fourth [omitted] Proposition of Law in Leonard's Application for Reopening of his direct appeal (Apx. Vol. 5 at 141). Because this is a claim which could have been raised on direct appeal and was not, it is procedurally defaulted under *State v. Perry*, 10 Ohio St. 2d 175 (1967), unless Leonard can establish excusing cause and prejudice. Ineffective assistance of appellate counsel can constitute excusing cause for omitting a claim on direct appeal, but the ineffective assistance claim cannot be presented as cause if it was procedurally defaulted in the state courts, unless one of the standard excuses for that procedural

default exists, to wit, actual innocence or cause and prejudice.  *Edwards v. Carpenter,* 529 U.S. 446 (2000).   An application for reopening is the proper method for raising an ineffective assistance of appellate counsel claim in Ohio.   However, the Ohio Supreme Court denied the application for reopening.  *State v. Leonard*, 106 Ohio St. 3d 1407 (2006)(Copy at Apx. Vol. 5 at232).   Since the Ohio Supreme Court did not invoke any potential procedural default in denying the Application for Reopening, the Court reads it as a denial on the merits.   "Under §2254(d), a habeas court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Wetzel v. Lambert*, 132 S. Ct. 1195 (2012), quoting *Harrington v. Richter*, 562 U.S. ___, ___ , 131 S. Ct. 770, 778, 178 L. Ed. 2d 624, 632 (2011). The question, then is whether the denial was contrary to or an objectively unreasonable application of clearly established Supreme Court precedent on the issue of ineffective assistance of appellate counsel.

Leonard has not argued any way in which this decision is not entitled to deference under AEDPA. All that he says on the point is "counsel failed to raise or properly litigate critical federal constitutional issues that were apparent from the record, that should have been evident to a competent appellate attorney, and for which there existed no reasonable strategic reason to not raise these issues." (Traverse, Doc. No. 17, PageID 406.)

To evaluate a claim of ineffective assistance of appellate counsel, then, the court must assess the strength of the claim that counsel failed to raise. *Henness v. Bagley*, 644 F.3d 308 (6th Cir. 2011), citing  *Wilson v. Parker*, 515 F.3d 682, 707 (6th Cir. 2008). Counsel's failure to raise an issue on appeal amounts to ineffective assistance only if a reasonable probability exists that inclusion of the issue would have changed the result of the appeal. *Id. citing Wilson.*  If a

reasonable probability exists that the defendant would have prevailed had the claim been raised on appeal, the court still must consider whether the claim's merit was so compelling that the failure to raise it amounted to ineffective assistance of appellate counsel. *Id. citing Wilson.* The attorney need not advance every argument, regardless of merit, urged by the appellant. *Jones v. Barnes*, 463 U.S. 745, 751-752 (1983)("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."). Effective appellate advocacy is rarely characterized by presenting every non-frivolous argument which can be made. *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003). *Williams v. Bagley,* 380 F.3d 932, 971 (6th Cir. 2004), *cert. denied,* 544 U.S. 1003 (2005); see *Smith v. Murray*, 477 U.S. 527 (1986).  However, failure to raise an issue can amount to ineffective assistance.  *McFarland v. Yukins*, 356 F.3d 688 (6th Cir. 2004), *citing Joshua v. Dewitt,* 341 F.3d 430, 441 (6th Cir. 2003);  *Lucas v. O'Dea*, 179 F.3d 412, 419 (6th Cir. 1999); and *Mapes v. Coyle,* 171 F.3d 408, 427-29 (6th Cir. 1999).

"In order to succeed on a claim of ineffective assistance of appellate counsel, a petitioner must show errors so serious that counsel was scarcely functioning as counsel at all and that those errors undermine the reliability of the defendant's convictions."  *McMeans v. Brigano*, 228 F.3d 674 (6th Cir. 2000), *citing Strickland* and *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994). Counsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal. *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004), *citing Greer v. Mitchell,* 264 F.3d 663, 676 (6th Cir. 2001), *cert. denied,* 535 U.S. 940 (2002).  "Counsel's performance is strongly presumed to be effective."  *McFarland, quoting Scott v. Mitchell*, 209 F.3d 854, 880 (6th Cir. 2000)(*citing Strickland*).  "To prevail on a claim of ineffective assistance of appellate counsel, a

petitioner must show that appellate counsel ignored issues [which] are clearly stronger than those presented." *Webb v. Mitchell,* 586 F.3d 383, 399 (6th Cir, 2009); *Smith v. Robbins*, 528 U.S. 259, 288 (2000), *quoting Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986). Appellate counsel is not ineffective for failure to predict the development of the law. *Thompson v. Warden*, 598 F.3d 281 (6th Cir. 2010), *citing Lott v. Coyle,* 261 F.3d 594, 609 (6th Cir. 2001)(not ineffective assistance of appellate counsel to fail to anticipate *State v. Foster* in an appellate district which had ruled the other way.) *Accord, Carter v. Timmerman-Cooper*, 2010 U.S. App. LEXIS 10549 (6th Cir. May 25, 2010).

Leonard does not argue, much less demonstrate, any way in which this particular issue is stronger than the issues that were raised on direct appeal. He has therefore not shown that the decision of the Ohio Supreme Court rejecting his ineffective assistance of appellate counsel claim was contrary to or an unreasonable application of clearly established United States Supreme Court precedent. Subclaim A is without merit and should be dismissed with prejudice.

Based on the foregoing analysis, Leonard's Eighth Ground for Relief is without merit and should be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability on this Ground for Relief.

### Ground Nine – Duplicitous Indictment

In his Ninth Ground for Relief, Leonard argues he was denied a fair trial and deprived of his right to a unanimous verdict by being tried on a duplicitous indictment (Traverse, Doc. No. 17, PageID 421). This ground for relief is solely argued in the Traverse (Final Brief, Doc. No. 39, PageID 945).

Leonard presented this claim as his seventeenth proposition of law on direct appeal. The

Ohio Supreme Court decided the claim as follows:

### E. Improper Indictment

[**P42]  Leonard contends in his 17th proposition of law that the
trial court erred by allowing him to be tried, convicted, and
sentenced on an indictment that charged two separate death-
penalty specifications in a single specification. Leonard claims that
he was deprived of his right to a unanimous verdict because the
jury did not specify whether he had been the principal offender in
the aggravated murder or whether he had committed the
aggravated murder with prior calculation and design. Leonard
failed to object to this issue at trial and has waived all but plain
error. Crim.R.52(B). For the following reasons, we conclude that
no error, plain or otherwise, occurred.

[**P43]  First, Leonard is mistaken in stating that the indictment
included specifications that charged that he had been the principal
offender "and/or" that he had committed the murder with prior
calculation and design. The specifications at issue (Specification
Two to Counts One and Two) tracked the language of R.C.
2929.04(A)(7) and alleged that "either [Leonard] was the principal
offender in the commission of the Aggravated Murder, or, if not
the principal offender, committed the Aggravated Murder with
prior calculation and design." Thus, there was no error because the
elements of R.C. 2929.04(A)(7) were charged disjunctively. See
*State v. Cook* (1992), 65 Ohio St.3d 516, 527, 605 N.E.2d 70.

[**P44]  Second, prior to submitting the case to the jury, the trial
court amended the indictment to delete the prior-calculation-and-
design element. See Crim.R. 7(D). Thus, the jurors unanimously
determined that Leonard was the principal offender.

[**P45]  Finally, no evidence suggested another offender. See
*State v. Chinn* (1999), 85 Ohio St.3d 548, 558, 1999 Ohio 288, 709
N.E.2d 1166; *State v. Nields,* 93 Ohio St.3d at 30, 752 N.E.2d 859.
Therefore, Leonard's 17th proposition of law is overruled.

*State v. Leonard*, 104 Ohio St. 3d 54 ¶¶ 42-45 (2004).

The Ohio Supreme Court expressly found that the indictment did not use the conjunctive

and/or of which Leonard complains.  Leonard offers no record citation to refute this express

finding of fact and examination of the Indictment plainly shows that the Ohio Supreme Court was correct (Apx. Vol. 1 at 22-27.) Moreover, as the Ohio Supreme Court found, Judge Schweikert prevented any non-unanimous verdict problem by deleting the prior calculation and design language from the indictment prior to submission of the case to the jury. Leonard's sole cited Supreme Court authority, *Schad v. Arizona*, 501 U.S. 624 (1991), does not hold to the contrary.

Leonard's Ninth Ground for Relief is without merit and should be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability on this Ground for Relief.

## Ground Ten – Limitations on the Conduct of Voir Dire

In his Tenth Ground for Relief, Leonard claims he was denied a fair trial when Judge Schweikert limited his ability to conduct voir dire. (Traverse, Doc. No. 17, PageID 430.) Leonard's sole argument on this claim is presented in his Traverse (Final Brief, Doc. No. 39, PageID 945).

Leonard raised this claim on direct appeal as part of his Twenty-First Proposition of Law which the Ohio Supreme Court decided as follows:

> [**P62] Leonard also raises several other issues under proposition of law 21. Leonard argues that the trial court placed unreasonable limitations on defense counsel during voir dire. The record does not support Leonard's claims.
>
> [**P63] [*65] "The manner in which voir dire is to be conducted lies within the sound discretion of the trial judge." *State v. Lorraine* (1993), 66 Ohio St.3d 414, 418, 613 N.E.2d 212. The trial court granted Leonard's counsel extensive leeway to question prospective jurors. Although the court attempted to keep voir dire

moving, counsel were rarely limited in questioning potential jurors. The trial court allowed counsel to individually question all prospective jurors regarding their views on capital punishment and further permitted counsel to address other issues that arose during individual questioning.

[**P64] Leonard complains that the trial court would not allow his counsel to use hypothetical questions to determine a juror's death-penalty position. The trial court did admonish defense counsel's use of a hypothetical question in one instance. Leonard's counsel asked a prospective juror who was adamantly opposed to capital punishment whether he could impose the death sentence in a case like Timothy McVeigh's.

[**P65] We determine that the trial court did not err in precluding this question. A trial court has "'great latitude in deciding what questions should be asked on voir dire.'" *State v. Wilson* (1996), 74 Ohio St.3d 381, 386, 1996 Ohio 103, 659 N.E.2d 292, quoting *Mu'Min v. Virginia* (1991), 500 U.S. 415, 424, 111 S. Ct. 1899, 114 L. Ed. 2d 493. Moreover, "although R.C. 2945.27 affords the prosecution and defense the opportunity to conduct a reasonable examination of prospective jurors, * * * the trial court reserves the right and responsibility to control the proceedings of a criminal trial pursuant to R.C. 2945.03, and must limit the trial to relevant and material matters with a view toward the expeditious and effective ascertainment of truth." *State v. Durr* (1991), 58 Ohio St.3d 86, 89, 568 N.E.2d 674. A review of the voir dire reveals that Leonard's counsel were permitted to thoroughly explore prospective jurors' views. Leonard has not shown that the trial court unreasonably or arbitrarily restricted counsel's examination.

[**P66] The trial court also denied defense counsel's request for sequestered voir dire. But "'there is no requirement that voir dire in a capital case must be conducted in sequestration.'" *State v. Yarbrough,* 95 Ohio St. 3d 227, 2002 Ohio 2126, P96, 767 N.E.2d 216, quoting *State v. Fears* (1999), 86 Ohio St.3d 329, 338, 1999 Ohio 111, 715 N.E.2d 136. The trial court did permit counsel to individually question prospective jurors. And although prospective jurors were not sequestered, the trial court gave all jurors the opportunity to be questioned in private if they were uncomfortable discussing their views in a group setting. We find that there was no error in not allowing sequestered voir dire.

[**P67] Leonard's remaining arguments under this proposition are also without merit. Leonard contends that during voir dire, the trial court "improperly commented upon the effect of convicting

Leonard of the aggravating factors." Leonard failed to object during trial and waived all but plain error. Crim.R. 52(B). Moreover, we have reviewed the transcript and find that the trial court's comments were not improper; they merely outlined the proper procedures employed during a capital trial.

[**P68]  Similarly, we conclude that no error occurred when the trial court failed to inform prospective jurors during voir dire that "parole eligibility is determined after [Leonard] serves a full sentence, that is to say, no good time credit." Further, contrary to Leonard's contention, the trial court did not err when it referred to aggravating "circumstances," as opposed to "factors." The trial court's reference to "circumstances" tracks the language in R.C. 2929.04. We also reject Leonard's claim regarding the juror questionnaire. Leonard has not shown how the questionnaire was flawed, nor has he identified which questions he claims were prejudicial.

*State v. Leonard,* 104 Ohio St. 3d 54 ¶¶ 62-68 (2004).

Leonard claims that this decision was "contrary to or constitutes an unreasonable application of clearly established federal law."  (Traverse, Doc. No. 17, PageID 433.) Nevertheless, none of the authority he cites requires a trial court to permit the use of hypothetical questions in voir dire or that voir dire in a capital case be conducted while the venire is sequestered.  Here the trial judge permitted individual questioning and allowed jurors to answer questions in private if they were uncomfortable discussing their views in public.  Leonard has not demonstrated any prejudice from denial of the additional features he requested.

The Tenth Ground for Relief is without merit and should be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability on this Ground for Relief.

**Ground Eleven – Failure to Excuse for Cause**

74

Leonard has withdrawn his Eleventh Ground for Relief (Traverse, Doc. No. 17, PageID 435).

## Ground Twelve – Improper Excuse for Cause

In his Twelfth Ground for Relief, Leonard asserts that certain venirepersons who expressed some reservations about the death penalty were improperly excused for cause (Traverse, Doc. No. 17, PageID 436). Leonard's sole argument on this claim is included in the Traverse (Final Brief, Doc. No. 39, PageID 945).

This claim was presented on direct appeal as the Twenty-Second Proposition of Law and decided by the Ohio Supreme Court as follows:

> [**P70] In proposition of law 22, Leonard contends that the trial court improperly excused for cause prospective jurors Gooding, Dignan, Ison, and Crockett. Leonard's assertions lack merit.
>
> [**P71] Prospective juror Gooding initially stated that she could follow the court's instructions and the law and consider imposing the death penalty. But Gooding later stated, "I'm not against [the death penalty] but personally I don't think I could make that decision. * * * I personally could not decide someone's fate, if they are going to live or die." When questioned further, Gooding agreed that her views would substantially impair the performance of her duties as a juror. Leonard's counsel and the trial court attempted to rehabilitate her. Gooding, however, reiterated that she could not consider imposing a death sentence.
>
> [**P72] Prospective juror Dignan also stated that she could consider imposing a death sentence. Dignan later said, "I feel that it's not a right that we have to deliberately take the life of another * * * except in self-defense." When asked if she could ever impose the death penalty, she could not answer yes or no but said she "would find it very difficult." Dignan then stated that her views against capital punishment were strongly held and that she is opposed to it in all cases, including this case. Finally, she agreed that she would not be able to sign a verdict imposing the death

sentence. After defense counsel tried to rehabilitate her, Dignan declared that "there are no circumstances" in which she could impose a death sentence.

[**P73] Prospective juror Ison also initially declared that she could consider imposing a death sentence. After further questioning, she stated that she is not against the death penalty, but she "didn't feel comfortable being the one to do it." Ison later reiterated, "I just don't want to be the one to do it. Now, if I could, say, sentence him to life in jail, maybe yes. But to say give him the chair, I don't want to do that." Ison equivocated when the trial court questioned her, but she ultimately decided that she did not believe she could sign a death verdict.

[**P74] Prospective juror Crockett said that she did not think that the death penalty was appropriate in any case but that she could consider imposing a death sentence "because that's the law that we live by in America." Crockett admitted that her views could prevent or substantially impair her ability to be fair and impartial. When defense counsel questioned Crockett, she stated, "I believe [I could consider imposing a death sentence]. But I can't 100 percent say that in the back of my mind that my views wouldn't allow that." Crockett could not assure the court that her beliefs would not impair her ability to serve as a juror and finally told the trial judge, "I guess, in all honesty, I don't think I could" sign a death verdict.

[**P75] We find that the trial court did not abuse its discretion by excusing these four prospective jurors. The record reflects that their views on the death penalty would have prevented or substantially impaired their ability to serve as fair and impartial jurors. See, e.g., *State v. Dunlap* (1995), 73 Ohio St.3d 308, 315, 1995 Ohio 243, 652 N.E.2d 988; *State v. Rogers,* 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus. Therefore, Leonard's 22nd proposition of law is overruled.

*State v. Leonard*, 104 Ohio St. 3d 54, ¶¶ 70-75 (2004).

