IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Patrick Leonard,               :      Case No. 1:09-cv-056
                               :
     Petitioner,               :      Chief Judge Susan J. Dlott
                               :
          v.                   :      Order Denying Habeas Petition,
                               :      Affirming Reports and
Warden, Ohio State Penitentiary, :    Recommendations, and Overruling
                               :      Objections
     Respondent.               :

In this case, Magistrate Judge Michael R. Merz has recommended that Petitioner Patrick Leonard's Petition for Writ of Habeas Corpus ("Habeas Petition") (Doc. 6) be denied.  Pending before the Court are Magistrate Judge Merz's Report and Recommendations ("R&R") (Doc. 47), Petitioner's Objections to the R&R ("Objections") (Doc. 53), Magistrate Judge Merz's Supplemental Report and Recommendations ("Supplemental R&R") (Doc. 60), and Petitioner's Objections to the Supplemental R&R ("Supplemental Objections") (Doc. 66).  Respondent Warden has not objected to the R&R nor to the Supplemental R&R.  Respondent Warden filed a Memorandum in Response (Doc. 56) to Petitioner's Objections, but did not respond to Petitioner's Supplemental Objections.

For the reasons that follow, the Court will **DENY** the Habeas Petition, **ADOPT** the R&R and the Supplemental R&R, and **OVERRULE** the Objections and Supplemental Objections.

## I.      BACKGROUND

### A.      Underlying Facts

The Ohio Supreme Court summarized the underlying facts and the trial court proceedings as follows:

{¶ 1} On July 29, 2000, Patrick T. Leonard, defendant-appellant, followed Dawn Flick, his former fiancée, while she was driving her car, forced her to a stop, and

1

ordered her to return to her home.  Leonard followed Flick to her house, and, once inside, Leonard handcuffed Flick, attempted to rape her, and then shot her three times in the head.  Leonard was convicted of the aggravated murder, attempted rape, and kidnapping of Flick and was sentenced to death.

{¶ 2} Leonard and Flick became engaged in the fall of 1995.  During their engagement, Leonard fathered a son by Penny McBride.  Leonard and Flick ended their engagement in 1998 but continued to date.  Leonard also continued his relationship with McBride.  Approximately nine months before Flick was murdered, a second child was born to Leonard and McBride.  Leonard tried to conceal from Flick and others that he was the child's father.

{¶ 3} The evidence presented at Leonard's trial indicated that Flick had intended to end her relationship with Leonard.  In his confession, Leonard stated that he had a "broken heart" because he was losing Flick.  On Friday, July 28, 2000, the day before the murder, Leonard told Alvie Woods, a friend of Leonard's and Flick's, that if he caught Flick "fooling around" with anyone, Leonard would kill somebody.  According to Woods, Leonard had said, "[I]f I can't have her, no one can."

{¶ 4} Flick tended bar at her family's restaurant, Les Flick's Home Like Inn, on the evening of July 28 and early morning of July 29.  After the restaurant closed for the night, Flick drove to Snow's Lake Bar to meet some friends.  Leonard followed Flick and, according to his confession, "got her to pull over."  Leonard then confronted Flick about her earlier statement that she would be staying home for the evening.  Leonard left Flick alone after she agreed to call him when she returned home.  When she arrived at Snow's, Flick appeared upset, according to Woods, Deborah Schroeder, and Reva Ketterer, and she told them that Leonard had just run her car off the road.

{¶ 5} When Snow's closed for the night, Flick planned to go to the house of her friend, Ryan Gries.  Leonard followed Flick as she drove to Gries's house and again stopped her car.  Leonard ordered Flick to return to her home, and he followed her there.  Once inside, Leonard handcuffed her wrists.  Leonard then pointed a gun at Flick as she called to tell Gries that she was not coming to his house.  During their telephone conversation, Gries was able to elicit from Flick that she was with Leonard and was in danger.

{¶ 6} Gries and his friend Frank Minges rushed to Flick's house.  When Leonard heard Gries's truck drive up, he shot Flick three times in the head.  He then fired through the door, striking Gries in the chest.  Gries and Minges left to call the police, and Leonard fled in his truck.

{¶ 7} Leonard then called a friend, Sergeant Nick Chaplin, a deputy sheriff in Campbell County, Kentucky.  Leonard told Chaplin that he had shot and killed Flick, and he agreed to surrender to Chaplin.  Leonard drove to Kentucky, where he was taken into custody.

2

{¶ 8} After being advised of his *Miranda* rights, Leonard gave a taped statement confessing to Flick's murder.  In his confession, Leonard admitted that before shooting Flick, he had restrained her with handcuffs.  Leonard said that he and Flick had talked about "making love [and had] decided to do that on the floor." Leonard said that when he had heard Gries's truck drive up, he jumped up off of Flick, pulled his pants up, and shot Flick three times in the head.  Leonard also admitted having shot at Gries and Minges through Flick's front door.

{¶ 9} Police officers investigating the shooting found Flick's partially clothed body lying in a pool of blood in her living room.  Flick's panties were down to her thighs, one pant leg was completely off, the other pant leg was around her calf, and one shoe was off.  Her wrists were bound by handcuffs.

{¶ 10} Dr. Robert Pfalsgraf, chief deputy coroner, determined that the cause of death was a gunshot wound to the head.  Flick had been shot once in the face, once in the back of the head, and once in the back of her neck at the hairline.  The shot to the back of Flick's head was fatal.

{¶ 11} Pfalsgraf found no injuries to Flick's vagina or anus and no semen in those areas.  Pfalsgraf noted, however, that this lack of evidence did not preclude a finding that Leonard had penetrated Flick.

{¶ 12} Pfalsgraf also testified that the pattern of bruising on Flick's wrists corresponded to the handcuffs found on her wrists.  Petechiae were found on her face and neck, indicating ruptured blood vessels caused by strangulation.  Flick also had ligature bruising on her neck that matched the pattern of the necklace she was wearing.  Based on these injuries, the coroner concluded that Flick had been strangled and had struggled with her assailant while she was handcuffed.

{¶ 13} Leonard was indicted on two counts of aggravated murder.  The first count charged Leonard with purposely causing Flick's death while committing or attempting to commit rape.  R.C. 2903.01(B).  The second count charged Leonard with purposely and with prior calculation and design causing Flick's death. R.C. 2903.01(A).  Leonard was also indicted for attempted murder in Counts Three and Four (R.C. 2903.02 and 2923.02), rape in Count Five (R.C. 2907.02[A] [2]), and kidnapping in Count Six (R.C. 2905.01[A] [2]).

{¶ 14} The aggravated-murder counts each contained two death-penalty specifications.  The first specification charged aggravated murder as part of a course of conduct to kill or attempt to kill two or more persons.  R.C. 2929.04(A)(5).  The second specification charged aggravated murder during a rape or an attempted rape. R.C. 2929.04(A)(7).  Gun specifications were included with all counts except Count Six, kidnapping.

{¶ 15} At trial, the defense presented testimony from five witnesses and other documentary evidence.  Leonard did not testify.  During defense counsel's opening statement, counsel conceded that Leonard had shot Flick.  However, the

defense's theory was that Leonard had been trying to salvage his relationship with Flick, had not intended to kill her, and had not acted with prior calculation and design.  The defense also contested the charges of rape and kidnapping and denied that Leonard had attempted to murder Gries and Minges.

{¶ 16} The defense introduced evidence to show that Leonard had purchased a planter with flowers from Renck's Garden Center and had given it to Flick as a gift on the afternoon before the murder.

{¶ 17} Eddie Sayers, an employee of Sam's Corner Store in New Baltimore, Ohio, testified that both Leonard and Flick had been in the store the day before the murder:  Leonard in the morning, and Flick in the afternoon.  Sayers testified that Leonard had not seemed upset and that Flick had appeared happy.  On cross-examination, Sayers stated that he had not seen Leonard and Flick together that day and admitted that he did not know how Leonard acted later that day.

{¶ 18} Rick Schoeny, a life-long friend of Leonard's, testified that Leonard always had guns and carried a gun in his jacket.  Leonard's brother Ted testified that Leonard had sometimes threatened to kill people when he was upset.  Ted noted, however, that this was "the way [Leonard] always voiced his opinion" and that these threats were never taken seriously.

{¶ 19} Other testimony indicated that Leonard and Flick had spent time together in the days leading up to the murder and had plans to go horseback riding the following day.  In his confession, Leonard claimed that he and Flick had begun to engage in consensual sex before he shot her. He also said that he "went blank" just before shooting her.

{¶ 20} Leonard also confessed to having shot at Flick's front door to keep Gries and Minges from entering the home.  Evidence at trial indicated that Leonard had fired only one shot at the door.

{¶ 21} The jury convicted Leonard of the two aggravated-murder counts (Counts One and Two) and kidnapping (Count Six).  The jury found Leonard not guilty of the two attempted-murder counts (Counts Three and Four) but guilty of the lesser included offense of felonious assault.  Leonard was also found not guilty of rape (Count Five) but was found guilty of attempted rape.

{¶ 22} As to the capital specifications, the jury found Leonard guilty of committing murder during a rape or attempted rape. R.C. 2929.04(A)(7).  He was found not guilty of the R.C. 2929.04(A)(5) course-of-conduct specification.  Leonard was also found guilty of all gun specifications.

{¶ 23} After the penalty phase of the trial, the jury recommended death.  Thereafter, the trial court sentenced Leonard to death, consecutive sentences of eight years each for his two felonious-assault convictions and his attempted rape conviction, and ten years for kidnapping.  Three-year sentences were imposed for

4

each of the gun charges.  Because several of the firearm specifications merged, the prison term imposed for the noncapital offenses was 40 years.

*Ohio v. Leonard*, 104 Ohio St. 3d 54, 54–57, 818 N.E.2d 229 (2004).

**B.     Procedural History**

Magistrate Judge Merz set forth the procedural history of this case in the R&R.  The history is re-stated here with minor edits and with the CM/ECF header, including PageID numbers, to aid the parties and the court upon the anticipated appeal.

Petitioner Leonard was indicted by the Hamilton County Grand Jury on August 7, 2000, on two counts of aggravated murder with capital specifications, two counts of attempted murder, and one count each of rape and kidnapping.  (Indictment, Doc. 61-1 at PageID 1567–73.)  The guilt phase of the trial commenced May 15, 2001.  (Entry, Doc. 61-2 at PageID 2190.)  On May 24, 2001, the jury found Leonard guilty of two counts of aggravated murder plus two of the three capital specifications for each murder, two counts of felonious assault, attempted rape, kidnapping.  (Verdicts, Doc. 61-2 at PageID 2254–76.)  They found him not guilty of attempted murder and of rape.  (*Id.*)

The penalty phase of the trial commenced May 25, 2001.  (Entry, Doc. 61-2 at PageID 2277.)  The jury returned a death penalty verdict on May 31, 2001.  (Verdict, Doc. 61-2 at PageID 2294–96.)  The trial judge imposed the death sentence on June 28, 2001.  (Judgment Entry, Doc. 61-2 at PageID 2305.)  Because the murder at issue occurred after January 1, 1995, Leonard's direct appeal was to the Ohio Supreme Court which affirmed the conviction and death sentence.  *Leonard*, 104 Ohio St. 3d at 92.

On July 30, 2002, while his direct appeal was pending in the Ohio Supreme Court, Leonard filed in the trial court a Post-Conviction Petition under Ohio Revised Code § 2953.21.  (Petition, Doc. 61-3 at PageID 3031–83.)  The trial court denied the Post-Conviction Petition.

(Entry, Doc. 61-5 at PageID 4301–08.)  Leonard appealed to the First District Court of Appeals which rejected all of Leonard's claims except those relating to the use of a stun belt during trial; those claims were remanded for an evidentiary hearing.  *Ohio v. Leonard*, 157 Ohio App. 3d 653, 670–71, 813 N.E.2d 50 (2004).  On remand and after hearing evidence, the trial court again rejected the stun belt claims.  Leonard appealed, but this time the First District affirmed the dismissal.  *Ohio v. Leonard*, No. C-061025, 2007 Ohio App. LEXIS 6214 (Dec. 31, 2007).

Also, on March 8, 2005, Leonard filed an Application for Reopening pursuant to Ohio Supreme Court Practice Rule XI, section 5.  (Doc. 61-3 at 2903–14.)  The Ohio Supreme Court denied the Application without explanation.  *Ohio v. Leonard*, 106 Ohio St. 3d 1407 (2005) (Table).

The Ohio Supreme Court declined jurisdiction over a further appeal.  (Entry, Doc. 61-6 at PageID 5338.)  The United States Supreme Court denied a petition for certiorari.  *Leonard v. Ohio*, 555 U.S. 1075 (2008).

Leonard filed the instant Habeas Petition on July 8, 2009 after this Court appointed counsel.  (Doc. 6.)  Leonard asserted thirty grounds for relief in the Habeas Petition.  Magistrate Judge Merz issued the R&R on March 6, 2013 recommending that the Court deny each ground for relief on the merits.  He further recommended that a certificate of appealability be issued for Grounds One, Sixteen, and Twenty-Four.  (Doc. 47 at PageID 1286.)  Petitioner Leonard filed his Objections on August 7, 2013 contesting the Magistrate Judge's recommendation on each ground for relief except as to Grounds Four, Six, Twenty-Eight, and Twenty-Nine.  (Doc. 53 at PageID 1303–07.)  Magistrate Judge Merz issued the Supplemental R&R on May 28, 2014 again recommending that the Court deny each ground for relief, but grant a certificate of appealability

on Grounds One, Sixteen, and Twenty-Four.  (Doc. 60 at PageID 1542.)  Petitioner Leonard filed

Supplemental Objections.  (Doc. 66.)  This matter is ripe for review.

## II.    LEGAL STANDARD

### A.    Habeas Petitions

Petitioner Leonard filed his Habeas Petition after April 24, 1996 so it is subject to the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Hamilton v. Morgan*,

474 F.3d 854, 858 (6th Cir. 2007).  A habeas petitioner must exhaust all remedies available to

him in state court before filing a habeas petition.  28 U.S.C. § 2254(b)(1)(A).

When the state court has adjudicated a claim on the merits, the AEDPA requires federal

courts to respect the merits determination unless it resulted in a decision that: (1) "was contrary

to, or involved an unreasonable application of, clearly established Federal law, as determined by

the Supreme Court of the United States," or (2) "was based on an unreasonable determination of

the facts in light of the evidence presented in the State court proceedings."  28 U.S.C.

§§ 2254(d)(1)–(2); *see also*, *Williams v. Taylor*, 529 U.S. 362, 402–03 (2000).

In *Williams*, the Supreme Court further explained the meaning of § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the
> state court arrives at a conclusion opposite to that reached by this Court on a
> question of law or if the state court decides a case differently than this Court has
> on a set of materially indistinguishable facts.  Under the "unreasonable
> application" clause, a federal habeas court may grant the writ if the state court
> identifies the correct governing principle from this Court's decisions but
> unreasonably applies that principle to the facts of the prisoner's case.

529 U.S. at 412–13.  To apply § 2254(d), the federal court examines "the last state court to reach

a reasoned opinion on the issue."  *Loza v. Mitchell*, 766 F.3d 466, 473 (6th Cir. 2014) (citation

omitted).  If a state court decision is contrary to clearly established federal law, then the

reviewing federal court is unconstrained by § 2254(d)(1) and must review the merits of

petitioner's claim de novo. *Dyer v. Bowlen*, 465 F.3d 280, 284 (6th Cir. 2006).

An unreasonable application is more than simply incorrect; it must be objectively

unreasonable. *Williams*, 529 U.S. at 411; *see also Rompilla v. Beard*, 545 U.S. 374, 380 (2005).

The court "must ask whether it is possible fairminded jurists could disagree that those arguments

or theories are inconsistent with the holding in a prior decision of this Court."

*Harrington v. Richter*, 562 U.S. 86, 102 (2011).

"Clearly established Federal law" under § 2254(d)(1) means "the governing legal

principle or principles set forth by the Supreme Court at the time the state court renders its

decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003). Circuit court of appeal precedent is

not sufficient to constitute clearly established federal law. *Parker v. Matthews*, 132 S. Ct. 2148,

2155 (2012). "Clearly established law should be construed narrowly[,]" but the "AEDPA does

not require state and federal courts to wait for some nearly identical factual pattern before a legal

rule must be applied." *Blackston v. Rapelje*, 780 F.3d 340, 348 (6th Cir. Feb. 17, 2014) (internal

citations and quotations omitted). "[E]ven a general standard may be applied in an unreasonable

manner." *Id.* (citation omitted). "Under [the] AEDPA, if there is no clearly established Federal

law, as determined by the Supreme Court, that supports a habeas petitioner's legal argument, the

argument must fail." *Miskel v. Karnes*, 397 F.3d 446, 453 (6th Cir. 2005) (internal quotation and

citation omitted).

Importantly, a § 2254(d)(1) review "is limited to the record that was before the state court

that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

The Supreme Court instructed that a petitioner cannot rely on new evidence admitted for the first

time in habeas proceedings to meet the § 2254(d)(1) standard. "[E]vidence introduced in federal

court has no bearing on § 2254(d)(1) review.  If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court."  *Id.* at 1400; *see also Bray v. Andrews*, 640 F.3d 731, 737 (6th Cir. 2011) (same).[1]

Section 2254(d) "applies even where there has been a summary denial."  *Cullen*, 131 S. Ct. at 1402.  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Harrington*, 562 U.S. at 99.  On a summary denial, "[a] habeas court must determine what arguments or theories . . . could have supporte[d] the state court's decision; and then it must ask whether it is

---

[1]  The Supreme Court explained that its holding—§ 2254(d)(1) claims were limited to the evidence before the state court—does not render § 2254(e)(2) superfluous.  *Cullen*, 131 S. Ct. at 1400–01.  Section 2254(e)(2) states as follows:

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--

 (A) the claim relies on--

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).  Section 2254(e)(2) "continues to have force where § 2254(d)(1) does not bar federal habeas relief[,]" such as where "deciding claims that were not adjudicated on the merits in state court."  *Cullen*, 131 S. Ct. at 1401.

The Supreme Court concluded its discussion on this subject in *Cullen* by admitting that "[a]lthough state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so."  *Id.*  "[F]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings."  *Id.* (citation omitted).

possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Cullen*, 131 S. Ct. at 1402 (citation omitted). "[A] habeas petitioner may meet his or her burden by 'showing there was no reasonable basis for the state court to deny relief.'" *Carter v. Mitchell*, 693 F.3d 555, 562 (6th Cir. 2012) (quoting *Harrington*, 131 S. Ct. at 784).

Pursuant to 28 U.S.C. § 2254(e)(1), a determination of a factual issue by a state court shall be presumed correct and the applicant shall have the burden of rebutting the presumption by clear and convincing evidence. *McAdoo v. Elo*, 365 F.3d 487, 493–94 (6th Cir. 2004). This presumption does not apply to mixed questions of law and fact. *Mitchell v. Mason*, 325 F.3d 732, 738 (6th Cir. 2003). Instead, the "unreasonable application" prong of § 2254(d)(1) applies to mixed questions of law and fact. *Id.*

A federal court will not review a question of federal law decided by an Ohio court if the decision rests "on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). This is true whether the state law ground is substantive or procedural. *Id.* If a state prisoner "has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Id.* at 750.

That is, a petitioner may not raise on federal habeas corpus a federal constitutional right he could not bring in state court because of procedural default. *Engle v. Isaac*, 456 U.S. 107, 128–29 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). Absent cause and prejudice, a federal habeas petitioner who fails to comply with a State's rules of procedure waives his right to

federal habeas corpus review if the State court relied on that procedural bar. *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle*, 456 U.S. at 128–29; *Boyle v. Million*, 201 F.3d 711, 716 (6th Cir. 2000).

The failure to present an issue to the state supreme court on discretionary review constitutes procedural default. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845–48 (1999). The Sixth Circuit Court of Appeals requires a four-part analysis when the State alleges a habeas claim is precluded by procedural default:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. * * *

> Second, the court must decide whether the state courts actually enforced the state procedural sanction. * * *

> Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. This question generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims. * * *

> Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate under *Sykes* that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986) (internal citations omitted); *see also Reynolds v. Berry*, 146 F.3d 345, 347–48 (6th Cir. 1998).

## B. Certificate of Appealability

An appeal may not be taken from a final order in an AEDPA case unless a certificate of appealability is issued:

> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from--

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

28 U.S.C. § 2253.  District courts have the authority to issue certificates of appealability pursuant to this section at the time they determine the habeas petition.  *See Castro v. U.S.*, 310 F.3d 900, 903 (6th Cir. 2002).

The United States Supreme Court has explained that where the district court has denied a constitutional claim on the merits, a certificate of appealability should issue if the petitioner demonstrates that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  The analysis is more complicated if the district court has denied the claim on procedural grounds:

> When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. . . .  Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further. In such a circumstance, no appeal would be warranted.

*Id.*  Ordinarily, courts should determine the procedural issues before the substantive issues.  *Id.* at 485.

"[I]ssuance of a [certificate of appealability] must not be *pro forma* or a matter of course."  *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).  The petitioner must prove something

more than good faith belief in his claims or the mere absence of frivolity.  *Id.* at 338.  On the

other hand, a court should not deny a certificate of appealability "merely because it believes the

applicant will not demonstrate an entitlement to relief."  *Id.* at 337.

## III.  ANALYSIS

**GROUND ONE**

> **Leonard's rights to a fair trial, due process, the presumption of innocence, counsel, and to participate in his own defense were violated when the trial court erred in forcing Leonard to wear a stun belt without adequate justification, thus violating his rights under the Sixth, Eighth, and Fourteenth Amendments.**

(Doc. 6 at PageID 57.)

Leonard asserts that his rights were violated when he was forced to wear a stun belt

during his trial.  This claim was determined by the state courts on the merits during the post-

conviction relief proceedings.  The common pleas court held an evidentiary hearing.  (Decision,

Doc. 61-6 at PageID 5095–5106.)  Because the trial court judge had retired from the common

pleas court, a new common pleas judge conducted the evidentiary hearing and issued a decision.

(*Id.*)  The court found that the trial judge had not made an individual determination of the

necessity for use of a stun belt, but rather had deferred to the policy of the Hamilton County

Sheriff.  (*Id.* at PageID 5096–97.)  However, there was evidence presented at the evidentiary

hearing that the need for courtroom security was particularly acute because of the small size of

the courtroom, the number of spectators supporting Leonard and the victim's family, tension

arising from the fact that the victim's father had killed himself after her murder, and the nature of

the crime.  (*See e.g.* Doc. 16-16 at PageID 8943, 8961–62, 9001–02, 9103.)

Leonard wore the stun belt under his shirt.  (Doc. 61-6 at PageID 5101.)  The court

reporter and the courtroom bailiff for Leonard's trial testified at the evidentiary hearing that they

could not see the stun belt underneath Leonard's clothing.  (Doc. 61-16 at PageID 9125, 9139.)

On the other hand, Leonard's sister, Jean Hutcherson, testified that she saw "a big bulky thing under the back of Leonard's shirt" when he was escorted in and out of the courtroom, when he was seated at counsel table, and when he approached the witness stand to make an unsworn statement during the sentencing proceeding. (*Id.* at PageID 5100.) She did not know what the object was. (*Id.*) Videotaped scenes from the courtroom revealed that "the outline of a square object [could] be observed on [Leonard's] back and under his shirt" as Leonard walked from counsel table to the witness stand. (*Id.*; Jt. Ex. 5) Court personnel, sheriff deputies, and trial observers testified that the stun belt was not visible to them during the trial. (*Id.* at PageID 5101.)

Leonard did not call any trial jurors to testify, so he did not present any direct evidence that the stun belt was visible to the jury. (*Id.*) However, he presented evidence that he sat within a few feet of the jury who could see his profile as he sat at the counsel table. (Doc. 61-12 at PageID 6701.) Leonard was not able to sit with his back flush against his chair in the courtroom. (Doc. 16-16 at PageID 9017.) Leonard also points out that the remote activator handled by the sheriff deputies was visible. The deputies passed the remote activator to each other when they changed positions. (Doc. 61-16 at PageID 8953–54.)

The common pleas court concluded as follows in the post-conviction relief proceeding:

> There is no evidence to suggest that any of the jurors had seen the square object under Leonard's clothing, and if they had, there is no evidence any juror knew that it was the [stun belt] as opposed to a medical device, a physical deformity, or any number of other objects. There is nothing to indicate the use of the React Belt infringed upon Leonard's presumption of innocence in that there is absolutely no evidence the jury was aware he was wearing a [stun belt].

(Doc. 61-6 at PageID 5102.) The common pleas court also stated that it was "not convinced" that the stun belt affected manner and appearance in such a way to interfere with his ability to consult with his attorneys or to present a defense. (*Id.* at 5124.)