When a trial judge excuses a juror as to whom the judge has a definite impression that the prospective juror will be unable faithfully to apply the law, that decision is entitled to deference. *State v. Beuke*, 38 Ohio St. 3d 29, 38 (1988), *citing Wainwright v. Witt*, 469 U.S. 412 (1985). In *Witt*, the Supreme Court held that a trial judge's determination of bias or not "is traditionally determined through *voir dire* culminating in a finding by the trial judge concerning the

venireman's state of mind. . . such a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province.  Such determinations were entitled to deference even on direct review; '[the] respect paid such findings in a habeas proceeding certainly should be no less." *Witt,* 469 U.S. at 428, *quoting Patton v. Yount*, 467 U.S. 1025, 1038 (1984).

Here there was no need to defer to the trial judge's weighing of demeanor.  Prospective Jurors Gooding, Dignan, Ison, and Crockett all said either unequivocally that they could not sign a death verdict or that they did not believe they could.  Those declarations, made after attempts by both defense counsel and the trial judge to rehabilitate these venirepersons, are conclusive; they are not overcome by generally favorable answers to such questions as whether the potential juror could be fair or could follow the law.

The Ohio Supreme Court's decision on this claim is not an objectively unreasonable application of *Wainwright v. Witt, supra.*  Leonard's Twelfth Ground for Relief is therefore without merit and should be dismissed with prejudice.  Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability on this Ground for Relief.

### Ground Thirteen – Improper Introduction of Police Reports

In his Thirteenth Ground for Relief, Leonard claims admission of police reports into evidence violated his rights under the Confrontation Clause (Traverse, Doc. No. 17, PageID 443).  Leonard's sole argument on this claim is made in the Traverse (Final Brief, Doc. No. 39, PageID 945).

This claim was presented on direct appeal as the Thirtieth Proposition of Law and decided by the Ohio Supreme Court as follows:

### D. Admission of Police Reports

[**P109] Leonard argues in proposition of law 30 that his Confrontation Clause rights were violated by the admission of two police investigative reports. After police had taken Leonard into custody, Leonard confessed to Flick's murder during an interview with Hamilton County Sheriff's Detectives Schweinefus and Diersing. The following day, Schweinefus prepared a written investigation report summarizing Leonard's tape-recorded confession. Approximately five months later, Schweinefus prepared a supplemental report that purported to summarize other, unrecorded statements that Leonard had made during the interview. Over defense's objection, the trial court admitted both police reports into evidence. Schweinefus's original report was admitted in redacted form, so that only the detective's summary of Leonard's statements could be seen, and his supplemental report was admitted in its entirety. The trial court also permitted Schweinefus, over objection, to rely extensively on his reports while testifying on direct examination.

[**P110] Leonard's claim that the trial court admitted these police reports in violation of his right of confrontation is without merit. Both the Sixth Amendment Confrontation Clause, and Section 10, Article I of the Ohio Constitution guarantee a criminal defendant the right to cross-examine witnesses who testify against him. See, e.g., *State v. Self* (1990), 56 Ohio St.3d 73, 78, 564 N.E.2d 446, citing *Henderson v. Maxwell* (1964), 176 Ohio St. 187, 188, 27 O.O.2d 59, 198 N.E.2d 456. Schweinefus's testimony on direct examination essentially mirrored the contents of his investigative reports. Leonard's counsel extensively and effectively cross-examined Schweinefus regarding the reports. The admission of hearsay does not violate the Confrontation Clause if the declarant (here, Schweinefus) testifies at trial. See *California v. Green* (1970), 399 U.S. 149, 157-158, 90 S. Ct. 1930, 26 L. Ed. 2d 489; *State v. Keenan* (1998), 81 Ohio St.3d 133, 142, 1998 Ohio 459, 689 N.E.2d 929. Thus, the trial court did not violate Leonard's constitutional right of confrontation.

[**P111] Nevertheless, we find that the trial court erred in admitting the reports. The police reports are inadmissible hearsay and should not have been submitted to the jury. In criminal cases, Evid.R. 803(8)(b) excludes from the public-records-and-reports

exception to hearsay police reports that "recite an officer's observations of criminal activities or observations made as part of an investigation of criminal activities." *State v. Ward* (1984), 15 Ohio St.3d 355, 358, 15 OBR 477, 474 N.E.2d 300. These investigative reports recite Detective Schweinefus's observations made during his investigation into Leonard's criminal activity. The trial court also erred in allowing Schweinefus to rely on his reports during direct examination because the prosecutor failed to first establish that the reports were necessary to refresh the detective's recollection. However, for the following reasons, these errors were harmless. Crim.R. 52(A).

[**P112]  First, the Rules of Evidence permitted Schweinefus to testify at trial as to matters contained in his investigative reports. In these reports, Schweinefus purported to have summarized statements, both recorded and unrecorded, that Leonard had made during his confession. A defendant's own out-of-court statements, offered against him at trial, are not hearsay. Evid.R. 801(D)(2)(a). Thus, while the investigative reports were inadmissible hearsay, the trial court properly admitted Schweinefus's in-court testimony regarding statements that Leonard had made.

[**P113]  In *State v. Jackson* (1991), 57 Ohio St.3d 29, 565 N.E.2d 549, we found harmless error under almost identical circumstances. In *Jackson,* the trial court allowed into evidence a police officer's written summary of statements that the defendant had made during a police interview. The trial court also let the officer read his written summary to the jury, even though the prosecutor did not first establish, as required by Evid.R. 803(5), that the officer's recollection prevented him from testifying fully and accurately. We held that any error was harmless because the defendant's statements made during his police interview were admissible under Evid.R. 801(D)(2)(a) through the police officer's testimony and no prejudice arose from the officer's recitation of his written summary. *Jackson,* 57 Ohio St.3d at 37, 565 N.E.2d 549.

[**P114]  Second, the jury's verdict undercuts Leonard's assertion that he was prejudiced by the admission of the reports. The state's primary purpose in offering these investigative reports was to provide conclusive evidence (i.e., evidence of sexual penetration) that Leonard had raped Flick before killing her. See R.C. 2907.02 and 2907.01(A). But the jury acquitted Leonard of rape. Thus, the record does not support Leonard's contention that the jury placed undue weight on the reports. Based on the foregoing, we overrule proposition of law 30.

*State v. Leonard*, 104 Ohio St. 3d 54, ¶¶ 109-114 (2004).

The Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant has a prior opportunity for cross-examinati" *Crawford v. Washington,* 541 U.S. 36 at 53-54 (2004).[16] The converse proposition that there is no Confrontation Clause violation if the declarant was present at trial for cross-examination was adopted in *California v. Green* 399 U.S. 149 (1970), on which the Ohio Supreme Court relied. Although Leonard claims the Ohio Supreme Court's decision was an unreasonable application of federal law, it does not cite *Green* or offer any argument about how any United States Supreme Court case has found a Confrontation Clause violation where the declarant actually testified at trial.

Leonard's Thirteenth Ground for Relief is without merit and should be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability on this Ground for Relief.

## Ground Fourteen – Partial Read-Back of Testimony

In his Fourteenth Ground for Relief, Leonard claims he was denied his right to a fair trial when Judge Schweikert permitted the reading back to the jury of portions of the testimony of two witnesses instead of all of their testimony (Traverse, Doc. No. 17, PageID 449). Leonard's sole argument on this claim is made in his Traverse (Final Brief, Doc. No. 39, PageID 945).

Leonard presented this as his Thirty-First Proposition of Law on direct appeal which the Ohio Supreme Court decided as follows:

---

[16] The Ohio Supreme Court did not cite *Crawford* in its decision. *Crawford* was decided March 8, 2004, and this case was not decided in the Ohio Supreme Court until December 8, 2004.

### F. Reading Back of Portions of Witness Testimony

[**P122]  In his 31st proposition of law, Leonard claims that the trial court erred when it allowed portions of testimony to be read to the jury. After beginning deliberations, the jury requested that the testimony of Kelly Fenech and Alvie Woods be read. The trial court, over defense counsel's objection, said to the jury, "I'm going to ask you all to go back into the jury room and to discuss whether you could be more specific in your request as to what portions of the testimony you are looking for. We do have the testimony available. And if you want to hear the whole thing, I could provide that." The jury responded by requesting that the testimony of Fenech "describing her driving by the flower shop on July 28, 2000," and the testimony "of Alvie Woods concerning all conversations and interactions" with Leonard on July 28, 2000, be read. Thereafter, the trial court had those portions of testimony read to the jury.

[**P123]  It is well settled that a trial court, upon a request from the jury, "may cause to be read all or part of the testimony of any witness." *State v. Berry* (1971), 25 Ohio St.2d 255, 54 O.O.2d 374, 267 N.E.2d 775, paragraph four of the syllabus. Moreover, the trial court has broad discretion in this regard. *Id*. See, also, *State v. Carter* (1995), 72 Ohio St.3d 545, 560, 1995 Ohio 104, 651 N.E.2d 965; *State v. Davis* (1991), 62 Ohio St.3d 326, 340, 581 N.E.2d 1362. Leonard has failed to show that the trial court abused its discretion and offers a purely speculative claim of prejudice. Moreover, no abuse of discretion is apparent from the record. Therefore, we overrule Leonard's 31st proposition of law.

*State v. Leonard*, 104 Ohio St. 3d 54, ¶¶ 122-123 (2004).

Although Leonard claims this decision is "contrary to or constitutes an unreasonable application of clearly established federal law" (Traverse, Doc. No. 17, PageID 451), he actually cites no Supreme Court precedent in his argument. *Id.* at PageID 449-452. His first citation is to *Roe v. Baker*, 316 F.3d 557, 567 (6th Cir. 2002), which has nothing to do with the issue of reading back testimony to a jury. *United States v. Walker,* 1 F.3d 423 (6th Cir. 1993), granted a

remand for a *Remmer*[17] hearing where some but not all the deliberating jurors had been exposed to some of the testimony of some witnesses without any court control. While the court noted the dangers of partial read-back, it was in the context of material getting before the jury with no judicial control. In *Spalla v. Foltz*, 788 F.2d 400 (6th Cir. 1986), also cited by Leonard, the court noted that it is within the trial judge's discretion whether to provide a deliberating jury with some or all of the transcribed testimony. None of the cited law suggests the Constitution is violated by giving a jury the testimony that they wanted to hear again.

Leonard's Fourteenth Ground for Relief is without merit and should be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability on this Ground for Relief.

## Ground Fifteen – Change of Verdict Forms

In his Fifteenth Ground for Relief, Leonard asserts his constitutional rights were violated when Judge Schweikert instructed the jurors to return a corrected verdict form (Traverse, Doc. No. 17, PageID 453). Leonard's sole argument on this claim is made in his Traverse (Final Brief, Doc. No. 39, PageID 945).

Leonard presented this as his Thirty-Second Proposition of Law on direct appeal and the Ohio Supreme Court decided it as follows:

> G. Changing of Verdict Forms
>
> [**P124] Leonard argues in proposition of law 32 that he was denied a fair trial when the trial court asked the jurors to submit a corrected verdict form in relation to the charge in Count Five. For

---

[17] *Remmer v. United States*, 347 U.S. 227 (1954), requires a hearing to determine prejudice when extrajudicial material is brought to a jury's attention.

the following reasons, we conclude that the trial court did not abuse its discretion.

[**P125] At the end of the guilt-determination phase, the jury found Leonard not guilty of the charge of rape in Count Five but guilty of the lesser included offense of attempted rape. During the penalty phase, the trial court learned that the verdict form signed by the jury contained a reference to R.C. 2907.05, the code section for gross sexual imposition, instead of the section numbers for attempted, R.C. 2923.02, and rape, R.C. 2907.02. The remaining language of the verdict form accurately reflected the jury's guilty verdict on the charge of attempted rape.

[**P126] To correct the error, the trial judge explained the error to the jury and provided the jury with a corrected verdict form, along with the other verdict forms for Count Five, and asked the jury to choose and complete the appropriate form. At defense counsel's request, the corrected form was not submitted to the jury until after it had returned its sentencing verdict. The jurors thereafter completed and signed the corrected verdict form.

[**P127] An analogous situation occurred in *State v. Davie* (1997), 80 Ohio St.3d 311, 1997 Ohio 341, 686 N.E.2d 245, in which the verdict form for aggravated robbery inadvertently contained the word "kidnapping." The trial court in that case granted the state's motion to amend the verdict forms. Although we did not find prejudicial error in *Davie,* we noted that "the better practice * * * would have been for the trial court to reconvene the jury to redeliberate" on the count at issue. *Id.* at 326, 686 N.E.2d 245.

[**P128] In the instant matter, the trial court followed the exact procedure set forth in *Davie.* See, also, *State v. Maurer,* 15 Ohio St.3d at 249, 15 OBR 379, 473 N.E.2d 768, citing *Hurley v. State* (1890), 4 Ohio C.C. 425, 428, 2 Ohio Cir. Dec. 630, 1890 WL 324. Thus, no error occurred.

[**P129] Leonard also claims that he was denied a fair trial because of an error in the "Not Guilty" verdict form for Count Five. This form did mistakenly contain the word "Guilty" in the upper right-hand corner. Nevertheless, prejudice is lacking. The trial court explained this error to the jury and provided it with a corrected "Not Guilty" verdict form, along with the other verdict forms for Count Five. But Leonard was found guilty of attempted rape, and neither the original nor the corrected "Not Guilty" verdict form was ever used. Thus, we overrule proposition of law 32.

83

*State v. Leonard*, 104 Ohio St. 3d 54, ¶¶ 124-129 (2004).

Here again, Leonard offers no United States Supreme Court precedent which was allegedly unreasonably applied. His only citation is to *McAdoo v. Elo*, 365 F.3d 487 (6th Cir. 2004), for the proposition that a trial court error on an evidentiary issue can rise to the level of constitutional error. There is no suggestion in that case of anything to do with allowing a jury to redeliberate and complete a corrected verdict form.

Leonard's Fifteenth Ground for Relief is without merit and should be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability on this Ground for Relief.

## Ground Sixteen – Prosecutorial Misconduct

In his Sixteenth Ground for Relief, Leonard claims the prosecutor's "pervasive and flagrant misconduct" deprived him of a fair trial (Traverse, Doc. No. 17, PageID 457). Leonard's sole argument on this claim is made in his Traverse (Final Brief, Doc. No. 29, PageID 945). Because of the way these claims were presented to the state courts, the Magistrate Judge divides them into subclaims for analysis.

### Subclaim A: Misconduct by Using Extrajudicial Subpoenas

In his first subclaim, Leonard asserts he was deprived of his constitutional right to a fair trial because the prosecutor used extrajudicial subpoenas to obtain pretrial statements from Penny McBride, the mother of Leonard's children, and Nick Chaplin, the Kentucky Deputy Sheriff to whom Leonard voluntarily surrendered, as well as hospital records of Ryan Gries, one

84

of the victims (Traverse, Doc. No. 17, PageID 460).

Leonard first presented this subclaim to the state courts as the Second Ground for Relief in his state post-conviction petition. The Hamilton County Court of Appeals decided the claim as follows:

## A. THE PROSECUTION'S MISUSE OF THE SUBPOENA POWER

[**P11] In his second claim for relief, Leonard contended that he was denied his constitutional right to a fair trial by the prosecution's use of subpoenas to compel the attendance of witnesses and to secure the production of documents for "nonjudicial" pretrial proceedings. In support of this claim, Leonard offered evidence of subpoenas that had been served upon a Kentucky law enforcement officer and upon a hospital's records custodian, ordering them to appear before the court, but directing them to report to the office of the prosecuting attorney. He also offered the affidavit of the mother of two of his children, who attested to her experience in responding to such a subpoena.

[**P12] Crim.R. 17 authorizes a court to issue a subpoena only to compel the attendance of a witness or the production of documents at a proceeding over which the trial court has jurisdiction. The rule does not compel a prospective witness to attend, or provide a means for discovery at, a pretrial interview with law enforcement officials. *State v. Campbell* (Jan. 8, 1997), 1st Dist. No. C-950746, 1997 Ohio App. LEXIS 11 (adopting the rule of *United States v. Keen* [C.A.6, 1975], 509 F.2d 1273); accord *State v. Cleveland Plain Dealer* (June 15, 1979), 8th App. Nos. 40531, 40532 and 40533, 1979 Ohio App. LEXIS 10995. The remedy for a violation of the rule must be tailored to the prejudice sustained by the accused. Therefore, no remedial action is required when the accused has not been prejudiced. See *Campbell*, supra.