14

The state appeals court affirmed the dismissal of the claim. *Leonard*, 2007 Ohio App. LEXIS 6214 at *11. The appeals court stated that the "record of the hearing provide[d] competent and credible evidence to support the common pleas court's conclusion that the circumstances surrounding Leonard's trial demonstrated a compelling need for exceptional security in the form of a stun belt." *Id.* at *10–11. The appeals court did not address whether the stun belt was visible to the jury, whether it infringed upon Leonard's presumption of innocence, or whether it interfered with Leonard's ability to consult with his trial attorneys or present mitigation evidence.

A.    **Subclaim 1.   Leonard suffered inherent prejudice when he was forced to wear a stun belt without adequate justification.** (Doc. 6 at PageID 59.)

The Supreme Court long has held that the use of visible restraints on a criminal defendant during a trial, absent special need, violates the defendant's constitutional rights. *See, e.g., Deck v. Mo.*, 544 U.S. 622, 626 (2005); *Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986). "[T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Deck*, 544 U.S. at 629. The concern is that the use of restraints might compromise the physical semblance of innocence, undermine the defendant's ability to participate in his own defense and to confer with his legal counsel, and impair the "dignity and decorum of the judicial process." *Kennedy v. Cardwell*, 487 F.2d 101, 105–06 (6th Cir. 1973); *see also Deck*, 544 U.S. at 630–31 (stating same concerns). Furthermore, the Supreme Court has held that "the Constitution forbids the use of visible shackles during the penalty phase, as it forbids their use during the guilt phase, unless that use is justified by an essential state interest— as the interest in courtroom security—specific to the defendant." *Deck*, 544 U.S. at 624. The Sixth Circuit has stated that the use of a stun belt implicates the "same fundamental issues" as

the use of shackles and has applied the same analysis. *U.S. v. Miller*, 531 F.3d 340, 345 (6th Cir. 2008).

Extraordinary situations, such as a possible danger of violence or escape, may necessitate the use of physical restraints even if such security measures infringe on the defendant's physical indicia of innocence. *Kennedy*, 487 F.2d at 110–11. Due to the nature and inherent prejudice of shackling, "where a court, without adequate justification orders a defendant to wear shackles *that will be seen by the jury*, the defendant need not demonstrate actual prejudice to make out a due process violation." *Deck*, 544 U.S. at 635 (emphasis added). In such situations, the State must prove "beyond a reasonable doubt that the shackling error complained of did not contribute to the verdict obtained." *Id.* (internal quotation and citation omitted); *Lakin v. Stine*, 431 F.3d 959, 966 (6th Cir. 2005). The State can meet its burden in appropriate cases with overwhelming evidence of the defendant's guilt. *Id.*

The use of and degree of security restraints exercised over the defendant, if deemed necessary, is within the trial judge's discretion. *Deck*, 544 U.S. at 633; *Payne v. Smith*, 667 F.2d 541, 544 (1981). The Sixth Circuit has identified multiple factors to be considered by trial courts in making decisions about the use of shackles or a stun belt:

> (1) the defendant's record, his temperament, and the desperateness of his situation; (2) the state of both the courtroom and the courthouse; (3) the defendant's physical condition; and (4) whether there is a less prejudicial but adequate means of providing security.

*Lakin*, 431 F.3d at 964 (shackles). A trial court's exercise of discretion must involve a "more individualized determination" than simply rubber stamping the preference of a corrections officer as to the use of restraints. *Id.* Additionally, "a per se rule that permitted shackling those defendants merely charged with certain crimes such as escape or murder would run afoul of the individualized determination that the due process clause requires." *Id.* at 965.

16

This Court agrees with Magistrate Judge Merz's conclusion that the trial court judge failed to make an individualized determination of whether the use of the stun belt was appropriate for Leonard during his trial. However, the Court cannot grant Leonard relief on this subclaim unless the use of the stun belt was visible to the jury. The trial judge made the factual finding that there was no evidence that the jury saw the stun belt or knew that the bulge under his shirt was a stun belt. (Doc. 61-6 at PageID 5102.) The appeals court affirmed the finding. *Leonard*, 2007 Ohio App. Lexis 6214, at *10. The Court concludes based on the evidence set forth earlier that this finding was not "an unreasonable determination of the facts" elucidated at the evidentiary hearing. 28 U.S.C. § 2254(d)(2).

Absent a factual finding that the stun belt was visible to the jury, the court's holding that use of the stun belt did not undermine the presumption of innocence or the fairness of the factfinding process is not contrary to or an unreasonable application of clearly established federal law. The Supreme Court cases relied upon by Petitioner Leonard in this subclaim all discussed the inherent prejudice from the use of visible restraint or protective procedure. *See e.g.*, *Deck*, 544 U.S. at 626, 632 (analyzing use of "visible shackles"); *Holbrook*, 475 U.S. at 568–69 (comparing use of visible shackles and gags to use of "conspicuous, or at least noticeable, deployment of security personnel"); *Ill. v. Allen*, 397 U.S. 337, 344 (1970) (discussing the "sight of shackles and gags"). The facts in those cases are distinguishable from the facts here based on the finding that Leonard's stun belt was not visible to the jury. For these reasons, the Court will adopt the recommendation of Magistrate Judge Merz and deny the subclaim.

**B.** **Subclaim 2. The stun belt had an adverse impact on Leonard's behavior, depriving him of the physical indicia of innocence, creating a risk of injecting an improper factor into sentencing, and undermining potential mitigation strategies.** (Doc. 6 at PageID 63.)

17

**Subclaim 3. Leonard's wearing of the stun belt infringed upon his right to counsel and his ability to assist in his own defense.**
(Doc. 6 at PageID 67.)

The Court will address these two subclaims together.  Leonard focuses on the alleged psychological impact wearing the stun belt had on Leonard's behavior at trial.  He argues that wearing the stun belt interfered with his right to consult with his attorneys in violation of the Sixth Amendment and interfered with his right to present mitigation evidence in violation of the Eighth and Fourteenth Amendments.  He points to evidence from the post-conviction evidentiary hearing that the stun belt was "designed for total psychological supremacy or complete safe body immobilization of potentially troublesome prisoners."  (Doc. 16-16 at PageID 9078–79.)

Leonard testified at the evidentiary hearing that he "became very conscious and aware of my movements so as to not cause any problems, so I would make sure to keep my movements to a minimum as far as what I did and make sure that my hands were visible."  (Doc. 61-16 at PageID 9033.)  He also testified that he believed he could not communicate with his attorneys freely during the trial because he did not want his efforts to attract their attention to be misinterpreted as disruptive behavior by the deputy controlling the stun belt.  (*Id.* at PageID 9033–35.)  He agreed that he was "somewhat" able to communicate with his trial attorneys.  (*Id.* at PageID 9047.)  Finally, he testified that although he was able to walk to the witness stand to give an unsworn statement during the sentencing phase of the trial, he was not able to finish his unsworn statement.  (*Id.* at PageID 9057.)  He did not testify as to what additional comments he had intended to make in his unsworn statement.

In the video montage of trial footage, Leonard moved forward and back in his chair, conferring with counsel, and put his head into his hands.  (Jt. Ex. 5.)  He walked into and out of the courtroom and up to the witness chair.  He gestured with his hands to a limited extent when he spoke.  (*Id.*)  Leonard's sister, Jean Hutcherson, testified that Leonard's posture and physical

demeanor were different than normal during the trial.  (Doc. 61-16 at PageID 9017–19.)  She testified that he sat more on the edge of his chair, instead of flush against the back of the chair, that he walked without his usual swagger, and that he seemed more quiet and stoic than usual. (*Id.*)

Dr. Robert Lee Smith, clinical psychologist, called the stun belt a "definite aversive punisher."  (Doc. 16-16 at PageID 9062, 9071.)  He testified that "people know what it means to be shocked, and that by placing the belt on the defendant, they'll be intimidated and will be controlled."  (*Id.* at 9080.)  Dr. Smith watched an approximately five-minute long video containing snippets of trial footage.  (*Id.* at PageID 9084.)  Dr. Smith concluded from that video that the stun belt "significantly inhibited" Leonard's behavior because he showed little movement of his head or hands and gave "no indication that he was reacting or responding to the environment and what was going on around him."  (*Id.* at PageID 9085.)  On cross-examination, Dr. Smith agreed that in the video clip Leonard had moved forward and back in his chair, had conferred with counsel on two occasions, and had put his head into his hands.  (*Id.* at PageID 9088.)  Leonard was seated next to one or both of his trial attorneys.  (*Id.* at PageID 9110–9111, 9126; Doc. 61-12 at PageID 6700–01.)  Dr. Smith also agreed that Leonard might have acted in a "stilted manner" because he felt shame for being charged with murder, because he felt apprehension being in front of the victim's family, and due to the media coverage.  (Doc. 16-16 at PageID 9095–96.)

Magistrate Judge Merz points out that Leonard does not identify any Supreme Court precedent clearly establishing a right to be free from the psychological impact of a stun belt on the relationship with counsel or presentation of mitigation.  Leonard is correct that the ability to consult with an attorney during trial is a clearly established Sixth Amendment right, but the right

is not absolute.  *Compare Geders v. U.S.*, 425 U.S. 80, 91 (1976) (holding that an order preventing a defendant from consulting with his attorney during a seventeen hour recess violated Sixth Amendment rights), *with Perry v. Leeke*, 488 U.S. 272, 284–85 (1989) (holding that a judge may restrict a testifying defendant from consulting with his attorney during a short break in his on-going testimony).  The common pleas court during the post-conviction relief proceedings concluded that Leonard had not proven that the stun belt so affected his manner and appearance as to interfere with his ability to consult with his attorneys or to present a defense. (Doc. 61-6 at 5124.)  This Court agrees.  Leonard has not established that the state court's conclusion that Leonard's Sixth Amendment right was not violated by the stun belt was contrary to or an unreasonable application of clearly established federal law.  For these reasons, the Court will adopt the Magistrate Judge's recommendation and deny the subclaim that the stun belt violated Leonard's constitutional rights.

Finally, the Court will deny the subclaim that the stun belt inhibited Leonard's ability to introduce mitigation evidence.  To the extent that this subclaim is predicated upon the factual assertion that the jury's perception of Leonard was tainted by the fact that he wore a stun belt, the claim is denied.  The Court has already stated that the state court factual determination that the jury was unaware of the stun belt was not unreasonable.  Leonard also argues that he was unable to present his entire unsworn statement during the sentencing phase of trial.  However, Leonard did not present evidence concerning what else he wanted to say during his unsworn statement or how that would have impacted his mitigation case.  Leonard simply has not established that the state court finding that the use of the stun belt did not violate his constitutional rights was contrary to or an unreasonable application of clearly established federal law.

C.      Conclusion

The Court will deny Ground One.  The Court will issue a certificate of appealability on this issue.

**GROUND TWO**

> **Leonard's rights to confront witnesses and to a fair trial as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated when improper hearsay was admitted into evidence by the trial court.**

(Doc. 6 at PageID 70.)

Leonard objects to the admission of numerous purported hearsay statements admitted at trial on the basis that it violated his rights under the Confrontation Clause and his right to a fair trial.  Leonard asserted claims based upon some of these purported hearsay statements on direct appeal and asserted claims based upon the remainder of the purported hearsay statements by in his Application for Reopening.  These sets of subclaims are treated separately below.

A.      Subclaims Asserted on Direct Appeal

In the Objections and Supplemental Objections, Leonard summarizes the hearsay claims he raised on his direct appeal as follows:

- Ryan Gries testified that Dawn Flick told him she was going down to his house to play pool after the bar closed.  (Tr. 1098.)  He was allowed to testify as to Flick's telephone conversation with him immediately before her death, in which she stated she would not be coming to his house to play pool.  (Tr. 1104.)  Further, he stated during the conversation, Flick told him that Patrick Leonard was at her house, and that he was beating her.  (Tr. 1105.)  In addition she told him not to come to her house or call the police.  (Tr. 1124.)

- Numerous witnesses, including Alvie Woods and Deborah Schroeder, testified to an alleged statement made by Flick about Leonard trying to drive her off the road.  (Tr. 1168-70, 1182-87.)

- Sabrina Frye was permitted to testify as to statements allegedly made by Flick as to Patrick Leonard's children with Penny McBride, and that she was going to break it off with Leonard.  (Tr. 1227-34.)  Additionally, Sabrina Frye was allowed to testify as to Leonard supposedly telling Dawn Flick that if he could not have

her, no one could and that if Leonard saw Flick with another man, Leonard would
kill him.  (Tr. 1235-36.)  Frye also testified that Flick believed that if she did not
let Leonard stay with her he would hurt himself.  (Tr. 1243.)

(Doc. 53 at PageID 1340; Doc. 66 at PageID 9348–49.)

The Ohio Supreme Court on direct appeal ruled that the testimony of Gries, Woods,

Schroeder, and Ketterer was admissible.  *Leonard*, 104 Ohio St. 3d at 70–72.  The Ohio Supreme

Court ruled that Frye's testimony was inadmissible, but that the trial court had committed

harmless error by admitting it.  The Ohio Supreme Court's analysis of Frye's testimony was as

follows:

{¶ 100} Leonard further complains of hearsay elicited through the testimony of
Sabrina Frye.  Leonard first complains of Frye's testimony that four days before
the murder, Flick had said she intended to end her relationship with Leonard
because he had fathered a second child by Penny McBride.  But Frye's testimony
was admissible as a statement of Flick's then existing mental condition.  Evid.R.
803(3) allows for introduction of a "statement of the declarant's then existing
state of mind, emotion, sensation, or physical condition (such as intent, plan,
motive, design, mental feeling, pain, and bodily health)."  This testimony was
probative of Flick's intent to end her relationship with Leonard.  *See, e.g.*, *State v.
Tibbetts,* 92 Ohio St.3d at 158–159, 749 N.E.2d 226.

{¶ 101} However, the state-of-mind exception does not permit witnesses to relate
why the declarant held a particular state of mind.  *See State v. Apanovitch* (1987),
33 Ohio St.3d 19, 21, 514 N.E.2d 394, citing *United States v. Cohen* (C.A.5,
1980), 631 F.2d 1223, 1225.  Therefore, Frye's testimony regarding Flick's
statement as to why she intended to end the relationship was inadmissible.

{¶ 102} Nevertheless, any error was harmless.  Leonard stipulated at trial that he
had fathered two children by McBride.  In his confession, he stated that he had
believed that his relationship with Flick was ending and that he had shot Flick
because she had broken his heart.

{¶ 103} Leonard also argues that the trial court erred in admitting hearsay
testimony from Frye regarding statements Leonard allegedly had made to Flick
during conversations to which Frye was not a party.  Specifically, Frye testified
that Flick had told her that Leonard had said that if he could not have her, no one
else could; and that if he ever saw Flick with another man, Leonard would kill
him.  Defense counsel's objection was overruled.

{¶ 104} We conclude that the trial court should have sustained counsel's
objection because Frye's testimony was inadmissible hearsay.  The testimony was

not admissible under Evid.R. 803(3), because it did not reflect Flick's then existing state of mind.  Instead, Frye merely restated a threat that Leonard had allegedly made to Flick.  Even if it were admitted to show Flick's state of mind (e.g., that she was afraid of Leonard), Frye's testimony goes beyond the scope of the exception because it encompasses the underlying basis for Flick's mental state.  *See State v. Awkal* (1996), 76 Ohio St.3d 324, 330–331, 667 N.E.2d 960, citing *State v. Apanovitch*, 33 Ohio St.3d at 21–22, 514 N.E.2d 394.  Thus, the trial court erred in admitting this testimony.

{¶ 105} However, we conclude that the error was harmless.  Leonard had told Alvie Woods the same thing directly that he had allegedly told Flick, and during Woods's testimony, the trial court properly admitted the statement under Evid.R. 801(D)(2)(a) (a statement is not hearsay if it is offered against a party and is the party's own statement).  Therefore, this evidence was cumulative.  *See*, *e.g.*, *State v. O'Neal*, 87 Ohio St.3d at 411, 721 N.E.2d 73.

{¶ 106} Finally, we find that Frye's testimony regarding Flick's statement explaining why she had permitted Leonard to stay at her house the night before the murder was inadmissible.  Frye testified that Flick had said that she had allowed Leonard to spend the night because Leonard "had continued to call and harass her and she was afraid that he would hurt himself."  Defense counsel objected, but the trial court admitted the testimony under Evid.R. 803(3).

{¶ 107} Evidence may be admitted under Evid.R. 803(3) when it concerns the declarant's present state of mind or to show that the declarant subsequently acted in accordance with that state of mind.  2 Giannelli & Snyder, Evidence (2d Ed. 2001) 102, Section 803.17.  However, Evid.R. 803(3) excludes a statement of "memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."

{¶ 108} According to Frye's testimony, Flick made this statement to Frye on Friday, July 28, 2000.  It concerned an event—Leonard's spending the night at Flick's house—that took place the previous evening.  Statements under Evid.R. 803(3) "must point towards the future rather than the past."  *State v. Apanovitch*, 33 Ohio St.3d at 21, 514 N.E.2d 394.  See, also, *Shepard v. United States* (1933), 290 U.S. 96, 105–106, 54 S.Ct. 22, 78 L.Ed. 196 (hearsay statements that relate past events are not admissible under the state-of-mind exception); Weissenberger, Ohio Evidence (2004) 463, Section 803.30 ("Where the statement does not pertain to a 'then existing' condition, it must be viewed as a narrative account of a past event formulated after time for reflection, and it is not admissible under Rule 803[3]").  Because Flick's statement related to past conduct, it does not fall within the state-of-mind exception under Evid.R. 803(3).  But the error of admitting the testimony was harmless.  Leonard confessed to the murder, and there was substantial evidence to support his attempted-rape conviction beyond a reasonable doubt.  *See*, *e.g.*, *State v. Steffen* (1987), 31 Ohio St.3d 111, 120, 31 OBR 273,

> 509 N.E.2d 383. Based on the foregoing, we overrule Leonard's 23rd proposition
> of law.

*Leonard*, 104 Ohio St. 3d at 72–74. Although the state court did not directly address the

Confrontation Clause aspect of these subclaims, this Court can assume the federal claims have

been denied on the merits because they were directly presented to the court. *Harrington*, 562

U.S. at 98; *Brown v. Bobby*, 656 F.3d 325, 329 (2011). The Magistrate Judge concluded that the

Ohio Supreme Court's decision was not an objectively unreasonable application of Supreme

Court law.

Leonard objects to the R&R and the Supplemental R&R only in regards to the purported

hearsay statements made by Frye. (Doc. 53 at PageID 1341–43; Doc. 66 at PageID 9349–52.)

"[T]he Sixth Amendment's right of an accused to confront the witnesses against him is likewise

a fundamental right and is made obligatory on the States by the Fourteenth Amendment."

*Pointer v. Tex.*, 380 U.S. 400, 403 (1965); *see also Crawford v. Wash.*, 541 U.S. 36, 42 (2004).

The Confrontation Clause is not co-extensive with hearsay rules, even if they protect similar

values. *White v. Ill.*, 502 U.S. 346, 352–53 (1992). A statement that qualifies for admission

under a firmly rooted hearsay exception or that is made in a context that provides substantial

guarantee of trustworthiness would not violate the Confrontation Clause. *Id.* at 355, 357.

The Ohio Supreme Court found that Frye's testimony about three hearsay statements by

Flick should have been deemed inadmissible, but also found that the errors in admitting the

statements were harmless. Assuming the hearsay violations amounted to a Confrontation Clause

violation, that "violation of the Confrontation Clause does not warrant automatic reversal but,

rather, is subject to harmless-error analysis." *Blackston*, 780 F.3d at 359. The harmless-error

standard to be applied when determining whether habeas relief must be granted because of a

constitutional error during trial is whether the error "had substantial and injurious effect or

24

influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993).[2]

When determining whether a Confrontation Clause violation was harmless under *Brecht*, the Court must examine a host of factors, including "the importance of the witness' [s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of the cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Blackston*, 780 F.3d at 359 (citation omitted). This Court agrees with the Ohio Supreme Court that the errors in admitting Flick's hearsay statements through Frye's testimony were harmless, even applying the federal *Brecht* harmless error standard.

The first hearsay statement was Frye's testimony that Flick told her that she intended to leave Leonard because he had fathered a second child with Penny McBride. Leonard had stipulated that he was the father of two of McBride's children. Also, Leonard had confessed to the police that he killed Flick because he had "a broken heart" and thought he was "losing" Flick. (Doc. 61-9 at PageID 6166–77.)[3] Therefore, Frye's testimony on these points was cumulative of or corroborated Leonard's confession. Similarly, Frye's testimony that Flick told her that Leonard had threatened that no other man could have Flick if he could not have Flick also is cumulative of other evidence. Alvie Woods testified at the trial that Leonard had made similar statements to him. (Doc. 61-14 at PageID 7928.) Finally, the trial court's decision to admit Frye's testimony that Flick told her that she allowed Leonard to spend the night at her house the

---

[2] Trial error is an error that occurs during the presentation of the case to the jury and one which can be quantitatively assessed in the context of the other evidence presented to determine the effect it had on the trial. *Brecht*, 507 U.S. at 629.

[3] This citation is to the transcript of the taped confession. The tape was admitted to the jury at trial. (Doc. 61-14 at PageID 8263.) The jury viewed the transcript while the tape was played at trial, but it was not admitted into evidence for purposes of jury's deliberations. (*Id.* at PageID 8264.)

night before she was killed because he had called and harassed her and she was afraid he would hurt himself is harmless error for a different reason.  The testimony was not very important to Leonard's convictions for murder and attempted rape when examined in context with Leonard's confession, the testimony of Ryan Gries, and the physical evidence.

For these reasons, the Court will deny the Second Ground for Relief as to the subclaims asserted on direct appeal.

### B.      Subclaims Not Asserted on Direct Appeal

Leonard asserted several hearsay-related subclaims in his Application for Reopening to the Ohio Supreme Court which he had failed to raise on direct appeal.  Relevant to the pending Objections, Leonard stated in Application that "the [trial] court erred when it admitted the testimony of Deborah Schroeder concerning the conversation that Leonard had with the victim at the restaurant on the evening of the homicide (Tr. 1179)" and when it admitted the testimony of "Lea Ketter [sic] concerning Leonard's telephone calls to the restaurant repeatedly that evening (Tr. 1212)."  (Doc. 61-3 at PageID 2912.) [4]  Leonard argued that the ineffective assistance of his appellate counsel in failing to raise the subclaims on direct appeal provided cause to excuse his procedural default as to these subclaims.  The Ohio Supreme Court denied the Application without explanation.  *Leonard*, 106 Ohio St. 3d 1407.

An ineffective assistance of appellate counsel claim is "analytically distinct" from the underlying claim about which it is asserted the appellate counsel should have raised.  *White v. Mitchell*, 431 F.3d 517, 526 (6th Cir. 2005).  The Ohio Supreme Court's decision on an application for reopening can preserve the merits of a petitioner's ineffective assistance of appellate counsel claims for review in federal district court, either insofar as such claims, if

---

[4]  Leonard stated in the Application that the relevant Schroeder testimony was on page 1176 (Doc. 61-14 at PageID 7942) of the trial transcript, but he clarified in his Supplemental Objections, that the relevant testimony was on page 1179 (*Id.* at PageID 7945.)

meritorious, might constitute excusing cause for a procedural default in presenting the underlying claims or in themselves as justifying the writ conditioned on the petitioner being granted a reopened appeal. *See Edwards v. Carpenter*, 529 U.S. 446, 451–53 (2000).

The test of *Strickland v. Washington,* 466 U.S. 668 (1984) (constitutionally deficient performance plus prejudice) applies to appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Parks v. Bobby*, 545 F. App'x 478, 481 (6th Cir. 2013). An appellate attorney need not advance every argument, regardless of merit, urged by the appellant. *Jones v. Barnes,* 463 U.S. 745, 751–52 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."). However, failure to raise an issue can amount to ineffective assistance. *McFarland v. Yukins*, 356 F.3d 688, 710–12 (6th Cir. 2004).

"In order to succeed on a claim of ineffective assistance of appellate counsel, a petitioner must show errors so serious that counsel was scarcely functioning as counsel at all and that those errors undermine the reliability of the defendant's convictions." *McMeans v. Brigano,* 228 F.3d 674, 682 (6th Cir. 2000). The failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal. *McFarland*, 356 F.3d at 710–11. The failure to raise an underlying claim in the appeal which would have been unsuccessful is not ineffective assistance of appellate counsel. *Meek v. Bergh*, 526 F. App'x 530, 534 (6th Cir. 2013). "Counsel's performance is strongly presumed to be effective." *McFarland*, 356 F.3d at 710 (quoting *Scott v. Mitchell,* 209 F.3d 854, 880 (6th Cir. 2000)). To prevail on a claim of ineffective assistance of appellate counsel, a petitioner must show that appellate counsel "ignored issues [which] are clearly stronger than

those presented." *Smith*, 528 U.S. at 288 (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).