[**P13] The evidence offered in support of the second claim showed that the prosecution misused the Crim.R. 17 subpoena power. But Leonard failed to demonstrate how the prosecution's misconduct in this regard had prejudiced him. We, therefore, hold that the common pleas court properly denied the second claim for relief, because Leonard failed to support the claim with evidentiary material setting forth sufficient operative facts to demonstrate substantive grounds for relief. See R.C. 2953.21(C); *Pankey,* supra; *Jackson,* supra.

*State v. Leonard*, 157 Ohio App. 3d 653 (Ohio App. 1st Dist. 2004).

In other words, the court of appeals found the prosecutor had abused the subpoena power, but there was no proven prejudice to Leonard.  Leonard presumably argued this claim to the Ohio court of appeals as a constitutional claim, as it is only constitutional claims which are cognizable under Ohio Revised Code § 2953.21.  The quoted decision is therefore taken as a decision on the merits of this constitutional claim.

Leonard makes no argument in this Court as to how he was unconstitutionally prejudiced by this use of subpoenas by the prosecutor.  Although Ohio R. Crim. P. 17 does not create authority for the use made of subpoenas here, Ohio law certainly could do so; there is nothing unconstitutional about granting subpoena power to investigating bodies and this is frequently done.  Certainly the grand jury, at the suggestion of the prosecutor, could have subpoenaed these witnesses and documents.  If the witnesses had been willing to speak with the prosecutor without a subpoena, there is no constitutional right of Leonard which would have precluded those conversations.

Leonard has failed to cite any Supreme Court precedent which the court of appeals allegedly misapplied here.  His Subclaim A is without merit.

**Subclaim B – Misconduct During Trial**

Leonard asserts in Subclaim B that the prosecutor engaged in misconduct during trial, including in his opening statement and closing arguments in both the guilt and penalty phases (Traverse, Doc. No. 17, PageID 458).  He presented these claims on direct appeal and the Ohio Supreme Court decided them as follows:

### V. Prosecutorial Misconduct

[**P155]  In propositions of law three, 20, and 27, Leonard argues that he was denied a fair trial because of prosecutorial misconduct. To determine whether a prosecutor's remarks at trial constituted misconduct, we must determine (1) whether the remarks were improper and (2) if so, whether the remarks prejudicially affected the accused's substantial rights. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78.

[**P156]  In his third proposition of law, Leonard complains about comments that the prosecutor made during opening statements and closing arguments of both phases of the trial. Leonard first complains that the prosecutor mentioned certain facts in his guilt-determination-phase opening statement that were not subsequently supported by evidence. His trial counsel objected a number of times to these allegedly improper comments. We find that this claim lacks merit.

[**P157]  During opening statement, counsel is accorded latitude and allowed fair comment on the facts to be presented at trial. See *Maggio v. Cleveland* (1949), 151 Ohio St. 136, 38 O.O. 578, 84 N.E.2d 912, paragraph two of the syllabus. See, also, e.g., *State v. LaMar,* 95 Ohio St. 3d 181, 2002 Ohio 2128, at P126, 767 N.E.2d 166. Each of the prosecutor's comments at issue here was supported by evidence subsequently offered at trial. Thus, Leonard has failed to establish that any error occurred. See, e.g., *State v. Davis,* 62 Ohio St.3d at 337, 581 N.E.2d 1362. Moreover, the trial court instructed the jury that it must decide the case on the evidence and that opening statements and closing arguments are not evidence. We presume that the jury followed the court's instructions. *State v. Loza* (1994), 71 Ohio St.3d 61, 79, 1994 Ohio 409, 641 N.E.2d 1082.

[**P158]  Leonard next complains about comments that the prosecutor made during the guilt-determination-phase closing argument. Leonard contends that the prosecutor expressed a personal opinion as to whether Flick had consented to having sex with Leonard before her death, whether Leonard and Flick had struggled, and whether Leonard had planned to kill Flick. Leonard's failure to object to these comments waived all but plain error. *State v. Slagle,* 65 Ohio St.3d at 604, 605 N.E.2d 916.

[**P159] We determine that no error, plain or otherwise, occurred. A prosecutor may state an opinion if based on evidence presented at trial. *State v. Watson* (1991), 61 Ohio St.3d 1, 9-10, 572 N.E.2d 97; *State v. Tyler,* 50 Ohio St.3d at 41, 553 N.E.2d 576; *State v. Bey* (1999), 85 Ohio St.3d 487, 496, 1999 Ohio 283, 709 N.E.2d 484. The state presented evidence supporting each of the contested statements.

[**P160] Leonard also claims that on two separate occasions, the prosecutor misinformed the jury that it could automatically find Leonard guilty of Specification Two to Counts One and Two (that the aggravated murder occurred during a rape or attempted rape). Again, Leonard's failure to object waived all but plain error. *Slagle,* 65 Ohio St.3d at 604, 605 N.E.2d 916.

[**P161] Only once did the prosecutor refer to the jury's findings in regard to these specifications as "automatic." Admittedly, the prosecutor's choice of words was unfortunate. But isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning. See *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 647, 94 S. Ct. 1868, 40 L. Ed. 2d 431; *State v. Hill* (1996), 75 Ohio St.3d 195, 204, 1996 Ohio 222, 661 N.E.2d 1068.

[**P162] Here, the prosecutor was merely arguing that a guilty verdict on Count One would logically result in the same verdict as to Specification Two to Counts One and Two. Statements made by counsel in closing arguments do not govern the law that should be applied. *State v. Loza,* 71 Ohio St.3d at 79, 641 N.E.2d 1082. The trial court properly charged the jury on all factual issues as to each count and specification charged in the indictment. Thus, plain error is absent.

[**P163] Leonard further claims that he was prejudiced by the prosecutor's remark that Leonard "deserves no break." He also claims that the prosecutor improperly referred to the penalty phase during his guilt-determination-phase closing arguments. Trial counsel did not object to the prosecutor's "no break" comment, and no outcome-determinative plain error occurred as a result of the remark. See, e.g., *State v. Bies* (1996), 74 Ohio St.3d 320, 326, 1996 Ohio 276, 658 N.E.2d 754, citing *State v. Long,* 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

[**P164] We find, however, that the prosecutor erred by referring to Leonard's penalty during the guilt-determination phase. See

*State v. Brown,* 38 Ohio St. 3d 305 at 316, 528 N.E.2d 523. The prosecutor's specific comments were as follows:

[**P165] "The defense has asked you to find the defendant guilty of Count One and Two, of murder and gun [specification], but not of either of the specifications that would take us to the second part of the trial where you would decide what the appropriate penalty is as we talked about in voir dire.

[**P166] "By finding the defendant guilty of murder and a gun specification and felonious assault, we would not get to that second part where more evidence would be presented, and then you would deliberate again to decide what the appropriate penalty is.

[**P167] "Remember, only by finding Patrick Leonard guilty of either Count One or Count Two, and either Specification One or Specification Two to either of those counts, will we even get to the penalty phase where his future will be decided."

[**P168] The prosecutor's comments could be interpreted as urging the jury to convict Leonard solely to impose the death sentence. See *Brown*; *State v. Hicks* (1989), 43 Ohio St. 3d 72, 75, 538 N.E.2d 1030. But Leonard failed to object, and for the following reasons, we find that the prosecutor's comments did not rise to the level of plain error.

[**P169] First, the trial court instructed the jurors to decide the case on the evidence alone and explained that arguments of counsel were not evidence. Second, the weight of the evidence against Leonard, including his confession, was substantial and "reduced the likelihood that the jury's decision was influenced by argument." See *Darden v. Wainwright* (1986), 477 U.S. 168, 182, 106 S. Ct. 2464, 91 L. Ed. 2d 144. Third, as was the case in *Darden,* the prosecutor's comments did not manipulate or misstate the evidence, nor did they implicate other specific rights of the accused. Id. Finally, the prosecutor's comments should not be taken out of context and given their most damaging meaning. *Donnelly v. DeChristoforo,* 416 U.S. at 647, 94 S.Ct. 1868, 40 L. Ed. 2d 431. After setting forth the state's case, the prosecutor urged the jury to carefully consider the evidence before reaching a determination regarding guilt. When viewed in this light, the remarks of the prosecutor did not deprive Leonard of a fair trial and did not result in outcome-determinative plain error.

[**P170] Leonard next contends that the record is replete with the prosecutor's personal attacks against him. Leonard cites three

89

specific instances: one in which the prosecutor said that Leonard had lied to Flick, another in which he said that Leonard is a liar, and a third in which Leonard claims that the prosecutor said that Leonard is a bad father and is manipulative and controlling. Leonard failed to object to these and other similar comments by the prosecutor. We conclude that plain error is absent.

[**P171] The prosecutor never referred to Leonard as a "bad father" but did refer to him on several occasions as a liar and as manipulative and controlling. A prosecutor's characterization of defendant as a liar or by other derogatory terms is generally improper. See, e.g., *State v. Clemons,* 82 Ohio St.3d at 452, 696 N.E.2d 1009; *State v. Brown,* 38 Ohio St.3d at 317, 528 N.E.2d 523. But we have permitted such comments when they fall short of being "purely abusive" or were based on evidence presented at trial. See, e.g., id.; *Clemons* at 452, 696 N.E.2d 1009; *State v. Nields,* 93 Ohio St.3d at 37-38, 752 N.E.2d 859; *State v. Hill,* 75 Ohio St.3d at 204, 661 N.E.2d 1068; *State v. Wilson,* 74 Ohio St.3d at 399, 659 N.E.2d 292. In this case, the prosecutor's characterizations of Leonard amounted to fair comment based on the evidence at trial. None of the comments were so egregious that they materially prejudiced Leonard or deprived him of a fair trial. Cf. *State v. Keenan* (1993), 66 Ohio St.3d 402, 613 N.E.2d 203.

[**P172] Leonard also claims that prosecutorial misconduct occurred during the penalty phase. He first contends that during opening statement, the prosecutor gave his personal opinion by stating, "One thing I do feel confident in, is that no matter what [the defense] produce[s] for you in mitigation, it will come nowhere close to the heavy weight that [the prosecutors] feel that you should attach to the aggravating circumstances." Leonard failed to object to this comment. A similar opening statement was found to be nonprejudicial in *State v. Reynolds,* 80 Ohio St.3d at 680-681, 687 N.E.2d 1358, in which we held, "The general rule is that 'where personal opinions of guilt are predicated upon the evidence, though frowned upon, they are not deemed to be prejudicially erroneous.' * * * It is difficult for prosecutors to argue vigorously for the death penalty without making statements that can be arguably construed as statements of personal opinion." *Id.*, quoting *State v. Stephens* (1970), 24 Ohio St.2d 76, 83, 53 O.O.2d 182, 263 N.E.2d 773. Thus, we reject Leonard's argument.

[**P173] Leonard also contends that the prosecutor misstated the penalty-phase weighing process. We find any error harmless. Leonard did not object, and the trial court instructed on the proper standard to apply in the weighing process. See *State v. Smith*

(2000), 87 Ohio St.3d 424, 444, 2000 Ohio 450, 721 N.E.2d 93.

[**P174] Leonard further contends that the prosecutor committed misconduct by referring to the jury's penalty-phase verdict as a recommendation. But the prosecutor's comments "neither reduced the jury's sense of responsibility nor increased the possibility of a recommendation of death in reliance upon the appellate process." *State v. Bedford* (1988), 39 Ohio St.3d 122, 124, 529 N.E.2d 913; accord *State v. Woodard,* 68 Ohio St.3d at 77, 623 N.E.2d 75.

[**P175] We also reject Leonard's argument regarding the prosecutor's commenting on Leonard's unsworn statement. See *State v. Smith,* 87 Ohio St.3d at 444, 721 N.E.2d 93, and *State v. Davis,* 76 Ohio St.3d at 119-120, 666 N.E.2d 1099.

[**P176] Leonard makes several additional claims of prosecutorial misconduct. In each instance, Leonard failed to object and waived all but plain error. *State v. Slagle,* 65 Ohio St.3d. at 604, 605 N.E.2d 916. The prosecutor's comments regarding the victim's mental anguish and his asking the jury to be fair to the victim were improper but not prejudicial. See, e.g., *State v. Combs* (1991), 62 Ohio St.3d 278, 282-283, 581 N.E.2d 1071; *State v. Brooks,* 75 Ohio St. 3d 148 at 158, 1996 Ohio 134, 661 N.E.2d 1030. None of the remaining statements that Leonard complains about constituted misconduct, let alone plain error. See *State v. Wilson,* 74 Ohio St.3d at 399, 659 N.E.2d 292 (prosecutors can urge the merits of their cause). Based on the foregoing, we overrule Leonard's third proposition of law.

[**P177] [omitted – deals with charging discretion claim.]

[**P178] Leonard argues in proposition 27 that he was denied a fair trial as a result of prosecutorial misconduct that occurred throughout his trial. Except in two instances, Leonard merely restates the claims of prosecutorial misconduct set forth in his third proposition of law. As to the new claims raised in this proposition, the transcript pages cited do not reflect any misconduct. Furthermore, to the extent that Leonard is contending that the cumulative effect of misconduct impaired the overall fairness of his trial, this argument is without merit as well. See, e.g., *State v. Landrum,* 53 Ohio St.3d at 113, 559 N.E.2d 710; *State v. Smith,* 87 Ohio St.3d at 444-445, 721 N.E.2d 93. Cf., *State v. Keenan,* 66 Ohio St.3d 402, 613 N.E.2d 203; *State v. Fears* (1999), 86 Ohio St.3d 329, 1999 Ohio 111, 715 N.E.2d 136. Proposition of law 27 is overruled.

*State v. Leonard*, 104 Ohio St. 3d 54, ¶¶ 155-178.

In his argument of this subclaim, Leonard relies on *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974), *United States v. Bagley*, 473 U.S. 667 (1985), and *Berger v. United States*, 295 U.S. 78 (1935) (Traverse, Doc. No. 17, PageID 467, 473). He does not offer any specific application of these cases to the prosecutorial acts of which he complains.

On habeas corpus review, the standard to be applied to claims of prosecutorial misconduct is whether the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process," *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Darden v. Wainwright,* 477 U.S. 168, 181 (1986), *quoting DeChrsitoforo, supra.*; *Wogenstahl v. Mitchell*, 668 F.3d 307, 327-328 (6th Cir. 2012), *citing Smith v. Mitchell,* 567 F.3d 246, 265 (6th Cir.); *Bates v. Bell*, 402 F.3d 635, 640-41 (6th Cir. 2005)(citations omitted); *Kincade v. Sparkman*, 175 F.3d 444, 445-46 (6th Cir. 1999)(citations omitted) or whether it was "so egregious as to render the entire trial fundamentally unfair." *Cook v. Bordenkircher*, 602 F.2d 117, 119 (6th Cir. 1979)(citations omitted); *accord Summitt v. Bordenkircher*, 608 F.2d 247, 253 (6th Cir. 1979), *aff'd sub nom*, *Watkins v. Sowders*, 449 U.S. 341 (1981)(citation omitted); *Stumbo v. Seabold*, 704 F.2d 910, 911 (6th Cir. 1983)(citation omitted). The court must first decide whether the complained-of conduct was in fact improper. *Frazier v. Huffman*, 343 F.3d 780 (6th Cir. 2003), *citing United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001). A four-factor test is then applicable to any conduct the Court finds inappropriate: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and whether the evidence against the defendant was strong." *Id.* The court must decide whether the prosecutor's statement likely had a bearing on the

outcome of the trial in light of the strength of the competent proof of guilt. *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982).  The court must examine the fairness of the trial, not the culpability of the prosecutor. *Serra v. Michigan Department of Corrections,* 4 F.3d 1348, 1355 (6th Cir. 1993)(*quoting Smith v. Phillips*, 455 U.S. 209, 219 (1982). In *Serra*, the Sixth Circuit identified factors to be weighed in considering prosecutorial misconduct:

> In every case, we consider the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused.

*Id.,* at 1355-56, *quoting Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982)(citation omitted). The misconduct must be so gross as probably to prejudice the defendant. *Prichett v. Pitcher*, 117 F.3d 959, 964 (6th Cir.), *cert. denied*, 522 U.S. 1001 (1997)(citation omitted); *United States v. Ashworth,* 836 F.2d 260, 267 (6th Cir. 1988).  Claims of prosecutorial misconduct are reviewed deferentially on habeas review.  *Thompkins v. Berghuis,* 547 F.3d 572 (6th Cir. 2008), rev'd on other grounds, __ U.S. __, 130 S.Ct. 2250 (2010), *citing Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004), *cert. denied,* 544 U.S. 921 (2005).