Turning back to the subclaims here, Leonard asserts that his appellate attorneys rendered ineffective assistance when they did not assert the claims based on Schroeder's and Ketterer's testimony. Magistrate Judge Merz recommended denying these subclaims. Schroeder testified that when Leonard called Flick at work on the night of the murder, Flick "would tell him that . . . she was busy." (Doc. 61-14 at PageID 7945.) Schroeder also testified that Flick was "a little nervous, a little upset." (*Id.*) The Magistrate Judge concluded that Schroeder's testimony that Flick told Leonard that she was busy constituted an admissible verbal act and was not offered for the truth of the matter asserted. (Doc. 60 at PageID 1509.) This Court agrees. "Some statements are merely verbal parts of acts and are, as the acts are themselves, admissible." *Ohio v. Blevins*, 36 Ohio App. 3d 147, 149, 521 N.E.2d 1105, 1108 (1987). Verbal acts "are offered for the fact they were said, not for the truth of the matter asserted." *Rex v. Univ. of Cincinnati Coll. of Med.*, No. 13AP-397, 2013 WL 6095889, at *3 (Ohio App. Nov. 19, 2013).[5] Schroeder's testimony was not offered to show that Flick was busy, but rather to establish what Flick told Leonard. Leonard has not established that appellate counsel was ineffective for failing to raise this claim for relief on direct appeal. *See Meek*, 526 F. App'x at 534 (stating that the failure to raise a non-meritorious claim is not ineffective).

The analysis of Ketterer's testimony is similar. Ketterer testified that Leonard called Flick four times at work the night she was murdered. (Doc. 61-14 at PageID 7978.) Ketterer was asked for Flick's reaction to the calls. (*Id.*) Ketterer testified in response: "She got

---

[5] The Court is aware that some cases define verbal acts more narrowly to include only the uttering of words that have independent legal significance such as the words of offer and acceptance that constitute a contract. *See Preferred Props., Inc. v. Indian Rives Estates, Inc.*, 276 F.3d 790, 798 n.5 (6th Cir. 2002); *Wade v. Commc'ns Workers of Am. Roberts*, No. 84AP-57, 1985 WL 10178, at *4 (Ohio Ct. App. Sept. 24, 1985). The distinction is not critical here as the key point is that the Court concludes that Flick's statement is not offered for the truth of the matter she asserted.

agitated.  She was working.  We were busy.  She's like, I don't have time."  (*Id.*)  To begin, it is

not clear that Ketterer intended her testimony to mean that Flick said the words "I don't have

time" to Leonard  or whether the testimony was part of her description of Flick's emotional

response to Leonard's phone calls.  The statement is not hearsay if that latter interpretation is

correct.  Additionally, even if Ketterer intended to testify that Flick said those words to Leonard,

the statement was not offered to prove that Flick in fact was busy at the restaurant.  It was a

verbal act offered to establish what Flick told Leonard.  The Court concludes that the trial court

did not err when it admitted Ketterer's testimony and that Leonard suffered no prejudice by his

appellate counsel's failure to raise the issue on direct appeal.

> ### C.       Conclusion

The Court will deny the Second Ground for Relief.  The Court will not issue a certificate

of appealability on this ground.

## GROUND THREE

> **Leonard's rights to remain silent, counsel, and a fair trial under the Fifth
> and Fourteenth Amendments to the United States Constitution were violated
> when the trial court failed to suppress Leonard's statement to the police.**

(Doc. 6 at PageID 73.)

Petitioner Leonard challenges the voluntariness of his confession.  He first raised the

issue in a motion to suppress to the trial court.  The trial court denied the motion after hearing

testimony from Sergeant Nick Chaplin of the Campbell County, Kentucky Sheriff's Office, the

friend of Leonard to whom Leonard surrendered  on the night of the murder, and Detective Ken

Schweinefus of the Hamilton County, Ohio Sheriff's Office.  (Doc. 61-13 at PageID 6816–85.)

Subsequently, Leonard asserted this claim on direct appeal to the Ohio Supreme Court.  The

Ohio Supreme Court denied the claim as follows:

{¶ 31} Leonard claims in proposition of law five that the trial court erred in failing to suppress his confession. Leonard contends that his waiver of his rights and his confession to police were not knowing, intelligent, and voluntary because, at the time, he was "suicidal, heartbroken, and exhausted."

{¶ 32} In determining whether a pretrial statement is voluntary, a court "'should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.'" *State v. Mason*, 82 Ohio St.3d at 154, 694 N.E.2d 932, quoting *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus. The same considerations apply to whether a defendant voluntarily, knowingly, and intelligently waived his rights. *State v. Eley* (1996), 77 Ohio St.3d 174, 178–179, 672 N.E.2d 640; *State v. Clark* (1988), 38 Ohio St.3d 252, 261, 527 N.E.2d 844.

{¶ 33} After Leonard surrendered, Campbell County (Kentucky) officers advised him of his *Miranda* rights. Hamilton County detectives gave a second *Miranda* warning. Leonard waived his rights each time, and he signed a waiver-of-rights form. Leonard now asserts that the trial court erred in admitting his confession into evidence because his emotional instability affected his ability to make a valid waiver and a voluntary confession. Evidence introduced at the suppression hearing indicated that Leonard had killed Flick because he was heartbroken and exhausted and that he had contemplated killing himself after he shot her.

{¶ 34} However, a defendant's mental condition is only one factor in the totality of circumstances to be considered in determining voluntariness. A defendant's mental condition may be a "significant factor in the 'voluntariness' calculus. But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" (Citation omitted.) *Colorado v. Connelly* (1986), 479 U.S. 157, 164, 107 S. Ct. 515, 93 L.Ed.2d 473. Issues of voluntariness have always turned on the presence or absence of police coercion or overreaching. *Id.* at 170, 107 S. Ct. 515, 93 L.Ed.2d 473. *See*, *also*, *State v. Eley*, 77 Ohio St. 3d at 178, 672 N.E.2d 640.

{¶ 35} We have reviewed the suppression-hearing transcript and find no evidence suggesting that Leonard's "will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct." *See State v. Otte* (1996), 74 Ohio St. 3d 555, 562, 660 N.E.2d 711; *Colorado v. Connelly*, 479 U.S. at 167, 107 S. Ct. 515, 93 L.Ed.2d 473. No threats or inducements were made, and both Campbell County and Hamilton County police officers conducted themselves with professionalism. After he was taken into custody, Leonard was cooperative and calm. According to Sergeant Chaplin, Leonard's friend of eight years, Leonard "appeared normal, like nothing was bothering him."

{¶ 36} Although Leonard claimed that one of the reasons he had killed Flick was his lack of sleep, he did not appear to police to be tired. *Cf.*, *State v. Tibbetts*, 92 Ohio St. 3d at 154–155, 749 N.E.2d 226 (claim of grogginess from medication did not render defendant's statements involuntary). Leonard did not appear to be under the influence of alcohol or drugs. Hamilton County detectives interviewed Leonard for approximately one hour, and during questioning, Leonard was offered water and cigarettes.

{¶ 37} Based on the totality of the circumstances, we have determined that Leonard's confession was knowing, voluntary, and intelligent and was admissible. See *State v. Eley*, 77 Ohio St.3d at 178–179, 672 N.E.2d 640; *State v. Clark*, 38 Ohio St.3d at 261, 527 N.E.2d 844; *State v. Edwards*, 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus. Therefore, we overrule Leonard's fifth proposition of law.

*Leonard*, 104 Ohio St. 3d at 59–60.

Leonard asserts that his confession was involuntary in violation of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. He asserts that the Ohio Supreme Court's determination of the facts was unreasonable in light of the evidence presented. Magistrate Judge Merz found that the decision of the Ohio Supreme Court, implicitly accepting Judge Schweikert's weighing of the credibility of Chaplin and Schweinefus, was neither an objectively unreasonable application of cited Supreme Court precedent nor based on a clearly erroneous determination of the facts. (Doc. 47 at PageID 1195–96.) This Court agrees.

The test of the voluntariness of a confession is whether the confession "is the product of an essentially free and unconstrained choice by its maker." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). "In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Id.* at 226. Relevant factors include the

youth, intelligence, and education level of the accused, the advisement of constitutional rights, and the length and condition of the accused's detention.  *Id.*

The Supreme Court held in *Colorado v. Connelly,* 479 U.S. 157 (1986), that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."  *Id.* at 167.  The Sixth Circuit has instructed that "[t]o determine voluntariness, a court must examine whether law enforcement officials have overborne the defendant's will through coercive activity."  *U.S. v. Brown,* 66 F.3d 124, 126 (6th Cir. 1995) (citations omitted).  The mental condition of a defendant is relevant to the voluntariness inquiry, but "mere examination of the confessant's state of mind can never conclude the due process inquiry."  *Connelly,* 479 U.S. at 164.

To the extent that Leonard also might be arguing that contends that he did not knowingly or intelligently waive his *Miranda* rights, he has the burden of establishing that his waiver was not knowing or intelligent.  *Garner v. Mitchell*, 557 F.3d 257, 260–61 (6th Cir. 2009) (*en banc*).  "To determine whether the confession was knowing and intelligent, we apply a totality of the circumstances test to ascertain whether [the petitioner] understood his right to remain silent and to await counsel."  *Clark v. Mitchell*, 425 F.3d 270, 283 (6th Cir. 2005).  "The *Miranda* warnings protect [the privilege against self-incrimination] by ensuring that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time."  *Colo. v. Spring*, 479 U.S. 564, 574 (1987).  Factors to be considered in the *Miranda* waiver analysis include the defendant's conduct during and prior to the custodial interrogation, his background and experiences, and other facts and circumstances relevant to the particular case.  *Garner*, 557 F.3d at 261.

The totality of the circumstances here indicates that Leonard's confession and his waiver of *Miranda* rights was voluntary and knowing.  Leonard has not asserted any facts suggesting that his age, intelligence, or education level impaired his ability to make voluntary decisions.  He has not established any facts demonstrating that the police behaved in an intimidating or coercive manner towards him.  His primary argument is that he had initially told Sgt. Chaplin that he felt heartbroken and was contemplating suicide.  However, Det. Schweinefus testified that Leonard later appeared calm at the police station when he was interrogated.  (Doc. 61-13 at PageID 6857.)  Sgt. Chaplin testified that Leonard seemed fine and appeared to understand the legal trouble that he was facing.  (*Id.* at PageID 6836, 6838.)  Leonard did not appear overly tired nor impaired by alcohol or drugs.  (Doc. 61-13 at PageID 6858.)  Upon consideration of these circumstances, the Court shares the Ohio Supreme Court conclusion that Leonard's confession was voluntary.

The Court will deny Ground Three because the Ohio Supreme Court determination was neither contrary to nor an unreasonable application of clearly established federal law nor was it based on an unreasonable determination of the facts.  *See* 28 U.S.C. §§ 254(d)(1)–(2) (review standard).  The Court will not grant a certificate of appealability on this ground for relief.

**GROUND FOUR**

> **Leonard's rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated when he was denied sufficient funds to adequately defend himself against the charges against him.**

(Doc. 6 at PageID 77.)

Petitioner Leonard is not contesting the Magistrate Judge's recommendation that this ground for relief be denied.  (Doc. 53 at PageID 1303–07.)  The Court considers this ground for relief to be withdrawn.

**GROUND FIVE**

> **Leonard's rights to a fair trial and due process under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when the trial court admitted gruesome and otherwise prejudicial photographs.**

(Doc. 6 at PageID 78.)

Leonard first asserted this claim in his direct appeal.  The Ohio Supreme Court

denied the claim as follows:

> {¶ 84} In the 12th proposition of law, Leonard contends that the trial court erred by admitting into evidence gruesome and cumulative photographs of the victim. Leonard's pretrial motion in limine to preclude admission of photographs of the victim was overruled, as were counsel's objections at trial.

> {¶ 85} In capital cases, nonrepetitive photographs, even if gruesome, are admissible as long as the probative value of each photograph outweighs the danger of material prejudice to the accused.  *State v. Maurer* (1984), 15 Ohio St. 3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus; *State v. Morales* (1987), 32 Ohio St. 3d 252, 257, 513 N.E.2d 267.  Decisions on the admissibility of photographs are "left to the sound discretion of the trial court." *State v. Slagle* (1992), 65 Ohio St. 3d 597, 601, 605 N.E.2d 916.

> {¶ 86} Leonard challenges the admission of five crime-scene photographs. These photos illustrated the testimony of the police officers who discovered Flick's body and illustrated the crime scene and the body's condition.  *See, e.g.*, *State v. Hughbanks*, 99 Ohio St. 3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, at ¶ 72.

> {¶ 87} None of these photos is duplicative or cumulative.  Each depicts a different view or angle of the victim's body and her injuries. State's Exhibit 1–E is a partial view of Flick's body as first seen by police looking through a window from outside her house.  State's Exhibit 1–I shows a full view of Flick's body and depicts how the body was positioned in the home.  State's Exhibit 1–J shows Flick with her panties at midthigh, with one pant leg down around her calf and the other pant leg completely off.  State's Exhibit 1–K depicts bruising on her thighs. State's Exhibit 1–L shows that Flick was handcuffed.  These photos, although gruesome, were probative of issues of intent, premeditation, and the manner and circumstances of Flick's death, including whether Leonard had attempted to rape her.  We determine that the probative value outweighed the danger of unfair prejudice.  *See, e.g.*, *State v. Biros* (1997), 78 Ohio St.3d 426, 444–445, 678 N.E.2d 891.

> {¶ 88} Leonard also objected to 11 autopsy photographs, claiming that they are gruesome and repetitive.  Autopsy photos serve a purpose different from the crime-scene photographs.  *See State v. Reynolds* (1998), 80 Ohio St. 3d 670, 676–

677, 687 N.E.2d 1358.  Two photos showed the three gunshot wounds to the head
from different angles.  These photos illustrated the coroner's testimony and
helped show Leonard's intent.  The coroner also used autopsy photos in his
testimony to explain injuries to Flick's neck and wrists.  State's Exhibits 20–K, J,
and I are different angles of Flick's right hand and wrist, portraying bruising that
corresponds to the handcuffs that had been on her wrists.  State's Exhibit 20–H
portrays similar bruising to the left wrist.  State's Exhibit 20–G depicts Flick's
face and shows petechiae, small reddish marks indicating ruptured blood vessels
that are caused by compression to the neck.  State's Exhibit 20–D demonstrates
ligature bruising on the neck caused by Flick's necklace.  This photo also shows
more petechiae around the neck and stippling, an injury to the skin caused by
unburned particles of gunpowder.  State's Exhibit 20–B is a close-up of the
ligature mark on the neck.  These photos supported the coroner's conclusions that
Flick had been strangled and had struggled while handcuffed.  Finally, State's
Exhibit 20–E demonstrates a gunshot injury to Flick's left index finger, and 20–F
shows a gunshot wound to the lower lip and also illustrates stippling.  None of the
autopsy photos were duplicative or cumulative, and the value of each photo
outweighed any prejudicial impact.  Thus, we conclude that no abuse of discretion
occurred in admitting the photos.

{¶ 89} Leonard also complains that photos of the victim were displayed on a "big
screen television."  During the state's case, photos of Flick were on a screen, but
the record does not indicate what size screen was used.  Moreover, Leonard did
not object to displaying the photos on screen.  Nothing in the record demonstrates
that the method of presenting this evidence prejudiced Leonard by inflaming the
jury's passions.  *See*, *e.g.*, *State v. Biros*, 78 Ohio St. 3d at 444–445, 678 N.E.2d
891.  *See*, *also*, *State v. Gumm* (1995) 73 Ohio St. 3d 413, 425, 653 N.E.2d 253
(the size of a photo alone does not increase the prejudicial aspect of the evidence
to the extent that it becomes inadmissible).  Thus, no plain error occurred.

{¶ 90} Finally, Leonard objects to the prosecutor's use of photographs during
closing argument.  It appears that the prosecutors referred to the photographs only
twice in their closing arguments, and Leonard failed to object both times.  Again,
we find there was no plain error.  Accordingly, we overrule proposition of law 12.

*Leonard*, 104 Ohio St. 3d at 69–70.

Leonard has raised the claim again on habeas review.  The Court reiterates and adopts the

well-reasoned recommendation of Magistrate Judge Merz who explained as follows:

Leonard argues first that the Ohio Supreme Court erred in determining the
probative value of the photographs outweighed their prejudicial effect.
(Objections, Doc. No. 53, PageID 1350-51, relying on Ohio R. Evid. 403.)  The
Ohio Supreme Court carefully described each photograph to which objection was
made and noted that they were not duplicative.  *State v. Leonard*, 104 Ohio St. 3d

54, ¶¶ 84-88 (2004).  Of course, the question whether the probative value of these photographs outweighs their prejudicial effect is a question of Ohio, not federal, law, on which we are bound by the state court's decision.  *Railey v. Webb*, 540 F.3d 393[, 421] (6th Cir. 2008), *quoting Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Maldonado v. Wilson*, 416 F.3d 470[, 476–77] (6th Cir. 2005); *Vroman v. Brigano*, 346 F.3d 598[, 604] (6th Cir. 2003); *Caldwell v. Russell*, 181 F.3d 731, 735-36 (6th Cir. 1999); *Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986).

As the relevant Supreme Court law allegedly applied unreasonably, Leonard cites *Romano v. Oklahoma,* 512 U.S. 1 (1994).  In that capital case the Supreme Court allowed admission of evidence that the defendant had been convicted of capital murder of another victim.  The case does not speak to the question the Ohio Supreme Court was called upon to decide here.

Leonard's assertion that the Ohio Supreme Court made an unreasonable determination in light of the evidence (Objections, Doc. No. 53, PageID 1352), is purely conclusory and contrasts markedly with the detailed analysis offered by that Court.

(Doc. 60 at PageID 1511–12.)

The Court will deny Ground Five.  The Court will not issue a certificate of appealability on this issue.

## GROUND SIX

**Leonard's rights to a fair trial as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated when the trial court failed to maintain a complete record of all proceedings in Leonard's trial.**

(Doc. 6 at PageID 81.)

Petitioner Leonard is not contesting the Magistrate Judge's recommendation that this ground for relief be denied.  (Doc. 53 at PageID 1303–07.)  The Court considers this ground for relief to be withdrawn.

## GROUND SEVEN

**Leonard's rights to a fair trial and due process under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when the trial court**

**committed numerous errors in instructing the jury in the guilt determination phase of Leonard's capital trial.**

(Doc. 6 at PageID 83.)

Leonard asserts that the trial court made the following errors in the culpability portion of his criminal trial:

1. The trial court included an instruction concerning "attempt". (Tr. p. 1606-08.) The defense vigorously objected, correctly arguing that the State argued actual penetration. The only lesser offense would be gross sexual imposition.

2. The trial court expanded the definition of the term "attempt" from the definition listed in Ohio Revised Code § 2923.01(A). (*Id.* at 1609-10.)

3. The trial court improperly instructed on the definition of "reasonable doubt" in that the phrase willing to act allowed the jury to find Leonard guilty based on a clear and convincing standard which is below that required by the due process clause. (*Id.* at 1696.) Further, the trial court used the phrase "moral evidence". (*Id.*) This phrase improperly shifted the focus of the jury to the subjective morality of the defendant rather than the required legal proof. *Victor v. Nebraska*, 511 U.S. 1 (1994).

4. The trial court erred in its instruction of causation. (*Id.* at 1703-04.) By defining cause as "an act or failure to act which in a natural and continuous sequence directly produces the death," the trial court diminished the State's burden to prove the mens rea element of the offense.

5. The trial court erred in its instruction on purpose, which created a mandatory rebuttal presumption of the mens rea that relieved the State of its burden of proof on that essential element. *See In re Winship*, 397 U.S. 358 (1970). (Tr. p. 1707.)

6. The jury was instructed on "good motive." (*Id.* at 1703.) This instruction was unnecessary and prejudicial, as trial counsel did not argue motive to the jury.

7. The jury was instructed as to how they would reach the mitigation phase of the case (*Id.* at 1742.) This instruction improperly injected the issue of punishment into the culpability phase.

(Doc. 53 at PageID 1353–54.)

Leonard presented these issues as a proposition of law to the Ohio Supreme Court. The Ohio Supreme Court denied the relief on these issues for the following reasons:

{¶ 115} Leonard contends in proposition of law 25 that the trial court committed numerous errors in instructing the jury during the guilt-determination phase. Leonard first argues that the trial court improperly included an instruction on attempted rape. He also contends that the trial court "expanded the definition of the term 'attempt' from the definition listed in Ohio Revised Code § 2923.01(A) [sic, 2923.02]." Defense counsel objected to both instructions. However, we find that no error occurred.

{¶ 116} Attempted rape is a lesser included offense of rape, and the evidence at trial supported the trial court's decision to instruct on that offense. *See State v. Williams*, 74 Ohio St.3d at 578, 660 N.E.2d 724. *See*, *also*, *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus. Also, the trial court did not erroneously expand the definition of "attempt" set forth in R.C. 2923.02. The trial court's definition substantially conformed to the definition of "attempt" set forth in *State v. Green* (1991), 58 Ohio St.3d 239, 240, 569 N.E.2d 1038. *See*, *also*, *State v. Woods* (1976), 48 Ohio St.2d 127, 2 O.O.3d 289, 357 N.E.2d 1059, paragraph one of the syllabus (construing R.C. 2923.02[A]), which was cited with approval in *Green*.

{¶ 117} Leonard next challenges the trial court's instruction on reasonable doubt. The reasonable-doubt instruction in the guilt-determination phase was in accord with R.C. 2901.05(D), and we have previously rejected complaints against the statutory definition. *See*, *e.g.*, *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 232, 594 N.E.2d 604; *State v. Getsy*, 84 Ohio St.3d at 202, 702 N.E.2d 866.

{¶ 118} Leonard also argues that the trial court erred in its instructions on causation and prior calculation and design, but Leonard failed to object to these instructions at trial. No error, plain or otherwise, occurred. *See State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 97–99 (in which a substantially identical causation instruction was upheld); *State v. Jones* (2001), 91 Ohio St.3d 335, 348, 744 N.E.2d 1163 (in which a similar prior-calculation-and-design instruction was upheld).

{¶ 119} Leonard's claim that the trial court instructed the jury "on making an inference based on an inference" is not supported by the record. He also asserts that the trial court's instruction that "a good motive is not a defense" negated the court's instruction on purpose. But the trial court instructed the jury that while proof of motive is not required, "[t]he presence or absence of motive is one of the circumstances bearing upon purpose." A single jury instruction may not be judged in artificial isolation but must be viewed in the context of the overall charge. *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772, paragraph four of the syllabus. Leonard failed to object to the trial court's "good motive" instruction, and plain error has not been shown. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

{¶ 120} We also reject Leonard's argument that the trial court's "purpose" instruction, which is a standard instruction, created a mandatory rebuttable presumption. *See State v. Phillips* (1995), 74 Ohio St.3d 72, 100, 656 N.E.2d 643; *State v. Wilson*, 74 Ohio St.3d at 392, 659 N.E.2d 292.

{¶ 121} Finally, Leonard asserts that the jury was instructed during the guilt-determination phase "as to how they would reach the mitigation phase of the case," but he does not explain how he was prejudiced. To the extent that Leonard contends that the trial court improperly injected the issue of punishment into the guilt-determination phase, we rejected similar arguments in *State v. Phillips*, 74 Ohio St.3d at 100–101, 656 N.E.2d 643, and *State v. Durr*, 58 Ohio St.3d at 90, 568 N.E.2d 674. *Cf.* R.C. 2929.03(B) ("The instruction to the jury shall * * * not mention the penalty that may be the consequence of a guilty or not guilty verdict on any charge or specification"). Accordingly, Leonard's 25th proposition of law is overruled.

*Leonard*, 104 Ohio St. 3d at 76–77.

Magistrate Judge Merz has recommended that this Court deny the claim for relief. He points out that a district court cannot grant habeas relief to correct alleged mistakes of state law, such as whether attempted rape is a lesser included offense of rape. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.") However, a district court can determine whether an improper instruction "so infected the entire trial that the resulting conviction violates due process." *Id.* at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). If an instruction is ambiguous, a district court should examine "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Id.* at 72 (quoting *Boyde v. Cal.*, 494 U.S. 370, 380 (1990)).

Petitioner Leonard argues only in broad and conclusory terms how the instructions were erroneous. Nonetheless, the Court will examine the relevant subclaims for which Leonard makes at least a minimal constitutional argument.

Leonard objects to the jury instruction on reasonable doubt in the third subclaim asserting it violated his due process rights. The trial judge gave the following instruction on reasonable doubt:

> Reasonable doubt is present when, after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced of the truth of the charge. It is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs.
>
> If after a full and impartial consideration of all the evidence, you are firmly convinced of the truth of the charge, the State has proved its case beyond a reasonable doubt. If you are not firmly convinced of the truth of the charge, you must find the defendant not guilty.