In *Parker v. Matthews*, 567 U.S. ___, 132 S. Ct. 2148, 183 L.Ed. 2d 32 (2012)(per curiam), the Supreme Court summarily reversed the Sixth Circuit, *Matthews v. Parker*, 651 F.3d 489 (6th Cir. 2011), noting that the "*Darden* standard is a very general one, leaving [state] courts 'more leeway . . . in reaching outcomes in case-by-case determinations.'" *Matthews* at *18, *quoting Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004), and criticizing the Sixth Circuit's reliance on its much more detailed standard in *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006).

In *Slagle  v. Bagley*, 457 F. 3d 501 (6th Cir. 2006), the court applied the foregoing law

and categorized various types of prosecutorial misconduct: character assault, referring to facts outside the record, referring to nonstatutory aggravating factors, denigration of defense counsel and witnesses, and vouching for prosecution witnesses. "Generally, "a prosecutor cannot make statements calculated to incite the passions and prejudices of the jurors." *Wogenstahl v. Mitchell*, 668 F.3d 307, 333 (6th Cir. 2012)(*quoting Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006) (internal quotation marks omitted). " Closing arguments that encourage juror identification with crime victims are improper. *Id. citing Johnson v. Bell*, 525 F.3d 466 at 484 (6th Cir. 2008). At the same time, "[n]othing prevents the government from appealing to the jurors' sense of justice or from connecting the point to the victims of the case." *Id. quoting Bedford v. Collins*, 567 F.3d 225 at 234 (6th Cir. 2009).

In habeas corpus, we are not reviewing the prosecutor's conduct *de novo*. Rather, we must determine whether the Ohio Supreme Court's review of that conduct was an objectively reasonable application of Supreme Court precedent. Thus Leonard makes his argument about the opening statement by citing trial transcript pages from the argument, but offers no refutation of the finding by the Ohio Supreme Court that each of the prosecutor's comments referred to evidence which was actually presented at trial. *Leonard*, 104 Ohio St. 3d 54 at ¶¶ 155-157.

Leonard complains that the prosecutor ignored rulings on objections to his examination of Detective Schweinefus, but gives this Court no reference to where that claim was raised before the Ohio Supreme Court.

Leonard complains that the prosecutor presented improper hearsay testimony as argued in the Second Ground for Relief (Traverse, Doc. No. 17, PageID 464). Based on the analysis given with respect to the Second Ground for Relief, none of the offers of testimony complained of there constituted prosecutorial misconduct.

Leonard complains about the prosecutor's comment that Leonard deserved no break (Traverse, Doc. No. 17, PageID 464).  The Ohio Supreme Court found no objection had been made to this comment and that there was no plain error involved.  *Leonard, supra*, ¶ 163.  Plain error review is, as noted *supra* with respect to Ground One, an enforcement of the procedural default.  Leonard has offered no excusing cause and prejudice.

Leonard complains that the prosecutor committed misconduct by referring to the penalty during the guilt phase (Traverse, Doc. No. 17, PageID 464-465).  The Ohio Supreme Court agreed this was improper, but procedurally defaulted for lack of objection.  *Leonard*, *supra*, ¶¶ 164-169.

Leonard complains of personal attacks on him by the prosecutor (Traverse, Doc. No. 17, PageID 465).  The Ohio Supreme Court found most of these comments were fair comment on the evidence.  *Leonard*, supra, ¶¶ 170-71.

Leonard complains that the prosecutor told the jurors a death verdict from them was a recommendation (Traverse, Doc. No. 17, PageID 466).  That, however, is an accurate statement of the law and therefore it was not misconduct to make it.

Leonard complains that the prosecutor inflamed the passions of the jury by telling them in the opening statement for the penalty phase that the aggravating circumstances would outweigh any evidence presented (Traverse, Doc. No. 17, PageID 466).  The Ohio Supreme Court found the claim procedurally defaulted because no contemporaneous objection was made. *Leonard, supra*, ¶ 172.

Leonard complains about the prosecutor's comments on his unsworn statement (Traverse, Doc. No. 17, PageID 466), but offers no argument about what Supreme Court precedent was improperly applied in rejecting this claim.

Leonard complains that the prosecutor "consistently argued improperly about the aggravating factor of rape" (Traverse, Doc. No. 17, PageID 466-467), but does not relate this to any Ohio Supreme Court ruling or to any arguably improperly applied United States Supreme Court precedent.

Leonard complains that the Ohio Supreme Court did not apply the strict standard of *Caldwell v. Mississippi*, 472 U.S. 320 (1985), to the prosecutor's closing argument in this case. But the portion of the closing argument in that case to which five members of the Supreme Court took exception was a comment about automatic appellate review.

Leonard's Subclaim B regarding prosecutorial misconduct during trial is without merit and should be dismissed with prejudice. Because reasonable jurists will have different evaluations of the prejudicial impact of prosecutorial comments, Petitioner should be granted a certificate of appealability on this Ground for Relief.

### Ground Seventeen – Brady Violation

In his Seventeenth Ground for Relief, Leonard claims his constitutional rights were violated when the prosecutor withheld material exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Leonard relies on his Traverse for argument on this claim, although he notes he was denied further factual development and believes such development would have led to further support for this claim (Final Brief, Doc. No. 39, PageID 946).

This claim was presented to the state courts as the Ninth Ground for Relief in Post-Conviction. The First District Court of Appeals affirmed denial of relief on this claim, holding:

**D. THE PROSECUTION'S FAILURE TO DISCLOSE EXCULPATORY EVIDENCE**

96

[**P35] Leonard contended in his ninth claim for relief that the state had failed to disclose, in response to his discovery requests, exculpatory evidence. In making this claim, Leonard neither specified the undisclosed exculpatory evidence nor supported his claim with evidence dehors the record. He instead cited nondisclosure claims made in other capital cases before the United States District Court for the Southern District of Ohio to show that the nondisclosure of exculpatory evidence by the Office of the Hamilton County Prosecuting Attorney had been "identified [as] an ongoing systemic problem." This "problem," Leonard argued, "warranted the granting of discovery to demonstrate that the chronic problem continued in [his] case."

[**P36] As we noted supra, a postconviction petitioner is not entitled to discovery to develop a claim if the claim and its supporting evidentiary material do not demonstrate substantive grounds for relief. See *State v. Issa*, supra. And a postconviction claim is subject to dismissal without a hearing if the petitioner has failed to support the claim with evidentiary material setting forth sufficient operative facts to demonstrate substantive grounds for relief. See R.C. 2953.21(C); *State v. Pankey*, supra; *State v. Jackson*, supra. In the absence of some demonstration of such grounds, we conclude that the common pleas court properly dismissed Leonard's ninth claim without a hearing and without permitting discovery on the matter. Accord *State v. Lynch*, 1st Dist. No. C-010209, 2001 Ohio 3914.

*State v. Leonard*, 157 Ohio App. 3d 653 ¶¶ 35-36 (Ohio App. 1st Dist. 2004).

Leonard's argument in this Court reprises his argument to the First District Court of Appeals:  since it has been shown in past cases that the Hamilton County Prosecutor's Office has violated its duties under *Brady*, they must have done so in this case (Traverse, Doc. No. 17, PageID 485-487).  He concludes by claiming the First District both unreasonably determined facts in light of the evidence and unreasonably applied clearly established federal law in finding no *Brady* violation.  Leonard does not claim that he has discovered any *Brady* material which was not revealed to his trial counsel.  State courts are not constitutionally compelled to authorize discovery in post-conviction on the basis of *Brady* violations in other cases.

Leonard's Seventeenth Ground for Relief is without merit and should be dismissed with prejudice.  Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability on this Ground for Relief.

## Ground Eighteen – Discriminatory Charging and Prosecution

In his Eighteenth Ground for Relief, Leonard claims his constitutional rights to fair trial, due process, and equal protection were denied by the existence of unregulated discretion of the Hamilton County prosecutor in deciding who will be charged with a capital crime (Traverse, Doc. No. 17, PageID 490).

Leonard presented this claim on direct appeal as his Twentieth Proposition of Law which the Ohio Supreme Court decided as follows:

> [**P177] In proposition of law 20, Leonard claims that he was denied a fair trial by "discriminatory charging and prosecution actions." But Leonard fails to explain how the prosecutor acted improperly by charging him with capital murder or how he was denied a fair trial as a result of the prosecutor's actions. In any event, "the existence of discretion in the charging stage of a capital prosecution does not violate the Constitution. " *State v. Nields,* 93 Ohio St.3d at 38, 752 N.E.2d 859; see, e.g., *State v. Coleman* (1989), 45 Ohio St.3d 298, 308, 544 N.E.2d 622; *Gregg v. Georgia* (1976), 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859. Leonard's 20th proposition of law is overruled.

*State v. Leonard*, 104 Ohio St. 3d 54, ¶ 177 (2004).  As with his Seventeenth Ground for Relief, Leonard relies on the argument made in his Traverse while complaining that he was not allowed further factual development of the claim (Final Brief, Doc. No. 39, PageID 947).

Leonard claims the Ohio "system is designed so as to permit a prosecuting attorney to sidestep the procedural safeguards of Supreme Court decisions by allowing arbitrary charging

decisions that unfairly impinge on defendants' rights before the trial safeguards commence."
(Traverse, Doc. No. 17, PageID 493).   However, Leonard did not present and this Court is
unaware of any evidence that the Ohio criminal justice system has been redesigned to avoid
Supreme Court precedent.  Prosecutorial discretion at the elected county prosecutor level is the
general pattern for criminal prosecution in the United States.  The Supreme Court has held that
such discretion may not be exercised on an unconstitutionally invidious basis, e.g., by
prosecuting black people for offenses for which whites are not prosecuted.  But ordinary rules of
proof for equal protection cases apply.  For example, in order to prove even a prima facie case of
racially selective prosecution, a defendant must show "that similarly situated individuals of a
different race were not prosecuted."  *United States v. Armstrong,* 517 U.S. 456 (1996), *citing Ah
Sin v. Wittman*, 198 U.S. 500 (1905).  To obtain discovery on a selective prosecution claim, a
defendant must show some evidence of both discriminatory intent and effect.  *United States v.
Jones,* 159 F.3d 969, 978 (6th Cir. 1998).  In *Armstrong*, the Supreme Court refused to uphold
dismissal of an indictment on racially selective prosecution grounds even though an affidavit
from the relevant public defender's office showed that in all 24 of that office's cocaine offense
cases in 1991, the defendant had been black.  Selective prosecution claims are appropriately
judged by ordinary equal protection standards.  *Cornwell v. Bradshaw*, 559 F.3d 398 (6th Cir.
2009), *citing Wayte v. United States,* 470 U.S. 598, 608 (1985).

Leonard has not suggested any invidious basis on which he was selected for capital
prosecution.  He is "white," at least by appearance in the trial videos; he is an American citizen;
he was not raised in a minority religion; and he has not suggested that domestic violence murders
attract more capital prosecutions in Hamilton County than, say, convenience store robbery
murders or drug deal murders.  See, e.g., *Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir. 2000);

*Fears v. Bagley*, 2012 U.S. App. LEXIS 3295 (6th Cir. Feb. 16, 2012).

Leonard's Eighteenth Ground for Relief is without merit and should be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability on this Ground for Relief.

## Ground Nineteen – Attorney Conflict of Interest

In his Nineteenth Ground for Relief, Leonard claims he received ineffective assistance of trial counsel because his trial counsel was retained by his family, was a friend of the family, and represented Leonard's brothers in civil litigation which also involved Leonard, i.e., civil litigation by the survivors of Dawn Flick asserting corporate liability for her death.

Leonard presented this claim to the state courts as the Third Ground for Relief in his petition for post-conviction relief and argues it in this Court in his Final Brief (Doc. No. 39, PageID 948-958).

The Ohio court of appeals affirmed the Common Pleas Court's denial of this claim as follows:

> *4. Counsel's conflicts of interest*
>
> **[**P25]** In his third claim for relief, Leonard contended that he was denied his Sixth Amendment right to conflict-free counsel. Specifically, he asserted that his counsel had had close personal ties to the members of his family who had retained and had paid counsel, and that counsel had simultaneously represented him in his criminal trial and him and his brothers' company in civil actions brought by the victims. These conflicts, Leonard asserted, had hampered counsel's willingness to uncover and to present at the mitigation hearing evidence concerning his dysfunctional family.
>
> **[**P26]** The Sixth Amendment guarantees a criminal defendant the effective assistance of counsel and, in doing so, secures to him

the assistance of counsel free from conflicts of interest. See *Glasser v. United States* (1942), 315 U.S. 60, 62 S. Ct. 457, 86 L. Ed. 680. To prevail on a claim that he was denied his right to conflict-free counsel, a defendant must demonstrate "an actual conflict of interest." *Wood v. Georgia* (1981), 450 U.S. 261, 273, 101 S. Ct. 1097, 67 L. Ed. 2d 220. An "actual conflict," for purposes of the Sixth Amendment, is "a conflict of interest that adversely affects counsel's performance." *Mickens v. Taylor* (2002), 535 U.S. 162, 172, 122 S. Ct. 1237, fn. 5, 152 L. Ed. 2d 291. Therefore, to prove an "actual conflict of interest," the defendant must show that his counsel "actively represented conflicting interests," and that the conflict "actually affected the adequacy of his representation." See id. (quoting *Cuyler v. Sullivan* [1980], 446 U.S. 335, 349-350, 100 S. Ct. 1708, 64 L. Ed. 2d 333); accord *State v. Pelphrey*, 149 Ohio App. 3d 578, 583, 2002 Ohio 5491, 778 N.E.2d 129; *State v. Haberek* (1988), 47 Ohio App. 3d 35, 38, 546 N.E.2d 1361.

*a.*

[**P27**] We note at the outset that the right to conflict-free counsel not only imposes upon defense counsel an affirmative duty to ensure conflict-free representation, but also imposes upon the trial court an affirmative duty to inquire into the matter when the court knows or should know of a potential conflict. See *State v. Gillard* (1992), 64 Ohio St. 3d 304, 1992 Ohio 48, 595 N.E.2d 878, syllabus. We conclude that the court in the proceedings below incurred no such duty, when the defendant offered no objection to his counsel's dual representation, and the record of the proceedings at trial contained no suggestion of a conflict of interest.

*b.*

[**P28**] A conflict of interest arises when counsel incurs a duty on behalf of one client "to contend for that which [his] duty to another client requires him to oppose." *State v. Manross* (1988), 40 Ohio St. 3d 180, 182, 532 N.E.2d 735. Leonard alleged that such a conflict arose as a consequence of his counsel's simultaneous representation of him in his murder trial and of him and his brothers' company in the victims' civil actions.

[**P29**] Leonard supported this allegation with copies of the complaints and entries filed in the civil actions. This evidentiary material showed that the victims had predicated their civil claims against the company upon the company's ownership of the van Leonard had driven to the murder victim's home, and that the

plaintiffs in each action had voluntarily dismissed their claims against the company before trial.

[**P30] The dismissal of the company as a defendant in the civil actions left Leonard solely liable on the victims' claims. In that sense, the evidence might be said to have permitted a conclusion that counsel, in securing the company's dismissal from the victims' actions, had incurred a duty adverse to their duties in defending Leonard in the civil action. But the evidence disclosed no duty incurred by counsel in defending the company in the civil action that might be said to have been adverse to or in conflict with counsel's duties in defending Leonard against the criminal charges. Thus, Leonard failed to show an actual conflict arising from his counsel's simultaneous representation of him in his murder trial and of the company in the victims' civil actions.

*c.*

[**P31] Leonard also contended that a conflict of interest arose from his counsel's close personal ties to his family. He asserted that his counsel had possessed "critical information" concerning his family that would have helped to explain his crime. Counsel's possession of this information, Leonard insisted, necessitated counsel's testimony at trial and thus required counsel, consistent with DR 5-102(A) of the Ohio Code of Professional Responsibility, to withdraw from representing him at trial.

[**P32] A criminal defense counsel's "breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel." *Nix v. Whiteside* (1986), 475 U.S. 157, 165, 106 S. Ct. 988, 89 L. Ed. 2d 123. Moreover, the evidence offered in support of Leonard's petition, coupled with the record of the proceedings at trial, showed the existence of a multitude of witnesses to "the dysfunctional dynamics of the Leonard family." In the absence of evidence that only his counsel could have provided this "critical information," Leonard failed to demonstrate that a conflict of interest arose from, and persisted as a consequence of, his counsel's failure to conform to the ethical standard by withdrawing from representing him and instead testifying on his behalf at trial.