(Doc. 61-15 at PageID 8462.) Leonard cites to *Victor v. Nebraska*, 511 U.S. 1 (1994), to argue that the trial court's use of the term "moral evidence" was improper. However, the Supreme Court in *Victor* upheld a challenge against the use of the terms "moral evidence" and "moral certainty" in jury instructions when the phrases were examined in the context of the instructions as a whole. *Id.* at 10–17, 21–22. Leonard cites to no Supreme Court precedent in which the challenged language was found to be unconstitutional. Substantially similar jury instruction language was upheld in *Coleman v. Mitchell*, 268 F.3d 417, 436–37 (6th Cir. 2001) and *Thomas v. Arn*, 704 F.2d 865, 867–69 (6th Cir. 1983). The Court will not grant habeas relief upon this subclaim.

In the fifth subclaim, Leonard argues that the trial court's instruction on purpose relieved the state of its burden of proof on the element of *mens rea*. He cites *In re Winship*, 397 U.S. 358 (1970), in support. The Supreme Court did not directly discuss *mens rea* or purpose instructions in the *Winship* case. The Court did hold in *Winship* that the state bears the burden of proof

beyond a reasonable doubt as to every element to obtain a criminal conviction. *Id.* at 364. The trial court defined "purpose" as follows:

> Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result. To do an act purposely is to do it intentionally and not accidentally. Purpose and intent mean the same thing. The purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct. The purpose with which a person brings about a result is determined from the manner in which it is done, the means used and all the other facts and circumstances in evidence.

(Doc. 61-15 at PageID 8469.) Leonard does not explain how the trial court's instructions on purpose relieved the State of Ohio of the burden of proof. The Supreme Court denounced the use of conclusive presumptions in *Sandstrom v. Montana*, 442 U.S. 510 (1979), but Leonard has not identified an improper conclusive presumption in these instructions. He also does not explain the manner in which the Ohio Supreme Court's decision was contrary to federal law. The Court will not grant habeas relief on this subclaim.

The Court will adopt the recommendation in the R&R and deny the Seventh Ground for Relief. The Court will not issue a certificate of appealability on this claim.

## GROUND EIGHT

> **Leonard was denied his rights to due process and a fair and reliable determination of his sentence under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution when erroneous instructions were given at the penalty phase of his capital trial.**

(Doc. 6 at PageID 86.)

### A. Introduction of Culpability Evidence into the Sentencing Phase of the Trial.

Leonard objects in this subclaim to the trial court's decision to admit all of the evidence from the culpability phase of the trial into the sentencing phase of the trial and then to allow the jury to determine what evidence was relevant. The trial court permitted the prosecutor to re-admit during the sentencing phase all the evidence introduced during the culpability phase over

41

the objection of the Leonard's trial attorneys.  (Doc. 61-15 at PageID 8578–79.)  The trial court later instructed the jury that they would determine which evidence was relevant when the trial court stated that "[y]ou will consider all the evidence raised at both stages of the trial which is relevant to the aggravating circumstances, or which is relevant to the mitigating factors."  (*Id.* at PageID 8813–14.)  Leonard argues that the jury should not have been permitted to consider crime scene photos, slugs, spent shell casings, autopsy photos, the victim's necklace, or pictures of the victim with Leonard's son because the evidence was irrelevant to the aggravating circumstance.  (Doc. 61-9 at PageID 6184–6222, 6249–88, 6292–6305.)

Leonard failed to raise this issue on direct appeal.  Instead, he raised the issue for the first time as the fourth proposition of law in his Application for Reopening.  (Doc. 61-3 at PageID 2910–11.)  He argued that his appellate counsel were constitutionally ineffective in the direct appeal.  (*Id.* at PageID 2904.)  He cited *Romano v. Oklahoma*, 512 U.S. 1, 7 (1994), *Furman v. Georgia*, 408 U.S. 238 (1972), *Stringer v. Black*, 503 U.S. 222, 237 (1992), and *Sochor v. Florida*, 504 U.S. 527, 532 (1992), in support of his constitutional claim that the trial court should not have left the relevant evidence determination to the jury.  The Ohio Supreme Court denied the Application for Reopening without analysis.  *Leonard*, 106 Ohio St. 3d 1407.

Leonard does not dispute that his claim was procedurally defaulted insofar as he failed to assert the claim on direct appeal.  He argues that the ineffective assistance of his appellate counsel serves as cause to excuse the procedural default.  When the Ohio Supreme Court denied the Application for Reopening without comment, that decision served as a de facto merits determination of whether his appellate counsel had been constitutionally ineffective.  *See Harrington*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the

merits in the absence of any indication or state-law procedural principles to the contrary.")  The Ohio Supreme Court decision on the Application for Reopening was not a merits decision on the underlying evidence issue.

Leonard asserts the alleged ineffective assistance of his appellate counsel here not as an independent ground for relief, but only as cause to excuse his procedural default of the evidence claim.  Ineffective assistance of appellate counsel can be an excusing cause to avoid a state procedural default rule when the ineffective assistance of appellate counsel claim was properly presented to the state courts in the first instance.  *Edwards*, 529 U.S. at 451–52.  Leonard argues that he does not need to meet the AEDPA standard of deference to the Ohio Supreme Court decision on the merits with respect to the ineffective assistance of appellate counsel claim insofar as it is used to establish cause to excuse his procedure default of the underlying evidence claim. *See Joseph v. Coyle*, 469 F.3d 441, 459 (6th Cir. 2006).  Leonard cannot establish cause whether or not the Court applies a deferential standard of review.

The Court earlier explained that *Strickland* applies to ineffective assistance of appellate counsel arguments.  *Robbins*, 528 U.S. at 285; *Parks*, 545 F. App'x at 481.  Leonard must show that appellate counsel "ignored issues [which] are clearly stronger than those presented." *Robbins,* 528 U.S. at 288 (citation omitted).  Appellate counsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal.  *McFarland*, 356 F.3d at 710–11.

If Leonard's appellate counsel had raised the issue on direct appeal, the Ohio courts likely would have held that the trial court erred in delegating to the jurors the determination of which evidence was relevant at sentencing.  All determinations as to the relevance and admissibility of any evidence are to be made by the trial court and not delegated to the jury.

*Ohio v. Getsy*, 84 Ohio St. 3d 180, 201 (1998); *Ohio v. Hale*, 119 Ohio St. 3d 118, 140 (2008).

At the penalty phase of a capital trial, counsel for the state is permitted to raise and address any

evidence that was (1) raised at trial and goes to aggravating circumstances, (2) any other relevant

evidence, (3) evidence to rebut the existence of any statutorily defined or asserted mitigating

factors from defendant, (4) the presentence report when one is requested by defendant and (5) the

mental examination report when one is requested by defendant. *Ohio v.Gumm*, 73 Ohio St. 3d

413, 421 (1995). An error instructing the jury to consider all relevant evidence—that is, to make

the relevance determination—is not reversible error unless it proves prejudicial to the outcome.

*Getsy*, 84 Ohio St. 3d at 201; *Hale*, 119 Ohio St. 3d at 140.

Leonard makes only conclusory statements that the evidence admitted during the

sentencing phase was prejudicial. He does not analyze each item or category of evidence to

explain why it was irrelevant to the sentencing determination and why its admission was

prejudicial.

The trial court described the aggravated circumstance upon which the jury convicted

Leonard as follows during the initial sentencing phase instructions:

> Patrick Leonard committed the offense of aggravated murder while committing or
> attempting to commit or fleeing immediately after committing or attempting to
> commit the offense of rape. And the offender was the principal offender in the
> commission of the aggravated murder.
> * * *
> The aggravated murder itself is not an aggravating circumstance.

(Doc. 61-15 at PageID 8567–68.) Some of the evidence submitted was irrelevant to the

aggravating circumstance, including the pictures of Flick with Leonard's son. However, trial

counsel had one of the defense witnesses describe the photographs of Flick holding Leonard's

son to support the mitigation case so it can be argued that those photographs could serve to elicit

sympathy for Leonard as a father. (*Id.* at PageID 8709.) At least some of the crime scene and

the autopsy photos were duplicative, but evidence regarding the circumstances of the crime is generally admissible. *See Zant v. Stephens*, 462 U.S. 862, 879 (1983) (stating that the Constitution does not forbid consideration of the circumstances of the crime as part of the sentencing determination); *Gumm*, 73 Ohio St. 3d at 417 (citing *Zant* for same proposition). The photos of Flick at the crime scene were relevant to the circumstances of the attempted rape. In sum, Leonard has not established the admission of the evidence was prejudicial to the outcome of sentencing. The trial court's error was not a reversible error because Leonard has not proven that the irrelevant evidence was prejudicial to the outcome. As such, the Court concludes that the alleged ineffective assistance of Leonard's appellate counsel in failing to raise the claim is itself without merit and does not provide cause to excuse his procedural default of the underlying sentencing evidence claim.

Additionally, even if the Court were to consider merits of the underlying sentencing evidence claim, the Court would not grant habeas relief. No Ohio court has determined this underlying claim on the merits so the deferential standard of review contained in § 2254(d)(1) and (2) does not apply. Leonard argues that the trial court's instruction to the jury to determine which evidence as relevant at sentencing "so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72. The Court does not agree. As explained above, Petitioner Leonard has not established that the *de facto* decision to admit all of the guilt phase evidence at the sentencing phase prejudiced him. Another Southern District of Ohio court stated in a case with similar underlying facts that "even if the trial court committed error as a matter of state law when it failed to determine or even consider, prior to readmitting at the penalty phase all of culpability phase evidence, whether that evidence was relevant to any penalty phase issues, *see, e.g.*, *Getsy*, 84 Ohio St.3d at 201, . . . , state law likewise dictates that the error could not

possibly have prejudiced the outcome of petitioner's sentencing hearing and was therefore

harmless." *Cowans v. Bagley*, 624 F. Supp. 2d 709, 813 (S.D. Ohio 2008), *aff'd*, 639 F.3d 241

(6th Cir. 2011). The district court further found in *Cowans* that the petitioner had not

demonstrated "an error so egregious as to deny petitioner fundamental fairness in violation of his

right to due process under the Fourteenth Amendment." *Id.* at 814; *see also*, *Hand v. Houk*, No.

2:07-cv-846, 2013 WL 2372180, at *54 (S.D. Ohio May 29, 2013) (reaching same outcome in

case with similar facts). The Court will deny subclaim A of Ground Eight.

### B.      Reasonable Doubt Jury Instruction

In this subclaim, Leonard argues that jury instruction on reasonable doubt given in the

sentencing phase of trial was unconstitutional. The trial judge gave the following instruction

during sentencing:

> Reasonable doubt is present when, after you have carefully considered and
> compared all the evidence, you cannot say you are firmly convinced that the
> aggravating circumstances which the defendant was found guilty of committing is
> sufficient to outweigh the factors in mitigation of imposing the death sentence.
>
> Reasonable doubt is a doubt based on reason and common sense. Reasonable
> doubt is not mere possible doubt, because everything relating to human affairs or
> depending on moral evidence is open to some possible or imaginary doubt. Proof
> beyond a reasonable doubt is proof of such character that an ordinary person
> would be willing to rely and act upon it in the most important of his or her own
> affairs.

(Doc. 61-15 at PageID 8810.) Leonard raised this issue on direct appeal and the Ohio Supreme

Court ruled against him. *Leonard*, 104 Ohio St. 3d at 79–80.

Leonard argues that the "willing to act" and "firmly convinced" language, taken together,

lessened the burden of proof required for the death penalty. He states that the Ohio Supreme

Court decision upholding the instruction is contrary to clearly established federal law that jury

cannot convict or recommend a death sentence on a burden less than reasonable doubt. *See*

*Winship*, 397 U.S. at 372 (Harlan, J., concurring); *Holland v. U.S.*, 348 U.S. 121, 140 (1954) (criticizing the "willing to act" language as creating instruction, but not striking it down). This Court disagrees. Neither of the cases can be fairly read to require a finding that the proffered jury instruction was unconstitutional. The Court will deny this subclaim.

### C. Jury's Death Sentence Decision

In this subclaim, Leonard objects to the penalty phase instruction which implied that a jury's sentencing recommendation was not binding upon the trial court. A jury decision that a death sentence is inappropriate is binding to the extent that the trial judge cannot impose a death sentence if the jury has recommended life. Ohio Rev. Code § 2929.03(D)(2) (1997). Nonetheless, Leonard concedes that the Sixth Circuit found that the challenged jury instruction was constitutional in *Buell v. Mitchell*, 274 F.3d 337 (6th Cir. 2001). The *Buell* decision is binding upon this Court. The Court will deny this subclaim.

### D. Conclusion

The Court will deny Ground Eight. The Court will not grant a certificate of appealability on his ground for relief.

## GROUND NINE

**The trial court erred by allowing Leonard to be tried, convicted, and sentenced to death on an indictment which charged Leonard with a rape specification based on the accusation that he was "the principal offender" and/or committed the aggravated murder "with prior calculation and design," in violation of the prohibition against duplicitous indictments, and deprived Leonard of his rights to a unanimous verdict, as well as substantive and procedural due process as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

(Doc. 6 at PageID 92.)

Leonard has withdrawn Ground Nine. (Doc. 53 at PageID 1362.)

**GROUND TEN**

> **Leonard was denied his right to a fair trial by an impartial jury in his capital case as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution when the trial court limited trial counsel's ability to conduct voir dire.**

(Doc. 6 at PageID 95.)

Leonard raises three objections to the voir dire procedures:  (1) the trial court would not allow defense counsel to pose a hypothetical question (Doc. 61-13 at PageID 7158); (2) defense attorneys were limited to one question while the State was permitted two questions in one instance (Doc. 61-13 at PageID 7365); and (3) defense counsel were not permitted to question the potential jurors individually (Doc. 61-13 at PageID 7366–68, 7514–17).

Leonard raised this issue on direct appeal where it was denied by the Ohio Supreme Court:

> {¶ 62} Leonard also raises several other issues under proposition of law 21.
> Leonard argues that the trial court placed unreasonable limitations on defense counsel during voir dire.  The record does not support Leonard's claims.
>
> {¶ 63} "The manner in which voir dire is to be conducted lies within the sound discretion of the trial judge."  *State v. Lorraine* (1993), 66 Ohio St.3d 414, 418, 613 N.E.2d 212.  The trial court granted Leonard's counsel extensive leeway to question prospective jurors.  Although the court attempted to keep voir dire moving, counsel were rarely limited in questioning potential jurors.  The trial court allowed counsel to individually question all prospective jurors regarding their views on capital punishment and further permitted counsel to address other issues that arose during individual questioning.
>
> {¶ 64} Leonard complains that the trial court would not allow his counsel to use hypothetical questions to determine a juror's death-penalty position.  The trial court did admonish defense counsel's use of a hypothetical question in one instance.  Leonard's counsel asked a prospective juror who was adamantly opposed to capital punishment whether he could impose the death sentence in a case like Timothy McVeigh's.
>
> {¶ 65} We determine that the trial court did not err in precluding this question.  A trial court has "'great latitude in deciding what questions should be asked on voir dire.'"  *State v. Wilson* (1996), 74 Ohio St.3d 381, 386, 659 N.E.2d 292, quoting *Mu'Min v. Virginia* (1991), 500 U.S. 415, 424, 111 S.Ct. 1899, 114 L.Ed.2d 493.

48

Moreover, "[a]lthough R.C. 2945.27 affords the prosecution and defense the opportunity to conduct a reasonable examination of prospective jurors, * * * the trial court reserves the right and responsibility to control the proceedings of a criminal trial pursuant to R.C. 2945.03, and must limit the trial to relevant and material matters with a view toward the expeditious and effective ascertainment of truth." *State v. Durr* (1991), 58 Ohio St.3d 86, 89, 568 N.E.2d 674. A review of the voir dire reveals that Leonard's counsel were permitted to thoroughly explore prospective jurors' views. Leonard has not shown that the trial court unreasonably or arbitrarily restricted counsel's examination.

{¶ 66} The trial court also denied defense counsel's request for sequestered voir dire. But "'[t]here is no requirement that voir dire in a capital case must be conducted in sequestration.'" *State v. Yarbrough,* 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 96, quoting *State v. Fears* (1999), 86 Ohio St.3d 329, 338, 715 N.E.2d 136. The trial court did permit counsel to individually question prospective jurors. And although prospective jurors were not sequestered, the trial court gave all jurors the opportunity to be questioned in private if they were uncomfortable discussing their views in a group setting. We find that there was no error in not allowing sequestered voir dire.

*Leonard*, 104 Ohio St. 3d at 64–65.

Leonard cites *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) and *Mu'Min v. Virginia*, 500 U.S. 415, 426 (1991) for the proposition that a defendant must be given an opportunity on voir dire to identify biased or unqualified jurors. The Supreme Court stated in *Morgan* that "part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." 504 U.S. at 729. The Supreme Court stated in *Mu'Min* that for voir dire questions or procedures to be constitutionally compelled, the questions and procedures must be more than "helpful." 500 U.S. at 425. Rather, the failure to ask questions or use the procedures "must render the defendant's trial fundamentally unfair." *Id.* at 426. Neither of the cases stands for the proposition that the voir dire procedures which Leonard requested were constitutionally mandated. In fact, Leonard does not cite to any clearly established federal law mandating that trial counsel be permitted to ask hypothetical questions or be permitted to question jurors in a sequestered setting.

The Court will adopt Magistrate Judge Merz's recommendation and deny this ground for

relief.  Further, the Court will not issue a certificate of appeal on this issue.

## GROUND ELEVEN

**Leonard's right to a fair trial by an impartial jury under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution was violated when the trial court failed to excuse for cause jurors whose statements during voir dire indicated that they could not be fair and impartial.**

(Doc. 6 at PageID 96.)

Petitioner Leonard has withdrawn this Ground Eleven.  (Doc. 17 at PageID 435.)

## GROUND TWELVE

**Leonard's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated when jurors were improperly excused by the prosecution because of some scruples against the death penalty.**

(Doc. 6 at PageID 100.)

Leonard asserts in this ground for relief that the trial court improperly excluded

prospective jurors from the venire based on their views about the death penalty.

Leonard's claim initially concerned the exclusion of four prospective jurors—Gooding,

Dignan, Ison, and Crocket—but he restricted his Objections to only Gooding and Ison.

(*Compare* Doc. 6 at PageID 100–03 *with* Doc. 53 at PageID 1367–68.)

He raised this issue in his direct appeal to the Ohio Supreme Court.  The Ohio

Supreme Court denied the claim:

> {¶ 70} In proposition of law 22, Leonard contends that the trial court improperly excused for cause prospective jurors Gooding, Dignan, Ison, and Crockett. Leonard's assertions lack merit.
>
> {¶ 71} Prospective juror Gooding initially stated that she could follow the court's instructions and the law and consider imposing the death penalty.  But Gooding later stated, "I'm not against [the death penalty] but personally I don't think I could make that decision. * * * I personally could not decide someone's fate, if they are going to live or die."  When questioned further, Gooding agreed that her

views would substantially impair the performance of her duties as a juror. Leonard's counsel and the trial court attempted to rehabilitate her.  Gooding, however, reiterated that she could not consider imposing a death sentence.

* * *

{¶ 73} Prospective juror Ison also initially declared that she could consider imposing a death sentence.  After further questioning, she stated that she is not against the death penalty, but she "didn't feel comfortable being the one to do it." Ison later reiterated, "I just don't want to be the one to do it.  Now, if I could, say, sentence him to life in jail, maybe yes.  But to say give him the chair, I don't want to do that."  Ison equivocated when the trial court questioned her, but she ultimately decided that she did not believe she could sign a death verdict.

* * *

{¶ 75} We find that the trial court did not abuse its discretion by excusing these four prospective jurors.  The record reflects that their views on the death penalty would have prevented or substantially impaired their ability to serve as fair and impartial jurors.  *See*, *e.g.*, *State v. Dunlap* (1995), 73 Ohio St.3d 308, 315, 652 N.E.2d 988; *State v. Rogers*, 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus.  Therefore, Leonard's 22nd proposition of law is overruled.

*Leonard*, 104 Ohio St. 3d at 66–67.

Leonard contends that the trial court's exclusion of the jurors violated the controlling standards for when potential jurors could be excluded from the venire because of their views on the death penalty set forth by the Supreme Court in the case of *Wainwright v. Witt*, 469 U.S. 412 (1985).  The "proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  *Wainwright*, 469 U.S. at 424 (internal quotation and citation omitted). A trial judge's factual finding of prospective juror bias is entitled to deference under § 2254(d). *Id.* at 428–29.

The Court has read the relevant voir dire questioning of prospective jurors Gooding and

Ison.  (Doc. 61–13 at PageID 7115–22, 7199–7205).  The Court agrees that the prospective

jurors clearly indicated that they would be unable to apply the law and impose the death penalty

if warranted.  (Doc. 61–13 at PageID 7122, 7202, 7205.)  The Ohio Supreme Court's factual

determination was not unreasonable nor was its decision an objectively unreasonable

interpretation of *Wainwright*.  The Court will adopt the Magistrate Judge's recommendation and

deny this ground for relief.  Further, the Court will not issue a certificate of appeal on this issue.

## GROUND THIRTEEN

**Leonard's right to confront witnesses and to a fair trial guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution were violated by the admission of police reports by the trial court.**

(Doc. 6 at PageID 104.)

Petitioner Leonard raised this issue as his thirtieth proposition of law to the Ohio

Supreme Court on direct appeal where it was denied:

> {¶ 109} Leonard argues in proposition of law 30 that his Confrontation Clause
> rights were violated by the admission of two police investigative reports.  After
> police had taken Leonard into custody, Leonard confessed to Flick's murder
> during an interview with Hamilton County Sheriff's Detectives Schweinefus and
> Diersing.  The following day, Schweinefus prepared a written investigation report
> summarizing Leonard's tape-recorded confession.  Approximately five months
> later, Schweinefus prepared a supplemental report that purported to summarize
> other, unrecorded statements that Leonard had made during the interview.  Over
> defense's objection, the trial court admitted both police reports into evidence.
> Schweinefus's original report was admitted in redacted form, so that only the
> detective's summary of Leonard's statements could be seen, and his supplemental
> report was admitted in its entirety.  The trial court also permitted Schweinefus,
> over objection, to rely extensively on his reports while testifying on direct
> examination.
>
> {¶ 110} Leonard's claim that the trial court admitted these police reports in
> violation of his right of confrontation is without merit.  Both the Sixth
> Amendment Confrontation Clause, and Section 10, Article I of the Ohio
> Constitution guarantee a criminal defendant the right to cross-examine witnesses
> who testify against him.  *See*, *e.g.*, *State v. Self* (1990), 56 Ohio St.3d 73, 78, 564
> N.E.2d 446, citing *Henderson v. Maxwell* (1964), 176 Ohio St. 187, 188, 27

O.O.2d 59, 198 N.E.2d 456.  Schweinefus's testimony on direct examination essentially mirrored the contents of his investigative reports.  Leonard's counsel extensively and effectively cross-examined Schweinefus regarding the reports.  The admission of hearsay does not violate the Confrontation Clause if the declarant (here, Schweinefus) testifies at trial.  *See California v. Green* (1970), 399 U.S. 149, 157–158, 90 S.Ct. 1930, 26 L.Ed.2d 489; *State v. Keenan* (1998), 81 Ohio St.3d 133, 142, 689 N.E.2d 929.  Thus, the trial court did not violate Leonard's constitutional right of confrontation.

{¶ 111} Nevertheless, we find that the trial court erred in admitting the reports.  The police reports are inadmissible hearsay and should not have been submitted to the jury.  In criminal cases, Evid.R. 803(8)(b) excludes from the public-records-and-reports exception to hearsay police reports that "recite an officer's observations of criminal activities or observations made as part of an investigation of criminal activities."  *State v. Ward* (1984), 15 Ohio St.3d 355, 358, 15 OBR 477, 474 N.E.2d 300.  These investigative reports recite Detective Schweinefus's observations made during his investigation into Leonard's criminal activity.  The trial court also erred in allowing Schweinefus to rely on his reports during direct examination because the prosecutor failed to first establish that the reports were necessary to refresh the detective's recollection.  However, for the following reasons, these errors were harmless.  Crim.R. 52(A).

{¶ 112} First, the Rules of Evidence permitted Schweinefus to testify at trial as to matters contained in his investigative reports.  In these reports, Schweinefus purported to have summarized statements, both recorded and unrecorded, that Leonard had made during his confession.  A defendant's own out-of-court statements, offered against him at trial, are not hearsay.  Evid.R. 801(D)(2)(a).  Thus, while the investigative reports were inadmissible hearsay, the trial court properly admitted Schweinefus's in-court testimony regarding statements that Leonard had made.

{¶ 113} In *State v. Jackson* (1991), 57 Ohio St.3d 29, 565 N.E.2d 549, we found harmless error under almost identical circumstances.  In *Jackson*, the trial court allowed into evidence a police officer's written summary of statements that the defendant had made during a police interview.  The trial court also let the officer read his written summary to the jury, even though the prosecutor did not first establish, as required by Evid.R. 803(5), that the officer's recollection prevented him from testifying fully and accurately.  We held that any error was harmless because the defendant's statements made during his police interview were admissible under Evid.R. 801(D)(2)(a) through the police officer's testimony and no prejudice arose from the officer's recitation of his written summary.  *Jackson*, 57 Ohio St.3d at 37, 565 N.E.2d 549.