*d.*

[**P33] Finally, Leonard contended that his counsel had breached their duty to present an adequate and effective case in mitigation because they had labored under a conflict of interest arising from

102

the fact that his family members had retained and paid them. Courts have recognized the dangers that inhere when a criminal defendant is represented by a lawyer hired and paid by a third party. See *Wood v. Georgia*, 450 U.S. at 268-269, 101 S. Ct. 1097. But, as we noted supra, the Sixth Amendment right to conflict-free counsel protects against "'an actual conflict of interest' * * *--as opposed to a mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. at 172, 122 S. Ct. 1237 (quoting *Wood v. Georgia*, 450 U.S. at 273, 101 S. Ct. 1097). Thus, Leonard was required to demonstrate not only that his counsel had "actively represented conflicting interests," but also that the conflict had "actually affected the adequacy of [their] representation." See id. (quoting *Cuyler v. Sullivan*, 446 U.S. at 349-350, 100 S. Ct. 1708). As we concluded supra, the record of the proceedings at trial demonstrated that counsel had presented the case in mitigation competently in view of the facts available to them. And nothing in the evidentiary material submitted by Leonard in support of his claim suggested the contrary. Leonard thus failed to demonstrate a causative link between the alleged conflict of interest and an inadequacy in his counsel's representation.

[**P34] Upon our determination that Leonard failed to demonstrate in any respect a violation of his Sixth Amendment right to conflict-free counsel, we hold that the common pleas court properly denied his third claim for relief without a hearing. See *Pankey,* supra; *Jackson,* supra.

*State v. Leonard*, 157 Ohio App. 3d 653, ¶¶ 25-34 (Ohio App. 1st Dist. 2004).

In arguing this Ground for Relief, Leonard relies in part on the depositions of trial counsel taken as part of these federal habeas corpus proceedings (Final Brief, Doc. No. 39, referencing Deposition of William Welsh, Ex. 1 to Doc. No. 33; Deposition of Michael Strong, Ex. 2 to Doc. No. 33). Shortly after this Court granted Petitioner's Motion to Expand the Record to allow consideration of these depositions on the merits, the United States Supreme Court decided in *Cullen v. Pinholster,* 563 U.S. ___, 131 S.Ct. 1388 (2011), that a federal court's review of a state court decision under 28 U.S.C. § 2254(d)(1) is strictly limited to "review of the state court record," and that evidence acquired through use of an evidentiary hearing may not be considered. *Id.* at 1399. The fact that the Welsh and Strong testimony came into the record by

103

expansion under Rule 5 of the Rules Governing § 2254 cases, rather than by evidentiary hearing under Rule 7 is of no consequence; *Pinholster* applies equally to both.  Thus the deposition testimony will not be considered.

In part Leonard argues that the Ohio courts unreasonably denied him discovery on this claim (Final Brief, Doc. No. 39, PageID 952-957).  Assuming that is true, it does not entitle him to habeas corpus relief:  he cites no United States Supreme Court precedent entitling him to discovery in post-conviction proceedings.  *Wood v. Georgia*, 450 U.S. 261 (1981), was a case in which the owner of an "adult" theater and bookstore provided counsel for employees arrested for distribution of obscene materials.  The employees' probation was revoked when they did not pay fines which they testified their employer's attorney had promised to pay.  The Court remanded for a hearing on whether there was an actual conflict of interest when conflict was "sufficiently apparent at the time of the revocation hearing to impose a duty on the trial court to inquire further."  *Id.* at 274.

Unlike the situation in *Wood* where the employer was apparently trying to create a test case of the Georgia obscenity statute, there is no apparent conflict of interest created when a family hires an attorney to represent one of its number accused of a capital crime.  There is no suggestion that the family had any interest in any outcome of the criminal case other than acquittal or minimization of the seriousness of the conviction.  This is simply not like the situation in *Wood* or, say, when a major drug dealer pays for counsel for arrested couriers.

The court of appeals dealt with the notion that Strong should have withdrawn to become a witness by noting that there was nothing unique about his knowledge of the Leonard family which made him the right witness for that purpose.

Leonard also relies on the fact that Strong represented LTS Builders in the civil litigation

brought by the victims on the basis that he was driving a company van the night of the crime. Of course, Leonard's personal interest in avoiding liability for the wrongful death and the assaults conflicted with the interest of his brother's company in not being held liable. But those interests were conflicting in the civil litigation only. There was nothing about the murder prosecution which turned on ownership of the vehicle Leonard drove that night. In other words, nothing about Strong's representation of LTS Builders in the civil litigation would have tempted him to be less than completely vigorous in his defense of Leonard in the criminal litigation.

The court of appeals' decision was not an objectively unreasonable application of clearly established Supreme Court precedent and it is therefore entitled to deference. Leonard's Nineteenth Ground for Relief is without merit and should be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability on this Ground for Relief.


### Ground Twenty – Ineffective Assistance of Trial Counsel at the Guilt Phase


In his Twentieth Ground for Relief, Leonard asserts he received ineffective assistance of trial counsel at the guilt phase of his trial (Traverse, Doc. No. 17, PageID 504). Argument for this Ground for Relief is made in Petitioner's Final Brief (Doc. No. 39, PageID 959-975). Part of this claim was presented as the Fourth, Seventeenth, and Twenty-First Propositions of Law on direct appeal, part as the Fifth and Sixth Grounds for Relief in post-conviction, and part as the First omitted Proposition of Law in the Application for Reopening the direct appeal (Traverse, Doc. No. 17, PageID 505; Final Brief, Doc. No. 39, PageID 959). This Report deals with these subclaims separately as they were dealt with by the Ohio courts.

**Ineffective Assistance of Trial Counsel Claims Raised on Direct Appeal**

In his direct appeal to the Ohio Supreme Court, Leonard alleged he had received ineffective assistance of trial counsel when his trial attorneys "failed to request experts, called witnesses who hurt the defense, did not properly prepare mitigation witness [sic], and did not properly question witnesses . . . ." (Traverse, Doc. No. 17, PageID 505.) He also claims that neither trial attorney was certified by the Ohio Supreme Court to represent capitally charged defendants (Final Brief, Doc. No. 39, PageID 959-960). The Ohio Supreme Court decided these claims as follows:

### IV. Ineffective Assistance of Counsel

[**P139] In his fourth proposition of law, Leonard makes various claims relating to ineffective assistance of counsel. Reversal of a conviction or sentence based upon ineffective assistance of counsel requires satisfying the two-pronged test set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674. *Strickland* requires that the defendant show, first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Id.* at 687, 104 S.Ct. 2052, 80 L. Ed. 2d 674.

[**P140] Leonard raises several claims of ineffective assistance during the guilt-determination phase. He first contends that counsel was deficient for failing to request defense experts. But as we discussed in relation to Leonard's propositions of law one and eight, the record does not reveal any need for experts. Thus, no basis exists to find deficient performance.

[**P141] Similarly, we reject Leonard's claims of ineffective assistance of counsel raised in propositions of law 17 and 21. Leonard has not shown that counsel's performance was either deficient or prejudicial. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus, following *Strickland,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674.

[**P142] Leonard also claims that he was prejudiced by trial

106

counsel's lack of experience in capital cases and that lead counsel was not certified pursuant to Sup.R. 20 (formerly C.P.Sup.R. 65). However, during arraignment, the trial court advised Leonard of his right to have counsel appointed who was certified in capital cases. Leonard, instead, chose to retain private counsel. In *State v. Keith* (1997), 79 Ohio St.3d 514, 534, 1997 Ohio 367, 684 N.E.2d 47, we declined to "impose a rule that creates a presumption of ineffective assistance of counsel where counsel has been retained by or for a defendant and is not qualified under C.P.Sup.R. 65."

[**P143] Leonard next argues that counsel was deficient in calling two witnesses in the guilt-determination phase who offered damaging testimony. Leonard claims that testimony from his brother Ted and from Rick Schoeny prejudiced his defense. "Generally, counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *State v. Treesh,* 90 Ohio St.3d at 490, 739 N.E.2d 749. We conclude that trial counsel's decision to call these witnesses represented reasonable trial strategy.

[**P144] Schoeny testified that it was common for Leonard to have guns and that he always carried a gun in his jacket. This testimony was apparently offered to rebut the state's claim that the murder was premeditated. Ted Leonard testified that Leonard had previously threatened to kill people but that he had never taken his brother's threats seriously. This testimony was apparently intended to diminish the impact of the state's evidence that Leonard had previously threatened Flick. And Ted's testimony that Leonard was a good shot supported the defense theory that Leonard did not intend to kill Gries and Minges when he shot at them through the door of Flick's residence. This strategy was ultimately successful: Leonard was acquitted of both attempted-murder counts. Finally, Ted's testimony that Leonard had admitted killing Flick was not prejudicial in light of Leonard's confession.

[**P145] Leonard also claims deficient performance in trial counsel's failure to request a continuance when three subpoenaed defense witnesses failed to appear at the guilt-determination phase of the trial. Defense counsel explained to the court that the witnesses "were not eyewitnesses or anything of that nature" but were subpoenaed to offer "background" information. Leonard has not explained how the failure to ask for a continuance was prejudicial. Moreover, the trial court asked Leonard whether his counsel had consulted with him in regard to the absence of these witnesses, and Leonard said that they had and that he agreed with counsel's decision to proceed without them.

107

[**P146] Leonard also argues that counsel failed to effectively cross-examine Gries and Minges. The extent and scope of cross-examination clearly fall within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel. See *State v. Campbell,* 90 Ohio St.3d at 339, 738 N.E.2d 1178; *State v. Otte,* 74 Ohio St.3d at 565, 660 N.E.2d 711; accord *State v. Bradley,* 42 Ohio St.3d at 142-144, 538 N.E.2d 373. Leonard claims that there were several inconsistencies in the testimony of Gries and Minges and that more effective cross-examinations could have bolstered the defense's argument that Flick had consented to having sex with Leonard. But Leonard does not explain what the alleged inconsistencies are or how they could have shown that Flick had consented. Nor are the inconsistencies clear from the record. Thus, we reject Leonard's argument.

*State v. Leonard,* 104 Ohio St. 3d 54, ¶¶ 139-146 (2004).

The governing standard for ineffective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668 (1984):

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687. In other words, to establish ineffective assistance, a defendant must show both deficient performance and prejudice. *Berghuis v. Thompkins,* ___ U.S. ___, ___, 130 S.Ct. 2250, 2255 (2010), *citing Knowles v. Mirzayance,* 556 U.S.111 (2009). The Ohio Supreme Court recognized the authority of Strickland and adopted it as governing Ohio law in *State v. Bradley*, 42 Ohio St.3d 136, paragraph two of the syllabus, (1989).

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential. . . .  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance;  that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689.

As to the second prong, the Supreme Court held:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to overcome confidence in the outcome.

466 U.S. at 694.  *See also Darden v. Wainwright*, 477 U.S. 168, 184 (1986), *citing*, *Strickland, supra.*; *Wong v. Money,* 142 F.3d 313, 319 (6th Cir. 1998), *citing, Strickland, supra*; *Blackburn v. Foltz*, 828 F.2d 1177, 1180 (6th Cir. 1987) *quoting*, *Strickland,* 466 U.S. at 687. "The likelihood of a different result must be substantial, not just conceivable."  *Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011), *cert. denied,* ___ U.S. ___, 132 S.Ct. 1760 (2012), *quoting Harrington v. Richter*, 562 U.S. ___, ___, 131 S. Ct. 770, 792 (2011).

With respect to the rulings that the record did not show the need for any experts or that the record did not show any inconsistencies upon which Gries and Manges could have been cross-examined, Leonard does not claim that these findings are clearly erroneous based on what was in the record on direct appeal.

Regarding Welsh and Strong's lack of certification as death-qualified counsel by the Ohio Supreme Court, Leonard does not dispute the Ohio Supreme Court's finding that Leonard

109

was advised he was entitled to appointment of certified counsel and elected to continue with Welsh and Strong.  Nor does he offer any United States Supreme Court precedent holding that counsel not certified in that way (or in whatever other way a State may choose to prepare capital-qualified counsel) are presumed to be ineffective.

With respect to the alleged ineffectiveness of calling Rick Schoeny and Ted Leonard, Petitioner's present counsel claim there was no good reason to do so.  The Ohio Supreme Court concluded, however, that their testimony was material to defending against the prior calculation and design specification and the testimony (perhaps considered with other testimony not adverted to) was so successful that the specification was amended out of the Indictment by the trial judge and not submitted to the jury.  It can hardly be doubted that eliminating a premeditation specification would be very helpful in an aggravated murder case, especially where, as here, there was arguable evidence to also eliminate the rape specification.

The last alleged issue of ineffective assistance of trial counsel raised on direct appeal was the failure to ask for a continuance to obtain the presence of defense witnesses who did not respond to subpoenas.  In his briefing, Leonard offers nothing to refute the Ohio Supreme Court's finding of waiver should be overturned.

With respect to the claims raised on direct appeal, then, Leonard has failed to show that the Ohio Supreme Court's decision was an objectively unreasonable application of *Strickland*.


**Ineffective Assistance of Trial Counsel Claims Raised in Post-Conviction**


Leonard raised additional claims of ineffective assistance of trial counsel in post-conviction.  Citing *Strickland* and *Brady* as the controlling law, the First District Court of

Appeals decided these claims as follows:

> *1. Ineffective assistance of counsel during the guilt phase of trial.*
>
> **[\*\*P17]** Leonard contended in his sixth claim for relief that his trial counsel had violated essential duties when they had failed to present a speedy-trial challenge, when they had failed to address during the voir dire examination of prospective jurors various matters that had surfaced later at his trial, and when they had adduced damaging testimony from defense witnesses at trial. New counsel had represented Leonard in his direct appeal to the Ohio Supreme Court, and these challenges to trial counsel's competence presented matters that could fairly have been determined without evidence dehors the record. These aspects of the sixth claim were, therefore, subject to dismissal without a hearing under the doctrine of res judicata. See *State v. Cole* (1982), 2 Ohio St. 3d 112, 2 Ohio B. 661, 443 N.E.2d 169.
>
> **[\*\*P18]** In his sixth claim, Leonard also challenged the adequacy of his trial counsel's cross-examination of certain state's witnesses, of counsel's failure to present testimony by his sister, and of counsel's failure to challenge the underrepresentation of African Americans on his petit jury venire. And in his fifth claim, Leonard assailed the adequacy of the investigation conducted by counsel in preparing for the guilt phase of his trial.
>
> **[\*\*P19]** The evidence offered in support of these challenges to counsel's competence demonstrated neither counsel's violation of an essential duty to Leonard nor a reasonable probability that, but for the alleged omissions of counsel, either independently or collectively, the results of the guilt phase of his trial would have been different. See *Bradley,* supra. Leonard thus failed to sustain his initial burden of demonstrating substantive grounds for relief. Accordingly, we hold that the common pleas court properly denied without a hearing the sixth claim and the relevant aspects of his fifth claim. See *Pankey,* supra; *Jackson,* supra.

*State v. Leonard*, 157 Ohio App. 3d 653, ¶¶ 17-19 (2004).  Because the Ohio Supreme Court declined review of this decision, it is the last reasoned state court decision on these claims and the one which this Court must review.

As to the failure to make a speedy trial challenge, failure to address certain issues during

voir dire, "various matters that had surfaced later at his trial," and the damaging testimony elicited from Ted Leonard and from Gries, the court of appeals held these were barred by the Ohio criminal *res judicata* doctrine.  *Id.* at ¶ 17, *citing State v. Cole*, 2 Ohio St. 2d 112 (1982).

This doctrine, first enunciated in *State v. Perry,* 10 Ohio St. 2d 175 (1967), is an adequate and independent state ground.  *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007); *Buell v. Mitchell*, 274 F. 3d 337 (6th Cir. 2001); *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir. 2000); *Rust v. Zent,* 17 F.3d 155, 160-61 (6th Cir. 1994)(citation omitted); *Van Hook v. Anderson*, 127 F. Supp. 2d 899, 913 (S.D. Ohio 2001).  The Ohio courts have consistently enforced the rule.   *State v. Cole*, 2 Ohio St. 3d 112, 443 N.E. 2d 169 (1982); *State v. Ishmail*, 67 Ohio St. 2d 16, 423 N.E. 2d 1068 (1981), and they did so here. Leonard has offered no excusing cause and prejudice.  Therefore the portions of Leonard's ineffective assistance of trial counsel claim dealt with in ¶ 17 of the court of appeals' decision are procedurally defaulted and barred from merit review in this Court.

As to the remaining claims not barred by *res judicata*, the court of appeals held Leonard had not met the threshold burden of demonstrating substantive grounds for relief.  *Id.* at ¶ 18. Leonard argues this portion of the decision does not bar merit relief because the court of appeals improperly interpreted Ohio Revised Code § 2953.21 in not allowing Leonard discovery and an evidentiary hearing(Final Brief, Doc. No. 39, PageID 969-970).  This Court is of course bound to accept the court of appeals' reading of Ohio law; there is no federal constitutional right to discovery and an evidentiary hearing in state post-conviction proceedings.