{¶ 114} Second, the jury's verdict undercuts Leonard's assertion that he was prejudiced by the admission of the reports.  The state's primary purpose in offering these investigative reports was to provide conclusive evidence (i.e.,

> evidence of sexual penetration) that Leonard had raped Flick before killing her. See R.C. 2907.02 and 2907.01(A). But the jury acquitted Leonard of rape. Thus, the record does not support Leonard's contention that the jury placed undue weight on the reports. Based on the foregoing, we overrule proposition of law 30.

*Leonard*, 104 Ohio St. 3d at 74–76. The Court notes that it agrees with Magistrate Judge Merz's observation that the Ohio Supreme Court found only a state law evidence error, but not a constitutional error, with the trial court's decision to admit the investigative reports. *Id.*

Petitioner Leonard argues that the admission of the investigative reports violated his rights under the Confrontation Clause of the Sixth Amendment. However, he fails to distinguish controlling Supreme Court authority stated in *California v. Green*, 399 U.S. 149 (1970). The Supreme Court stated in *Green* that the core value protected by the Confrontation Clause was the "literal right to 'confront' the witness at the time of the trial." *Id.* at 157. "[T]he Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination." *Id.* That is exactly what happened in Leonard's trial. Schweinefus's investigative reports were admitted, but his trial counsel had the opportunity to confront Schweinefus with a full and effective cross-examination at trial about the reports. (Doc. 61-14 at PageID 8182–8207.) The Court will deny Ground Thirteen. Further, the Court will not issue a certificate of appealability on this issue.

## GROUND FOURTEEN

> **Leonard's rights to due process and a fair trial under the Fifth and Fourteenth Amendments were violated when partial testimony of witnesses was read to the jury during deliberations.**

(Doc. 6 at PageID 105.)

Leonard objects to the trial court's decision to allow specific portions of the trial testimony of Kelly Fenech and Alvie Woods to be read back to the jury during their culpability

deliberations.  (Doc. 61-15 at PageID 8532–42.)  Leonard raised this issue on direct appeal.  The

Supreme Court of Ohio denied the claim:

> {¶ 122} In his 31st proposition of law, Leonard claims that the trial court erred
> when it allowed portions of testimony to be read to the jury.  After beginning
> deliberations, the jury requested that the testimony of Kelly Fenech and Alvie
> Woods be read.  The trial court, over defense counsel's objection, said to the jury,
> "I'm going to ask you all to go back into the jury room and to discuss whether
> you could be more specific in your request as to what portions of the testimony
> you are looking for.  We do have the testimony available.  And if you want to
> hear the whole thing, I could provide that."  The jury responded by requesting that
> the testimony of Fenech "describing her driving by the flower shop on July 28,
> 2000," and the testimony "of Alvie Woods concerning all conversations and
> interactions" with Leonard on July 28, 2000, be read.  Thereafter, the trial court
> had those portions of testimony read to the jury.

> {¶ 123} It is well settled that a trial court, upon a request from the jury, "may
> cause to be read all or part of the testimony of any witness."  *State v. Berry*
> (1971), 25 Ohio St.2d 255, 54 O.O.2d 374, 267 N.E.2d 775, paragraph four of the
> syllabus.  Moreover, the trial court has broad discretion in this regard. *Id. See*,
> *also*, *State v. Carter* (1995), 72 Ohio St.3d 545, 560, 651 N.E.2d 965; *State v.
> Davis* (1991), 62 Ohio St.3d 326, 340, 581 N.E.2d 1362.  Leonard has failed to
> show that the trial court abused its discretion and offers a purely speculative claim
> of prejudice.  Moreover, no abuse of discretion is apparent from the record.
> Therefore, we overrule Leonard's 31st proposition of law.

*Leonard*, 104 Ohio St. 3d at 77–78.

Leonard has not identified any clearly established federal law to which the Ohio Supreme

Court analysis was contrary.  Instead, he cites Sixth Circuit decisions explaining the potential

risks of reading back witness testimony to jurors.  *See U.S. v. Walker*, 1 F.3d 423, 430 (6th Cir.

1993) (stating that reading testimony to jurors creates risk of jurors giving the testimony undue

emphasis or taking it out of context); *Spalla v. Foltz*, 788 F.2d 400, 405 (6th Cir. 1986) (stating

that trial judges have discretion in whether to grant jury requests, but that trial court errors can

rise to the level of depriving the defendant of fundamental fairness).  The cases do not stand for

the proposition that reading back testimony to jurors is a constitutional error in all circumstances.

Moreover, only the Supreme Court, and not circuit courts of appeal, can set forth the standards

constituting clearly established federal law.  *See Lockyer*, 538 U.S. at 71–72; *Parker*, 132 S. Ct. at 2155.

The Court will deny Ground Fourteen.  The Court will not issue a certificate of appealability on this issue.

## GROUND FIFTEEN

**Leonard's rights to due process and a fair trial under the Sixth and Fourteenth Amendments were violated when the trial court changed the verdict forms after the jury had rendered a verdict.**

(Doc. 6 at PageID 107.)

Leonard has withdrawn this ground for relief.  (Doc. 53 at PageID 1375.)

## GROUND SIXTEEN

**Leonard's rights to due process and a fair trial under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when the prosecutor engaged in misconduct during his capital trial and sentencing.**

(Doc. 6 at PageID 109.)

**A.      Leonard's right to a fair trial was violated when the prosecutor engaged in misconduct by issuing extrajudicial subpoenas.  (Doc. 6 at PageID 109.)**

Petitioner objects in this subclaim to the state prosecutor issuing extrajudicial subpoenas to Penny McBride, the mother of Leonard's children, and Nick Chaplin, the Kentucky deputy sheriff, for the purpose of securing witness interviews.  (Doc. 61-4 at PageID 3555–58, 3665.) Petitioner also objects to the issuance of a subpoena duces tecum to University Hospital for the medical records of Ryan Gries, the friend of Dawn Flick shot through the door at Flick's house. (*Id.* at PageID 3666.)

An Ohio appeals court held in 1997 that Ohio Rule of Criminal Procedure 17, like Federal Rule of Criminal Procedure 17, did not give prosecutors authority to issue subpoenas to "to compel a prospective witness's attendance or to provide a means for discovery at a pretrial interview with law enforcement officials."  *Ohio v. Campbell*, No. C-950746, 1997 Ohio App.

Lexis 11 at *39–41 (Jan. 8, 1997). Leonard raised this issue as second ground for relief in his Post-Conviction Petition. The Ohio appeals court held that the state prosecutor had misused the subpoena power set forth in Ohio Rule of Criminal Procedure 17, but denied issuing Leonard relief on the claim because Leonard had not established that he was prejudiced by the state prosecutor's error. *Leonard*, 157 Ohio App. 3d at 660–61.

The Magistrate Judge recommended denying this subclaim because Leonard had not established how he was constitutionally prejudiced by the prosecutor's subpoenas. This Court agrees with his analysis. Leonard has not established how the decision of the Ohio court of appeals was contrary to or an unreasonable application of clearly established federal law as explained by the Supreme Court.

**B.** **Leonard's rights to a fair trial and reliable sentencing determination were violated when the prosecutor committed acts of misconduct during the trial and penalty phase of his trial. (Doc. 6 at PageID 112.)**

Leonard asserted that the prosecutor committed misconduct with statements he made during opening statements, closing arguments, during the questioning of Detective Schwienefus, and during the sentencing phase of the trial. He raised these issues on direct appeal. The Ohio Supreme Court examined each instance of purported misconduct, then denied the claim as follows:

{¶ 155} In propositions of law three, 20, and 27, Leonard argues that he was denied a fair trial because of prosecutorial misconduct. To determine whether a prosecutor's remarks at trial constituted misconduct, we must determine (1) whether the remarks were improper and (2) if so, whether the remarks prejudicially affected the accused's substantial rights. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

{¶ 156} In his third proposition of law, Leonard complains about comments that the prosecutor made during opening statements and closing arguments of both phases of the trial. Leonard first complains that the prosecutor mentioned certain facts in his guilt-determination-phase opening statement that were not

subsequently supported by evidence. His trial counsel objected a number of times to these allegedly improper comments. We find that this claim lacks merit.

{¶ 157} During opening statement, counsel is accorded latitude and allowed fair comment on the facts to be presented at trial. *See Maggio v. Cleveland* (1949), 151 Ohio St. 136, 38 O.O. 578, 84 N.E.2d 912, paragraph two of the syllabus. *See*, *also*, *e.g.*, *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 126. Each of the prosecutor's comments at issue here was supported by evidence subsequently offered at trial. Thus, Leonard has failed to establish that any error occurred. *See*, *e.g.*, *State v. Davis*, 62 Ohio St.3d at 337, 581 N.E.2d 1362. Moreover, the trial court instructed the jury that it must decide the case on the evidence and that opening statements and closing arguments are not evidence. We presume that the jury followed the court's instructions. *State v. Loza* (1994), 71 Ohio St.3d 61, 79, 641 N.E.2d 1082.

{¶ 158} Leonard next complains about comments that the prosecutor made during the guilt-determination-phase closing argument. Leonard contends that the prosecutor expressed a personal opinion as to whether Flick had consented to having sex with Leonard before her death, whether Leonard and Flick had struggled, and whether Leonard had planned to kill Flick. Leonard's failure to object to these comments waived all but plain error. *State v. Slagle*, 65 Ohio St.3d at 604, 605 N.E.2d 916.

{¶ 159} We determine that no error, plain or otherwise, occurred. A prosecutor may state an opinion if based on evidence presented at trial. *State v. Watson* (1991), 61 Ohio St.3d 1, 9–10, 572 N.E.2d 97; *State v. Tyler*, 50 Ohio St.3d at 41, 553 N.E.2d 576; *State v. Bey* (1999), 85 Ohio St.3d 487, 496, 709 N.E.2d 484. The state presented evidence supporting each of the contested statements.

{¶ 160} Leonard also claims that on two separate occasions, the prosecutor misinformed the jury that it could automatically find Leonard guilty of Specification Two to Counts One and Two (that the aggravated murder occurred during a rape or attempted rape). Again, Leonard's failure to object waived all but plain error. *Slagle*, 65 Ohio St.3d at 604, 605 N.E.2d 916.

{¶ 161} Only once did the prosecutor refer to the jury's findings in regard to these specifications as "automatic." Admittedly, the prosecutor's choice of words was unfortunate. But isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning. *See Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431; *State v. Hill* (1996), 75 Ohio St.3d 195, 204, 661 N.E.2d 1068.

{¶ 162} Here, the prosecutor was merely arguing that a guilty verdict on Count One would logically result in the same verdict as to Specification Two to Counts One and Two. Statements made by counsel in closing arguments do not govern the law that should be applied. *State v. Loza*, 71 Ohio St.3d at 79, 641 N.E.2d

1082. The trial court properly charged the jury on all factual issues as to each count and specification charged in the indictment. Thus, plain error is absent.

{¶ 163} Leonard further claims that he was prejudiced by the prosecutor's remark that Leonard "deserves no break." He also claims that the prosecutor improperly referred to the penalty phase during his guilt-determination-phase closing arguments. Trial counsel did not object to the prosecutor's "no break" comment, and no outcome-determinative plain error occurred as a result of the remark. *See*, *e.g.*, *State v. Bies* (1996), 74 Ohio St.3d 320, 326, 658 N.E.2d 754, citing *State v. Long*, 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

{¶ 164} We find, however, that the prosecutor erred by referring to Leonard's penalty during the guilt-determination phase. *See State v. Brown*, 38 Ohio St.3d at 316, 528 N.E.2d 523. The prosecutor's specific comments were as follows:

{¶ 165} "The defense has asked you to find the defendant guilty of Count One and Two, of murder and gun [specification], but not of either of the specifications that would take us to the second part of the trial where you would decide what the appropriate penalty is as we talked about in voir dire.

{¶ 166} "By finding the defendant guilty of murder and a gun specification and felonious assault, we would not get to that second part where more evidence would be presented, and then you would deliberate again to decide what the appropriate penalty is.

{¶ 167} "Remember, only by finding Patrick Leonard guilty of either Count One or Count Two, and either Specification One or Specification Two to either of those counts, will we even get to the penalty phase where his future will be decided."

{¶ 168} The prosecutor's comments could be interpreted as urging the jury to convict Leonard solely to impose the death sentence. *See Brown*; *State v. Hicks* (1989), 43 Ohio St.3d 72, 75, 538 N.E.2d 1030. But Leonard failed to object, and for the following reasons, we find that the prosecutor's comments did not rise to the level of plain error.

{¶ 169} First, the trial court instructed the jurors to decide the case on the evidence alone and explained that arguments of counsel were not evidence. Second, the weight of the evidence against Leonard, including his confession, was substantial and "reduced the likelihood that the jury's decision was influenced by argument." *See Darden v. Wainwright* (1986), 477 U.S. 168, 182, 106 S.Ct. 2464, 91 L.Ed.2d 144. Third, as was the case in *Darden*, the prosecutor's comments did not manipulate or misstate the evidence, nor did they implicate other specific rights of the accused. *Id.* Finally, the prosecutor's comments should not be taken out of context and given their most damaging meaning.

*Donnelly v. DeChristoforo*, 416 U.S. at 647, 94 S.Ct. 1868, 40 L.Ed.2d 43. After setting forth the state's case, the prosecutor urged the jury to carefully consider the evidence before reaching a determination regarding guilt. When viewed in this light, the remarks of the prosecutor did not deprive Leonard of a fair trial and did not result in outcome-determinative plain error.

{¶ 170} Leonard next contends that the record is replete with the prosecutor's personal attacks against him. Leonard cites three specific instances: one in which the prosecutor said that Leonard had lied to Flick, another in which he said that Leonard is a liar, and a third in which Leonard claims that the prosecutor said that Leonard is a bad father and is manipulative and controlling. Leonard failed to object to these and other similar comments by the prosecutor. We conclude that plain error is absent.

{¶ 171} The prosecutor never referred to Leonard as a "bad father" but did refer to him on several occasions as a liar and as manipulative and controlling. A prosecutor's characterization of defendant as a liar or by other derogatory terms is generally improper. *See, e.g., State v. Clemons*, 82 Ohio St.3d at 452, 696 N.E.2d 1009; *State v. Brown*, 38 Ohio St.3d at 317, 528 N.E.2d 523. But we have permitted such comments when they fall short of being "purely abusive" or were based on evidence presented at trial. *See, e.g., id.*; *Clemons* at 452, 696 N.E.2d 1009; *State v. Nields*, 93 Ohio St.3d at 37–38, 752 N.E.2d 859; *State v. Hill*, 75 Ohio St.3d at 204, 661 N.E.2d 1068; *State v. Wilson*, 74 Ohio St.3d at 399, 659 N.E.2d 292. In this case, the prosecutor's characterizations of Leonard amounted to fair comment based on the evidence at trial. None of the comments were so egregious that they materially prejudiced Leonard or deprived him of a fair trial. *Cf. State v. Keenan* (1993), 66 Ohio St.3d 402, 613 N.E.2d 203.

{¶ 174} Leonard further contends that the prosecutor committed misconduct by referring to the jury's penalty-phase verdict as a recommendation. But the prosecutor's comments "neither reduced the jury's sense of responsibility nor increased the possibility of a recommendation of death in reliance upon the appellate process." *State v. Bedford* (1988), 39 Ohio St.3d 122, 124, 529 N.E.2d 913; *accord State v. Woodard*, 68 Ohio St.3d at 77, 623 N.E.2d 75.

{¶ 175} We also reject Leonard's argument regarding the prosecutor's commenting on Leonard's unsworn statement. *See State v. Smith,* 87 Ohio St.3d at 444, 721 N.E.2d 93, and *State v. Davis*, 76 Ohio St.3d at 119–120, 666 N.E.2d 1099.

{¶ 176} Leonard makes several additional claims of prosecutorial misconduct. In each instance, Leonard failed to object and waived all but plain error. *State v. Slagle,* 65 Ohio St.3d. at 604, 605 N.E.2d 916. The prosecutor's comments regarding the victim's mental anguish and his asking the jury to be fair to the victim were improper but not prejudicial. See, e.g., *State v. Combs* (1991), 62 Ohio St.3d 278, 282–283, 581 N.E.2d 1071; *State v. Brooks*, 75 Ohio St.3d at

158, 661 N.E.2d 1030. None of the remaining statements that Leonard complains about constituted misconduct, let alone plain error. *See State v. Wilson*, 74 Ohio St.3d at 399, 659 N.E.2d 292 (prosecutors can urge the merits of their cause). Based on the foregoing, we overrule Leonard's third proposition of law.

{¶ 177} In proposition of law 20, Leonard claims that he was denied a fair trial by "discriminatory charging and prosecution actions." But Leonard fails to explain how the prosecutor acted improperly by charging him with capital murder or how he was denied a fair trial as a result of the prosecutor's actions. In any event, "the existence of discretion in the charging stage of a capital prosecution does not violate the Constitution." *State v. Nields*, 93 Ohio St.3d at 38, 752 N.E.2d 859; see, e.g., *State v. Coleman* (1989), 45 Ohio St.3d 298, 308, 544 N.E.2d 622; *Gregg v. Georgia* (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859. Leonard's 20th proposition of law is overruled.

{¶ 178} Leonard argues in proposition 27 that he was denied a fair trial as a result of prosecutorial misconduct that occurred throughout his trial. Except in two instances, Leonard merely restates the claims of prosecutorial misconduct set forth in his third proposition of law. As to the new claims raised in this proposition, the transcript pages cited do not reflect any misconduct. Furthermore, to the extent that Leonard is contending that the cumulative effect of misconduct impaired the overall fairness of his trial, this argument is without merit as well. *See, e.g., State v. Landrum*, 53 Ohio St.3d at 113, 559 N.E.2d 710; *State v. Smith*, 87 Ohio St.3d at 444–445, 721 N.E.2d 93. Cf., *State v. Keenan*, 66 Ohio St.3d 402, 613 N.E.2d 203; *State v. Fears* (1999), 86 Ohio St.3d 329, 715 N.E.2d 136. Proposition of law 27 is overruled.

*Leonard*, 104 Ohio St. 3d at 84–88.

Magistrate Judge Merz recommended that the claim be denied on the merits. The Warden raised no objections to this merits determination. This Court will apply the deferential standard of § 2254(d)(1) on the merits review. The issue is whether the Ohio Supreme Court decision is contrary to or an unreasonable application of clearly established federal law. Leonard argues that the Magistrate Judge erred by applying the standard of *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974), instead of *Caldwell v. Mississippi*, 472 U.S. 320 (1985).

In *Donnelly*, a non-capital case, the Supreme Court examined a claim of prosecutorial misconduct by asking whether the misconduct "made the [petitioner's] trial so fundamentally unfair as to deny him due process." 416 U.S. at 645. The specific issue in *Caldwell* was whether

a capital sentence was invalid when the prosecutor led a jury to believe that the responsibility for deciding to impose the death penalty rested not with the jury, but with the appeals court which would review the case. 472 U.S. at 323. The Supreme Court vacated the death sentence after finding that the state prosecutor had "sought to minimize the jury's sense of responsibility for determining the appropriateness of death." *Id.* at 341. In its analysis, the Court stated that death penalty sentences require a "greater degree of scrutiny of the capital sentencing determination." *Id.* at 329. Of significance, the Supreme Court in *Caldwell* distinguished that case from *Donnelly* in two respects: (1) the trial judge in *Caldwell* openly agreed with the prosecutor's misstatement and (2) the misstatements in *Caldwell* were "pointedly directed at . . . the procedure by which the State imposes the death sentence . . . and fundamentally incompatible with the Eighth Amendment." *Id.* at 339–40. Leonard argues that the tougher standard from *Caldwell* should govern in all death penalty cases, at least for closing argument misconduct.

Leonard argues that after *Caldwell* courts must examine prosecutorial misconduct cases with greater scrutiny than was applied in *Donnelly*. However, contrary to Leonard's argument, courts have applied *Donnelly* as the primary standard for analyzing prosecutorial misconduct in death penalty cases even after the issuance of *Caldwell*. The Sixth Circuit recently explained the standard of review for claims of prosecutorial misconduct as follows:

> Prosecutorial misconduct can merit habeas relief only if the prosecutor's remarks render the trial so unfair as to be a denial of due process. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 643–45, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). "'[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor.'" *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)). In order to obtain relief on a claim of prosecutorial misconduct, a petitioner "must demonstrate that the prosecution's conduct was both improper and so flagrant as to warrant reversal." *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005).

*Moore v. Mitchell*, 708 F.3d 760, 799 (6th Cir. 2013), *cert. denied sub nom.*, *Moore v. Robinson*, 134 S. Ct. 693, 187 L. Ed. 2d 559 (2013).  The *Caldwell* standard, on the other hand, has been used in the context of claims for which the trial court failed to give a curative instruction.  *See Gordon v. Kelly*, No. 98-1905, 2000 WL 1451444, at *7 (6th Cir. Feb. 1, 2000) (also citing favorably to *Donnelly*).

Further, the Supreme Court recently instructed that the proper standard for evaluating a claim for prosecutorial misconduct during closing arguments is the standard stated in *Darden v. Wainwright*, 477 U.S. 168 (1986).  *Parker*, 132 S. Ct. at 2153–56.[6]  The Supreme Court in *Darden* had adopted the *Donnelly* standard—whether the prosecutor's comments so infected the trial with unfairness to make the resulting conviction a denial of due process.  477 U.S. at 181 (citing *Donnelly*).  This Court concludes that the Magistrate Judge applied the proper standard of review.

The Court also agrees with the Magistrate Judge that Leonard has not established the Ohio Supreme Court's analysis of the instances of prosecutorial misconduct, whether examined individually or cumulatively, was contrary to or an unreasonable application of clearly established federal law as stated in Supreme Court decisions.  (Doc. 47 at PageID 1237–41.)  The Court will not repeat that analysis here.  Leonard makes only conclusory arguments in rebuttal.  For these reasons, the Court will deny Subclaim B.

---

[6]  The *Parker* decision also is noteworthy for the fact that it overturned the Sixth Circuit for having relied on Sixth Circuit precedent setting a detailed standard for evaluating prosecutorial misconduct claims.  132 S. Ct. at 2155–56.  "The highly generalized standard for evaluating claims of prosecutorial misconduct set forth in *Darden* bears scant resemblance to the elaborate, multistep test employed by the Sixth Circuit" in evaluating the Parker's claim."  *Id.* at 2155.

C.     Conclusion

The Court will deny Ground Sixteen.  However, the Court also agrees with Magistrate Judge Merz that a certificate of appealability should be issued on Subclaim B because reasonable jurist could have differing opinions as to the prejudicial impact of the prosecutor's comments.

**GROUND SEVENTEEN**

**Leonard's right to a fair trial under the Fifth, Eighth, and Fourteenth Amendment was violated when the prosecutor withheld material, exculpatory evidence.**

(Doc. 6 at PageID 117.)

Leonard raised this claim in the ninth ground for relief in his Post-Conviction Petition in state court.  An Ohio appeals court denied this claim and the Ohio Supreme Court declined to hear an appeal.  The Ohio appeals court denied the claim because Leonard had not identified any exculpatory evidence which the prosecutor failed to produce:

> {¶ 35} Leonard contended in his ninth claim for relief that the state had failed to disclose, in response to his discovery requests, exculpatory evidence.  In making this claim, Leonard neither specified the undisclosed exculpatory evidence nor supported his claim with evidence dehors the record.  He instead cited nondisclosure claims made in other capital cases before the United States District Court for the Southern District of Ohio to show that the nondisclosure of exculpatory evidence by the Office of the Hamilton County Prosecuting Attorney had been "identified [as] an ongoing systemic problem."  This "problem," Leonard argued, "warrant[ed] the granting of discovery to demonstrate that the chronic problem continued in [his] case."

> {¶ 36} As we noted supra, a postconviction petitioner is not entitled to discovery to develop a claim if the claim and its supporting evidentiary material do not demonstrate substantive grounds for relief.  *See State v. Issa*, *supra*.  And a postconviction claim is subject to dismissal without a hearing if the petitioner has failed to support the claim with evidentiary material setting forth sufficient operative facts to demonstrate substantive grounds for relief.  *See* R.C. 2953.21(C); *State v. Pankey*, *supra*; *State v. Jackson*, *supra*.  In the absence of some demonstration of such grounds, we conclude that the common pleas court properly dismissed Leonard's ninth claim without a hearing and without permitting discovery on the matter.  *Accord State v. Lynch* (Dec. 21, 2001), 1st Dist. No. C–010209, 2001 WL 1635760.

*Leonard*, 157 Ohio App. 3d at 666–67.