In arguing the merits of these claims, present counsel focus primarily on the alleged failure to adequately investigate and present the details of Leonard's relationship with Dawn Frick (Final Brief, Doc. No. 39, PageID 960-962).  Obviously there could have been a great deal

more of the history discovered, although defense counsel Strong, as a long-time friend of the Leonard family, may have known much of it without hiring an investigator. The question remains about what additional facts would have had any impact on the guilt phase of the trial. The essential facts appear to be that Frick, having tolerated to some extent Leonard's fathering a child with another woman while they were engaged, decided to end the relationship when the second child was born. Unwilling to accept the rejection, Leonard attempted to force her to have sex with him again, then shot her execution style when Gries attempted a rescue. Overcome with remorse, Leonard surrendered to a police officer acquaintance and confessed what happened. Given those facts, proposed testimony by Leonard's sister Jeanne Hutcherson that, while she had never seen Leonard hit Frick, she had seen Frick hit Leonard and she had seen Frick kissing Gries at a party after Leonard left, both on undated occasions sometime during the ten-year relationship is hardly the stuff of which successful defenses to confessed murder are made (Final Brief, Doc. No. 39, PageID 961).

Leonard also currently argues the failures to aggressively cross-examine witnesses Gries and Manges (the two attempted rescuers) about inconsistencies between their statements to police at the time of the crime, their civil lawsuit pleadings, and their trial testimony (Final Brief, Doc. No. 39, PageID 963). Focusing on minor inconsistencies is not likely to have persuaded the jury that these witnesses were lying or even inaccurate in the major points of their testimony. Far too frequently inexperienced trial lawyers focus on minor inconsistencies when any juror with much life experience probably remembers from his or her own life reporting the same event differently on different occasions. The standard jury instruction in both Ohio and federal courts reminds jurors to distinguish between inconsistencies in reporting minor details and the major events about which witnesses have testified. None of the inconsistencies about which these

witnesses were not cross-examined displays failure to undermine key testimony.

Leonard does not press in this Court his claim about underrepresentation of African Americans in the petit jury venire which he raised in post-conviction.

Leonard adverts in this portion of his Final Brief to the deposition testimony of trial counsel in these habeas corpus proceedings.  As previously noted, consideration of that testimony is barred by *Cullen v. Pinholster,* 563 U.S. ___, 131 S.Ct. 1388 (2011).

With respect to the claims raised in post-conviction, Leonard has failed to show that the court of appeals' decision was an objectively unreasonable application of *Strickland*.


**Ineffective Assistance of Trial Counsel Claims Raised in Application for Reopening**


Leonard raised a claim of ineffective assistance of trial counsel in voir dire in his First omitted Proposition of Law in his Application for Reopening (Traverse, Doc. No. 17, PageID 505. Citing Apx. Vol. 5, p. 135).  The particular deficiencies raised in the Application for Reopening are (1) defense counsel failed to inquire about ability to consider individual mitigating factors (*Id.* at 136); and (2) defense counsel failed to adequately rehabilitate anti-death penalty jurors (*Id.* at 137).

These are both claims which could have been raised on direct appeal because they appear on the face of the record, but were not.  They were therefore procedurally defaulted under the Ohio criminal *res judicata* doctrine unless the default was excused.  The Ohio Supreme Court summarily denied reopening which amounts to a denial of Leonard's claim that it was ineffective assistance of appellate counsel to fail to raise these two deficiencies on direct appeal.  In attempting to show that decision of the Ohio Supreme Court was unreasonable, Leonard does no

114

more than assert in conclusory language that these "claims were strong claims." (Traverse, Doc. No. 17, PageID 506). It is the comparative strength of the omitted issues which must be evaluated. *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003). *Williams v. Bagley,* 380 F.3d 932, 971 (6th Cir. 2004), *cert. denied,* 544 U.S. 1003 (2005); see *Smith v. Murray*, 477 U.S. 527 (1986). Leonard makes no argument comparing these omitted issues with the issues which were actually argued on direct appeal.

Leonard has not shown that the Ohio Supreme Court's rejection of this claim of ineffective assistance of appellate counsel was an unreasonable application of the Supreme Court precedent applying *Strickland* at the appellate level. Leonard has therefore not established excusing cause and the two claims of ineffective assistance of trial counsel during voir dire raised for the first time in the Application for Reopening are procedurally defaulted.

On the basis of this combined analysis, the Magistrate Judge recommends that the Twentieth Ground for Relief be dismissed on the merits. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability on this Ground for Relief.


**Ground Twenty-One – Ineffective Assistance of Trial Counsel at the Mitigation Phase**


Leonard claims he was denied ineffective assistance of trial counsel during the mitigation phase of trial when his trial attorneys "failed to conduct a reasonable mitigation investigation, and presented an incomplete and damaging mitigation case." (Traverse, Doc. No. 17, PageID 529.)

Leonard refers in his Traverse to three "sub-claims" under this claim. Those sub-claims

115

are:

**Subclaim 1** – Failure to Conduct a Reasonable Mitigation Investigation (Traverse, Doc. No. 17, PageID 532).

**Subclaim 2** – Presentation of "incomplete, damaging, and misleading information through a psychiatrist." *Id.* at PageID 536.

**Subclaim 3** – Making erroneous and misleading statements about the law.  *Id.* at PageID 539.

In responding to the Warden's procedural default arguments, Leonard says that the first and second subclaims were raised in the Fifth, Seventh, and Eighth Grounds for Relief in his amended petition for post-conviction relief and the third sub-claim was raised in the Fourth Proposition of Law on direct appeal (Traverse, Doc. No. 17, PageID 530, 532).

Leonard, however, also admits that the first two sub-claims were raised on direct appeal in his Fourth and Twenty-Eighth Propositions of Law (Traverse, Doc. No. 17, PageID 530).  He then claims that because these claims could only be supported by record evidence and evidence dehors the record was needed to make a "full and fair presentation," the Ohio Supreme Court's ruling on the merits of these claims was "less than a reasoned decision by that court."  (Traverse, Doc. No. 17, PageID 530, note 4).  He asserts that therefore the court of appeals' decision on post-conviction is "controlling for purposes of federal review."  *Id.* Whether or not the court of appeals could have refused merit consideration of these claims on a *res judicata* basis, it did not do so.  A procedural default that is not enforced by the state courts does not bar merit review in habeas.  *Wogenstahl v. Mitchell*, 668 F.3d 307, 327 (6th Cir.  2012).

In considering these claims in post-conviction, the court of appeals wrote:

> 2. *Ineffective assistance of counsel during the penalty phase of trial.*
>
> **[\*\*P20]** Leonard directed his seventh claim and the balance of his

116

fifth claim against the adequacy and effectiveness of counsel's preparation for and presentation of the case in mitigation. The defense presented at trial a mitigation theory that proposed that Leonard was a good person who had acted out of character when he had killed Dawn Flick. The evidentiary material offered by Leonard in support of his claims of counsel's ineffectiveness merely supported an alternative theory of mitigation. When, as here, counsel presented the case in mitigation competently in view of the facts available to them, evidence offered to prove the existence of mitigation evidence that counsel had failed to present at trial, and that supported an alternative theory of mitigation, did not provide proof of counsel's ineffectiveness. See *State v. Post* (1987), 32 Ohio St. 3d 380, 388-389, 513 N.E.2d 754. Because Leonard failed to demonstrate substantive grounds for relief, we hold that the common pleas court properly denied the seventh claim and the balance of the fifth claim. See *Pankey,* supra*; Jackson,* supra.

*3. Ineffective assistance of mental health expert.*

[**P21] In his eighth claim, Leonard contended that he had been denied the effective assistance of counsel and had been effectively denied his "right" to "a competent mental health examination * * * for purposes of the mitigation [phase of his trial]," because counsel had inadequately prepared and presented the testimony of the psychiatrist retained to examine Leonard, and because the psychiatrist had inadequately evaluated him and had incompetently testified at the mitigation hearing.

[**P22] In asserting his "right" to a competent mental health evaluation, Leonard relied upon the decision of the United States Supreme Court in *Ake v. Oklahoma* (1985), 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53. This reliance was misplaced.

[**P23] The Supreme Court in *Ake* held that due process requires the government to provide an indigent criminal defendant with the funds to obtain expert assistance, upon a showing of benefit and fairness to the defendant. See *State v. Mason* (1998), 82 Ohio St. 3d 144, 150, 1998 Ohio 370, 694 N.E.2d 932. But Leonard was not indigent and thus was not provided with a mental health expert at government expense. Moreover, we note that while a defendant charged with aggravated murder has a *statutory* right to "reasonably necessary" expert assistance, see R.C. 2929.024, a postconviction claim must be predicated upon the denial or infringement of a state or federal *constitutional* right. See R.C. 2953.21(A)(1). Finally, we agree with the Sixth Appellate District

that the decision in *Ake* cannot reasonably be read to recognize a constitutionally based right to the effective assistance of an appointed mental health expert, independent of the constitutional right to the effective assistance of counsel. See *State v. Baston* (Nov. 17, 2000), 6th Dist. No. L-98-1264, 2000 Ohio App. LEXIS 5309; accord *Wilson v. Greene* (C.A.4, 1998), 155 F.3d 396, 401; *Harris v. Vasquez* (C.A.9, 1990)*, 949 F.2d 1497, 1518*; *Silagy v. Peters* (C.A.7, 1990), 905 F.2d 986, 1013; *Waye v. Murray* (C.A.4, 1989), 884 F.2d 765, 767; *Davie v. Mitchell* (N.D.Ohio 2003), 291 F. Supp. 2d 573, 616. Thus, Leonard's eighth claim was reduced to yet another challenge to trial counsel's competence in presenting the case in mitigation.

[**P24] Leonard supported his eighth claim with a report prepared by a licensed clinical psychologist at the behest of the Office of the Ohio Public Defender, highlighting alleged deficiencies in the evaluation conducted and the testimony presented at the mitigation hearing by the psychiatrist retained by the defense. These alleged deficiencies included the psychiatrist's failure to identify and testify to the dysfunctional nature of Leonard's social and sexual relationships and his mother's culpability in his emotional development. The introduction of much of this evidence would only have served to undermine the defense's mitigation strategy. And, again, proof of the existence of evidence not presented in mitigation that supported an alternative theory of mitigation did not prove counsel's ineffectiveness, when, as here, the record demonstrated that counsel had presented the case in mitigation competently in view of the facts available to them. See *State v. Post*, supra. Thus, upon our determination that Leonard failed to demonstrate substantive grounds for relief, we hold that the common pleas court properly denied the eighth claim. See *Pankey,* supra*; Jackson,* supra.

*State v. Leonard*, 157 Ohio App. 3d 653, ¶¶ 20-24 (2004).


**Subclaim 1 – Failure to Conduct a Reasonable Mitigation Investigation [and Present its Results] (Traverse, Doc. No. 17, PageID 532)**


In his Traverse, Leonard summarizes the mitigation case his current counsel believe his trial counsel should have presented (Traverse, Doc. No. 17, PageID 535; repeated verbatim in the Final Brief, Doc. No. 29, at PageID 978-979).  The supporting evidence consists largely of

affidavits from family members, although there is one from The Most Reverend Gerald Gettelfinger, Roman Catholic Bishop of Evansville, Indiana, who knew the Leonard children except for Patrick, and one from Amy Fugate, a sexual partner of Leonard at the time of the murder (Apx. Vol. 8 at 66-68, 79-80).  All of the Affidavits were transparently constructed by someone other than the affiant, then modified by hand before being signed and filed.  The gist of the alternative theory of mitigation is that Leonard grew up in a strict family where there were high expectations about behavior of the children.  His parents did not express much affection toward him. Unlike his siblings, Leonard was not particularly good in school and left home immediately after finishing high school to avoid his parents' strict rules.  He had a number of sexual relationships, but was "unable to meaningfully commit" to any of them.

As the court of appeals noted, defense counsel had a coherent theory of mitigation: Leonard was a first offender and his actions toward Dawn were completely out of character. That theory was well presented.  It is difficult to discern how any of the evidence presented in post-conviction would have made, taken together, a more convincing mitigation case, given that it would have been on a different theory:  Leonard's character had been badly shaped by his upbringing, leading him to be sexually promiscuous and eventually killing one of his long-term partners.

Anyone who reads many accounts of the childhoods of death row inmates becomes acquainted with tales of extreme child abuse:  children severely beaten by parents or sexual partners of parents, children exposed to their mothers' prostitution and parents' drug abuse, and so forth.  It is reasonable to expect that jurors' will feel some empathy for persons reared in that way who eventually commit murder.  But if that is so, are the same representative citizens to be expected to feel empathy for a person reared as Leonard was?  Leonard's habeas counsel have

done almost nothing to show that a convincing case could have been made for the alternative theory. The court of appeals' decision that trial counsel made a reasonable choice among available alternative theories of mitigation is not an unreasonable application of *Strickland*.

**Subclaim 2 – Presentation of "incomplete, damaging, and misleading information through a psychiatrist." (Traverse, Doc. No. 17 at PageID 536.)**

Defense counsel retained Dr. James Hawkins, a psychiatrist, to evaluate Leonard and testify at the mitigation phase of the trial. He assertedly performed badly because counsel "did not give him a proper understanding of his role or ensure that he had sufficient information to evaluate Leonard. . . ." *Id.* at PageID 536-537. Leonard now asserts that Dr. Hawkins was not given an adequate psychosocial history with which to work and did not perform the correct tests for evaluation, asserting the Minnesota Multiphasic Personality Inventory (the "MMPI) and Millon Clinical Mutiaxial Inventory were "inappropriate tests." (Traverse, Doc. No. 17, PageID 537, with no citation of authority.) Habeas counsel criticize Dr. Hawkins for describing Leonard as "a person whose rage bottles up so much as to become uncontrollable." *Id.* at PageID 538.

In the Traverse, in one sentence, habeas counsel cite to the psychological evaluation done in post-conviction by Nancy Schindler, Psy. D., without any elaboration of content (Apx. Vol. 9, at 190-211). Summarizing what she learned from his siblings, Dr. Schindler wrote "All of Patrick's siblings describer similar family values, including a focus on education, good grades, religion and church activities. . . .The Leonard children were taught that to be good you had to be generous and help others." *Id.* at 196. In addition to this, she reports on Leonard's dysfunctional sexual relationships, including those with Penny McGuire and Amy Fugate. Dr. Schindler also described Leonard as a person who bottles up rage (*Id.* at 206, 208). She nowhere criticizes Dr.

Hawkins' use of the MMPI or Millon tests and in fact reports that she reviewed those results herself. *Id.* at 192.

As to the assertion that counsel did not adequately prepare Dr. Hawkins for cross-examination and thus some of his answers may not have been as knowledgeable as one would hope, the Magistrate Judge relies on *Moore v. Mitchell*, ___ F.3d ___, 2013 U.S. App. LEXIS 3915 (6th Cir. Feb. 26, 2013).

**Subclaim 3. Trial Counsel Made Erroneous and Misleading Statements About the Law During Their Mitigation Presentation (Traverse, Doc. 17, PageID 539).**

Leonard raised this third subclaim in his Fourth Proposition of Law on direct appeal (Traverse, Doc. No. 17, PageID 532). On this subclaim, the Ohio Supreme Court wrote:

> Leonard contends that during opening statement, counsel reversed the penalty-phase balancing test, saying that the life that Leonard had led until the murder outweighed the aggravating factor and that the jury's penalty verdict was only a recommendation. However, the trial court correctly instructed the jury on the legal standards. Thus, any misstatement by counsel was nonprejudicial. See *State v. Stallings* (2000), 89 Ohio St.3d 280, 286, 2000 Ohio 164, 731 N.E.2d 159.

*State v. Leonard*, 104 Ohio St. 3d 54, ¶ 151. Habeas counsel misreads this holding to say that counsel did make misstatements of law and that doing so was deficient performance (Traverse, Doc. No. 17, PageID 551). If the life Leonard led up to the point of Dawn Flick's murder in fact outweighed the aggravating factor of attempted rape, it was not a misstatement of law to make that claim. It is a claim about what the facts will show, not what the law requires.[18] In any

---

[18] Imagine the rhetorical impact of the statement made with saying "Ladies and Gentlemen of the jury, the law does not require us to prove that Patrick's good life before he shot Dawn outweighs the aggravating factor of attempted rape, but only that it is equal in weight to that aggravating factor. If we prove that, then the States will not have proved that the aggravating factor outweighs the mitigation." As evidence of the belief that stating one has more proof than necessary is a good rhetorical move, see Leonard's argument about the ineffective assistance of his

event, the Ohio Supreme Court addressed only the prejudice prong of the *Strickland* test, habeas counsel has pointed to no evidence of prejudice, and the Ohio Supreme Court's application of *Strickland* is entitled to deference.