Leonard again in this federal habeas claim fails to identify any non-disclosed *Brady* material. Instead, he relies upon what he calls a pattern of *Brady* violations by the Hamilton County prosecutor's office and he requests discovery in order to support a claim. Leonard does not suggest the type of exculpatory evidence which might have been withheld. He does not specifically state that any of the prosecutors involved in his case have been found to have withheld exculpatory material in other cases. Leonard has not established a constitutional or statutory right to take discovery on this issue. His claim fails on the merits because he has not proven that the prosecutors withheld exculpatory material in this case in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The Court will not grant a certificate of appealability on this issue.

**GROUND EIGHTEEN**

> **Leonard was denied his constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments due to the prosecutor's discriminatory process of charging and prosecution of actions in Hamilton County.**

(Doc. 6 at PageID 121.)

Leonard alleges in this ground for relief that he was denied equal protection and made to suffer cruel and unusual punishment because Ohio provides county prosecutors unregulated discretion in choosing who to charge with a capital crime. He suggests that some independent body or court should be permitted to conduct a review of the charging decision.

Leonard presented this claim as his twentieth proposition of law on direct appeal in state court. The Ohio Supreme Court denied the claim citing *Ohio v. Nields*, 93 Ohio St. 3d 6 (2001), and *Gregg v. Georgia*, 428 U.S. 153 (1976), in support. *Leonard*, 104 Ohio St. 3d at 88. The Ohio Supreme Court stated in *Nields* that the "existence of discretion in the charging stage of a capital prosecution does not violate the Constitution." 93 Ohio St. 3d at 38. The United States

Supreme Court in *Gregg* upheld the constitutionality of the death penalty in general against an Eighth Amendment challenge. 428 U.S. at 187. The Court also held that the "unfettered authority" of the Georgia prosecutor to choose whom to prosecute for a capital offense was not per se unconstitutional. *Id.* at 199.

In his habeas claim, Leonard relies on extrajudicial findings that there are racial and geographic disparities in Ohio regarding when prosecutors seek capital punishment. The findings were published by the Ohio Joint Task Force to Review the Administration of Ohio's Death Penalty[7] and by the American Bar Association.[8] The Court has no basis to challenge the factual findings of the reviews. Unfortunately for Leonard, these findings are not sufficient to establish that the Ohio Supreme Court's determination that Ohio's prosecutorial system is constitutional is contrary to or an unreasonable application of clearly established federal law. Moreover, the Sixth Circuit has rejected similar claims that the Ohio system of prosecutorial discretion violates the Eighth or Fourteenth Amendment. *See Smith v. Mitchell*, 567 F.3d 246, 261 (6th Cir. 2009); *Williams v. Bagley*, 380 F.3d 932, 963 (6th Cir. 2004). The Court will deny the Eighteenth Ground for Relief. Further, the Court will not issue a certificate of appealability on this issue.

**GROUND NINETEEN**

> **Leonard's right to the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments was violated when his trial counsel suffered from a conflict of interest.**
>
>> **A conflict of interest was created when Leonard's family retained counsel for Leonard.** (Doc. 6 at PageID 123.)

---

[7] *Final Report and Recommendations*, Joint Task Force to Review the Administration of Ohio's Death Penalty (Apr. 2014).

[8] *Evaluating Fairness and Accuracy in State Death Penalty Systems: The Ohio Death Penalty Assessment Report*, American Bar Association (Sept. 2007).

> **A conflict of interest was created when a friend of the Leonard family represented Leonard at trial.**  (*Id.* at PageID 124.)

> **A conflict of interest was created by the dual representation of Leonard and his brothers' corporation.** (*Id.* at PageID 125.)

The subclaims contained in the Nineteenth Ground for Relief are interrelated and can be addressed together.  Leonard properly raised an ineffective assistance of counsel claim in his Post-Conviction Petition.  The Ohio appeals court denied the claim on the merits:

### 4. Counsel's conflicts of interest

{¶ 25} In his third claim for relief, Leonard contended that he was denied his Sixth Amendment right to conflict-free counsel.  Specifically, he asserted that his counsel had had close personal ties to the members of his family who had retained and had paid counsel, and that counsel had simultaneously represented him in his criminal trial and him and his brothers' company in civil actions brought by the victims.  These conflicts, Leonard asserted, had hampered counsel's willingness to uncover and to present at the mitigation hearing evidence concerning his dysfunctional family.

{¶ 26} The Sixth Amendment guarantees a criminal defendant the effective assistance of counsel and, in doing so, secures him the assistance of counsel free from conflicts of interest.  *See Glasser v. United States* (1942), 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680.  To prevail on a claim that he was denied his right to conflict-free counsel, a defendant must demonstrate "an actual conflict of interest."  *Wood v. Georgia* (1981), 450 U.S. 261, 273, 101 S.Ct. 1097, 67 L.Ed.2d 220.  An "actual conflict," for purposes of the Sixth Amendment, is "a conflict of interest that adversely affects counsel's performance."  *Mickens v. Taylor* (2002), 535 U.S. 162, 172, 122 S.Ct. 1237, 152 L.Ed.2d 291, fn. 5. Therefore, to prove an actual conflict of interest, the defendant must show that his counsel "actively represented conflicting interests" and that the conflict "actually affected the adequacy of his representation."  *See id.* (quoting *Cuyler v. Sullivan* [1980], 446 U.S. 335, 349–350, 100 S.Ct. 1708, 64 L.Ed.2d 333); *accord State v. Pelphrey*, 149 Ohio App.3d 578, 583, 2002-Ohio-5491, 778 N.E.2d 129; *State v. Haberek* (1988), 47 Ohio App.3d 35, 38, 546 N.E.2d 1361.

### a

{¶ 27} We note at the outset that the right to conflict-free counsel not only imposes upon defense counsel an affirmative duty to ensure conflict-free representation, but also imposes upon the trial court an affirmative duty to inquire into the matter when the court knows or should know of a potential conflict.  *See State v. Gillard* (1992), 64 Ohio St.3d 304, 595 N.E.2d 878, syllabus.  We conclude that the court in the proceedings below incurred no such duty, when the

defendant offered no objection to his counsel's dual representation, and the record of the proceedings at trial contained no suggestion of a conflict of interest.

### *b*

{¶ 28} A conflict of interest arises when counsel incurs a duty on behalf of one client "to contend for that which [his] duty to another client requires him to oppose." *State v. Manross* (1988), 40 Ohio St.3d 180, 182, 532 N.E.2d 735. Leonard alleged that such a conflict arose as a consequence of his counsel's simultaneous representation of him in his murder trial and of him and his brothers' company in the victims' civil actions.

{¶ 29} Leonard supported this allegation with copies of the complaints and entries filed in the civil actions. This evidentiary material showed that the victims had predicated their civil claims against the company upon the company's ownership of the van Leonard had driven to the murder victim's home, and that the plaintiffs in each action had voluntarily dismissed their claims against the company before trial.

{¶ 30} The dismissal of the company as a defendant in the civil actions left Leonard solely liable on the victims' claims. In that sense, the evidence might be said to have permitted a conclusion that counsel, in securing the company's dismissal from the victims' actions, had incurred a duty adverse to their duties in defending Leonard in the civil action. But the evidence disclosed no duty incurred by counsel in defending the company in the civil action that might be said to have been adverse to or in conflict with counsel's duties in defending Leonard against the criminal charges. Thus, Leonard failed to show an actual conflict arising from his counsel's simultaneous representation of him in his murder trial and of the company in the victims' civil actions.

### *c*

{¶ 31} Leonard also contended that a conflict of interest arose from his counsel's close personal ties to his family. He asserted that his counsel had possessed "critical information" concerning his family that would have helped to explain his crime. Counsel's possession of this information, Leonard insisted, necessitated counsel's testimony at trial and thus required counsel, consistent with DR 5–102(A) of the Ohio Code of Professional Responsibility, to withdraw from representing him at trial.

{¶ 32} A criminal defense counsel's "breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel." *Nix v. Whiteside* (1986), 475 U.S. 157, 165, 106 S.Ct. 988, 89 L.Ed.2d 123. Moreover, the evidence offered in support of Leonard's petition, coupled with the record of the proceedings at trial, showed the existence of a multitude of witnesses to "the dysfunctional dynamics of the Leonard family." In the absence of evidence that only his counsel could have provided this "critical information,"

Leonard failed to demonstrate that a conflict of interest arose from, and persisted as a consequence of, his counsel's failure to conform to the ethical standard by withdrawing from representing him and instead testifying on his behalf at trial.

*d*

{¶ 33} Finally, Leonard contended that his counsel had breached their duty to present an adequate and effective case in mitigation because they had labored under a conflict of interest arising from the fact that his family members had retained and paid them. Courts have recognized the dangers that inhere when a criminal defendant is represented by a lawyer hired and paid by a third party. *See Wood v. Georgia*, 450 U.S. at 268–269, 101 S.Ct. 1097, 67 L.Ed.2d 220. But, as we noted supra, the Sixth Amendment right to conflict-free counsel protects against "'an actual conflict of interest' * * *—as opposed to a mere theoretical division of loyalties." *Mickens v. Taylo*r, 535 U.S. at 172, 122 S.Ct. 1237, 152 L.Ed.2d 291 (quoting *Wood v. Georgia*, 450 U.S. at 273, 101 S.Ct. 1097, 67 L.Ed.2d 220). Thus, Leonard was required to demonstrate not only that his counsel had "actively represented conflicting interests," but also that the conflict had "actually affected the adequacy of [their] representation." *See id.* (citing *Cuyler v. Sullivan*, 446 U.S. at 349–350, 100 S.Ct. 1708, 64 L.Ed.2d 333). As we concluded supra, the record of the proceedings at trial demonstrated that counsel had presented the case in mitigation competently in view of the facts available to them. And nothing in the evidentiary material submitted by Leonard in support of his claim suggested the contrary. Leonard thus failed to demonstrate a causative link between the alleged conflict of interest and an inadequacy in his counsel's representation.

{¶ 34} Upon our determination that Leonard failed to demonstrate in any respect a violation of his Sixth Amendment right to conflict-free counsel, we hold that the common pleas court properly denied his third claim for relief without a hearing. *See Pankey*, supra; *Jackson*, supra.

*Leonard*, 157 Ohio App. 3d at 664–66.

Petitioner Leonard asserts that he can satisfy the § 2254(d)(1) standard because the Ohio Supreme Court decision was contrary to or an unreasonable application of *Mickens v. Taylor*, 535 U.S. 162 (2002), and *Wood v. Georgia*, 450 U.S. 260 (1981). The Court will begin by discussing *Mickens* and its application to this case and then later discuss *Wood*.

The Supreme Court in *Mickens* set forth the standard to prove a Sixth Amendment violation based on a conflict of interest. The Court began in *Mickens* by recognizing that as "a general matter, a defendant alleging a Sixth Amendment violation must demonstrate a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 535 U.S. at 166 (internal quotation and citation omitted). The Supreme Court then stated that there are exceptions to this general standard where the burden of proof upon the petitioner is lessened. *Id.* at 168. For example, "a defendant who shows that a conflict of interest *actually affected the adequacy of his representation* need not demonstrate prejudice in order to obtain relief." *Id.* at 171 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 349–50 (2002)) (emphasis added in *Mickens*). The Supreme Court stated that "the rule applied when the trial judge is not aware of the conflict (and thus not obligated to inquire) is that prejudice will be presumed only if the conflict has significantly affected counsel's performance—thereby rendering the verdict unreliable, even though *Strickland* prejudice cannot be shown." *Id.* at 172. To qualify for relief under *Mickens*, therefore, Leonard would have to establish both that his trial counsel suffered from an actual conflict of interest and that the conflict of interest adversely affected the quality of their representation of Leonard.

Leonard was represented by attorneys William Welsh and Michael Strong at his trial. Leonard asserts that his trial counsel suffered from an actual conflict of interest in three related ways: (1) his family paid their legal fees, (2) attorney Strong was a family friend and could have testified as a mitigation witness, and (3) attorney Strong represented Leonard and his employer, a company owned by Leonard's brothers, in a civil lawsuit arising from the death of Dawn Flick and shooting of Ryan Gries.

The third basis for finding an alleged conflict is the most simple to address. Both the state appeals court and Magistrate Judge Merz found that Leonard had not established that an actual conflict of interest existed because Strong also represented his brothers' company, LTS Builders, in the civil lawsuit. The estate of Dawn Flick, Ryan Gries, and Frank Minges filed

civil suits against LTS Builders and Patrick Leonard.  They sought to hold LTS Builders liable for Leonard's acts because Leonard was driving a car owned by LTS on the night of the shootings.  (Doc. 61-4 at PageID 3630–33, 3611–17.)  Strong obtained a dismissal of the claims against LTS Builders.  Leonard's interests appear to have been adverse to those of LTS Builders in the civil suit.  Leonard argues that Strong's representation of LTS Builders in the civil suit also created a conflict of interest for Strong in Leonard's criminal trial.  This Court disagrees. Leonard has not explained how obtaining the dismissal of the civil suit against LTS Builders created an adverse interest for Strong in the criminal suit.  Nor has Leonard identified any clearly established federal law contrary to the state appeals court's decision.

Regarding the subclaims based on the facts that Leonard's family paid his legal fees and attorney Strong is a family friend, the analysis of whether a conflict existed is intertwined with the assertion that the alleged conflicts adversely affected trial counsel's performance.  The fact that Leonard's family paid his legal fees did not in and of itself create a conflict of interest for the trial attorneys as to Leonard.  The conflict arises because Leonard asserts that it was in his best interest for his trial counsel to have presented evidence about difficult family dynamics to support his mitigation case during sentencing, but that his family would not have wanted to be portrayed in a bad light.  Leonard argues that Welsh's and Strong's performance was adversely affected because they did not pursue the best mitigation strategy in an effort to protect the image of the Leonard family.

Leonard points to the following evidence from the state court record:

- Sue Leonard Glaze, Patrick Leonard's older sister, could have testified that she complained to her parents about the foster children the Leonard family supported, that her father and brothers had anger issues, that Patrick might have had low self-esteem if he compared his accomplishments to those of his siblings, that Patrick made bad decisions, and that Patrick was hurt when his family members were mad that he had a child out of wedlock.  (Doc. 61-4 at PageID 3561–63.)

- Carol Blankman, another older sister, could have testified that Patrick was sensitive and quick to lose his temper, that he was more likely to get in trouble at home than at school, that his parents made the children attend mass daily and do household chores, and that Patrick was upset when his family was disappointed to learn about his children with Penny McBride.  (*Id.* at 3566–67.)

- Jeanne Hutcherson, a third sister, could have testified that her parents were only "mildly affectionate" towards each other; that the Leonard siblings sometimes resented the foster children their parents brought into the family; that their parents enforced rules and were strict; that Patrick respected his mother but did not feel close to her; that Patrick got in trouble more than the other children and that he became angry when disciplined; that Patrick did worse in school than his siblings, that Patrick and Flick had a verbally aggressive relationship, but that Patrick did not get physical with Flick; that Patrick did not know how to care for others; that Patrick's mother was angry when she met Patrick's son; that Patrick's brothers for whom he worked threatened to fire him when he did not show up for work; and that "Patrick's life was out of control" at the time of the murder.  (*Id.* at 3571–74.)

- Nancy Schlindler, Psy.D., who conducted a psychological examination of Leonard for his state post-conviction appeal, stated that Patrick "grew up in a family environment devoid of empathy and emotional understanding;" that he suffered trauma when a foster child in his family's care died when Patrick was a young child; that his mother was emotionally unavailable and substituted religion for internal structure;  that he used women to "fill a void where his mother had been absent;" that he suffered "unbearable emotions of frustration and feelings of abandonment;" that he was "terrified of close and continuing relationships and tended to destroy the relationships;" and finally that Patrick had a "diagnosable learning disability which contributed to his feeling inadequate and feeling rejected in his family and at school."  (*Id.* at PageID at 3993–4013.)

One problem with Leonard's argument is that this evidence is duplicative of mitigation evidence which his trial counsel did introduce during the sentencing phase of the trial.  Dr. James Hawkins, a psychiatrist, testified at mitigation that he concluded that Leonard was "a loner," was "oversensitive to criticism, a bit mistrustful and suspicious," "tended to bottle up his emotion, [and felt] somewhat personally inadequate."  (Doc. 61-15 at PageID 8593.)  Dr. Hawkins also testified that Leonard was "raised in a rigid household" where "emotions just weren't allowed." (*Id.* at PageID 8596.)  He stated that the Leonards had ten children and "a whole bunch of foster kids" and that "everybody had a job and you had to do it to keep it in order."  (*Id.* at PageID 8596.)  He compared the family dynamic to that of the Army.  (*Id.*)  Dr. Hawkins testified that

Patrick told him that he never learned how to manage anger so he bottled it up.  (*Id.* at PageID 8597.)

Leonard's father testified about the importance of religion to the family and the fact that the boys were required to help do maintenance at the church.  (*Id.* at PageID 8646–47.)  He stated that Leonard went to public school, not parochial, because he struggled in school more than his siblings.  (*Id.* at PageID 8649.)  David Leonard, Patrick's older brother, testified that the parents were "strict all the way through as to where you were and what your obligations were to the family."  (*Id.* at PageID 8656.)  Carol Leonard Blackmon, Leonard's sister and his godmother, testified that the Leonard's parents supported more than 100 foster children over time, usually one to three foster children at a time.  (*Id.* at PageID 8715.)  She testified that Leonard did poorly at and did not enjoy school.  (*Id.* at PageID 8720.)

The Court finds that the witnesses trial counsel called at mitigation touched on most of the themes that Leonard suggests his trial counsel neglected.  The lay witnesses spoke about Leonard's strict upbringing, his feelings of inadequacy and his habit of bottling up emotions, the presence of foster children in an already large family, the central role that the Catholic faith and church played in his family life, his struggles at school, and the fact that he was the only Leonard sibling not to be educated in Catholic schools.  The mitigation witnesses did not testify about the Leonard family's disapproval over the fact that Patrick Leonard fathered children out of wedlock.  However, the jury likely could have inferred from testimony that some family members disapproved of Leonard's actions.  Moreover, the psychiatrist did address directly Leonard's low self-esteem, his tendency to be a loner, and his oversensitiviy to criticism, and his inability to handle his emotions.  The Court cannot conclude based on this evidence that trial counsel would have presented substantively different evidence portraying Leonard's family in a

worse light had trial counsel not been paid by Leonard's family and had attorney Strong not been a family friend.  Leonard has not met the *Mickens* standard of proving an actual conflict of interest that adversely affected his trial counsel's performance.

Leonard also asserts that the Ohio appeals court erred when it denied him the chance to develop additional evidence regarding the conflicts and their effect on trial counsel's representation of Leonard.  He asks the Court to consider additional evidence developed in this habeas case—the depositions of his trial counsel, attorneys Welsh and Strong—prior to the issuance of the *Cullen v. Pinholster* decision by the Supreme Court.  (Doc. 53 at PageID 1398–1400.)  The Supreme Court instructed in *Cullen* that district courts cannot consider new evidence developed in habeas on a § 2254(d)(1) review of a state court decision on the merits.  131 S. Ct. at 1400.  Petitioner Leonard argues that the *Cullen* limitation should not apply because the state court unfairly limited his ability to take discovery at the state court level in violation of *Wood v. Georgia*.

In *Wood*, employees of a movie theater and book store were prosecuted and convicted for distributing obscene materials in violation of state law.  450 U.S. at 263.  Their employer paid for their legal representation and promised to pay for any legal fines incurred as well.  *Id.* at 264–66.  The trial court revoked the probation of the defendant employees when their employer failed to pay the fines levied.  *Id.* at 264, 267.  On appeal of the revocation decision, the defendant employees sought the federal court to determine whether it was "constitutional under the Equal Protection Clause to imprison a probationer solely because of his inability to make installment payments on fines."  *Id.* at 264.  The Supreme Court declined to answer the question presented.  Instead, the Court directed its attention to an apparent conflict of interest which had created the defendant employees' predicament:

> For some reason, however, the employer declined to provide money to pay the fines in the cases presently under review. Since it was this decision by the employer that placed petitioners in their present predicament, and since their counsel has acted as the agent of the employer and has been paid by the employer, the risk of conflict of interest in this situation is evident. The fact that the employer chose to refuse payment of these fines, even as it paid other fines and paid the sums necessary to keep petitioners free on bond in this case, suggests the possibility that it was seeking—in its own interest—a resolution of the equal protection claim raised here. If offenders cannot be jailed for failure to pay fines that are beyond their own means, then this operator of "adult" establishments may escape the burden of paying the fines imposed on its employees when they [are] arrested for conducting its business. To obtain such a ruling, however, it was necessary for petitioners to receive fines that were beyond their own means and then risk jail by failing to pay.

*Id.* at 267. The Supreme Court stated that these circumstances required them to consider whether defendant employees' due process rights had been trampled because due process protections adhere to probation revocations. *Id.* at 271. The Supreme Court determined that it lacked sufficient information to make a final determination of the conflict of interest issue. It noted that the state trial court had ignored the potential conflict of interest issue even after it was raised by the state prosecutor. *Id.* at 266, 272–73. It remanded the case to state court with instructions to hold "a hearing to determine whether the conflict of interest that this record strongly suggests actually existed at the time of the probation revocation or earlier." *Id.* at 273.

Leonard argues that the new evidence prohibition set forth in *Cullen* should not apply to his case because the state appeals court erred in reaching a decision on the merits without first providing for an evidentiary hearing on the conflict of interest issue as required by *Wood*. This Court does not believe that *Wood* can be read so broadly. The potential conflict of issue was ignored by the trial court in *Wood* and not raised as an issue by the employees in the state appeals process. It was raised *sua sponte* by the Supreme Court. Conversely, there was no suggestion in Leonard's case that the trial court was or should have been aware of the potential conflict of interest. Petitioner raised the issue for the first time in the Post-Conviction Petition

and the appeals court examined the issue on the merits. The court's decision suggests that Leonard was permitted to submit some evidence in support of his claim. *Leonard*, 157 Ohio App. 3d at 664–66. Thus, the case is distinguishable on the facts from *Wood*. Leonard identifies no clearly established federal law compelling the state appeals court in a post-conviction relief proceeding to have permitted further discovery or have held an evidentiary hearing. *See Lang v. Bobby*, No. 5:12 cv 2923, 2014 WL 5393574, at *6 (N.D. Ohio Oct. 23, 2014) (finding that the Sixth Circuit has rejected arguments that "a state-court decision was not adjudicated on the merits because petitioner was not given a full and fair evidentiary hearing despite petitioner's diligence in seeking one") (citing *Ballinger v. Prelesnik*, 709 F.3d 558, 562 (6th Cir. 2013)). Accordingly, the Court holds that *Cullen* controls this habeas review. This Court is not permitted to consider evidence first developed in the habeas proceedings.

For all these reasons, the Court finds that the state court determination that Leonard was not denied the right to effective assistance of counsel due to a conflict of interest was not contrary to or an unreasonable application of federal law. The Court will deny the Nineteenth Ground for Relief. However, because the Court finds that reasonable jurists could disagree with this decision, the Court will issue a certificate of appealability on this ground for relief.

**GROUND TWENTY**

> **Leonard was denied the effective assistance of counsel during the trial phase of his capital trial in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**
>
> > **Leonard was denied the effective assistance of counsel during the pretrial stages of his capital case.** (Doc. 6 at PageID 127.)
> >
> > **Leonard was denied the effective assistance of counsel during the voir dire of his capital case.** (*Id.* at PageID 130.)
> >
> > **Leonard was denied the effective assistance of counsel during the trial stage of his capital case.** (*Id.* at PageID 133.)

Leonard asserts three sets of subclaims in the Twentieth Ground for Relief as set forth immediately above. However, the Court finds it easier to address the subclaims in sets defined by their procedural posture.

Each subclaim addressed below raises an issue of ineffective assistance of counsel. The governing standard for effective assistance of counsel is found in *Strickland*:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687. Strategic decisions of defense counsel are "virtually unchallengeable." *Buell*, 274 F.3d at 359 (citation omitted). However, an attorney's strategy must be "reasonable" and must be "within the range of logical choices an ordinarily competent attorney" would consider "as reasonable to achieve a 'specific goal.'" *Cone v. Bell*, 243 F.3d 961, 978 (6th Cir. 2001), *overturned on other grounds*, *Bell v. Cone*, 535 U.S. 685 (2002).

Under the prejudice prong of the *Strickland* test, "[t]he defendant[/petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. A reasonable probability is one that "is sufficient to undermine confidence in the outcome." *Id.* The Supreme Court further explained that when a petitioner challenges a conviction, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.

When the state court addresses only one of the two prongs of an ineffective assistance of counsel claim—whether counsel was deficient and whether the alleged deficiency was prejudicial—the issue arises whether the federal court's review of the remaining prong is de novo. The Supreme Court has stated that federal review "in not circumscribed by a state court conclusion" on a particular prong when that prong was not addressed by the state courts below. *Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *see also Davis v. Lafler*, 658 F.3d 525, 540 (6th Cir. 2011) (*en banc*) (Martin, J., concurring in part and dissenting in part) ("The deficiency prong is subject to de novo review as well because the Michigan trial court failed to address this prong.").