Leonard's Twenty-First Ground for Relief is without merit and should be dismissed with prejudice.  Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability on this Ground for Relief.  See particularly *Moore v. Mitchell,* ___ F.3d ___, 2103 U.S. App. LEXIS 3915 (6th Cir. Feb. 26, 2013).


## Ground Twenty-Two – Ineffective Assistance of Appellate Counsel


In his Twenty-Second Ground for Relief, Leonard asserts he received ineffective assistance of appellate counsel (Traverse, Doc. No. 17, PageID 557).  He argues these claims principally in his Final Brief (Doc. No. 39, PageID 999-1011).

As noted above, Leonard raised these claims in the state courts in his Application for Reopening the direct appeal, the exclusive method for raising ineffective assistance of appellate counsel claims on direct appeal in a capital case in Ohio.  As also noted, the Ohio Supreme Court summarily denied the Application.  Leonard concedes that this was an adjudication on the merits (Final Brief, Doc. No. 39, PageID 999).

Leonard relies in substantial part on the depositions taken in these proceedings of his appellate counsel, A. Norman Aubin and Herbert E. Freeman (Final Brief, Doc. No. 39, PageID 999-1004).  For reasons already given, this Court is precluded from considering that testimony by *Cullen v. Pinholster,* 563 U.S. ___, 131 S.Ct. 1388 (2011).

---

appellate counsel where he claims their "performance fell **far** below the prevailing professional norms."  (Final Brief, Doc. No. 39, PageID 999.)

Having conceded that the Ohio Supreme Court decided this claim on the merits, Leonard then claims that for there to have been an "adjudication on the merits," the Ohio practice had to provide a mechanism for presenting a factual basis for his claims to the Ohio Supreme Court (Final Brief, Doc. No. 39, PageID 1005).  He then asserts that the only method for placing facts before the Ohio Supreme Court on such a claim is by way of an affidavit which he claims is "the equivalent of a legal memorandum" *Id.* at 1006.  Since that process does not permit the kind of factual inquiry endorsed by the Sixth Circuit in *Mapes v. Coyle*, 171 F.3d 408 (6th Cir. 1999), Leonard asserts the resulting decision is "in and of itself unreasonable."  (Final Brief, Doc. No. 39, PageID 1007).

Habeas counsel appear to have missed an important portion of Ohio Sup. Ct. Prac. R. 11.6, subsection H, which expressly provides for an evidentiary hearing if the Ohio Supreme Court determines one to be necessary.

For the reasons given above in the analysis of these ineffective assistance of appellate counsel claims offered as excusing cause for procedural default of Grounds for Relief Two, Eight, and Twenty, the Ohio Supreme Court decision denying the Application for Reopening is neither contrary to nor an objectively unreasonable application of *Strickland* as it applies to appellate cases.  Therefore the Twenty-Second Ground for Relief should be dismissed with prejudice.  Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability on this Ground for Relief.


**Ground Twenty-Three – System of Inadequate Appellate and Proportionality Review**


In his Twenty-Third Ground for Relief, Leonard asserts Ohio's death penalty system fails

123

to provide constitutionally adequate appellate and proportionality review (Traverse, Doc. No. 17, PageID 563).  Leonard relies on his Traverse to argue this claim (Final Brief, Doc. No. 39, PageID 947).

Leonard asserts he presented this claim to the Ohio courts as his Nineteenth Proposition of Law on direct appeal (Traverse, Doc. No. 17, PageID 564).  His actual Proposition of Law XIX reads:

> Appellant's death sentence is excessive and disporportionate to sentences in similar cases, thereby depriving Mr. Leonard of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as Sections 9 and 16, Article I of the Ohio Constitution.

(Appellant's Brief, Apx. Vol. 4, p. 164.) As Leonard argued this claim to the Ohio Supreme Court, it was that the death sentence in this case was disproportionate to death sentences of others in Hamilton County.  *Id.* at p. 165

The Ohio Supreme Court decided that claim as follows:

### D. Proportionality

[**P138] Leonard contends in proposition of law 19 that his death sentence is excessive and disproportionate when compared with other cases in which the death penalty has been imposed. We will address this argument during our independent review of Leonard's death sentence. R.C. 2929.05.
* * *
[**P202] Finally, in proposition of law 19, Leonard contends that his sentence is excessive and disproportionate when compared with other cases in which the death penalty has been imposed. Based on our independent review, we overrule this argument and find that the penalty imposed here is not excessive when compared with similar cases in which death sentences have been approved. See, e.g., *State v. Powell* (1990), 49 Ohio St.3d 255, 552 N.E.2d 191; *State v. Phillips,* 74 Ohio St.3d 72, 1995 Ohio 171, 656 N.E.2d 643; *State v. Mason,* 82 Ohio St.3d 144, 1998 Ohio 370, 694 N.E.2d 932; *State v. Scudder,* 71 Ohio St.3d 263, 1994 Ohio 298, 643 N.E.2d 524.

*State v. Leonard*, 104 Ohio St. 3d 54, ¶¶ 138, 202 (2004).

The claim Leonard makes in this Court is not the same claim he made on direct appeal. As he words it in his Traverse, it is "The Supreme Court of Ohio's arbitrary refusal to review life sentences imposed in similar cases as part of a statutorily mandated proportionality review denied Leonard due process of law under the Fourteenth Amendment." (Traverse, Doc. No. 17, PageID 563.)  He elaborates that "[w]hen the Ohio General Assembly redrafted and reinstated the current capital punishment scheme, it enacted a system of proportionality review that mandated the filing and consideration of capital cases in which life sentences were imposed for similar offenses." *Id.* at PageID 566.

Leonard acknowledges that since 1987 the Ohio Supreme Court has consistently interpreted the relevant statute, Ohio Revised Code § 2929.05(A) to require only that the death sentence in any particular case need only be compared for proportionality purposes with other death sentences affirmed by the same reviewing court. *Id.* at 568, *citing State v. Steffen*, 31 Ohio St. 3d 111 (1987).

The constitutional argument presented in Ground Twenty-Three is procedurally defaulted by Leonard's failure to fairly present it to the Ohio courts.  His Nineteenth Proposition of Law as argued says nothing about his present allegation that Ohio Revised Code § 2929.05(A) creates a liberty interest.  Instead, citing pre-*Steffen* law, he argues for a different interpretation of that statute than the one which has controlled since *Steffen.*

To preserve a federal constitutional claim for presentation in habeas corpus, the claim must be "fairly presented" to the state courts in a way which provides them with an opportunity to remedy the asserted constitutional violation, including presenting both the legal and factual basis of the claim. *Williams v. Anderson,* 460 F.3d 789, 806 (6th Cir. 2006); *Levine v. Torvik*,

986 F.2d 1506, 1516 (6th Cir.), *cert. denied,* 509 U.S. 907 (1993), overruled in part on other grounds by *Thompson v. Keohane,* 516 U.S. 99 (1995); *Riggins v. McMackin,* 935 F.2d 790, 792 (6th Cir. 1991).

Merely using talismanic constitutional phrases like "fair trial" or "due process of law" does not constitute raising a federal constitutional issue. *Slaughter v. Parker,* 450 F.3d 224, 236 (6th Cir. 2006); *Franklin v. Rose,* 811 F.2d 322, 326 (6th Cir. 1987); *McMeans v. Brigano,* 228 F.3d 674, 681 (6th Cir. 2000), *citing Petrucelli v. Coombe*, 735 F.2d 684, 688-89 (2d Cir. 1984). Mere use of the words "due process and a fair trial by an impartial jury" are insufficient. *Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006); *Blackmon v. Booker*, 394 F.3d 399, 400 (6th Cir. 2004)(same). "A lawyer need not develop a constitutional argument at length, but he must make one; the words 'due process' are not an argument." *Riggins v. McGinnis*, 50 F.3d 492, 494 (7th Cir. 1995).

If a petitioner's claims in federal habeas rest on different theories than those presented to the state courts, they are procedurally defaulted. *Williams v. Anderson,* 460 F.3d 789, 806 (6th Cir. 2006); *Lorraine v. Coyle,* 291 F.3d 416, 425 (6th Cir. 2002), *citing Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998); *Lott v. Coyle*, 261 F.3d 594, 607, 619 (6th Cir. 2001)("relatedness" of a claim will not save it). A state prisoner ordinarily does not fairly present a federal claim to a state court if that court must read beyond a petition, a brief, or similar papers to find material that will alert it to the presence of such a claim. *Baldwin v. Reese*, 541 U.S. 27 (2004).

The Ohio Supreme Court would have had to read well beyond Appellant's Brief to understand he was raising the constitutional claim he raises here. Therefore the claim is procedurally defaulted.

Secondly, this Court is bound by the Ohio Supreme Court's interpretation of Ohio

statutes. *Railey v. Webb*, 540 F.3d 393 (6th Cir. 2008), quoting *Bradshaw v. Richey,* 546 U.S. 74, 76 (2005)("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.")*, Maldonado v. Wilson*, 416 F.3d 470 (6th Cir. 2005)*; Vroman v. Brigano*, 346 F.3d 598, (6th Cir. 2003); *Caldwell v. Russell*, 181 F.3d 731, 735-36, (6th Cir. 1999); *Duffel v. Dutton,* 785 F.2d 131, 133 (6th Cir. 1986). Ohio Revised Code § 2929.05(A) does not require comparison of death sentences with life sentences in similar cases.

Third, even if the Ohio Supreme Court had ignored rather than following its prior interpretation of Ohio Revised Code § 2929.05(A), that would not create a constitutional violation. "A mere error of state law is not a denial of due process." *Rivera v. Illinois*, 556 U.S. 148 (2009), quoting *Engle v. Isaac*, 456 U.S. 101, 121, n. 21 (1982). "The Due Process Clause, our decisions instruct, safeguards not the meticulous observance of state procedural prescriptions, but 'the fundamental elements of fairness in a criminal trial." *Rivera*, quoting *Spencer v. Texas,* 385 U.S. 554, 563-64 (1967). See also *Levine v. Torvik*, 986 F.2d 1506, 1515 (6th Cir.), *cert. denied,* 509 U.S. 907 (1993), overruled in part on other grounds by *Thompson v. Keohane,* 516 U.S. 99 (1995)( "A state cannot be said to have a federal due process obligation to follow all of its procedures; such a system would result on the constitutionalizing of every state rule, and would not be administrable.").Failure to abide by state law is not itself a constitutional violation. *Roberts v. City of Troy*, 773 F.2d 720 (6th Cir. 1985).

Finally, the United States Constitution does not require the kind of proportionality review for which Leonard contends. *Getsy v. Mitchell,* 495 F.3d 295 (6th Cir. 2007)(en banc), citing, *inter alia, Pulley v. Harris*, 465 U.S. 37 (1984), and *McCleskey v. Kemp*, 481 U.S. 279 (1987).

Leonard's Twenty-Third Ground for Relief is procedurally defaulted and without merit; it

should therefore be dismissed with prejudice.  Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability on this Ground for Relief.

### Ground Twenty-Four – Conviction on Insufficient Evidence and Against the Manifest Weight of the Evidence

In his Twenty-Fourth Ground for Relief, Leonard claims his conviction rests on insufficient evidence and is against the manifest weight of the evidence (Traverse, Doc. No. 17, PageID 572).  His argument for this claim relies entirely on the Traverse (Final Brief, Doc. No. 39, PageID 945.)

Leonard states he presented this claim to the Ohio Supreme as his Sixth Proposition of Law on direct appeal.  The Ohio Supreme Court decided the claim as follows:

**A. Sufficiency/Manifest Weight of Evidence**

[**P76**] In his sixth proposition of law, Leonard claims that the evidence was insufficient to support his aggravated-murder convictions. We disagree.

[**P77**] In reviewing a record for sufficiency, "the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus , following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560.

[**P78**] Leonard was convicted of two counts of aggravated murder: purposely causing the death of Flick while committing, attempting to commit, or fleeing immediately after committing or attempting to commit rape, and the purposeful killing of Flick with prior calculation and design[19]. See R.C. 2903.01(B) and (A).

[**P79**] We conclude that sufficient evidence was introduced at trial to support these convictions. On the night of the murder,

---

[19] As previously noted, the "prior calculation and design" element was amended out of the Indictment before the case was submitted to the jury.  (See Amendment at Apx. Vol. 3, p. 188, and Verdict at *Id.* p. 220.)

Leonard twice followed and stopped Flick in her car. After stopping her car the second time, Leonard ordered Flick to return to her house. Leonard followed Flick to her home, where he handcuffed her and held her at gunpoint. Leonard confessed to firing three shots into Flick's head from close range. Leonard also told police that just before he shot Flick, he had been on top of her with his pants down because they had "decided to [have sexual intercourse] on the floor."

[**P80] Although Leonard's confession suggests that Flick had consented, there was substantial evidence of forcible sexual conduct, and a rational trier of fact could find Leonard guilty of attempted rape. See, e.g., *State v. Williams* (1996), 74 Ohio St.3d 569, 576, 1996 Ohio 91, 660 N.E.2d 724; *State v. Scudder* (1994), 71 Ohio St.3d 263, 274-275, 1994 Ohio 298, 643 N.E.2d 524. But cf. *State v. Davis* (1996), 76 Ohio St.3d 107, 114-115, 1996 Ohio 414, 666 N.E.2d 1099 (holding that evidence that victim's body was found naked, that victim had been seen pushing the defendant away before she was shot, and that there were possible finger marks on one of the victim's thighs was insufficient evidence to support attempted-rape conviction). Police found Flick's body lying in a pool of blood on her living room floor, partially nude. She had been shot three times in the head, her panties had been pulled down to her thighs, one pant leg had been pulled off, the other had been pulled down to her calf, and one shoe had been removed. Her hands were bound by handcuffs, and bruising on her wrists indicated that she had struggled while handcuffed. Marks on her neck and petechiae on her face indicated that she had been strangled.

[**P81] Leonard also contends under this proposition that his aggravated murder convictions are contrary to the manifest weight of the evidence. The question to be answered when a manifest-weight issue is raised is whether "there is *substantial* evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt." (Emphasis sic.) *State v. Getsy* (1998), 84 Ohio St.3d 180, 193-194, 1998 Ohio 533, 702 N.E.2d 866, citing *State v. Eley* (1978), 56 Ohio St.2d 169, 10 O.O.3d 340, 383 N.E.2d 132, syllabus. In conducting this review, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury "'clearly lost its way and created such a manifest miscarriage of justice that the conviction [***253] must be reversed and a new trial ordered.'" *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 1997 Ohio 52, 678 N.E.2d 541, quoting

129

*State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

[**P82] At trial, defense counsel conceded that Leonard had killed Flick but argued that the state had failed to prove that Leonard was guilty of *aggravated* murder under R.C. 2903.01. Specifically, counsel maintained that the state had not proven rape or attempted rape under R.C. 2903.01(B) or prior calculation and design under section (A).

[**P83] This is not, however, the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin, 20 Ohio App3d* at 175, 20 OBR 215, 485 N.E.2d 717. Substantial evidence existed to support convictions on both counts of aggravated murder. Therefore, Leonard's sixth proposition of law lacks merit and is overruled.

*State v. Leonard*, 104 Ohio St. 3d 54, ¶¶ 76-83 (2004).

Although Leonard pleads both an insufficient evidence and a manifest weight claim, he only argues the former (Traverse, Doc. No. 17, PageID 572-578).  This is appropriate because the manifest weight claim is not cognizable in habeas corpus.  That is, imprisoning a person on a conviction which is against the manifest weight of the evidence does not violate the United States Constitution.

In *State v. Thompkins,* 78 Ohio St. 3d 380 (1997)*,* the Ohio Supreme Court reaffirmed the important distinction between appellate review for insufficiency of the evidence and review on the claim that the conviction is against the manifest weight of the evidence.    It held:

In essence, sufficiency is a test of adequacy.  Whether the evidence is legally sufficient to sustain a verdict is a question of law. *State v. Robinson* (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process.   *Tibbs v. Florida* (1982), 457 U.S. 31, 45, 102, 387 S.Ct. 2211, 2220, 72 L.Ed.2d 652, 663, *citing Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.  Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that

court may nevertheless conclude that the judgment is against the weight of the evidence. *Robinson, supra*, 162 Ohio St. at 487, 55 O.O. at 388-389, 124 N.E.2d at 149.  Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.  It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them.  Weight is not a question of mathematics, but depends on its effect in inducing belief."  (Emphasis added.)