## A.      Issues Raised on Direct Appeal

Leonard raised the first set of subclaims on direct appeal where they were denied on the merits by the Ohio Supreme Court:

{¶ 139} In his fourth proposition of law, Leonard makes various claims relating to ineffective assistance of counsel. Reversal of a conviction or sentence based upon ineffective assistance of counsel requires satisfying the two-pronged test set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. *Strickland* requires that the defendant show, first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Id.* at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 140} Leonard raises several claims of ineffective assistance during the guilt-determination phase. He first contends that counsel was deficient for failing to request defense experts. But as we discussed in relation to Leonard's propositions of law one and eight, the record does not reveal any need for experts. Thus, no basis exists to find deficient performance.

{¶ 141} Similarly, we reject Leonard's claims of ineffective assistance of counsel raised in propositions of law 17 and 21. Leonard has not shown that counsel's performance was either deficient or prejudicial. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus, following *Strickland,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 142} Leonard also claims that he was prejudiced by trial counsel's lack of experience in capital cases and that lead counsel was not certified pursuant to Sup.R. 20 (formerly C.P.Sup.R. 65). However, during arraignment, the trial court advised Leonard of his right to have counsel appointed who was certified in

capital cases. Leonard, instead, chose to retain private counsel. In *State v. Keith* (1997), 79 Ohio St.3d 514, 534, 684 N.E.2d 47, we declined to "impose a rule that creates a presumption of ineffective assistance of counsel where counsel has been retained by or for a defendant and is not qualified under C.P.Sup.R. 65."

{¶ 143} Leonard next argues that counsel was deficient in calling two witnesses in the guilt-determination phase who offered damaging testimony. Leonard claims that testimony from his brother Ted and from Rick Schoeny prejudiced his defense. "Generally, counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *State v. Treesh*, 90 Ohio St.3d at 490, 739 N.E.2d 749. We conclude that trial counsel's decision to call these witnesses represented reasonable trial strategy.

{¶ 144} Schoeny testified that it was common for Leonard to have guns and that he always carried a gun in his jacket. This testimony was apparently offered to rebut the state's claim that the murder was premeditated. Ted Leonard testified that Leonard had previously threatened to kill people but that he had never taken his brother's threats seriously. This testimony was apparently intended to diminish the impact of the state's evidence that Leonard had previously threatened Flick. And Ted's testimony that Leonard was a good shot supported the defense theory that Leonard did not intend to kill Gries and Minges when he shot at them through the door of Flick's residence. This strategy was ultimately successful: Leonard was acquitted of both attempted-murder counts. Finally, Ted's testimony that Leonard had admitted killing Flick was not prejudicial in light of Leonard's confession.

{¶ 145} Leonard also claims deficient performance in trial counsel's failure to request a continuance when three subpoenaed defense witnesses failed to appear at the guilt-determination phase of the trial. Defense counsel explained to the court that the witnesses "were not eyewitnesses or anything of that nature" but were subpoenaed to offer "background" information. Leonard has not explained how the failure to ask for a continuance was prejudicial. Moreover, the trial court asked Leonard whether his counsel had consulted with him in regard to the absence of these witnesses, and Leonard said that they had and that he agreed with counsel's decision to proceed without them.

{¶ 146} Leonard also argues that counsel failed to effectively cross-examine Gries and Minges. The extent and scope of cross-examination clearly fall within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel. *See State v. Campbell*, 90 Ohio St.3d at 339, 738 N.E.2d 1178; *State v. Otte,* 74 Ohio St.3d at 565, 660 N.E.2d 711; accord *State v. Bradley,* 42 Ohio St.3d at 142–144, 538 N.E.2d 373. Leonard claims that there were several inconsistencies in the testimony of Gries and Minges and that more effective cross-examinations could have bolstered the defense's argument that Flick had consented to having sex with Leonard. But Leonard does not explain what the alleged inconsistencies are or how they could have shown that Flick had

> consented.  Nor are the inconsistencies clear from the record.  Thus, we reject
> Leonard's argument.

*Leonard*, 104 Ohio St. 3d at 80–82.  A district court's review of a state court decision on the

merits denying an ineffective assistance of counsel claim is "doubly deferential." *Cullen*, 131 S.

Ct. at 1403.  "We take a highly deferential look at counsel's performance through the deferential

lens of § 2254(d)." *Id.* (internal citations and quotations omitted).

In the Objections, Leonard first objects to the determination that his trial counsel, Welsh

and Strong, did not render ineffective assistance after accepting the representation of Leonard

when they were not qualified to provide representation in capital cases.  Leonard points to Welsh

and Strong's lack of certification under Ohio Superintendence Rule 20 to provide representation

to indigent clients in capital cases.  He then asserts that counsel were under an ethical duty to

decline a case which they were not competent to handle.  This claim fails because Leonard does

not identify clearly established Supreme Court precedent specifying that attorneys not certified

under state law to provide indigent representation in capital cases should be presumed

incompetent to handle a death penalty case.  Additionally, Leonard concedes he was informed of

his right to have appointed, capital-certified counsel, but he chose to be represented by Welsh

and Strong.

Next, Leonard argues that his trial counsel failed to impeach the testimony of Gries and

Minges with prior inconsistent statements they had made to the police and during the civil case

against Patrick Leonard and his employer, the company owned by his brothers.  This Court

agrees with the Ohio Supreme Court that Leonard has not established how the inconsistencies

identified would have been relevant to establish that Flick consented to intercourse with Leonard

before he shot her.  As such, Leonard cannot establish either deficient performance or prejudicial

effect.

Leonard also objects to trial counsel's presentation of testimony by Ted Leonard, Patrick Leonard's brother, and Rick Schoeny. Portions of their testimony could be considered unfavorable to Leonard when examined out of context. However, the Court agrees with the Ohio Supreme Court that their testimony was relevant to undercut the State's allegations that Leonard had premeditated intent to kill Flick and that he had intent to kill Gries and Minges when he fired shots at the front door of Flick's home.

Also, the Court agrees with the Ohio Supreme Court that Leonard has not established prejudice from trial counsel's failure to present evidence from three subpoenaed witnesses who failed to appear.

Finally, Leonard does not raise specific objections to the Ohio Supreme Court's finding regarding expert witnesses.

For all these reasons, the Court will deny the ineffective assistance of counsel subclaims first raised on direct appeal.

### B.    Issues Raised in the Post-Conviction Proceedings

Leonard raised a second set of subclaims in his Post-Conviction Petition. The Ohio appeals court denied the subclaims:

> {¶ 17} Leonard contended in his sixth claim for relief that his trial counsel had violated essential duties when they failed to present a speedy-trial challenge, when they failed to address during the voir dire examination of prospective jurors various matters that had surfaced later at his trial, and when they adduced damaging testimony from defense witnesses at trial. New counsel had represented Leonard in his direct appeal to the Ohio Supreme Court, and these challenges to trial counsel's competence presented matters that could fairly have been determined without evidence dehors the record. These aspects of the sixth claim were, therefore, subject to dismissal without a hearing under the doctrine of res judicata. *See State v. Cole* (1982), 2 Ohio St.3d 112, 2 OBR 661, 443 N.E.2d 169.
>
> {¶ 18} In his sixth claim, Leonard also challenged the adequacy of his trial counsel's cross-examination of certain state's witnesses, counsel's failure to present testimony by his sister, and counsel's failure to challenge the

underrepresentation of African-Americans on his petit jury venire.  And in his fifth claim, Leonard assailed the adequacy of the investigation conducted by counsel in preparing for the guilt phase of his trial.

{¶ 19} The evidence offered in support of these challenges to counsel's competence demonstrated neither counsel's violation of an essential duty to Leonard nor a reasonable probability that, but for the alleged omissions of counsel, either independently or collectively, the results of the guilt phase of his trial would have been different.  *See Bradley*, supra.  Leonard thus failed to sustain his initial burden of demonstrating substantive grounds for relief.  Accordingly, we hold that the common pleas court properly denied without a hearing the sixth claim and the relevant aspects of his fifth claim.  *See Pankey*, supra; *Jackson*, supra.

*Leonard*, 157 Ohio App. 3d at 661–62.

The Court will begin with the speedy trial issue.  The Ohio appeals court held that the subclaim was barred by *res judicata* because Leonard could have raised the subclaim on direct appeal without *dehors* evidence, but failed to do so.  Leonard does not dispute that Ohio's application of *res judicata* is an adequate and independent state ground sufficient to preclude habeas review absent excusing cause and prejudice.  *Coleman*, 501 U.S. at 729; *Murray*, 477 U.S. at 485; *Mapes v. Coyle*, 171 F.3d 408, 413 (6th Cir. 1999).  He argues, instead, that he should have been permitted to submit evidence *dehors* the record.  (Doc. 53 at PageID 1410–11.)  Leonard does not explain what evidence he was prohibited from submitting or how that additional evidence would have proven his claim.  Leonard also argues that the ineffective assistance of his appellate counsel in failing to raise this claim should excuse his procedural default.  However, it does not appear that Leonard asserted an ineffective assistance of appellate counsel claim on this issue in his Application for Reopening.  (Doc. 61-3 at 2903–14.)  He therefore did not preserve the ineffective assistance of appellate counsel argument and it cannot be used as excusing cause.  *See Edwards*, 529 U.S. at 451–53.  The Court denies this subclaim as procedurally barred.

Next, Leonard argues that his trial counsel should have examined potential jurors about issues that arose later in trial such as experimental sex and dysfunctional sexual relationships, infidelity, and the age difference between Flick and Leonard. (Doc. 53 at PageID 1408.) He also argues that his trial counsel were ineffective for eliciting damaging testimony from defense witnesses. The Ohio appeals court also denied these claims as barred by *res judicata* because they did not require consideration of evidence *dehors* the record. These subclaims are denied applying the same analysis as was applied to the speedy trial subclaim.

The failure to investigate subclaim, including the failure to present testimony by Jeanne Hutcherson, Leonard's sister, is more complex. The state appeals court agreed with the trial court's decision in the post-conviction proceedings to deny these subclaims after the submission of evidence, but without a hearing. *Leonard*, 157 Ohio App. 3d at 661–62. Trial counsel gave the defense investigator a limited investigation mandate focused primarily on finding witnesses who saw Leonard and Flick together in the days immediately prior to the murder and on Leonard's personal history. (Doc. 61-4 at PageID 3655–56.) Leonard contends that the investigator should have attempted to interview the police investigators listed in the prosecutor's discovery. (Doc. 61-3 at PageID 3222.) He contends that the investigator should have investigated the victims, Dawn Flick and Ryan Gries. Leonard also argues that the investigator should have spoken to him.

Leonard fails to prove that his trial counsel rendered ineffective assistance of counsel in their pretrial investigation. To begin, Leonard does not assert what his investigator could have discovered if he had contacted the law enforcement officers identified in the prosecutor's case file or if he had investigated Flick and Gries. Leonard cannot establish prejudice on these issues,

nor that the state appeals court decision was contrary to clearly established federal law, in the absence of such information.

Leonard also argues that his trial counsel should have focused more investigation on the nature of his relationship with Dawn Flick. Leonard told his trial counsel, but not the investigator, that he had a volatile relationship with Flick and that he and Flick engaged in "experimental sex" including the use of handcuffs, guns, whips, and other sexual apparatuses.[9] Finally, Leonard suggests that Hutcherson could have verified the volatile nature of his relationship with Leonard. Hutcherson provided an affidavit in the post-conviction proceedings in which she stated the following:

> I saw Pat [Leonard] and Dawn [Flick] together. They would frequently argue and become verbally aggressive. I have seen Dawn punch and kick Pat, but never saw Pat strike Dawn. Pat would walk away when Dawn struck him. When I asked Pat about her behavior, he would blow off the argument.

(Doc. 61-4 at PageID 3573.) Hutcherson stated that the trial attorneys did not ask her "any detailed social history questions" about Leonard. (*Id.* at PageID 3574.)

Leonard argues that his trial counsel could have presented facts at the trial about the volatile nature of his relationship with Flick and could have presented testimony about the couple's prior use of restraints in their sexual relationship. He argues that such evidence would have undercut the State's case proving the death penalty specification of attempted rape and proving premeditation. The Court does not agree that this argument is a sufficient basis to find that his trial counsel rendered ineffective assistance of counsel. Hutcherson's statements that Leonard and Flick had a volatile relationship were as likely to hurt Leonard at trial as to help him. Also, her testimony likely would not have been sufficient to overcome the evidence

---

[9] Leonard identifies his post-conviction proceeding exhibits 19 and 28, (Doc. 61-3 at PageID 3159–60, 3224–25), in support of these purported facts, but the Court could not find those factual assertions in the exhibits. (Doc. 66 at PageID 9376.)

presented at trial indicating that the killing of Flick was premeditated.  Hutcherson's testimony

that Flick previously had struck Leonard, if admissible and if believed, was not relevant to

disprove the attempted rape charge.  Testimony that Leonard and Flick had used handcuffs

previously in their sexual relationship might have been relevant to a defense against the

attempted rape specification.  However, Leonard's attorneys were aware of this purported fact.

Leonard does not suggest that he wanted to directly testify as to this purported fact at trial.  Nor

does he identify any other witness who could have testified as to this purported fact at trial.  The

Court concludes that the state appeals court decision denying these subclaims was not contrary to

or an unreasonable application of *Strickland*.

### C.    Issues Raised in the Application for Reopening

Leonard asserts that trial counsel did not define the term "mitigation" to the venire panel

and therefore did not ensure that the chosen jury could be impartial when it considered

mitigation evidence.  He also asserts that trial counsel failed to attempt to rehabilitate venire

members Glover, Ison, and Allen who expressed opposition to the death penalty.  Leonard

asserted subclaims based on trial counsel's failures to conduct an adequate voir dire in his

Application for Reopening.  (Doc. 61-3 at PageID 2904–07.)  The Ohio Supreme Court

summarily denied the Application for Reopening.  *Leonard*, 106 Ohio St. 3d at 1407.

Leonard does not dispute that his claim was procedurally defaulted insofar as he failed to

assert the claim on direct appeal.  He argues that the ineffective assistance of his appellate

counsel serves as cause to excuse the procedural default.  When the Ohio Supreme Court denied

the Application for Reopening without comment, that decision served as a de facto merits

determination of whether his appellate counsel had been constitutionally ineffective.  *See*

*Harrington*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the

state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.")

Leonard asserts the alleged ineffective assistance of his appellate counsel here not as an independent ground for relief, but only as cause to excuse his procedural default of the voir dire subclaim.  Ineffective assistance of appellate counsel can be an excusing cause to avoid a state procedural default rule when the ineffective assistance of appellate counsel claim was properly presented to the state courts in the first instance.  *Edwards*, 529 U.S. at 451–52.  Leonard again argues that he does not need to meet the AEDPA standard of deference to the Ohio Supreme Court decision on the merits with respect to the ineffective assistance of appellate counsel claim insofar as it is used to establish cause to excuse his procedure default of the underlying evidence claim.  *See Joseph*, 469 F.3d at 459.  Leonard cannot establish cause whether or not the Court applies a deferential standard of review.

Turning to the merits, Leonard needs to establish ineffective assistance of appellate counsel as an excusing cause to excuse his failure to bring a claim for ineffective assistance of trial counsel during voir dire.  Leonard asserts that this appellate counsel should have argued on direct appeal that trial counsel erred by not defining mitigation to the venire panel.  He argues that if the jury did not understand mitigation, then his trial attorneys could not sufficiently determine that the jury would be impartial.  "[D]ue process alone has long demanded that  . . the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment."  *Morgan*, 504 U.S. at 727.  The Supreme Court recognized in *Morgan* that a potential juror "could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so."  *Id.* at 734–35.  The Supreme Court held that the defendant had the right to inquire at voir dire whether a

potential juror who stated that he would follow the law, in fact, would follow specific instructions that he consider mitigating evidence before determining whether to impose a death sentence.  *Id.* at 734–36.

Leonard identifies several excerpts from the venire during which individual venire members expressed confusion about mitigation.  (Doc. 61-13 at PageID 7125, 7169–70, 7180, 7610–11.  In one instance, the trial court provided an explanation of mitigation to the venire member who expressed confusion.  (*Id.* at PageID 7125.)  In another instance, the trial counsel explained that mitigation was presented to persuade jury members to not give a death penalty sentence.  (*Id.* at PageID 7610–11.)  In two other situations, trial counsel responded to the confusion expressed by potential jurors Hemmer and Springmyer by asking them generally if they could follow the judge's instructions.  (*Id.* at PageID 7169–71, 7180.)  However, Hemmer and Springmyer testified in response to further questioning that they could not impose the death penalty no matter the judge's instructions about weighing evidence.  (*Id.* at PageID 7171, 7181.)  The trial court properly excused Hemmer and Springmyer.  (*Id.* at 7173, 7182.)  Leonard has not established a violation or unreasonable application of *Morgan*.

Relatedly, Leonard asserts that his trial counsel should have rehabilitated potential jurors who voiced opposition to the death penalty.  He again asserts that the ineffective assistance of his appellate counsel in failing to raise this claim on direct appeal excuses his procedural default of the claim.  Leonard asserts in this subclaim that his trial counsel rendered ineffective assistance of counsel when they failed to attempt to rehabilitate potential jurors Glover, Allen, and Ison. Each of the potential jurors had expressed an unwillingness to impose the death penalty.  (Doc. 61–13 at PageID 7157–58, 7174–75, 7203–05.)

The Supreme Court has held that a potential juror cannot be excluded on the sole ground that he or she voiced general objections to the imposition of capital punishment. *Witherspoon v. Ill.*, 391 U.S. 510, 522–23 (1968).  Rather, the trial court must inquire whether a potential juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (citation omitted)).  The voir dire questioning of potential jurors Glover, Allen, and Ison did not run afoul of *Witherspoon* or *Wainwright*.  These jurors were questioned by trial counsel and by the judge.  They did more than voice general objections to the death penalty.  Potential juror Glover called the death penalty cruel and against his beliefs.  (Doc. 61-13 at PageID 7157–58.) He stated that he could not impose the death sentence even in the law allowed it and the evidence warranted it.  (*Id.*)  Potential juror Allen stated that he could not, for religious reasons, "follow the Court's instructions and the law as provided by the Court and fairly consider the imposition of the sentence of death if the evidence warrants it and the law allows it." (*Id.* at PageID 7174–75.)  Potential juror Ison stated that she could not sign a verdict of death even if the judge instructed that she must do so if the jury found that the aggravating circumstances outweighed the mitigating factors.  (*Id.* at PageID 7204–05.)

The Court concludes that Leonard has not established that his appellate counsel erred in failing to assert these subclaims on direct appeal.  He has not established either deficient performance or prejudice by his trial attorneys or his appellate attorneys on these issues.  He also has not established that his arguments on these issues were stronger than his arguments on claims which appellate counsel did assert on appeal.  As such, the purported ineffective assistance of appellate counsel does not excuse the procedural default of the underlying subclaims.

### D.        Conclusion

For the foregoing reasons, the Court will deny the Twentieth Ground for Relief.  The

Court grants a certificate of appealability only as to the subclaims based on the failure to

impeach the testimony of Gries and Minges, the lack of an investigation, and the testimony of

Jeanne Hutcherson.

## GROUND TWENTY-ONE

**Leonard's right to the effective assistance of counsel was violated when his counsel performed deficiently during the mitigation phase of his capital trial, in violation of the Sixth, Eighth, and Fourteenth Amendments to the Constitution.**

> **Leonard was denied the effective assistance of counsel when his counsel failed to conduct a reasonable investigation into issues relevant to the mitigation phase.**  (Doc. 6 at PageID 138.)

> **Leonard was denied the effective assistance of counsel when his counsel presented incomplete, damaging, and misleading information during the mitigation phase.**  (*Id.* at PageID 143.)

### A.        Mitigation Evidence

Leonard presented two of the subclaims contained in this ground for relief in his Post-

Conviction Petition.  The Ohio appeals court denied the subclaims:

{¶ 20} Leonard directed his seventh claim and the balance of his fifth claim against the adequacy and effectiveness of counsel's preparation for and presentation of the case in mitigation.  The defense presented at trial a mitigation theory that proposed that Leonard was a good person who had acted out of character when he killed Dawn Flick.  The evidentiary material offered by Leonard in support of his claims of counsel's ineffectiveness merely supported an alternative theory of mitigation.  When, as here, counsel presented the case in mitigation competently, in view of the facts available to them, evidence offered to prove the existence of mitigation evidence that counsel had failed to present at trial, and that supported an alternative theory of mitigation, did not provide proof of counsel's ineffectiveness.  *See State v. Post* (1987), 32 Ohio St.3d 380, 388–389, 513 N.E.2d 754.  Because Leonard failed to demonstrate substantive grounds for relief, we hold that the common pleas court properly denied the seventh claim and the balance of the fifth claim.  *See Pankey,* supra*; Jackson,* supra*.*

*Leonard*, 157 Ohio App. 3d at 662.

Leonard's ineffective assistance of trial counsel subclaims are governed by the *Strickland* standard. 466 U.S. at 687. In presenting these claims in this habeas action, Leonard focuses his attention on the deficiency prong of the *Strickland* standard, not on the prejudice prong. Leonard argues that the state court erred in giving his trial counsel's legal strategy deference because it was not the product of a reasonable investigation. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91. Leonard argues that his trial counsel unreasonably limited their investigation to the goal of finding evidence that Leonard was a good person. He asserts that trial counsel's investigator spoke to only three Leonard family members in completing the investigation, though the Court does not see proof of that assertion on the evidence cited. (Doc. 61-4 at PageID 3654–66.) Leonard argues that a reasonable investigation requires more than acquiring "only rudimentary knowledge of his history from a narrow set of sources." *Wiggins*, 539 U.S. at 524. The Court will assume without deciding that Leonard can establish the deficient performance of his trial counsel.

Leonard's subclaims falter, however, when he attempts to prove prejudice. "When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appeals court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. Leonard argues that if his trial counsel had done a more thorough investigation, they would have used a different mitigation strategy and could have convinced at least one juror to impose a life sentence. Leonard argues that trial counsel should have presented evidence

about his unusually strict upbringing, his lack of a relationship with his emotionally distant mother, his similar personality to his strict, bad-tempered father, his feelings of inadequacy and anger, the disapproval he felt from his family after he had a child out of wedlock, and his history of engaging in sexual relationships devoid of emotional intimacy.  (Doc. 61-4 at PageID 3561–63, 3566–67, 3571–74, 3993–4013.)  Leonard suggests that his evidence would have engendered a jury's sympathy towards him and helped the jury understand that he was ill-equipped to handle the heartbreak of a break-up from Flick.  Additionally, he argues that his trial counsel should have presented evidence that he had adjusted well to life in prison.  "[E]vidence that the defendant would not pose a danger if spared [the death penalty] (but incarcerated) must be considered potentially mitigating."  *Skipper v. S.C.*, 476 U.S. 1, 5 (1986).  Finally, he asserts that the mitigation expert, Dr. Hawkins, should have explained "how Leonard's history and background influenced his development, how it affected Leonard's perception of himself and others, and how it affected his relationships."  (Doc. 39 at PageID 981.)

Though not addressed by counsel or by the Magistrate Judge, the Court finds that this ineffective assistance of counsel subclaim overlaps with the conflict of interest subclaims stated in the Ground Nineteen.  Leonard argued in Ground Nineteen that his trial counsel failed to investigate and present mitigation evidence which would have portrayed Leonard's family in an unflattering light.  Leonard relied on the same *dehors* evidence to support Ground Nineteen and Ground Twenty-One.  The Court found for Ground Nineteen that trial counsel did present at least limited evidence during the sentencing phase about the following mitigation topics:  Leonard's strict upbringing, his feelings of inadequacy and his habit of bottling up emotions, the presence of foster children in his already large family, the central role that the Catholic faith and church played in his family life, his struggles at school, and the fact that he was the only family member

91

not to be educated in Catholic schools. These are all mitigation topics which Leonard suggests that his trial counsel failed to adequately present to the jury. (*Compare* Doc. 61-15 at 8593–97, 8646–47, 8649, 8656, 8715–8720 *with* Doc. 61-4 at PageID 3561–63, 3566–67, 3571–74, 3993–4013.) The fact that much of the new evidence is cumulative of evidence which was introduced as mitigation undercuts the prejudice argument. "[I]n order to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *McGuire v. Warden*, 738 F.3d 741, 757 (6th Cir. 2013) (quoting *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005)).

The Court acknowledges that Leonard's trial counsel had a different mitigation strategy than Leonard now argues counsel should have used. Trial counsel did not emphasize these negative aspects of Leonard's upbringing which were presented in the mitigation testimony. The mitigation testimony focused on Leonard's skill with horses and as a carpenter, his kindness to family members, and his love for his children. (Doc. 61-15 at PageID 8651, 8661, 8670–71, 8676, 8725, 8731–32, 8740). Trial counsel presented the theme that Leonard was a good person whose actions committing the crimes were inconsistent with his life up until that point. (*Id.* at PageID 8786.)