When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a " 'thirteenth juror' " and disagrees with the factfinder's resolution of the conflicting testimony.  *Tibbs*, 457 U.S. at 42, 102 S.Ct. at 2218, 72 L.Ed.2d at 661.  See, also, *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720-721 ("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.").

78 Ohio St. 3d at 387.  This Court's habeas review, then, is solely for sufficiency of the evidence.

In cases such as Leonard's challenging the sufficiency of the evidence and filed after enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214)(the "AEDPA"), two levels of deference to state decisions are required:

In an appeal from a denial of habeas relief, in which a petitioner challenges the constitutional sufficiency of the evidence used to convict him, we are thus bound by two layers of deference to groups who might view facts differently than we would. First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781,

131

> 61 L. Ed. 2d 560 (1979). In doing so, we do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. See *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution. Second, even were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable. See 28 U.S.C. § 2254(d)(2).

*Brown v. Konteh,* 567 F.3d 191, 205 (6ᵗʰ Cir. 2009). In a sufficiency of the evidence habeas corpus case, deference should be given to the trier-of-fact's verdict under *Jackson v. Virginia* and then to the appellate court's consideration of that verdict, as commanded by AEDPA. *Tucker v. Palmer*, 541 F.3d 652 (6ᵗʰ Cir. 2008).

> We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, "it is the responsibility of the jury -- not the court -- to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith,* 565 U. S. 1, ___, 132 S. Ct. 2, 181 L. Ed. 2d 311, 313 (2011) (*per curiam*). And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Ibid.* (quoting *Renico v. Lett*, 559 U. S. ___, ___, 130 S. Ct. 1855, 176 L. Ed. 2d 678 (2010)).

*Coleman v. Johnson*, 566 U.S. ___, ___, 132 S. Ct. 2060, 2062, (2012)(*per curiam*).

"On habeas review pursuant to § 2254, a 'court faced with a record of historical facts that supports conflicting inferences [and *a fortiori* findings] must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of

132

the prosecution, and must defer to that resolution.'" *Blackmon v. Booker*, 696 F. 3d 536, ___ (6th Cir. 2012), *quoting McDaniel v. Brown*, 558 U.S. 120, 130 S. Ct. 665, 673, 175 L. Ed. 2d 582 (2010).

In arguing there was no prior calculation and design, Leonard ignores the fact that the prior calculation and design specification was amended out of the Indictment before the case was submitted to the jury and the jury returned a verdict instead on the principal offender specification (See Apx. Vol. 3, p. 220).

The evidence of attempted rape is certainly sufficient:  Flick was handcuffed and forcibly partially disrobed.  She had marks on her body consistent with her having struggled with Leonard and inconsistent with the notion that whatever sexual activity Leonard intended was consensual.  The jury was not required to believe Leonard's self-serving statements about consent.

Ground Twenty-Four is without merit and should be dismissed with prejudice.  Because sufficiency of the evidence claims are so much a matter of individual judgment, however, Leonard should be granted a certificate of appealability on this claim.


**Ground Twenty-Five – Racial Discrimination in Jury Selection**


In his Twenty-Fifth Ground for Relief, Leonard contends he was denied a fair trial and equal protection of the laws by the State's racial discrimination in selection the members of the grand jury and the petit jury venire (Traverse, Doc. No. 17, PageID 579).  Leonard relies for argument on this claim on his Traverse (Final Brief, Doc. No. 39, PageID 945-946).

Leonard asserts he presented this claim to the Ohio courts as the Tenth and Twenty-

Fourth Propositions of Law on direct appeal and as the Fourth Ground for Relief in Post-

Conviction (Traverse, Doc. No. 17, PageID 580).

> ### D. Grand-Jury Issues
>
> [**P40**] Leonard argues in proposition of law ten that he was indicted "by an improperly constituted grand jury and upon inadequately presented evidence." In proposition 24, Leonard argues that his constitutional rights were violated because the "process utilized in Hamilton County to select the foremen of grand juries that return capital indictments is biased geographically, racially, culturally, and socio-economically."
>
> [**P41**] Leonard failed to raise these issues in the trial court and has thus waived all but plain error. *State v. Williams,* 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus ; *State v. Joseph* (1995), 73 Ohio St.3d 450, 455, 1995 Ohio 288, 653 N.E.2d 285; *State v. Taylor* (1997), 78 Ohio St.3d 15, 23, 1997 Ohio 243, 676 N.E.2d 82. Leonard has failed to demonstrate plain error. Moreover, we rejected identical grand-jury arguments in *State v. Issa* (2001), 93 Ohio St.3d 49, 61-62, 2001 Ohio 1290, 752 N.E.2d 904, and *State v. Nields,* 93 Ohio St.3d at 18-20, 752 N.E.2d 859. Accordingly, we overrule Leonard's 10th and 24th propositions of law.

*State v. Leonard*, 104 Ohio St. 3d 54, ¶¶40-41 (2004).

As noted above with respect to Ground for Relief One, reliance on the plain error rule is

an enforcement of procedural default.  *Supra* at p. 31, *citing, inter alia*, *Wogenstahl v. Mitchell*,

668 F.3d 307, 337 (6th Cir.  2012).  Ohio has procedural rules for raising objections to the

composition of the grand jury and the petit jury venire that require these types of challenges to be

raised a specific times in the trial court.  Ohio R. Crim. P. 6, 24(F).  By finding that these claims

were never raised in the trial court, the Ohio Supreme Court was enforcing those rules.  The rules

are plainly independent of federal law and are "adequate" within the meaning of procedural

default jurisprudence for the same reasons that support the contemporary objection rule:  the

need to raise error when it can be readily corrected and before it infects subsequent process.

134

For excusing cause and prejudice, Leonard merely refers the Court to Subclaim B of his Twentieth Ground for Relief (Traverse, Doc. No. 17, PageID 581.)   Although Leonard mentioned the claim about underpresentation of African-Americans, he did not make any argument in its favor with respect to Ground Twenty (See Report, *supra*, p. 113).   Leonard has not shown how it was deficient performance to fail to challenge the racial composition of the venire in that he has not shown there was any underrepresentation.   And so far as he has shown to this Court, he never claimed in the Ohio courts that it was ineffective assistance of trial counsel not to challenge the grand jury composition.   He is therefore barred from arguing that failure of counsel here in the first instance.   *Edwards v. Carpenter,* 529 U.S. 446 (2000).

As his Fourth Ground for Relief in post-conviction, raised the underrepresentation claim as a stand-alone constitutional violation.   The court of appeals decided the claim as follows:

### B. THE UNDERREPRESENTATION OF MINORITIES ON THE JURY VENIRE

[**P14] In his fourth claim for relief, Leonard contended that the underrepresentation of African Americans on his petit jury venire constituted a denial of his rights to due process and equal protection and of his right to a jury consisting of a fair cross-section of the community. He supported this claim with U.S. Census Bureau data for the county and juror questionnaires that had been completed by prospective jurors in his trial and in the trials of three other Hamilton County defendants who had been sentenced to death. This evidence was in existence and was available to the defense at the time of Leonard's trial. See *State v. Coleman* (Mar. 17, 1993), 1st Dist. No. C-900811, 1993 Ohio App. LEXIS 1485. We, therefore, conclude that the common pleas court properly dismissed the fourth claim under the doctrine of *res judicata*. See *State v. Jones*, supra.

*State v. Leonard*, 157 Ohio App. 3d 653, ¶ 14 (Ohio App. 1st Dist. 2004).   Thus the court of appeals plainly invoked the Ohio criminal *res judicata* doctrine and, as noted above, the Sixth Circuit has repeatedly held that is an adequate and independent state ground of decision.   See,

e.g., *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007); *Buell v. Mitchell*, 274 F. 3d 337 (6th Cir. 2001); *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir. 2000); *Rust v. Zent,* 17 F.3d 155, 160-61 (6th Cir. 1994)(citation omitted).

Ground Twenty-Five should be dismissed with prejudice as procedurally defaulted. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability on this Ground for Relief.

### Ground Twenty-Six – Inadequate State Post-Conviction Process

In his Twenty-Sixth Ground for Relief, Leonard asserts that his conviction and sentence must be set aside because Ohio's post-conviction process is constitutionally inadequate (Traverse, Doc. No. 17, PageID 589).

Leonard asserts he presented this claim as his Eleventh Ground for Relief in post-conviction. *Id.* at PageID 590. The court of appeals decided this claim as follows:

> F. THE CONSTITUTIONALITY OF R.C. 2953.21
>
> [**P38] In his eleventh claim for relief, Leonard contended that R.C. 2953.21 violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution. As we noted supra, R.C. 2953.21(A)(1) requires a postconviction petitioner to demonstrate a denial or infringement of his rights *in the proceedings resulting in his conviction that rendered the conviction void or voidable* under the state or federal constitution. The constitutional deprivations asserted by Leonard in his eleventh claim did not occur during the proceedings resulting in his convictions. And a determination that the postconviction statutes were constitutionally infirm would not have rendered his convictions void or voidable. Moreover, we held in *State v. Fautenberry* (Dec. 31, 1998), 1st Dist. No. C-971017, 1998 Ohio App. LEXIS 6415, that R.C. 2953.21 satisfies the requirements of due process. We, therefore, conclude that the common pleas court properly denied the eleventh claim for relief.

*State v. Leonard*, 157 Ohio App. 3d 653 (Ohio App. 1st Dist. 2004). To summarize, the court of appeals decided that this claim was not cognizable in an Ohio Revised Code § 2953.21 proceeding and was, in any event, without merit.

Post-conviction state collateral review is not a constitutional right, even in capital cases. *Murray v. Giarratano*, 492 U.S. 1 (1989); *Pennsylvania v. Finley*, 481 U.S. 551, 107 S. Ct. 1990, 95 L. Ed. 2d 539 (1987); *Estelle v. Dorrough*, 420 U.S. 534, 536 (1975); *Kirby v. Dutton,* 794 F.2d 245 (6th Cir. 1986)(claims of denial of due process and equal protection in collateral proceedings not cognizable in federal habeas because not constitutionally mandated). *Accord, Greer v. Mitchell,* 264 F. 3d 663, 681 (6th Cir. 2001); *Johnson v. Collins,* 1998 WL 228029 (6th Cir. 1998); *Trevino v. Johnson*, 168 F.3d 173 (5th Cir.1999); *Zuern v. Tate*, 101 F. Supp. 2d 948 (S.D. Ohio 2000), *aff'd.*,336 F.3d 478 (6th Cir. 2003).

Ground Twenty-Six should therefore be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability on this Ground for Relief.

**Ground Twenty-Seven – Ohio's Unconstitutional Death Penalty Scheme**

In his Twenty-Seventh Ground for Relief, Leonard asserts that Ohio's death penalty scheme is unconstitutional (Traverse, Doc. No. 17, PageID 595). Leonard relies on the Traverse for presenting this claim (Final Brief, Doc. No. 39, PageID 946).

Leonard asserts he presented this claim in his Seventh and Sixteenth Propositions of Law on direct appeal. *Id.* at 596. The Ohio Supreme Court decided this claim as follows:

**VI. Constitutionality/Settled Issues**

[**P179] Leonard claims in proposition of law seven that Ohio's death-penalty statutes violate various international laws. We overrule this claim on the authority of *State v. Ashworth* (1999), 85 Ohio St.3d 56, 70, 1999 Ohio 204, 706 N.E.2d 1231, and *State v. Phillips,* 74 Ohio St.3d at 103-104, 656 N.E.2d 643.

* * *

[**P181] In his 16th proposition of law, Leonard raises various constitutional challenges to Ohio death-penalty statutes. We reject these challenges. Ohio's capital-sentencing scheme is constitutional. See, e.g., *State v. Clemons,* 82 Ohio St.3d at 454, 696 N.E.2d 1009; *State v. Evans* (1992), 63 Ohio St.3d 231, 253-254, 586 N.E.2d 1042; *State v. Smith* (1991), 61 Ohio St.3d 284, 294, 574 N.E.2d 510; *State v. Lott* (1990), 51 Ohio St.3d 160, 170, 555 N.E.2d 293; *State v. Taylor,* 78 Ohio St.3d at 32, 676 N.E.2d 82; *State v. Jenkins,* 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264; and *State v. Smith,* 80 Ohio St.3d 89, 1997 Ohio 355, 684 N.E.2d 668. Leonard also argues that Ohio's death-penalty laws violate international treaties. We rejected the same argument under proposition of law seven. Therefore, we summarily overrule propositions of law 13 and 16.

*State v. Leonard*, 104 Ohio St. 3d 54, ¶¶ 179, 181 (2004).

While Leonard has cited to a recent ABA assessment of the death penalty in Ohio and critical comments by the United Nations High Commissioner for Human Rights, he has not cited in this argument any United States Supreme Court precedent violated by the Ohio death penalty scheme. The Ohio Supreme Court decision on this claim is therefore not an objectively unreasonable application of clearly established federal law. Ground Twenty-Seven should be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability on this Ground for Relief.

**Ground Twenty-Eight – Burden of Proof on Mitigating Factors**

138

In his Twenty-Eighth Ground for Relief, Leonard asserts his constitutional rights were violated by the Ohio requirement that mitigating factors be proved by the defendant by a preponderance of the evidence (Traverse, Doc. No. 17, PageID 601).  Leonard relies on the Traverse for presenting this claim  (Final Brief, Doc. No. 39, PageID 946).

This claim was presented as Proposition of Law 13 on direct appeal and rejected by the Ohio Supreme Court on the basis of precedent:

> [**P180] Leonard's argument in proposition of law 13 challenging the constitutionality of the requirement that mitigating factors be proven by a preponderance of the evidence is without merit. *State v. Jenkins,* 15 Ohio St.3d at 171-172, 15 OBR 311, 473 N.E.2d 264; *Delo v. Lashley* (1993), 507 U.S. 272, 275-276, 113 S. Ct. 1222, 122 L. Ed. 2d 620.

*State v. Leonard,* 104 Ohio St. 3d 54, ¶ 180 (2004).  Leonard cites no clearly established Supreme Court precedent which this ruling misapplies.  This Court has previously rejected the argument on the merits  *Zuern v. Tate*, 101 F. Supp. 2d 948 (S.D. Ohio 2000), *rev'd on other grounds*, 336 F.3d 478 (6th Cir. 2003), relying on *Walton v. Arizona,* 497 U.S. 639 (1990); overruled in part on other grounds by *Ring v. Arizona*, 536 U.S. 584 (2002).

Ground Twenty-Eight is without merit and should be dismissed with prejudice.  Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability on this Ground for Relief.

### Ground Twenty-Nine – Lethal Injection Claim

Leonard has withdrawn this Ground for Relief (Final Brief, Doc. No. 39, PageID 947.)

### Ground Thirty – Cumulative Error

In his Thirtieth Ground for Relief, Leonard claims the cumulative effects of errors and omissions in the preceding twenty-seven claims deprived him of a fair trial and sentencing determination (Traverse, Doc. No. 17, PageID 610).  The argument on this claim is presented entirely in the Traverse (Final Brief, Doc. No. 39, PageID 947).

This claim was presented to the Ohio Supreme Court as Proposition of Law 29 and rejected on the basis of precedent.  *State v. Leonard*, 104 Ohio St. 3d 54, ¶ 185 (2000).

Recent Sixth Circuit precedent confirms this claim is not cognizable in habeas corpus since enactment of the AEDPA.  *Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir.), *cert. denied,* ___ U.S. ___, 132 S.Ct. 2751 (2011), citing *Moore v. Parker,* 425 F.3d 250, 256 (6th Cir. 2005), *cert. denied,* 549 U.S. 1027 (2006).

> Moreland argues that the cumulative effect of counsel's errors should be considered in determining whether he has demonstrated a reasonable probability of a more favorable outcome. However, "post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief." *Hoffner v. Bradshaw*, 622 F.3d 487, 513 (6th Cir. 2010) (quoting *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005)).

*Moreland v. Bradshaw*, 699 F. 3d 908, 931 (6th Cir. 2012).

Leonard's Thirtieth Ground for Relief should therefore be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability on this Ground for Relief.

**Conclusion**

Based on the foregoing analysis, it is respectfully recommended that the Petition herein be dismissed with prejudice.  Leonard should, however, be granted a certificate of appealability on Grounds for Relief One, Sixteen, and Twenty-Four.

March 6, 2013

s/ *Michael R. Merz*
United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).

141