However, in the final analysis, Leonard does not establish that there is a reasonable probability that the jury would have concluded that the aggravating circumstance did not outweigh the mitigating circumstances if trial counsel had presented a different mitigation case. Leonard points to no cases holding that an attorney's failure to present mitigation facts similar to those omitted here was deficient performance and prejudicial. A finding of prejudice in the sentencing phase of capital cases "is not made lightly, especially where the petitioner was not a victim of abuse and did not suffer from any mental disorders or difficulties." *Hawkins v. Coyle*,

547 F.3d 540, 550 (6th Cir. 2008).  The Sixth Circuit in *Hawkins* provided a list of cases in which counsel's failure to investigate mitigating evidence prejudiced the defendant, but most common relevant mitigating factors in those cases are not present here:  alcoholic parents, physical or sexual abuse of the defendant, exposure to extreme violence during youth, drug addiction, brain damage, and severe mental illness.  *Id.* at 549–50.  Significantly, the omitted mitigation facts for Leonard are even less severe than the omitted personal history mitigation facts the Sixth Circuit found in *Hawkins* to be insufficient to warrant a finding prejudice:  alcohol abuse by Hawkins' father, extramarital affairs and spousal abuse by Hawkins' father, favoritism shown to Hawkins' brother, the childhood death of Hawkins' sister, and Hawkins' depression and attempts at suicide.  *Id.* at 550–51. For these reasons, the Court concludes that Leonard has not established the ineffective assistance of counsel based upon an insufficient mitigation investigation.

> **B.     Sentencing Attorney Arguments and Instructions**

Leonard presented the final subclaim argued in this ground for relief on direct appeal.  He argues that trial counsel were ineffective because they made erroneous and misleading statements about the law during the sentencing phase of the trial.  Leonard contends that his trial counsel wrongly shifted the burden of proof to Leonard at sentencing when he stated during opening statement that the defense was going to "show" how Leonard's "good life . . . surely outweigh[s] the one aggravating factor that they . . . have shown."  (Doc. 61-15 at PageID 8576–77.)  Trial counsel also erred when he told the jury that "the death penalty in this case is not the right - - will not be the right verdict for you or the recommendation for you."  (*Id.* at PageID 8577.)  Finally, Leonard asserts that his trial attorney erred when he referred to plural

"aggravating circumstances" in the closing arguments when only one aggravating circumstance had been proven.  (*Id.* at PageID 8785.)

The Ohio Supreme Court denied the subclaim on the merits:

{¶ 151} Leonard raises other ineffective-assistance claims related to the penalty phase.  Leonard contends that during opening statement, counsel reversed the penalty-phase balancing test, saying that the life that Leonard had led until the murder outweighed the aggravating factor and that the jury's penalty verdict was only a recommendation.  However, the trial court correctly instructed the jury on the legal standards.  Thus, any misstatement by counsel was nonprejudicial.  *See State v. Stallings* (2000), 89 Ohio St. 3d 280, 286, 731 N.E.2d 159.

*Leonard*, 104 Ohio St. 3d at 83.  Because this was a merits determination, Leonard must establish that Ohio Supreme Court decision was contrary to or an unreasonable application of clearly established federal law.  Leonard does not meet this burden.

Leonard asserts that the Ohio Supreme Court erred because it did not assess the prejudicial effect of the alleged misstatements in consideration of the totality of the evidence.  However, Leonard does not take the next step of proving prejudice in the totality of the circumstances.  He does not dispute the correctness of the trial court's instructions to the jury at the sentencing phase as to the burden of proof.  (Doc. 61-15 at PageID 8809–10.)  The trial judge did refer to plural "aggravating circumstances" in his final instructions, but he also clarified that the specifications from Count One and Count Two had merged for purpose of sentencing.  (Doc. 61-15 at PageID 8806, 8811.)  He defined the merged aggravating circumstance to be "that the aggravated murder was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit rape, and the defendant was the principal offender in the commission of the aggravated murder."  (*Id.* at 8811.)  The trial judge also stated that it was his role to define the law to the jury.  (*Id.* at PageID 8807.)

In sum, Leonard has failed to prove prejudice arising from the alleged deficient performance of his trial counsel during the sentencing phase of the trial.  The Court agrees with Magistrate Judge Merz's recommendation and will deny the Twenty-First Ground for Relief. The Court will issue a certificate of appealability on the issue about the scope of the mitigation investigation.

## GROUND TWENTY-TWO

**Leonard was denied the effective assistance of appellate counsel on his sole appeal of right to the Supreme Court of Ohio and as such his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated.**

(Doc. 6 at PageID 149.)

Leonard first asserted this ground for relief in his Application for Reopening filed in the Ohio Supreme Court pursuant to Ohio Supreme Court Practice Rule 11 on March 8, 2005.  (Doc. 61-3 at PageID 2903–14.)  The Ohio Supreme Court denied the Application for Reopening on June 29, 2005.  *Leonard*, 106 Ohio St. 3d 1407.

In this ground for relief, Leonard asserts that his appellate counsel were ineffective when they failed to raise certain meritorious claims on direct appeal, including the trial court's error in admitting improper hearsay statements of Dawn Flick at the trial (*see* Ground Two subclaim B), the trial court's error in giving erroneous instruction about the admission of evidence at the sentencing phase of the trial (*see* Ground Eight subclaim A), and the ineffective assistance of trial counsel (*see* Grounds Twenty and Twenty-One).  The ineffectiveness of appellate counsel is raised here as a substantive grounds for relief, not simply as cause to excuse the procedural default of the underlying claims.  The Court found in Grounds Two, Eight, and Twenty that Leonard could not prove the ineffective assistance of his appellate counsel as excusing cause. The same analysis forecloses the granting of relief on Ground Twenty-Two on the same issues.

Ground Twenty-One concerned issues which Leonard's attorneys properly raised on direct

appeal or in post-conviction relief proceedings.  Leonard cannot support an ineffective assistance

of appellate counsel claim on the basis of those issues either.

The Court will address one other issue in regards to this ground for relief.  Leonard

argues that the despite the fact that the Ohio Supreme Court denied this claim on the merits, this

Court should consider *dehors* evidence developed in the habeas case.  Leonard submitted for

consideration the deposition testimony of attorneys Norman Aubin and Herbert Freeman, the

attorneys who presented his direct appeal to the Ohio Supreme Court.  Magistrate Judge Merz

found that the Court was prohibited from considering the deposition testimony because *Cullen*

mandates that the Court consider only the evidence before the state court in its merits review.

131 S. Ct. at 1400.  Leonard argues that the *Cullen* evidence limitation should not apply because

he was not given a full and fair opportunity to submit evidence outside the record to support his

Application for Reopening.

The Court disagrees with Leonard's interpretation of Ohio law.  Ohio Supreme Court

Practice Rule 11.06 governs applications for reopening "based on a claim of ineffective

assistance of appellate counsel in the Supreme Court."  Ohio S. Ct. Prac. R. 11.06(A).  The Ohio

Supreme Court Practice Rules provide for counsel to establish the basis for their applications

with "(4) [a]n affidavit stating the basis for the claim that appellate counsel's representation was

ineffective . . . which affidavit may include citations to applicable authorities and references to

the record; [and]  (5) [a]ny relevant parts of the record available to the applicant and *all*

*supplemental affidavits* upon which the applicant relies."  Ohio S. Ct. Prac. R. 11.06(B)(4) & (5)

(emphasis added).  The Rules also permit an evidentiary hearing if the Ohio Supreme Court

determines that a hearing "is necessary."  Ohio S. Ct. Prac. R. 11.06(H).  The Ohio Supreme

Practice Rule treats the case record and supplemental affidavits separately in subsection (B)(5) implying that supplemental affidavits can include evidence *dehors* the record. The Court agrees with Magistrate Judge Merz that *Cullen* controls. The Court cannot consider the attorney deposition evidence developed after the Ohio Supreme Court issued its merits decision denying the Application to Reopen.

The Court will deny Ground Twenty-Two. The Court will not issue a certificate of appealability on this issue.

## GROUND TWENTY-THREE

**Leonard's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated when he was convicted and sentenced to death under Ohio's death penalty system which fails to provide an adequate system of appellate and proportionality review in death penalty cases.**

(Doc. 6 at PageID 151.)

In this claim, Leonard objects to the proportionality review procedure followed by the Ohio courts. There is some dispute whether Leonard raised this claim on direct appeal. Leonard asserts that he raised this claim as his nineteenth proposition of law on direct review. However, as pointed out by the Magistrate Judge, in that proposition of law Leonard alleged that his death sentence was excessive and disproportionate compared to sentences in other cases. (Doc. 61-2 at PageID 2544.) The Ohio Supreme Court denied that claim. *Leonard*, 104 Ohio St. 3d at 80, 92. The Ohio Supreme Court found that "the penalty imposed here is not excessive when compared with similar cases in which death sentences have been approved." *Id.* at 92. The Court does not interpret Leonard's direct appeal claim to include an attack on the constitutionality of Ohio's proportionality review scheme in general. As such, the Court will deny the claim as procedurally defaulted. *See O'Sullivan*, 526 U.S. at 845–48.

Additionally, the claim fails on the merits. The Ohio Revised Code calls for the Ohio

Supreme Court to conduct a proportionality review:

> [T]he supreme court shall review the judgment in the case and the sentence of
> death imposed by the court or panel of three judges in the same manner that they
> review other criminal cases, except that they shall review and independently
> weigh all of the facts and other evidence disclosed in the record in the case and
> consider the offense and the offender to determine whether the aggravating
> circumstances the offender was found guilty of committing outweigh the
> mitigating factors in the case, and whether the sentence of death is appropriate. In
> determining whether the sentence of death is appropriate, . . . *the supreme court*
> *shall consider whether the sentence is excessive or disproportionate to the penalty*
> *imposed in similar cases*.

Ohio Rev. Code § 2929.05(A) (emphasis added). Leonard contends that the italicized language

should be interpreted to mandate that the Ohio Supreme Court compare the facts of each death

sentence case to the facts in cases in which the death penalty was imposed and to cases in which

life sentences were imposed.

Leonard's interpretation of § 2929.05(A) has been rejected by the Ohio Supreme Court as

a matter of Ohio law:

> We hold, therefore, that the proportionality review required by R.C. 2929.05(A) is
> satisfied by a review of those cases already decided by the reviewing court in
> which the death penalty has been imposed. . . . No reviewing court need consider
> any case where the death penalty was sought but not obtained or where the death
> sentence could have been sought but was not.

*Ohio v. Steffen*, 31 Ohio St. 3d 111, 123–24, 509 N.E.2d 383 (1987). Additionally, the Sixth

Circuit has held that the Constitution does not require the type of proportionality review

advocated for by Leonard. *See e.g.*, *Getsy v. Mitchell*, 495 F.3d 295, 306–07 (6th Cir. 2007)

(stating that a defendant "simply had no constitutional guarantee that his jury would reach the

same results as prior or future juries dealing with similar facts, irrespective of the offense with

which he was charged"); *Williams v. Bagley*, 380 F.3d 932, 962 (6th Cir. 2004) ("This court has

held repeatedly that Ohio's system of proportionality review complies with the dictates of the Due Process Clause."). Accordingly, the claim fails on the merits.

The Court will deny Ground Twenty-Three on the merits and as procedurally defaulted. The Sixth Circuit recently has granted a certificate of appealability in another case challenging Ohio's proportionality review system. *Hill v. Mitchell*, Case Nos. 13-3412/13-3492, Doc. 37-1 (6th Cir. Aug. 13, 2014); *Id.* Doc. 31 (6th Cir. May 23, 2014). This Court will grant a certificate of appealability on Ground Twenty-Three as well.

## GROUND TWENTY-FOUR

> **Leonard's rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated when he was convicted of aggravated murder without legally sufficient evidence, and contrary to the manifest weight of the evidence.**

(Doc. 6 at PageID 156.)

Leonard asserts that the State of Ohio had insufficient evidence to prove that Leonard committed aggravated murder. Specifically, Leonard has narrowed this claim in his Objections to the R&R to an argument that the State had insufficient evidence to prove attempted rape, an element of aggravated murder. (Doc. 53 at PageID 1435.) Leonard first asserted this claim on direct appeal. The Ohio Supreme Court denied the claim on the merits:

> {¶ 76} In his sixth proposition of law, Leonard claims that the evidence was insufficient to support his aggravated-murder convictions. We disagree.
>
> * * *
>
> {¶ 78} Leonard was convicted of two counts of aggravated murder: purposely causing the death of Flick while committing, attempting to commit, or fleeing immediately after committing or attempting to commit rape, and the purposeful killing of Flick with prior calculation and design. *See* R.C. 2903.01(B) and (A).
>
> {¶ 79} We conclude that sufficient evidence was introduced at trial to support these convictions. On the night of the murder, Leonard twice followed and stopped Flick in her car. After stopping her car the second time, Leonard ordered Flick to return to her house. Leonard followed Flick to her home, where he

handcuffed her and held her at gunpoint.  Leonard confessed to firing three shots into Flick's head from close range.  Leonard also told police that just before he shot Flick, he had been on top of her with his pants down because they had "decided to [have sexual intercourse] on the floor."

{¶ 80} Although Leonard's confession suggests that Flick had consented, there was substantial evidence of forcible sexual conduct, and a rational trier of fact could find Leonard guilty of attempted rape.  *See, e.g.*, *State v. Williams* (1996), 74 Ohio St.3d 569, 576, 660 N.E.2d 724; *State v. Scudder* (1994), 71 Ohio St.3d 263, 274–275, 643 N.E.2d 524.  *But cf. State v. Davis* (1996), 76 Ohio St.3d 107, 114–115, 666 N.E.2d 1099 (holding that evidence that victim's body was found naked, that victim had been seen pushing the defendant away before she was shot, and that there were possible finger marks on one of the victim's thighs was insufficient evidence to support attempted-rape conviction).  Police found Flick's body lying in a pool of blood on her living room floor, partially nude.  She had been shot three times in the head, her panties had been pulled down to her thighs, one pant leg had been pulled off, the other had been pulled down to her calf, and one shoe had been removed.  Her hands were bound by handcuffs, and bruising on her wrists indicated that she had struggled while handcuffed.  Marks on her neck and petechiae on her face indicated that she had been strangled.

*Leonard*, 104 Ohio St. 3d at 67–68.

Insufficient evidence claims in habeas proceedings are subject to two layers of judicial deference:

First, on direct appeal, it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial.  A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.  And second, on habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was objectively unreasonable.

*Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (internal quotations and citations omitted).

This Court agrees with the Ohio Supreme Court and Magistrate Judge Merz that Leonard's insufficiency of the evidence claim fails on the merits, especially in light of the doubly deferential review in habeas proceedings.  Flick was found partially undressed, bruised, and in handcuffs.  The evidence was sufficient for a jury to convict Leonard of attempted rape.

The Court will deny this ground for relief.  Magistrate Judge Merz recommended granting a certificate of appealability because "sufficiency of the evidence claims are so much a matter of individual judgment."  (Doc. 47 at PageID 1278.)  The Court will issue the certificate of appealability on this issue.

## GROUND TWENTY-FIVE

**Leonard's right to a fair and impartial jury and equal protection were violated when the state engaged in racial discrimination in the selection of members of the grand jury and petit jury venire as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

(Doc. 6 at PageID 159.)

Leonard withdrew this ground for relief in his Objections.  (Doc. 53 at PageID 1436.)

## GROUND TWENTY-SIX

**Leonard's constitutional rights to due process, equal protection, and a reliable trial and sentencing were violated by Ohio's inadequate state post-conviction process that failed to provide a remedy for Leonard to fully and fairly vindicate his federal constitutional claims in the state courts.**

(Doc. 6 at PageID 163.)

Leonard challenges the constitutionality of Ohio's procedures for post-conviction relief as set forth in Ohio Revised Code § 2953.21.  Leonard first asserted this claim in his Petition for Postconviction Relief.  The Ohio appeals court denied the claim on the merits:

{¶ 38} In his eleventh claim for relief, Leonard contended that R.C. 2953.21 violates the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.  As we noted supra, R.C. 2953.21(A)(1) requires a postconviction petitioner to demonstrate a denial or infringement of his rights *in the proceedings resulting in his conviction that rendered the conviction void or voidable* under the state or federal constitution.  The constitutional deprivations asserted by Leonard in his eleventh claim did not occur during the proceedings resulting in his convictions.  And a determination that the postconviction statutes were constitutionally infirm would not have rendered his convictions void or voidable.  Moreover, we held in *State v. Fautenberry* (Dec. 31, 1998), 1st Dist. No. C–971017, 1998 WL 906395, that R.C. 2953.21 satisfies the requirements of

> due process.  We, therefore, conclude that the common pleas court properly
> denied the eleventh claim for relief.

*Leonard*, 157 Ohio App. 3d at 667.

Leonard implicitly concedes in his Objections to the R&R that the Supreme Court has not

recognized a constitutional right to post-conviction collateral review.  (Doc. 53 at PageID 1437).

However, he argues that the Supreme Court in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and

*Trevino v. Thaler*, 133 S. Ct. 1911 (2013), "recognize[d] that defendants have a constitutional

right to have the fair opportunity for review of the claims that can only be brought for the first

time on post-conviction."  (*Id.*)

The Court finds that *Martinez* and *Trevino* cannot be read to create constitutional rights in

post-conviction relief proceedings.  The Supreme Court in *Martinez* was presented with the issue

of whether a convicted person had a constitutional right to effective counsel in collateral

proceedings which provide the first occasion to raise a claim of ineffective assistance at trial.

132 S. Ct. at 1315.  The Supreme Court avoided the constitutional dimension of the issue,

however, and instead addressed "whether ineffective assistance in an initial-review collateral

proceeding on a claim of ineffective assistance at trial may provide cause for a procedural default

in a federal habeas proceeding."  *Id.*  Indeed, the Supreme Court's holding was not of a

constitutional dimension.  *Id.* at 1315, 1320.  The Supreme Court held only that "[i]nadequate

assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's

procedural default of a claim of ineffective assistance at trial."  *Id.* at 1315.  It expounded upon

its holding as follows:

> [W]hen a State *requires a prisoner to raise an ineffective-assistance-of-trial-
> counsel claim in a collateral proceeding*, a prisoner may establish cause for a
> default of an ineffective-assistance claim in two circumstances.  The first is where
> the state courts did not appoint counsel in the initial-review collateral proceeding
> for a claim of ineffective assistance at trial.  The second is where appointed
> counsel in the initial-review collateral proceeding, where the claim should have

been raised, was ineffective under the standards of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.  *Cf.  Miller–El v. Cockrell,* 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (describing standards for certificates of appealability to issue).

*Id.* at 1318–19 (emphasis added).

In *Trevino*, the Supreme Court first summarized the *Martinez* standard as having four elements:  (1) a substantial ineffective assistance of counsel claim, (2) "cause" of having no counsel or ineffective counsel during state collateral review proceedings, (3) the state collateral review proceedings were the initial review proceeding for the ineffective assistance of counsel claim, and (4) state law required that the ineffective assistance of counsel claim be brought in the initial collateral review proceeding.  133 S. Ct. at 1918.  The Supreme Court then expanded the scope of the fourth element, holding that the *Martinez* standard also applies to the State of Texas where state law did not *require* that the ineffective assistance of counsel claim be brought in the initial review proceeding.  The Supreme Court held that *Martinez* also applied where the "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal."  *Id.* at 1921.[10]

The Supreme Court in *Martinez* and *Trevino* did not recognize any constitutional rights of convicted persons in post-conviction review proceedings.  Leonard has not proven that the decision of the Ohio appeals court was contrary to or an unreasonable application of clearly established federal law.  This Court must deny this ground for relief.  However, the Court will

---

[10]  The Sixth Circuit has not held whether an Ohio habeas petitioner can show cause to excuse a procedural default under *Trevino*.  *Jones v. Bradshaw*, No. 07-3766, 2015 WL 374883, at *1 (6th Cir. Jan. 28, 2015).

grant a certificate of appealability on this claim because reasonable jurists could disagree as to

the future implications of *Martinez* and *Trevino*.[11]

## GROUND TWENTY-SEVEN

> **Leonard's constitutional rights under the Fifth, Sixth, Eighth, and
> Fourteenth Amendments to the United States Constitution were violated
> when he was convicted and sentenced to death under Ohio's unconstitutional
> death penalty scheme.**

(Doc. 6 at PageID 165.)

Leonard challenges the constitutionality of Ohio's death penalty in this ground for relief.

He raised this claim on direct appeal where it was denied by the Ohio Supreme Court.  *Leonard*,

104 Ohio St. 3d at 88–89.

Leonard cites reports from the American Bar Association and the United Nations High

Commission for Human Rights, plus dissenting and concurring judicial opinions, to support this

claim.  He does not and cannot cite clearly established federal law holding Ohio's death penalty

to be unconstitutional.  *See e.g.*, *Baze v. Rees*, 553 U.S. 35, 47 (2008); *Gregg*, 428 U.S. at 187;

*Buell*, 274 F.3d at 367–70.  The Court will deny the Twenty-Seventh Ground for Relief.

However, because reasonable jurists can and do disagree with the clearly established precedents

finding the death penalty to be constitutional, the Court will grant a certificate of appealability on

this ground for relief.

## GROUND TWENTY-EIGHT

> **Leonard's rights under the Eighth and Fourteenth Amendments were
> violated by requiring that mitigating factors be proven by a preponderance
> of the evidence during the penalty phase of his capital trial.**

(Doc. 6 at PageID 168.)

---

[11]  Justice Scalia, in his *Martinez* dissent, expressed the concern that the result of the Supreme Court's equitable
holding was "precisely the same" as if the Supreme Court had held that there was a constitutional right to counsel in
state collateral review.  132 S. Ct. at 1321 (Scalia, J. dissenting joined by Thomas, J.).

Leonard asserted this claim on direct appeal where it was denied by the Ohio Supreme Court. *Leonard*, 104 Ohio St. 3d at 88. The Magistrate Judge recommended that the claim be denied on the merits. Leonard does not raise any objections to this recommendation in his Objections to the R&R. (Doc. 53 at PageID 1303–07.) Therefore, the Court considers Ground Twenty-Eight to be withdrawn. Alternatively, the Court denies this claim on the merits.

## GROUND TWENTY-NINE

**The practice of execution by lethal injection violates Leonard's right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.**

(Doc. 6 at PageID 170.)

Petitioner Leonard withdrew this Ground Twenty-Nine. (Doc. 39 at PageID 947.)

## GROUND THIRTY

**The cumulative effects of the errors and omissions set forth in the preceding claims for relief prejudiced Leonard and deprived him of his right to a fair trial and sentencing determination in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

(Doc. 6 at PageID 172.)

Leonard asserted this claim for cumulative error on direct appeal where it was denied on the merits by the Ohio Supreme Court:

{¶ 185} In proposition 29, Leonard contends that his death sentence is inappropriate and must be reversed. Leonard argues that the cumulative effect of errors committed at trial undermine the reliability of his sentence. However, the errors committed at this trial do not compel invocation of the cumulative-error doctrine set forth in *State v. DeMarco* (1987), 31 Ohio St.3d 191, 31 OBR 390, 509 N.E.2d 1256, paragraph two of the syllabus. *See, e.g.*, *State v. Moore* (1998), 81 Ohio St.3d 22, 41, 689 N.E.2d 1. Leonard received a fair trial; the errors committed during trial were harmless or nonprejudicial, cumulatively as well as individually. *See, e.g.*, *State v. Goff*, 82 Ohio St.3d at 140, 694 N.E.2d 916. Leonard's 29th proposition of law is overruled.

*Leonard*, 104 Ohio St. 3d at 89–90.

Leonard concedes that the Sixth Circuit has refused to recognize a claim for cumulative error post-AEDPA as stated in *Moreland v. Bradshaw*, 699 F.3d 908, 931 (6th Cir. 2012). (Doc. 53 at PageID 1441.) Leonard objected to this claim merely to preserve the issue for appellate review. (*Id.*) The Court will deny this ground for relief on the merits. Additionally, the Court will not issue a certificate of appealability on this ground for relief.

## IV.    CONCLUSION

For the foregoing reasons, the Habeas Petition (Doc. 6) is hereby **DENIED**, Magistrate Merz's R&R (Doc. 47) and Supplemental R&R (Doc. 60) are **AFFIRMED**, and the Objections (Doc. 53) and Supplemental Objections (Doc. 66) are **OVERRULED**. A Certificate of Appealability is hereby **GRANTED** as to Grounds One, Sixteen (subclaim B), Nineteen, Twenty (the subclaims based on the failure to impeach the testimony of Gries and Minges, the lack of an investigation, and the testimony of Jeanne Hutcherson), Twenty-One (the subclaim on the scope of the mitigation investigation.), Twenty-Three, Twenty-Four, Twenty-Six, and Twenty-Seven.

IT IS SO ORDERED.


S/Susan J. Dlott_____
Judge Susan J. Dlott
United States District Court